Gregory P. Olson (Ca. Bar No. 177942)
LAW OFFICE OF GREGORY P. OLSON
501 West Broadway, Suite 1370
San Diego, CA 92101
Telephone: (619) 564-3650
Facsimile: (619) 233-1969
greg@olsonesq.com

Daniel Kotchen (*Pro Hac Vice Application Forthcoming)*
Daniel Low (*Pro Hac Vice Application Forthcoming*)
Robert Klinck (*Pro Hac Vice Application Forthcoming*)
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037
Telephone (202) 416-1848
Facsimile: (202) 280-1128
dkotchen@kotchen.com
dlow@kotchen.com
rklinck@kotchen.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. '12CV0668 W KSC<br><br>**COMPLAINT FOR MONEY DAMAGES AND INJUNCTIVE RELIEF:**<br><br>**(1) PER SE ILLEGAL GROUP BOYCOTT;**<br>**(2) PER SE ILLEGAL TYING;**<br>**(3) MONOPOLIZATION;**<br>**(4) ATTEMPTED MONOPOLIZATION;**<br>**(5) UNFAIR BUSINESS PRACTICES;**<br>**(6) INTENTIONAL INTERFERENCE WITH CONTRACT; AND**<br>**(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

1. This case arises from Facebook Inc.'s attempts to eliminate competition in the sale of online display advertising impressions. Facebook maintains a website used for social networking and as

a platform through which third-party developers distribute and operate applications, such as applications that allow users to customize the appearance of their Facebook pages and online games. Facebook makes money by selling display advertising on its site, and it is the single largest supplier of advertising impressions on the internet.

2. Sambreel Holdings LLC, Yontoo LLC, and Theme Your World LLC (collectively "Sambreel") offer products that add functionality to web browsers. Sambreel's products operate as part of a browser add-on known as the "Yontoo Platform." One of Sambreel's first products – and its most profitable product – was PageRage, which allows users to add designs that appear on their web browsers when they visit Facebook's website. PageRage does not alter the programming of Facebook's computers or interact with Facebook's computers in any manner. Instead, PageRage operates by adding layers to the web browser residing on its users' computers. The designs added by PageRage are visible only to individuals who have installed the Yontoo Platform and enabled the PageRage application. PageRage and Sambreel's other products compete with Facebook in the sale of display advertising impressions. PageRage offers the most direct competition to Facebook advertising, as it offers advertisers with an alternative means to display advertising to individuals while they are accessing the Facebook website.

3. PageRage was launched October 2008. Initially, PageRage included the browser add-on along with an application that operated on the Facebook Platform. In the first half of 2009, PageRage was generating approximately $100,000 per month in revenues with a relatively limited user base. In July 2009, Facebook approached Sambreel regarding PageRage. Facebook explained that it thought it was "great" that PageRage offered users the ability to customize their Facebook experience. Facebook explained that PageRage needed to be operated independent of the Facebook Platform and requested that the PageRage application not operate on the Platform. Facebook made clear that it did not object to the browser add-on and even offered suggestions on how Sambreel could operate PageRage without the application. Sambreel agreed to Facebook's request and removed the application from the Platform.

4. Between July 2009 and October 2010, PageRage grew significantly, to the point that it was regularly garnering more than 1 million users per day and its revenues consistently exceeded $1 million per month. At that point, Facebook's attitude towards PageRage changed. On October 20, 2010,

Facebook (through its counsel) sent a letter to Sambreel objecting to PageRage. Sambreel worked with Facebook's counsel to address any concerns and believed that the parties had resolved the issue by early 2011. Throughout this time period, PageRage continued to grow. By mid-July 2011, PageRage consistently had more than 4 million users per day. More troubling from Facebook's perspective, Sambreel had grown into a legitimate competitor in the sale of online display advertising impressions. During the second quarter of 2011, for example, Sambreel served nearly 89 billion display advertising impressions – trailing only Facebook and Yahoo! among internet publishers. And Sambreel's increasing user base indicated that it was likely to surpass Yahoo! to become the second leading supplier of display advertising impressions. PageRage represented a particular threat to Facebook because it offered advertisers a low-cost alternative to purchasing advertisements from Facebook. Rather than compete with Sambreel on the merits, Facebook pursued an anticompetitive scheme designed to eliminate Sambreel as a competitive threat. Facebook's scheme had two principal components.

5. First, in violation of the antitrust laws and California tort law, Facebook organized a *per se* unlawful group boycott of Sambreel. Facebook enlisted the third-party developers that operate applications on Facebook (hereafter "Application Developers") and various advertising partners to participate in the boycott. The goal of the group boycott was simple – to minimize or eliminate Sambreel as a competitive threat in the advertising market. To accomplish this goal, Facebook and the Application Developers – entities that compete with Facebook and Sambreel in the sale of advertising impressions – agreed not to deal with advertising partners who do business with PageRage. In mid-2011, Facebook began threatening advertising partners to coerce them to stop doing business with PageRage. Specifically, Facebook informed a number of these entities that they would not be allowed to work with Facebook or the Application Developers unless they ceased doing business with PageRage. Advertising partners who continued to work with PageRage were blacklisted, thereby foreclosing a critical – and growing – outlet for the purchase of display ads. Advertising partners who acceded to Facebook's demand and ceased working with PageRage, on the other hand, were allowed to continue to deal with Facebook and the Application Developers. This boycott proved effective: Sambreel's largest PageRage advertising partners – accounting for roughly 80 percent of the PageRage advertising revenue – ceased

doing business with PageRage. As a result, the rates for advertising on PageRage fell by more than 50 percent, as demand for PageRage ad impressions plummeted.

6. Second, in violation of the antitrust laws, California's anti-hacking law, and California tort law, Facebook gated consumers who had downloaded PageRage. Specifically, without their knowledge or consent, Facebook scanned the browsers of consumers who logged on to Facebook to discern whether the consumers had downloaded PageRage. Facebook then required users who had downloaded PageRage to remove the entire Yontoo Platform from their computers (thereby disabling all Sambreel products, including not only PageRage but also products used on other websites) before they were allowed to login to Facebook. Consumers were required to certify that they had removed the Yontoo Platform before they could access Facebook. Facebook's gating campaign worked. Within two weeks, Sambreel lost more than one million users of its products. Facebook agreed to stop gating only when Sambreel agreed that it would no longer advertise on PageRage, thereby eliminating PageRage as a competitive advertising alternative to Facebook. Thus, on December 22, 2011, Sambreel took down all PageRage ads and stopped generating any revenue through PageRage.

7. Facebook's scheme has restrained competition. Facebook's actions eliminated a low cost, direct substitute to Facebook for display advertising (PageRage), stopped Sambreel's growth in the sale of internet display ads, and left Facebook as the only supplier of display advertising impressions experiencing meaningful growth. Moreover, Facebook's conduct has devastated Sambreel. Since the start of 2012, Sambreel has terminated 124 employees and contractors in San Diego County (more than half its workforce), stopped the development of new products, and suffered significant financial losses.

8. Sambreel brings this action under federal antitrust laws, state unfair competition laws, and state tortious interference laws. Sambreel seeks injunctive relief to prevent Facebook from enforcing a group boycott, threatening Sambreel's advertising partners (or potential partners), and gating. Sambreel also seeks damages.

**PARTIES**

9. Sambreel Holdings LLC is a Delaware limited liability company with its principal place of business at 5857 Owens Avenue, Suite 300, Carlsbad, California 92008. Sambreel Holdings is the

parent corporation of Yontoo LLC and Theme Your World LLC.

10. Yontoo LLC is a Delaware limited liability company with its principal place of business at 5857 Owens Avenue, Suite 300, Carlsbad, California 92008. Yontoo LLC operates a browser add-on platform on which products marketed by other organizations owned by Sambreel Holdings operate.

11. Theme Your World LLC is a Delaware limited liability company with its principal place of business at 5857 Owens Avenue, Suite 300, Carlsbad, California 92008. Theme Your World operates PageRage, which was – until the end of 2011 – the largest (measured in terms of revenue generated) product operated by Sambreel.

12. Facebook, Inc. is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, California 94025. Facebook maintains a website (www.facebook.com) used for social networking and as a platform through which third party developers distribute and operate applications.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

13. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in this action arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §15(a)). The Court has supplemental jurisdiction over Sambreel's state law claims pursuant to 28 U.S.C. § 1367.

14. Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26 in that Sambreel resides in this District; Facebook transacts business, resides, and/or has an agent in this District; a portion of the affected interstate trade and commerce described below has been carried out in this District; and a substantial part of the events giving rise to Sambreel's claims occurred in this District.

15. Facebook's anticompetitive activities were within the flow of and had a proximate, direct, substantial and reasonably foreseeable effect on interstate commerce.

## FACTS

### *A. Facebook Overview*

16. Facebook operates a social networking site on which users connect with friends and family. Facebook was started in 2004 and, in its incipiency, competed aggressively with a number of other social networking websites, including MySpace. Since that time, social networking users have migrated overwhelmingly to Facebook. Facebook is now the most heavily trafficked website on the entire internet: it has 845 million monthly active users ("MAUs"), one in every five page views among internet users in the United States is a page on Facebook, and internet users spend more time on Facebook than any other site.

17. As Facebook's popularity has grown, Facebook has broadened its site to provide a platform to host applications developed and marketed by third parties. There is a wide array of products available on Facebook's platform, including (a) applications that allow users to add photos or designs to their pages, (b) applications that allow users to add landing pages with graphics, (c) applications that allow users to otherwise customize the appearance of their pages with graphics or designs to express their sentiment or mood, and (d) social games.

18. Facebook makes money primarily by selling "display advertising impressions" on its site – *i.e.*, the opportunity to display an advertisement to a certain number of users. Similarly, Application Developers make money, in part, by selling display advertising impressions on their applications. Facebook and the Application Developers compete in selling display advertisements. Facebook and the Application Developers sell their advertising to or through "Advertising Partners" – *i.e.*, organizations to which, or through which, display ads are sold. Advertising Partners include organizations that: (a) directly purchase display ads, (b) host advertising purchase exchanges in which display ad space is bid on and purchased, (c) purchase display ads on behalf of others, and (d) other organizations that provide display ad purchasing services or tools.

19. Facebook enjoys at least three financial benefits from allowing Application Developers to distribute their Applications through the Facebook Platform. First, Facebook sells display advertising that appears when its users are using Facebook applications operated on Facebook's website. Second,

certain applications sell credits to their users through Facebook, which retains 30 percent of the proceeds from these sales. Third, Applications drive consumers to log in to Facebook and to remain on the website for longer periods of time, allowing Facebook to sell more advertising. Facebook has become a critical distribution channel for Application Developers because of its large user base and its viral marketing abilities.

20. To distribute their Applications on the Facebook Platform, Application Developers must agree to certain Facebook policies. For example, Application Developers agree to ensure that the content of ads placed on their applications comply with Facebook's advertising guidelines – *e.g.*, ads with a sexual emphasis or hate speech are not allowed. In addition, and separate from the content of ads, Application Developers agree that they will only sell advertising to (or through) Advertising Partners that Facebook itself approves. Facebook maintains a list of approved Advertising Partners. If Facebook blacklists an Advertising Partner for any reason, Application Developers are not allowed to sell to (or use the services of) that entity on applications distributed on Facebook. Application Developers must also agree that they will not link to any applications running on competing social networking websites.

21. Purchasing advertising impressions from Facebook (and the Application Developers) is critically important to Advertising Partners because of Facebook's large user base and its viral marketing capabilities. In order to advertise on Facebook, including any applications operated on its website, Advertising Partners must agree to certain Facebook policies. Among other things, Facebook has a policy that gives it the right to prohibit Advertising Partners from "associat[ing] . . . in any manner" with another company that Facebook prohibits from operating on its platform, which could include a Facebook competitor:

> If the Advertising Provider intends to associate itself in any manner with a company that Facebook has prohibited from operating on Facebook Platform or its current or former employees, the Advertising Provider will disclose this intent to Facebook in advance. Facebook reserves the right to limit or prohibit the Advertising Provider's operation on Facebook Platform in light of any such association.

*See* Facebook Platform Terms for Advertising Providers ¶ 10.

22. Thus, Facebook's agreements give Facebook extraordinary (and unlawful) latitude to

restrict competition: if Facebook decides that it does not want its own – or its Application Developers' – Advertising Partners to purchase display ads from a competitor, Facebook can simply prohibit a competitor from operation on the Facebook Platform and then require the Advertising Partners to stop buying ads from the competitor. Any Advertising Partner that does not comply with Facebook's demand will be prohibited from dealing with Facebook and the Application Developers, thereby foreclosing the customer from a critical distribution channel.

***B. Sambreel Overview***

23. Sambreel operates the Yontoo Platform, a browser add-on that allows developers to add functionality to individual user's internet browsers. The Yontoo Platform itself does not add any functionality; it serves as a platform on which applications are built. The first two products offered on the Yontoo Platform were SanitySwitch and PageRage. SanitySwitch allowed users to alter the way MySpace pages appeared on their browser.

24. PageRage allows users to add designs that they see on their browser when they access Facebook. When Sambreel first launched PageRage, the product included a control panel that operated through the Facebook Platform. In mid-2009, Facebook approached Sambreel regarding the control panel application. After discussions, on July 16, 2009, Facebook's Platform team sent an e-mail to Sambreel that praised the PageRage functionality: "Like I mentioned, it's great that you and your team are trying to bring users a unique Facebook experience." Facebook explained, however, that the PageRage functionality was not permitted as part of the Facebook Platform so the control panel would need to be removed. Facebook assured Sambreel that it was not asking Sambreel to discontinue PageRage. Facebook encouraged Sambreel to send a message to PageRage users about how to use the add-on without the control panel. To satisfy Facebook, Sambreel removed the control panel and ensured that PageRage operated independent of Facebook.

25. In addition to PageRage and SanitySwitch, Sambreel has launched a number of additional products. These products allow users to add functionality to other websites, including search websites and shopping websites. Throughout Sambreel's history, PageRage has accounted for more than half of its revenues.

26. Since its founding, Sambreel's products have gained a significant following, and it has shown consistent growth in the number of monthly active users. During the fourth quarter of 2010, Sambreel had 3.5 million MAUs. This number grew significantly throughout 2011 – 6.4 million MAUs in the first quarter, 14.5 million MAUs in the second quarter, 18.5 million MAUs in the third quarter, and 20.6 million MAUs in the fourth quarter. A number of users actively use multiple Sambreel products.

27. Sambreel makes money in two ways: (a) by selling display advertising impressions and (b) for consumers who do not want to see any ads, by charging $1.99 to download the products. Like Facebook and Application Developers, Sambreel makes most of its money through the sale of display ads to or through Advertising Partners and has experienced substantial growth in the sale of advertising impressions. During the first quarter of 2011, Sambreel sold nearly 64 billion display advertising impressions. This number grew to nearly 89 billion impressions in the second quarter, 139 billion impressions in the third quarter, and nearly 158 billion impressions in the fourth quarter. By the end of 2011, Sambreel was second only to Facebook in the number of display advertising impressions sold. PageRage was the primary source of these display advertising impressions, and it represented a direct, low-cost substitute to Facebook in the sale of display ads.

***C. Facebook's Anticompetitive Scheme***

28. By late 2010, Facebook began viewing PageRage as a competitive threat and began harassing PageRage, its advertising partners, and its users.

29. In October 2010, Facebook (through its counsel) contacted Sambreel and expressed concern about PageRage. Facebook asserted that users were confused about the source of ads served by Sambreel and that PageRage's functionality was covering or obscuring Facebook content.

30. Just as it had in 2009, Sambreel took steps to address Facebook's concerns. Specifically, Sambreel took a number of steps to strengthen the disclosures to its users regarding the source of the advertisements. Sambreel included an "About this ad" link to the advertisement published by PageRage. The link directs the user to a website that explains that PageRage is providing the advertisement and explains how a user may disable PageRage. Sambreel also strengthened the disclosure that is part of the download prompt. When a user downloads the PageRage add-on, the download prompt contains a

boldface reminder that the product is ad-supported and that the advertisements are not the responsibility of Facebook: "Once PageRage is installed you will see additional ads placed by us while browsing Facebook®. These ads are not the responsibility of Facebook. PageRage shows ads that help keep PageRage 100% free to you." The download prompts had additional disclosures that the product was ad-supported in future prompt pages. While PageRage was always designed not to interfere or cover Facebook content, Sambreel made additional changes to further ensure that PageRage did not overlap any Facebook content.

31. In a March 23, 2011 letter, Sambreel informed Facebook of its changes and invited Facebook personnel to contact Theme Your World's CEO to discuss "any other pertinent matters." Facebook did not contact Sambreel regarding its changes. Instead, in July or August 2011, Facebook initiated its anticompetitive scheme. Facebook's scheme had two principal components: (i) a group boycott and (ii) gating PageRage users, which required them to uninstall all Sambreel products before they could access Facebook.

***(i) Facebook's Group Boycott***

32. Facebook began its anticompetitive scheme by organizing a group boycott of PageRage. As set forth in Paragraph 20, Facebook and the Application Developers agree that they will not sell advertising impressions to or through Advertising Partners who are not on a list of approved entities maintained by Facebook. Beginning in or around July 2011 and continuing through November 2011, Facebook used these agreements to coerce Advertising Partners to cease doing business with PageRage. Specifically, Facebook approached Advertising Partners that purchased display advertisements from Sambreel (or that facilitated such purchases from Sambreel), and informed these entities that they would be removed from the list of Facebook approved advertisers if they continued to do business with Sambreel. Effectively, these Advertising Partners were given the choice to work either with Facebook and the Application Developers or with PageRage.

33. In spite of Sambreel's best efforts to convince its Advertising Partners to continue their relationships, seven major Advertising Partners agreed to join the boycott and ceased doing business with PageRage: Advertising.com, RubiconProject, Admeld, OpenX, LifeStreet, SayMedia, and Microsoft

Media Network. These seven entities had entered into contracts with Sambreel and more than 80 percent of PageRage's revenues flowed through these Advertising Partners. As a result of Facebook's threats, one of these Advertising Partners – Admeld – ceased purchasing advertising from Sambreel altogether, including for non-PageRage products. Upon information and belief, in addition to the seven previously referenced partners, Facebook threatened other Advertising Partners who ceased doing business with PageRage without specifically informing Sambreel of Facebook's threats.

34. Several Sambreel Advertising Partners refused to stop purchasing PageRage advertising. Specifically, Sambreel is aware of three Advertising Partners who refused Facebook's demands that they cease doing business with PageRage. Facebook promptly blacklisted these entities (removing them from the approved advertiser list), thereby foreclosing these Advertising Partners from purchasing advertising from either Facebook or the Application Developers.

35. Facebook's boycott has no legitimate business justification. The exclusivity requirements of the policies that Facebook forces the Application Developers and Advertising Partners to accept are against these parties' self-interests. To maximize the rates they can charge for advertising, the Application Developers should seek to sell their supply to the widest possible range of buyers. Yet, the Application Developers agree not to sell their supply to Advertising Partners blacklisted by Facebook. Similarly, the Advertising Partners should seek out the widest possible range of suppliers from whom to purchase advertising impressions (or to offer on their exchanges). Yet, these Advertising Partners agree not to purchase from certain suppliers – *e.g.,* PageRage – simply because Facebook has blacklisted them. Apparently, Facebook and the Application Developers are willing to limit their pool of Advertising Partners in the short term to drive Sambreel out of the market.

36. Facebook has also interfered with Sambreel's distribution partners. Sambreel uses a number of methods to obtain new users. One such method is to use affiliate networks that utilize third parties to market Sambreel's products (among others). One of Sambreel's largest affiliate network partners was Neverblue. In addition to affiliate network marketing, Neverblue offers online advertising, including social networking advertising. Sambreel did not use Neverblue for marketing on Facebook, but instead used Neverblue to market Sambreel's products elsewhere. In August 2011, Facebook began

threatening Neverblue, including by threatening to deactivate all of Neverblue's links on Facebook. Facebook informed Neverblue that if it continued to do business with Sambreel – on other websites – Facebook would make it impossible for Neverblue and its affiliates to advertise on Facebook (*e.g.,* by deactivating Neverblue's links). As a result of these threats, Neverblue ceased doing business with Sambreel.

***(ii) Facebook's Gating***

37. Facebook escalated its anticompetitive scheme in December 2011 when it began gating Sambreel users. To achieve this gating, when a Facebook user logged on, Facebook would access that user's computer and scan the user's web browser to determine if PageRage had been installed. These scans far exceeded the actions of traditional internet web pages and nothing in Facebook's terms of service gave it explicit or implicit authorization to conduct these scans. Moreover, Facebook did not inform its users that it was conducting these scans and it neither sought nor received permission from its users to access their computers to conduct these scans.

38. When Facebook's unauthorized scans determined that a user had downloaded PageRage, Facebook would deny the user access to its website until the user certified that the Yontoo Platform had been removed. Specifically, the user would receive a notice stating: "It looks like you downloaded software that is affecting your Facebook account and showing you unauthorized ads. We'll walk you through a few steps that will remove the software and secure your account." The prompts then directed the user to uninstall not only PageRage but also the entire Yontoo Platform, thereby disabling all Yontoo applications. The disabled Yontoo applications include, for example, Sambreel's shopping-related app (Drop Down Deals) and Sambreel's search engine app (Buzzdock). The user was allowed to access Facebook only after certifying that he/she had performed the required steps.

39. Facebook's gating worked. Within days, Sambreel saw massive losses in the number of active users. Sambreel immediately removed all PageRage functionality, hoping to stem the losses resulting from Facebook's gating campaign. Even after Sambreel disabled PageRage, Facebook continued to gate users who had downloaded and used PageRage in the past. Based upon the continued gating, Sambreel concluded that Facebook must have been scanning users' computers for some time and

storing a list of users who used PageRage. Sambreel approached Facebook in an attempt to resolve the matter. Facebook stated that it would stop gating if Sambreel agreed to cease advertising on PageRage and any other Sambreel product that operated when users accessed Facebook. To avoid the continued loss of users, Sambreel was forced to agree to Facebook's terms by removing advertising from PageRage. As a result of the gating, Sambreel lost more than 1 million active users of the Yontoo Platform.

40. Facebook has continued to gate a small number of Sambreel users, and has maintained PageRage among the list of products that Facebook warns are "[k]nown adware programs" and asserts that PageRage will "cover your News Feed and profile (timeline) with ads." *See* https://www.facebook.com/help/?faq=225507867498721#Known-adware-programs.

***D. Effects of Facebook's Anticompetitive Scheme***

41. Facebook's scheme has had at least five anticompetitive effects. First, Facebook's scheme has eviscerated the competitiveness of PageRage, a readily interchangeable, low cost display ad alternative to Facebook. Before Facebook's scheme, Advertising Partners could purchase display advertising impressions from PageRage in lieu of, or in addition to, purchasing ads directly from Facebook or the Application Developers. PageRage's display advertising prices were lower than Facebook's. Facebook's scheme has removed PageRage as a legitimate competitor. Because of Facebook's boycott, PageRage's largest and most substantial advertising partners cannot purchase PageRage display ads or broker such purchases for fear of losing distribution through Facebook and the Application Developers. This has foreclosed PageRage from selling to a substantial portion of the market. Moreover, as a result of Facebook's gating, Sambreel lost more than 1 million users, and Sambreel was forced to remove the advertising from PageRage.

42. Second, Facebook's scheme resulted in advertisers paying supra-competitive prices for display advertisements in the social networking space. Display advertising on PageRage was (and is) a readily interchangeable, low-cost alternative to display advertising sold by either Facebook or the Application Developers. By preventing customers from purchasing PageRage display ads, Facebook has forced advertisers to spend more for online display advertising. Moreover, Facebook pursued its

anticompetitive scheme at the very same time that it was implementing price increases. In the fall of 2011, Facebook increased the minimum purchase price for its display advertising. Had PageRage advertising remained an option, advertisers – including the Advertising Partners forced to boycott PageRage – would have had a competitive alternative to which to turn in response to Facebook's price increases. Because of Facebook's scheme, advertisers did not (and a do not) have the low-cost alternative available.

43. Third, Facebook's scheme has devastated Sambreel. Prior to Facebook's scheme, Sambreel was experiencing rapid growth in active users and revenues. Facebook's boycott diminished substantially the demand for Sambreel advertising, which has led to a substantial reduction in the rates per thousand advertising impressions Sambreel receives from advertising purchasers. Moreover, because of Facebook's gating, Sambreel lost more than one million users (and the revenue associated by serving ads to these users) and stopped all PageRage advertising. As a result of the lost revenue caused by Facebook's scheme, Sambreel has suffered losses, fallen into default on its primary line of credit with its bank, terminated 124 of its 220 employees and contractors, and been forced to shelve a number of new products it was developing for lack of resources.

44. Fourth, Facebook's scheme has arrested Sambreel's growth in sale of internet display advertising, leaving Facebook as the only competitor experiencing meaningful growth. As set forth in paragraph 27, prior to Facebook's interference, Sambreel was experiencing consistent, significant growth in the number of advertising impressions it served. Upon information and belief, by the second half of 2011, Sambreel was second only to Facebook in the number of display advertising impressions served. Facebook's anticompetitive conduct arrested Sambreel's growth and caused the number of display advertising impressions it offers to drop precipitously. By forcing Sambreel to discontinue advertising on PageRage, Facebook eliminated a substantial competitor with the potential to discipline Facebook's pricing decisions.

45. Finally, as a result of Facebook's scheme, social networking users will be denied access to certain attractive features. If Sambreel is not able to advertise on PageRage, it will be forced to shutter this product. PageRage provides functionality that its users view as beneficial. Facebook's action will

leave these users without the option of implementing this functionality.

46. Facebook's actions have also had collateral negative effects. Facebook has now revoked the authority of Sambreel and its subsidiaries to develop products that use the Facebook Platform. As a result, Sambreel has been forced to shutter a subsidiary that was developing Facebook applications. That entity had launched a photo editing application, which Sambreel has now deactivated, and was working to develop social games that would operate on the Facebook Platform. Similarly, Sambreel offers products (and was nearing launch of another product) that made use of the Facebook API to provide functionality when users access other websites. Sambreel, for example, offers a product known as OverApps, which allows users to cover advertisements. Rather than simply blocking the ads, however, OverApps allows users to replace the ads on their screen with other functionality. One option was for users to see their Facebook News Feed in place of the ads. As a result of Facebook's revocation of permission to use the Platform, Sambreel has modified OverApps to remove the Facebook News Feed as an option.

47. Sambreel has also been forced to cease development of other products because of the lost revenue due to Facebook's actions. Sambreel has ceased development on more than half a dozen new products because it can no longer afford the costs to develop and deploy these products.

***E. Relevant Markets***

48. The United States is the relevant geographic market in which to assess Facebook's scheme.

49. There are three relevant product markets in which to assess Facebook's scheme: (i) the market for social networking services, (ii) the market for products that allow users to customize or enhance social networking websites, and (iii) the market for online display advertising, including the submarket for display advertising to social media users.

***(i) The Market for Social Networking***

50. The market for social networking services constitutes a relevant product market. Social networking services are online services that allow users to connect with friends, families, colleagues, and other members of the user's social group. These websites allow users to create personal profiles, to make

connections with others, and to learn about the world around them. There are only a handful of full-service social networking websites that operate in the United States, including Facebook and Google+. In addition to the full-service social networking sites, there are a number of entities that operate niche services. LinkedIn, for example, focuses on allowing individuals to make professional connections. Myspace, which was created as a full-service social network, is now seeking to carve out a niche focusing on its online music functionality. Twitter and Pinterest serve niche roles that allow for limited communications between members without the robust services offered by the full-service social networks.

51. Facebook has monopoly power among the social networking sites. Among the full-service social networks, Facebook has greater than 95 percent market share. For the week ending January 28, 2012, for example, Facebook had 1.6 billion visits compared to 10.8 million visits for Google+ and 10.4 million visits to Myspace. Thus, among the social networks that could be characterized as full-service, Facebook's share of visits exceeded 98 percent. Facebook's power in the market exceeds its share of visits, however, because users generally spend considerably more time per visit to Facebook than to any other social networking site. Because the value offered by social networks is the ability to connect with others, the amount of time that users spend on a site is important in assessing that firm's market position.

52. Even in the broader market that includes all social networking sites regardless of whether they are full-service or niche services, Facebook has monopoly power. Facebook accounts for approximately 90 percent of all page views among social networking sites in the United States and similarly represents between 85 and 90 percent of time that internet users in the United States spend on social networking sites. The competitors each represent less than 2 percent of page views and less than 3 percent of the time spent on social networking sites.

53. Facebook's current monopoly position creates barriers to entry for competitors. There are strong network effects that reinforce Facebook's current market power and create barriers to entry for competitors. Social networks offer value to users by allowing them to connect with friends, family, and other members of a social group. As such, network effects are an important component of the value for a

social network. Because of its incredibly large network of users, Facebook offers new users with value that they cannot obtain from competitors. No other social networking site offers users with the ability to connect with such a wide range of individuals, groups, and companies. The strong network effects tend to create a self-reinforcing monopoly for Facebook.

54. In addition to the network effects, there are high switching costs for users. Switching from one social networking site to another is not a simple matter. A typical user has uploaded a number of photos and other media to Facebook. It requires considerable effort for a user to transfer the information on their Facebook account to an account at a competing social network. These high switching costs create a natural tendency for current Facebook users to remain Facebook users rather than migrating to another social networking site.

55. As a result of the high barriers to entry, many potential competitors now seek to serve as complimentary services rather than seeking to displace Facebook as a full-service social networking site. Twitter, Tumblr, and Pinterest have integrated their services with Facebook, allowing users to automatically post their actions on these other sites on Facebook. Myspace is similarly seeking to focus on linking its online music player capabilities with Facebook's network.

***(ii) The Market for Products that Allow Users to Customize Social Networking Websites***

56. In light of the wide acceptance of social networking, markets have emerged for products and services that operate to enhance social networking websites. One such market is for products and services that allow users to customize their social networking experience. The market includes, for example, products that allow users to alter the appearance of their social networking page (*e.g.*, PageRage and the various Facebook Applications that allow users to create a "banner" or "cover"), applications that allow users to add a landing page, and applications that otherwise allow users to express their sentiment or mood using graphics or designs.

57. Sambreel offers a number of products that compete in this market, including PageRage and UnPageRage (formerly known as SanitySwitch). Prior to Facebook's anticompetitive scheme, Sambreel was also developing a product that would have allowed users to enhance their experience on LinkedIn with information from Facebook. Each of these products allows a user to customize the social

networking experience.

58. Facebook has financial interests in a number of third-party Application Developers that have developed applications that allow users to enhance or customize their social networking experience. These products include applications that allow for the posting of cover banners, allow for the creation of a landing page, and allow users to express their sentiment or mood using graphics or design. Facebook displays advertising on the application pages for each of these products, giving Facebook a financial interest in their success.

***(iii) The Market for Online Display Advertising***

59. A relevant market exists for the sale of online display advertising. Internet advertising represents a channel that is distinct from advertising in other media. The internet offers a unique set of qualities that set it apart from traditional advertising avenues. The internet offers a breadth that is unparalleled – it reaches billions of individuals worldwide, including the vast majority of Americans. At the same time, the internet allows advertisers to tailor their campaigns more precisely and effectively than advertising in other media. And unlike advertising in other media, internet advertising allows advertisers to provide an immediate link to their websites, thereby allowing for easy conversion of demand into purchases.

60. Internet advertising is divided into two distinct markets – search advertising and display advertising. Search advertising refers to the practice of paying an internet search engine (*e.g.*, Google) to include an advertisement in response to a specific search term. Display advertising refers to paying internet publishers to show advertisements to individuals browsing their websites. Advertisers do not consider these two distinct types of advertising to be substitutes for each other, and the industry has long recognized a sharp distinction between these two markets.

61. The display advertising market is further divided into a number of submarkets. As applicable here, there is a submarket for display advertising for social media users. Industry experts have long considered advertising in social media as a distinct category of advertising, and advertisers often allocate a specific portion of their advertising budget for advertising in this space. Moreover, a number of advertising agencies and networks offer social media advertising as a stand-alone product or service.

62. There are a number of reasons that advertisers have generally considered social media as a distinct category. First, because the majority of the content on such sites is user generated, advertisers cannot know in advance what type of content will appear next to their advertisement. Second, social networking users are not demonstrating an intent to make a purchase based upon their presence on the site.

63. Facebook is the dominant firm in the display advertising market generally and has monopoly power in the submarket for display advertising on social media. In 2011, Facebook controlled 28 percent of the supply of all display advertising impressions for United States internet users. The closest competitors – Yahoo! – controlled just less than 11 percent of the supply. Moreover, Facebook's supply of advertising impressions (and its commensurate share of the market) has grown significantly over the last three years, while the other leading competitors have not shown significant growth in either the total number of display advertising impressions or share of the market. Thus, Facebook is already the largest supplier and its share of the market is expected to continue to grow over time.

64. Among advertising in the submarket for social media users, Facebook has monopoly power. Facebook has leveraged its market share in terms of social networking users to build a monopoly in selling advertising to social media users. In 2011, Facebook garnered approximately 70 percent of the revenue from selling advertising to social media users. The closest single competitor – Twitter – represented only 5 percent of the revenue.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (*Per Se* Unlawful Group Boycott In Violation of Section 1 of the Sherman Act)

65. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set for the herein.

66. Facebook has entered into a contract, combination or conspiracy in restraint of trade and commerce, the purpose and effect of which has been to boycott Sambreel, restrict the ability of Sambreel to compete, and/or eliminate from the market a low cost display ad alternative to Facebook and/or the Application Developers.

67. The contract, combination or conspiracy is a naked restraint of trade that is illegal per se under Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, the restraint of trade involves a group boycott. Facebook has agreed with horizontal competitors – the Application Developers – to threaten to withhold business from the Advertising Partners unless they agree to help injure Sambreel, which competes with Facebook and the Application Developers.

68. Alternatively, Facebook's contract, combination or conspiracy constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason or "Quick Look" test because:

a. Facebook's contract, combination or conspiracy constitutes a naked restraint of trade;

b. Facebook's contract, combination or conspiracy has caused substantial actual anticompetitive effects in the market for internet display advertising (including sub-markets therein), including, but not limited to:

i. Actual elimination of advertising on PageRage as a competitive alternative to advertising on Facebook and/or applications of Application Developers;

ii. Foreclosure of Sambreel's ability to deal with critical Advertising Partners;

iii. Foreclosure of Sambreel's Advertising Partners that did not accede to Facebook's demand to boycott Sambreel from a critical distribution outlet: purchasing display ads from Facebook or Application Developers;

iv. Price increases to Advertising Partners that would have purchased PageRage display ads if not for the boycott, but instead were forced to buy higher-priced display ads, such as those offered by Facebook; and

v. The loss of new products that Sambreel would have developed and implemented had the boycott (and Facebook's other conduct) not financially devastated Sambreel's business.

c. Facebook possesses market power in the market for online display advertising, including in the submarket for advertising on social media sites.

69. Facebook's group boycott has no legitimate business purpose. It achieves no legitimate efficiency or pro-competitive benefit to counterbalance the substantial anticompetitive effects it has

caused.

70. Facebook's conduct substantially and adversely affects interstate commerce.

71. As a direct and proximate result of Facebook's violation of the Sherman Act, Sambreel has been damaged (i) in its business and property by lost revenue, lost customer contracts, damaged customer relationships, and lost users; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a). Sambreel's injury is of the type that the antitrust laws were intended to prevent.

**SECOND CLAIM FOR RELIEF**

**(*Per Se* Unlawful Negative Tying in Violation of Section 1 of the Sherman Act)**

72. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

73. Facebook has entered into a contract, combination or conspiracy in restraint of trade and commerce, the purpose and effect of which has been to restrict the ability of Sambreel to compete and/or eliminate from the market a low cost alternative to Facebook and/or the Application Developers.

74. As set forth more fully in Paragraphs 48 - 55, there is a relevant market that consists of social networking in the United States. Facebook maintains monopoly power in that market. Facebook's market share exceeds 85 percent and there are high barriers to entry that prevent competitors from offering competing products.

75. Facebook used its monopoly power in the social networking market to eliminate competitors that compete in the market for products that customize or enhance social networking and in the market for display advertising. Specifically, Facebook's gating campaign as described more fully in Paragraphs 6 and 37 - 40 represented a negative tying agreement. Facebook would allow users to access Facebook's social networking website only if they would agree not to use Sambreel's products that compete with applications on the Facebook Platform in the tied market for products used to customize or enhance social networking. Facebook has a financial interest in Sambreel's competitors in the tied market for products to customize and enhance social networking.

76. The negative tying agreements concerned a significant amount of interstate commerce.

Prior to the gating campaign, Sambreel's advertising revenues consistently exceeded $6.5 million per month. As a direct result of the negative tying, Sambreel's revenues decreased by millions of dollars per month.

77. The contract, combination or conspiracy is a naked restraint of trade that is illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

78. Alternatively, Facebook's contract, combination or conspiracy constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason or "Quick Look" test because:

a. Facebook's contract, combination or conspiracy constitutes a naked restraint of trade;

b. Facebook's contract, combination or conspiracy has caused substantial actual anticompetitive effects in the market for products that allow users to customize and enhance their social networking experience, including, but not limited to:

i. Actual elimination of PageRage as a competitive alternative;

ii. Foreclosure of Sambreel's ability to deal with critical users; and

iii. The loss of new products that Sambreel would have developed and implemented absent Facebook's conduct.

c. Facebook has market power in the market for social networking sites.

79. Facebook's tying arrangement has no legitimate business purpose. It achieves no legitimate efficiency or pro-competitive benefit to counterbalance the substantial anticompetitive effects it has caused.

80. As a direct and proximate result of Facebook's violation of the Sherman Act, Sambreel has been damaged (i) in its business and property by lost revenue, lost customer contracts, damaged customer relationships, and lost users; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a). Sambreel's injury is of the type that the antitrust laws were intended to prevent.

**THIRD CLAIM FOR RELIEF**

**(Monopolization in Violation of Section 2 of the Sherman Act)**

81. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully

set forth herein.

82. In violation of Sherman Act § 2, Facebook has engaged in exclusionary conduct to maintain its monopoly power in the submarket for display advertising to social media users.

83. As set forth more fully in Paragraphs 59 - 64, there is a relevant market or submarket that includes the sale of display advertising impressions to social media users. As set forth in those paragraphs, Facebook has monopoly power in that market. Regardless of the metric, Facebook has a market share of 70 percent or more. The other competitors have a market share of 5 percent or less.

84. PageRage represented a direct, low-cost alternative for advertisers seeking to reach Facebook users. Specifically, PageRage allowed advertisers to purchase advertising that would appear in the internet browser of users when they accessed Facebook. As such, PageRage represented the most direct substitute for Facebook's own advertising and provided a means to discipline Facebook's pricing.

85. Facebook engaged in a series of exclusionary practices designed to eliminate PageRage as a competitor so that Facebook could maintain its monopoly power. Specifically, Facebook used the group boycott, gating, and disruption of Sambreel's business with Neverblue to eliminate PageRage as an avenue for advertisers to purchase advertising impressions in the relevant market. Facebook's course of conduct has no legitimate justification but was instead intended to force PageRage out of the relevant market altogether.

86. Facebook's actions forced advertising partners to cease doing business with PageRage, caused the loss of a substantial number of PageRage users, and ultimately forced Sambreel to stop advertising on PageRage. Accordingly, Facebook's actions succeeded in eliminating and/or minimizing PageRage as a competitive alternative, allowing Facebook to maintain its monopoly power with respect to display advertising in social media.

87. As a direct and proximate result of Facebook's violation of Sherman Act § 2, Sambreel has been damaged: (i) in its business and property by lost revenue, lost customer contracts, damaged customer relationships, and lost users; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a). Sambreel's injury is of the type that the antitrust laws were intended to prevent.

**FOURTH CLIAM FOR RELIEF**

**(Willful Attempted Monopolization in Violation of Section 2 of the Sherman Act)**

88. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

89. In violation of Sherman Act § 2, Facebook has engaged in exclusionary conduct with specific intent to monopolize the market for internet display advertising (and submarkets therein). Specifically, Facebook's group boycott, gating, and disruption of Sambreel's business with Neverblue were designed to eliminate purchases of advertising on PageRage as a competitive alternative to Facebook and/or the Application Developers and to drive Sambreel out of business. Facebook's course of conduct has no legitimate justification.

90. There was and is a dangerous probability of success that Facebook will succeed in its attempt to monopolize the market for internet display advertising (and submarkets therein). Facebook has the largest share of the relevant market, is the only competitor in the market experiencing meaningful growth, and has almost three times the market share of its next largest competitor.

91. As a direct and proximate result of Facebook's violation of Sherman Act § 2, Sambreel has been damaged (i) in its business and property by lost revenue, lost customer contracts, damaged customer relationships, and lost users; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a). Sambreel's injury is of the type that the antitrust laws were intended to prevent.

**FIFTH CLAIM FOR RELIEF**

**(Unfair and Illegal Business Practices in Violation of California Unfair Competition Law)**

92. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

93. In violation of California Business & Professions Code § 17200 *et seq.*, Facebook has engaged in business practices that are unfair and in violation of law.

94. Facebook's actions are unfair because they either: (i) represent an actual violation of antitrust law, (ii) threaten an incipient violation of the antitrust laws, (iii) violate the policy and spirit of

the antitrust laws because the effect of the actions is comparable to the harms addressed by those law, or (iv) significantly threatens to harm competition. As set forth in Counts 1 through 4 and the Paragraphs referenced therein, Facebook has engaged in exclusionary conduct, including organizing the boycott of Sambreel by Advertising Partners, the gating of PageRage users, and the disruption of Sambreel's relationship with Neverblue. This exclusionary conduct has had an effect on competition in that it forced Sambreel to stop for some period competing directly with Facebook and it has reduced Sambreel's ability to function in the broader markets. Facebook's actions, therefore, are unfair under § 17200 *et seq.* and subject to injunctive relief.

95. Facebook's business practices with respect to the gating are independently illegal. To facilitate the gating campaign, Facebook accessed its users' computers without their permission in violation of California Penal Code § 502(c)(7). To determine whether the users had installed PageRage, Facebook accessed the logical, arithmetical, and storage elements of its users' computers in a manner that went beyond the access that is normal in the industry. Specifically, Facebook accessed its users' internet browsers, scanned those browsers to determine whether PageRage was installed, and recorded information about which users had installed PageRage. Facebook did not seek or obtain consent from its users to conduct these scans. Moreover, neither industry practice nor Facebook's terms of service provided implied consent for Facebook to conduct these scans. Facebook's actions are therefore illegal and subject to injunctive relief.

96. Because Sambreel has been harmed as a direct and proximate result of Facebook's violation of § 17200 *et seq.*, it has standing to bring this action for injunctive relief.

**SIXTH CLAIM FOR RELIEF**

**(Intentional Interference with Contract)**

97. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

98. Facebook has tortiously interfered with Sambreel's existing contractual relationships with its advertising partners, including: RubiconProject, Advertising.com, Admeld, OpenX, LifeStreet, SayMedia, Microsoft Media Network, and Neverblue.

99. Sambreel had valid, binding contracts with RubiconProject, Advertising.com, Admeld, OpenX, LifesStreet, SayMedia, Microsoft Media Network, and Neverblue (hereafter "the Advertising Contracts"). These contracts controlled the business relationships that Sambreel maintained with these entities.

100. Upon information and belief, Facebook was aware of the Advertising Contracts.

101. Facebook engaged in intentional acts designed to cause the breach of the Advertising Contracts and/or the disruption of the contractual relationships covered by those contracts. Specifically, Facebook threatened to blacklist these entities, preventing them from doing business on or with Facebook or any of the Application Developers unless they withdrew from their contractual relationships with Sambreel or at a minimum ceased doing business with PageRage.

102. As a result of Facebook's threats, the Advertising Contracts were actually breached and/or disrupted. Specifically, RubiconProject, Advertising.com, Admeld, OpenX, LifeStreet, SayMedia, Microsoft Media Network, and Neverblue terminated their contractual relationships with Sambreel and/or ceased doing business with PageRage.

103. As a direct and proximate result of Facebook's actions, Sambreel has suffered damages. Specifically, Sambreel suffered a significant decline in its advertising rates as a direct result of the loss of its contractual relationships. Additionally, Sambreel suffered a loss of users, which resulted in a loss of revenue, as a result of Facebook's interference with its contractual relationship with Neverblue.

104. Facebook's acts were committed willfully, maliciously, oppressively, and/or fraudulently, with the wrongful and deliberate intention of injuring Sambreel, and with a conscious disregard for Sambreel's rights and Facebook's obligations under applicable law. Therefore, in addition to all other types of relief requested herein, Sambreel is entitled to recover punitive and exemplary damages in amounts according to proof at the time of trial.

## SEVENTH CLAIM FOR RELIEF

### (Intentional Interference with Prospective Economic Advantage)

105. Sambreel repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

106. Facebook's actions, including its gating campaign, have tortiously interfered with Sambreel's prospective economic advantage.

107. Sambreel had relationships with its existing users that created the expectation of economic advantage in the future for Sambreel. Specifically, Sambreel reasonably expected to be able to serve advertising to these users, resulting in revenues for Sambreel.

108. Facebook was aware of these relationships generally and became aware of the specific relationships as a result of its gating campaign.

109. Facebook engaged in intentional, wrongful acts designed to disrupt the relationships. Specifically, Facebook engaged in anticompetitive conduct and engaged in an independent violation of California law. As alleged in Claims for Relief One through Six, Facebook has engaged in an ongoing anticompetitive scheme in an attempt to drive Sambreel out of business. These actions, which are in violation of the Sherman Act and California's Unfair Competition Law, have interfered with Sambreel's prospective economic relationships. Moreover, Facebook scanned its users' computers without permission in violation of California Penal Code § 502(c)(7) and then used the information obtained from these illegal scans to gate Sambreel's users. Facebook used the illegally obtained information to disrupt Sambreel's relationships with these users, including not only their use of PageRage but also their use of all other Sambreel products.

110. As a result of Facebook's actions, Sambreel lost more than 1 million users.

111. As a result of Facebook's actions, Sambreel has lost the ability to sell advertising to or through a number of advertising partners.

112. As a direct and proximate result of Facebook's actions, Sambreel suffered damages. First, because of the loss of users, Sambreel was able to serve fewer advertising impressions, resulting in a reduction in revenues. Second, because of the interference with relationships with potential advertising partners, the rates Sambreel could charge for PageRage advertisements declined.

113. Facebook's acts were committed willfully, maliciously, oppressively, and/or fraudulently, with the wrongful and deliberate intention of injuring Sambreel, and with a conscious disregard for Sambreel's rights and Facebook's obligations under applicable law. Therefore, in addition to all other

types of relief requested herein, Sambreel is entitled to recover punitive and exemplary damages in amounts according to proof at the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Sambreel requests of entry of judgment:

a. Awarding Sambreel full monetary damages to be proved at trial;

b. Awarding Sambreel treble its monetary damages, pursuant to 15 U.S.C. § 15;

c. Awarding Sambreel punitive damages;

d. Awarding Sambreel pre-and post-judgment interest on its damages as allowed by law;

e. Awarding Sambreel the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15;

f. Awarding Sambreel appropriate preliminary and final injunctive relief to address Facebook's business conduct, including, but not limited to, injunctive relief to prevent Facebook from (i) enforcing its restrictive agreements with Application Developers or Advertising Partners; (ii) threatening Sambreel's Advertising Partners and distribution partners (*e.g.*, Neverblue); and (iii) gating Sambreel users; and

g. Awarding Sambreel such other and further relief as the Court deems just and proper.

Dated: March 19, 2012

LAW OFFICE OF GREGORY P. OLSON

By: s/ Gregory P. Olson
Attorney for Plaintiffs
E-mail: greg@olsonesq.com

and

KOTCHEN & LOW LLP
DANIEL KOTCHEN
DANIEL LOW
ROBERT KLINCK

**JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Sambreel demands a trial by jury of all claims asserted in this Complaint.

Dated: March 19, 2012

LAW OFFICE OF GREGORY P. OLSON

By: s/ Gregory P. Olson
Attorney for Plaintiffs
E-mail: greg@olsonesq.com

and

KOTCHEN & LOW LLP
DANIEL KOTCHEN
DANIEL LOW
ROBERT KLINCK