1  Gregory P. Olson (Ca. Bar No. 177942)
   LAW OFFICE OF GREGORY P. OLSON
2  501 West Broadway, Suite 1370
   San Diego, CA 92101
3  Telephone: (619) 564-3650
   Facsimile: (619) 233-1969
4  greg@olsonesq.com

5  Daniel Kotchen (*Pro Hac Vice Application Forthcoming*)
   Daniel Low (*Pro Hac Vice Application Forthcoming*)
6  Robert Klinck (*Pro Hac Vice Application Forthcoming*)
   KOTCHEN & LOW LLP
7  2300 M Street NW, Suite 800
   Washington, DC 20037
8  Telephone (202) 416-1848
   Facsimile: (202) 280-1128
9  dkotchen@kotchen.com
   dlow@kotchen.com
10 rklinck@kotchen.com

11 *Attorneys for Plaintiffs*

12

13                 IN THE UNITED STATES DISTRICT COURT

14                 SOUTHERN DISTRICT OF CALIFORNIA

15

16 SAMBREEL HOLDINGS LLC; YONTOO LLC;      Case No. 3:12-CV-00668-W-KSC
   and THEME YOUR WORLD LLC,
17                                          **PLAINTIFFS' MEMORANDUM OF POINTS**
           Plaintiffs,                      **AND AUTHORITIES IN SUPPORT OF**
18                                          **MOTION FOR PRELIMINARY**
           vs.                              **INJUNCTION**
19
   FACEBOOK, INC.,                          Hon. Thomas J. Whelan
20
           Defendant.                       Hearing Date:   April 23, 2012
21                                          Hearing Time:   10:00 a.m.
                                            Dept:           Courtroom 7
22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2   I.      INTRODUCTION ....................................................................................1

3   II.     STATEMENT OF FACTS ......................................................................3

4           A.      Facebook Has Emerged As The Dominant Force On The Internet. ...................................3

5           B.      Facebook Has Adopted Exclusionary Policies. ..................................................4

6           C.      Sambreel Has Built A Successful Competing Company. ..........................................5

7           D.      Sambreel's Interaction With Facebook. ..........................................................6

8           E.      Facebook's Anticompetitive Attack On Sambreel. ................................................8

9           F.      Facebook's Attacks Have Led To Financial And Irreparable Injury...............................9

10  III.    LEGAL STANDARD FOR ISSUING A PRELIMINARY INJUNCTION ................................10

11  IV.     ARGUMENT .........................................................................................11

12          A.      Sambreel Has A Strong Likelihood Of Success On The Merits.....................................11

13                  1.      Facebook's Actions Are *Per Se* Illegal Under Section 1 Of The Sherman

14                          Act...........................................................................................11

15                  2.      Facebook's Actions Violate Section 2 Of The Sherman Act. .............................15

16                  3.      Facebook's Actions Violate California's Unfair Competition Law. .....................19

17          B.      Sambreel Will Be Irreparably Harmed In The Absence Of Injunctive Relief...................20

18          C.      The Balance of Equities Favors Sambreel. ......................................................22

19          D.      The Public Interest Will Be Served By A Preliminary Injunction...............................24

20  V.      CONCLUSION.......................................................................................25

21

22

23

24

25

26

27

28

-i-

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..................................11

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) .........................13

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................14

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ....................19

*Christian Schmidt Brewing Co. v. G. Helleman Brewing Co.*, 600 F. Supp. 1326 (E.D. Mich. 1985).....24

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) ...............23

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010).......................15

*Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir. 1984) ....................................15

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ........................................................................21

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) .................14, 15, 18

*Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941)......................................11

*Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88 (D. Haw. 1974................24

*Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687 (2d Cir. 1973) .........24

*Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........................17

*In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008) ....................15

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)................................................................10

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)..............................................11

*Liveuniverse, Inc. v. Myspace, Inc.*, No. CV 06–6994 AHM, 2007 WL 6865852 (C.D. Cal. June 4, 2007) ........................................................................................................................14, 16

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ..................................................17, 18

*Moore v. James H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977).........................................15

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)..................................................................14

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)........................12

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)............................................................11, 12

*Paschall v. Kansas City Star Co.*, 441 F. Supp. 349 (W.D. Miss. 1977) ..................................24

*People v. Lawton*, 48 Cal. App. 4th Supp. 11 (1996) .................................................................20

-i-

1 | *Redbud Hosp. Dist. v. Heckler*, No. C-84-4382-MHP, 1984 WL 2857 (N.D. Cal. July 30, 1984)..........22

2 | *Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ................22

3 | *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ........................................................16

4 | *Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ....................................22

5 | *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ........................................................12, 13

6 | *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982) ..........16, 18

7 | *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..........................16

8 | **Statutes**

9 | 15 U.S.C. § 1 ..............................................................................................................11

10 | 15 U.S.C. § 2 ..............................................................................................................16

11 | CAL. BUS. & PROF. CODE §§ 17200, 17203 ........................................................................19, 20

12 | CAL. PENAL CODE § 502(b)(1)........................................................................................20

-ii-

1  Sambreel Holdings LLC, Yontoo LLC, and Theme Your World LLC (collectively "Sambreel")
2  request that this Court enter a preliminary injunction that: (a) prevents Facebook, Inc. ("Facebook")
3  from enforcing or threatening to enforce the portions of its advertising and platform development policies
4  that require Facebook's partners to boycott competing companies and (b) prevents Facebook from
5  requiring Sambreel users to uninstall any Sambreel product before accessing www.facebook.com.

6  **I.   INTRODUCTION**

7  This case stems from Facebook's campaign to drive a competitor out of the market. Facebook's
8  actions are illegal, and Sambreel will be irreparably harmed without the requested relief. As such, this
9  Court should enter a preliminary injunction to prevent Facebook's continued illegal actions.

10  Facebook is the dominant social network and has become the dominant power on the internet.
11  Facebook's market share in the social networking space exceeds 85 percent, and most of its
12  "competitors" do not offer full-service social networks that can truly compete. As a result of its market
13  share among users, Facebook has significant market power in the related advertising markets.
14  Specifically, Facebook controls access to more than 70 percent the supply of advertising impressions for
15  social networking users. Facebook's dominance extends to the internet more generally. Facebook's
16  website is the most heavily trafficked website in the United States, representing approximately 20 percent
17  of all traffic, and in 2011, Facebook controlled the supply of 27.9 percent of all display advertising for
18  internet users in the United States.

19  Sambreel is an innovative company that competes with Facebook. Sambreel's products operate
20  as browser add-ons that add functionality to a user's internet browser. One of Sambreel's first products –
21  and its most successful product to date – is PageRage, which allows a user to create borders that appear
22  on the browser when the user accesses Facebook's website. Like Facebook, Sambreel makes money by
23  selling advertising space. Sambreel launched PageRage in 2008 and has competed with Facebook since
24  that time. Facebook did not initially view Sambreel as a competitive threat. Instead, early on, Facebook
25  recognized that PageRage allowed users to have a "unique" Facebook experience.

26  As Sambreel has grown into a significant competitor for the sale of advertising, Facebook's
27  attitude has changed. Facebook has now launched a campaign to drive Sambreel out of business.

28

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Between July and November 2011, Facebook approached Sambreel's advertising partners and presented them with a stark choice:  deal *either* with Facebook and the entities that operate applications on Facebook *or* with PageRage.  Given Facebook's sheer size and the reach of its application developers, a number of Sambreel's most important advertising partners agreed to cease purchasing advertising space from PageRage.  Then, in December 2011, Facebook went after Sambreel's users.  Facebook began scanning its users' web browsers (without their consent) to determine whether PageRage was installed and required its users to uninstall all of Sambreel's products before they were allowed to access www.facebook.com.  Facebook offered to stop this "gating" *only if* Sambreel would remove advertising from PageRage.  Facing the prospect of being driven out of business entirely by Facebook's gating, Sambreel's only option was to agree to Facebook's demands.

Facebook's scheme has caused – and continues to cause – Sambreel considerable harm. Sambreel's revenues have plummeted, and its consistent profits have turned into losses.  As a result, Sambreel is in default on its primary business credit line, has been forced to terminate 124 employees or contractors in San Diego County, has been forced to cease development of new products, continues to lose good will, and continues to suffer lost users from Facebook's gating and an inability to market Sambreel's services.  Sambreel is now in a tenuous financial position and needs revenue from PageRage to avoid irreparable harm.  But if Sambreel renews advertising without injunctive relief, Facebook will almost certainly renew its scheme, which will lead Sambreel to lose millions of users.  Thus, absent injunctive relief, Sambreel will have no choice but to deactivate PageRage, which will lead to immediate and irreparable harm, including:  (1) a loss of advertising partners and inability to enter into relationships with major advertising partners, (2) a loss of current users, (3) a loss of prospective users, (4) a loss of goodwill, (5) an inability to resolve the default on its credit line, (6) an inability to develop existing and new products, (7) the forced deactivation of its current products, and (8) potential additional employee layoffs.  Moreover, Facebook will not suffer *any* prejudice if a preliminary injunction is granted, and the balance of equities weighs overwhelmingly in favor of granting a preliminary injunction.  Accordingly, a preliminary injunction is appropriate.

## II.   STATEMENT OF FACTS

### A.   Facebook Has Emerged As The Dominant Force On The Internet.

Facebook operates a social networking website. Individuals sign up for service with Facebook and create a profile with personal information about themselves. Individuals then use Facebook to connect with friends and family, discover events and trends in the world around them, and share and express what matters to them. *See* Facebook, Inc. Form S-1 at 1-2 (Feb. 1, 2012) (excerpts attached as Ex. 1) ("Facebook S-1"). Users are able to post opinions, ideas, photos, and other information about themselves and control who is able to access that information. *See id.* at 2. As of December 31, 2011, Facebook had amassed 845 million monthly active users ("MAUs") and 483 million daily active users. *See id.* at 1. As a result of its large base of regular users, Facebook has the dominant share of traffic on social networking websites. According to a recent study, Facebook's traffic accounts for 90 percent of all visits to social networking sites, with its nearest competitor representing just over 2 percent of traffic. *See* Adweek, Data Points (Feb. 7, 2012) (attached as Ex. 2) ("Adweek"). But Facebook's dominance is not limited to social networking websites. For more than a year, Facebook has been the most heavily trafficked website on the internet. *See* Experian Hitwise, "Facebook was the top search term for third straight year" (Dec. 21, 2011) (attached as Ex. 3). In fact, in January 2012, one in every five page views among internet users in the United States was a Facebook page. *See* Experian, "10 Key Statistics about Facebook" (Feb. 7, 2012) (attached as Ex. 4).

Although it began as a stand-alone website, Facebook has since evolved into a website along with a platform that allows outside companies and developers to integrate with Facebook. Outside companies can integrate the Facebook experience with their websites, and third parties now develop applications that interact with Facebook through an interface known as the Facebook Platform. *See* Facebook S-1 at 3. Through the Facebook Platform, outside companies ("Application Developers") are able to offer a range of applications to enhance users' social networking experiences, including applications that allow users to customize the layout or design of their social networking pages.[1]

---

[1] Application Developers have also developed a number of social games that can be played while users are on the Facebook website. *See* Facebook S-1 at 84.

-3-

1    Facebook makes money by selling space on its webpage to advertisers. *See* Facebook S-1 at 12.
2   Given its dominant position in page views, Facebook wields considerable power in the internet
3   advertising world.   In 2011, Facebook offered 27.9 percent of all internet display advertising
4   impressions. *See* comScore, "U.S. Digital Future in Focus 2012" at 18 (Feb. 2012) (attached as Ex. 5)
5   ("comScore Digital Future").   Its nearest competitor offered 11 percent of the impressions.   *See id.*
6   Moreover, Facebook's market share is growing while the competing entities are stagnating or declining.
7   *Compare* comScore, "U.S. Online Display Advertising Market Delivers 1.1 Trillion Impressions in Q1
8   2011" (May 4, 2011) (attached as Ex. 6) ("comScore Q1 2011") (showing total display advertising
9   impressions in the first quarter of 2011), *with* comScore, "Americans Received 1 Trillion Display Ads in
10  Q1 2010 as Online Advertising Market Rebounds from 2009 Recession" (May 13, 2010) (attached as Ex.
11  7) (showing total display advertising impressions in the first quarter of 2010).

12    The Application Developers also make money, in part, by selling display advertising impressions
13  on their applications. *See* Advertising Partners on Facebook Platform (attached as Ex. 8) ("Facebook
14  Advertising Providers").   Accordingly, Facebook and the Application Developers compete in the market
15  for the sale of advertising impressions.   Facebook allows the Application Developers to operate on the
16  Facebook Platform because it has a financial stake in the applications.   Facebook sells its own display
17  advertising that appears when users access applications through Facebook, *see* Facebook S-1 at 81, and
18  collects a portion of the money that users pay to buy credits for certain applications.   *Id.* at 47.

19    **B.    Facebook Has Adopted Exclusionary Policies.**

20    Facebook has adopted "Advertising Guidelines," which govern the content of advertisements.
21  *See* Facebook Advertising Guidelines (Aug. 23, 2011) (attached as Ex. 9).   These guidelines apply to
22  advertisements that appear on Facebook, including on applications.   *See id.*   In addition to these
23  guidelines, Facebook has adopted policies governing the use of the Facebook Platform.   Any advertiser
24  wishing to advertise on the platform must agree to an additional set of terms.   *See* Facebook Platform
25  Terms for Advertising Providers" (Dec. 16, 2010) (attached as Ex. 10) ("Platform Advertising Terms").
26  The Platform Advertising Terms require advertisers to abide by the Advertising Guidelines, Facebook's
27  Statement of Rights and Responsibilities, and the Facebook Platform Policies. *See id.* ¶ 2. The Platform

28

-4-

Terms also contain a number of substantive provisions regarding access to user data and communications with Facebook. *See id.* ¶¶ 3-9. They also contain a provision that gives Facebook the right to control an advertiser's interaction with any entity that Facebook has blacklisted:

> If the Advertising Provider intends to associate itself in any manner with a company that Facebook has prohibited from operating on Facebook Platform or its current or former employees, the Advertising Provider will disclose this intent to Facebook in advance. Facebook reserves the right to limit or prohibit the Advertising Provider's operation on Facebook Platform in light of any such association.

*See id.* ¶ 10.

Facebook has also adopted limitations on Application Developers. Most notably, Facebook maintains a list of advertising partners who have signed the Platform Advertising Terms and mandates that developers may use *only* advertisers included on that list. *See* Facebook Advertising Providers. The stated rationale for the limitation is Facebook's hope to enhance user experience: "We hope that by providing this list of companies that have acknowledged their commitment to advertising quality that we can all foster a better user experience." *See id.*

## C.   Sambreel Has Built A Successful Competing Company.

Sambreel was formed in 2008 and operates products that enhance the internet experience for users. The core of Sambreel's business is the Yontoo Platform, which allows users to add functionality to their web browser software. *See* Declaration of A. Trouw ¶ 2 ("Trouw Decl.").[2] The Yontoo Platform itself does not add any functionality; it serves as a platform on which applications are built. *See id.* Sambreel's first two products were SanitySwitch and PageRage. *See id.* ¶¶ 3-4. SanitySwitch allowed users to alter the way Myspace pages appeared on their browser; specifically, a user could view Myspace pages without the often overwhelming graphic designs that Myspace accountholders had created. *See id.* ¶ 3. PageRage allows Facebook users to alter the way Facebook pages appear on their browser. PageRage users can add designs that they see on their browser when they access Facebook.[3] *See id.* ¶ 4.

---

[2] The Yontoo Platform is a browser plug-in that is installed on a user's computer. *See* Trouw Decl. ¶ 2.

[3] Sambreel's products do not alter the underlying webpage. *See id.* ¶ 8. As a result, the customization is seen only by individuals who have downloaded the product. *See id.* PageRage customization, for example, is seen only by users who have installed the Yontoo Platform and enabled PageRage. *See id.* Facebook users who have not enabled PageRage will not see any changes. *See id.*

1 │ Sambreel has since launched additional products.  These products add functionality to a user's web

2 │ browser when the user accesses other websites, including search and shopping websites.  *See id.* ¶ 9.

3 │       Since its founding, Sambreel's products have gained a significant following, and it has shown

4 │ consistent growth in the number of monthly active users.  During the fourth quarter of 2010, Sambreel

5 │ had 3.5 million MAUs.  *See id.* ¶ 10.  This number grew significantly throughout 2011:  6.4 million

6 │ MAUs in the first quarter, 14.5 million MAUs in the second quarter, 18.5 million MAUs in the third

7 │ quarter, and 20.6 million MAUs in the fourth quarter.  *See id.*  A number of users actively used multiple

8 │ Sambreel products.  *See id.* ¶ 11.  PageRage itself had a considerable user base with approximately 13.2

9 │ million MAUs at its peak.  *See id.* ¶ 12.

10 │       Sambreel's business model is similar to Facebook's – it offers its products to users at no cost and

11 │ sells display advertising impressions to monetize the products.[4]  *See id.* ¶ 13.  As a result of its wide user

12 │ base, Sambreel has become a significant competitor in the sale of display advertising impressions.

13 │ During the first quarter of 2011, Sambreel offered nearly 64 billion display advertising impressions.  *See*

14 │ *id.* ¶ 15.[5]  This number grew to nearly 89 billion impressions in the second quarter, 139 billion

15 │ impressions in the third quarter, and nearly 158 billion impressions in the fourth quarter.  *See id.*  The

16 │ vast majority of these advertising impressions were served by PageRage.  *See id.*

17 │       **D.**    **Sambreel's Interaction With Facebook.**

18 │       When it was first launched, PageRage included the browser plug-in and a control panel that

19 │ operated through the Facebook Platform.  *See id.* ¶ 5.  In mid-2009, Facebook approached Sambreel

20 │ regarding the control panel application.  *See id.* ¶ 6.  After discussions, on July 16, 2009, Facebook's

21 │ Platform team sent an e-mail to Sambreel that praised the PageRage functionality:  "Like I mentioned,

22 │ it's great that you and your team are trying to bring users a unique Facebook experience."  *See* E-Mail

23 │ from Facebook Platform Team to A. Trouw (Jul. 16, 2009) (attached as Ex. 11).  The e-mail explained

24 │ that the functionality was not permitted as part of the Platform, so the application would need to be

25 │

26 │ ───────────────────

[4] Sambreel also offers premium, ad-free versions of its product for $1.99.  *See id.* ¶ 13.

27 │ [5] The only two websites that offered more impressions were Facebook (346 billion) and Yahoo! (112.5

28 │ billion).  *See* comScore Q1 2011.

removed. *See id.* The e-mail expressly stated that Facebook was not asking Sambreel to discontinue the plug-in and encouraged Sambreel to send a message to the application users about how to use the plug-in without relying on the Facebook control panel. *See id.* Facebook's platform team subsequently offered suggestions on how Sambreel could operate PageRage without the application. *See* E-Mails between Facebook Platform Team and A. Trouw (Jul. 2009) (attached as Ex. 12). In response to Facebook, Sambreel removed the application and began to operate PageRage independent of Facebook. *See* Trouw Decl. ¶ 6.

Sambreel did not hear anything further from Facebook until more than a year later. On October 20, 2010, Facebook's counsel sent a letter to Sambreel. *See* Letter from J. Cutler to Yontoo Technology, Inc. (Oct. 20, 2010) (attached as Ex. 13). In that letter, Facebook asserted that Sambreel was violating Facebook's Statement of Rights and Responsibilities and might be violating various federal and state laws. *See id.* Sambreel responded quickly, pointing out that Facebook had previously recognized that the plug-in was appropriate and noting that Sambreel was not bound by Facebook's Statement of Right and Responsibilities. *See* Letter from M. Radcliffe to J. Cutler (Nov. 11, 2010) (attached as Ex. 14). Counsel to Sambreel and Facebook continued their discussions, and Facebook expressed concern that users were confused about the source of PageRage's ads and that PageRage was obscuring Facebook content. *See* Letter from J. Cutler to M. Radcliffe (Jan. 24, 2011) (attached as Ex. 15).

In an attempt to assuage Facebook's concerns, Sambreel made a number of changes and informed Facebook of these changes in a letter dated March 23, 2011. *See* Letter from M. Radcliffe to J. Cutler (Mar. 23, 2011) (attached as Ex. 16). Sambreel strengthened the disclosures to its users regarding the source of the advertisements.[6] Sambreel began including an "About this ad" link with the advertisements published by PageRage. *See* Trouw Decl. ¶ 19. The link directs the user to a website that explains that PageRage is providing the advertisement and explains how a user may disable PageRage. *See id.* Sambreel also strengthened the disclosure that is part of the download prompt. When a user downloads

---

[6] The PageRage website explains that users will see advertisements: "PageRage is ad-supported to keep it 100% FREE to our users." *See* http://www.pagerage.com. The words "ad-supported" are hyperlinked and direct users to a page that further explains the advertising that is used by PageRage and shows where the advertisements will appear. *See* http://www.pagerage.com/pagerage-ads.aspx.

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

the PageRage application, the download prompt contains a boldface reminder that the product is ad-supported and that the ads are not the responsibility of Facebook: "Once PageRage is installed you will see additional ads placed by us while browsing Facebook©.  These ads are not the responsibility of Facebook©.  PageRage shows ads that help keep PageRage 100% free to you."  *See* March 23 Letter, Attachment 1.  Although PageRage was always designed not to cover Facebook content, Sambreel also made technical change to further ensure that PageRage layouts would not cover Facebook content or advertisements.  *See* Trouw Decl. ¶ 20.

### E.     Facebook's Anticompetitive Attack On Sambreel.

Facebook did not respond to Sambreel's March 23 letter.  Instead, beginning in or around July 2011 and continuing until November 2011, Facebook leveraged its market position to coerce Sambreel's business partners to cease doing business with PageRage.  Specifically, Facebook threatened Sambreel's advertising partners, informing them that if they did not cease doing business with Sambreel they would be removed from the list of advertisers with whom Application Developers are allowed to work.  *See, e.g.*, E-Mail from Facebook and RubiconProject (Aug. 2011) (attached as Ex. 17) ("Rubicon E-Mail").  These threats continued throughout the fall.  *See* E-Mail from T. Rosenberg to A. Sullivan (Nov. 23, 2011) (attached as Ex. 18).  As a result of these threats, Sambreel is aware of seven major advertising partners who ceased doing business with Sambreel.  *See* Declaration of A. Sullivan ¶ 3 ("Sullivan Decl.").  Those partners represented more than 80 percent of PageRage's advertising business.  *See id.*  At least three advertising partners refused Facebook's demands, and Facebook followed through with its threat to remove them from the list of approved advertising partners.  *See id.* ¶ 4.

Facebook also sought to interfere with Sambreel's distribution partners.  Sambreel uses a number of methods to obtain new users, including using affiliate networks that utilize third parties to market Sambreel's products.  *See* Declaration of M. Levin ¶ 2.  One of Sambreel's affiliate network partners was Neverblue.  *See id.*  In addition to affiliate network marketing, Neverblue offers traditional online advertising and social networking advertising.  *See id.*  In August 2011, Facebook informed Neverblue that if it continued to do business with Sambreel, Facebook would make it impossible for Neverblue and its affiliates to advertise on Facebook.  *See* E-Mail from R. Pridy to J. Morris *et al.* (Aug. 29, 2011)

1  (attached as Ex. 19). In response, Neverblue ceased marketing PageRage. *See id.*

2  In early December 2011, Facebook's counsel sent a cease and desist letter to Sambreel

3  demanding that Sambreel immediately deactivate PageRage. *See* Letter from J. Cutler to M. Radcliffe

4  (Dec. 5, 2011) (attached as Ex. 20). Around this time, Facebook began scanning its own users'

5  computers – without their consent – as they logged on to Facebook to determine whether the users had

6  installed PageRage. *See* Trouw Decl. ¶ 25. Facebook subsequently began gating PageRage users,

7  preventing them from accessing Facebook until they uninstalled the Yontoo Platform, including

8  PageRage. These users would receive a notice stating: "It looks like you downloaded software that is

9  affecting your Facebook account and showing you unauthorized ads. We'll walk you through a few steps

10 that will remove the software and secure your account." *See* Gating Screen Shot (attached as Ex. 21).

11 The prompts directed the user to uninstall the entire Yontoo Platform, disabling all Sambreel

12 applications. *See* Trouw Decl. ¶ 24. In response to the gating, Sambreel immediately deactivated

13 PageRage, but Facebook continued its gating. *See id.* ¶¶ 26-27. Sambreel approached Facebook, and

14 Facebook offered to stop gating if Sambreel would cease advertising on PageRage. *See id.* ¶ 28. To

15 avoid the continued loss of users, Sambreel agreed to remove the advertising from PageRage. *See id.*

16 ¶ 29. Facebook agreed to stop gating Sambreel users on December 22, 2011. *See id.* ¶ 30. In spite of its

17 agreement, Facebook has continued to gate a small number of Sambreel users. *See id.* ¶ 31.

18 At the same time that Facebook was engaging in its exclusionary conduct towards Sambreel, it

19 was raising the prices it charged advertisers to purchase display advertising impressions on Facebook.

20 *See* Facebook S-1 at 46 (stating that Facebook raised the reserve price for its advertising during the

21 fourth quarter of 2011).

22 **F.    Facebook's Attacks Have Led To Financial And Irreparable Injury.**

23 Facebook's efforts have dramatically impacted Sambreel. Prior to Facebook's interference,

24 Sambreel was experiencing consistent growth – in active users, rates per ad impression, and revenues.

25 *See* Declaration of B. Miller ¶¶ 2-10 ("Miller Decl."). Facebook's interference has halted this growth on

26 every front. As a result of Facebook's gating, Sambreel lost more than 1 million users and lost the

27 revenue that would have been generated by serving ads to these users. *See id.* ¶ 15. The average rate

28

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Sambreel receives per ad impression has declined considerably since Facebook began threatening Sambreel's advertising partners. *See id.* ¶¶ 12-13. Before Facebook's interference, Sambreel regularly received average rates in excess of 10 cents per thousand impressions served by PageRage. *See id.* ¶ 6. By December 2011, the average PageRage advertising rates had fallen to 5 cents per thousand impressions. *See id.* ¶ 13. Finally, Sambreel was forced to cease all advertising on PageRage so that Facebook would agree to stop gating users. This has resulted in significant lost revenues. Before the gating campaign, Sambreel was consistently generating between $100,000 and $150,000 per day from PageRage. *See id.* ¶ 9. The gating campaign forced Sambreel to forego that revenue. *See id.* ¶ 18.

The economic damages Sambreel has suffered have led to irreparable injuries. As a result of the reduction in revenues, Sambreel posted a loss in December 2011. *See id.* ¶ 19. This, in turn, put Sambreel in default on its primary line of credit with Wells Fargo bank, meaning Sambreel may no longer draw on that line of credit. *See* Trouw Decl. ¶ 38. Sambreel was forced to terminate 124 of the 220 employees and contractors working for it. *See id.* ¶ 39. The lack of revenue also forced Sambreel to curtail its marketing of PageRage, leading to a slow but steady decline in the number of users. *See id.* ¶ 40. Sambreel also has been forced to shelve a number of new products it was developing because it does not have the resources to develop them. *See id.* ¶ 41. Sambreel was also forced to shelve products because Facebook has revoked Sambreel's authorization to use the Facebook Platform. *See id.* ¶ 42.

Without revenue from PageRage, Sambreel cannot continue to operate that product. Thus, contemporaneous with this filing, Sambreel has reinitiated its advertising on PageRage. Should this Court deny the preliminary injunction, Sambreel anticipates that it will be forced to completely deactivate the PageRage application. *See id.* ¶ 43.

## III.   LEGAL STANDARD FOR ISSUING A PRELIMINARY INJUNCTION

In analyzing whether to grant a preliminary injunction, courts consider: (1) plaintiff's likelihood of success on the merits, (2) whether plaintiff is likely to suffer irreparable harm in the absence of injunctive relief, (3) the balance of equities between the parties, and (4) whether an injunction is in the public interest. *See Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009). The test is analyzed under a sliding scale – as the likelihood of irreparable harm increases, the required showing regarding the

likelihood of success decreases.  Where a plaintiff demonstrates the likelihood of irreparable harm, that the public interest favors injunctive relief, and that the balance of hardships is tipped sharply in the plaintiff's favor, it needs to demonstrate only "serious questions" going to the merits of the claims.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## IV.    ARGUMENT

Sambreel is entitled to a preliminary injunction.  It has a substantial likelihood of success on the merits, it faces irreparable harm without injunctive relief, and the balance of equities and public interest favor injunctive relief.

### A.    Sambreel Has A Strong Likelihood Of Success On The Merits.

#### 1.    Facebook's Actions Are *Per Se* Illegal Under Section 1 Of The Sherman Act.

Section 1 of the Sherman Act provides:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Although the statute is written in the absolute, the Supreme Court has noted that only unreasonable restraints of trade are outlawed.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).   While a Section 1 claim generally requires a plaintiff to demonstrate that an agreement is unreasonable under the "rule-of-reason" test, the Supreme Court has concluded that certain classes of agreements do not require such analysis and are, instead, *per se* illegal. *See id.*  Facebook has engaged in two forms of *per se* unlawful conduct:  (a) it has organized a group boycott, and (b) it has engaged in tying.

##### a.    Facebook Has Organized A Group Boycott.

The Supreme Court has long concluded that group boycotts can be *per se* illegal.  *See, e.g., Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 465-67 (1941); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).  But not all group boycotts are subject to *per se* analysis.  In *NYNEX Corporation v. Discon, Inc.*, the Supreme Court explained that group boycotts must involve some level of horizontal agreement among competitors to invoke *per se* analysis.  The Court then set forth what it viewed as the classic example of a group boycott subject to *per se* analysis:

> The agreement in *Fashion Originators' Guild* involved what may be called a group boycott in the strongest sense:  A group of competitors threatened to withhold business from third parties unless those third parties would

1  help them injure their directly competing rivals.

2  525 U.S. at 135. This is known as a "classic" group boycott.

3  Where there is no evidence of a classic group boycott, the Supreme Court has set forth several

4  factors that tend to support a finding that a concerted refusal to deal is a "group boycott" subject to *per se*

5  analysis, including: (1) the boycotting firms (or the firm organizing the boycott) has a dominant position,

6  (2) the boycott cuts off access to a supply, facility, or market necessary to the boycotted firm, and (3) the

7  practices were not justified by a plausible argument that they were intended to make markets more

8  competitive. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294

9  (1985). But "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se*

10  treatment." *See id.* at 295. Instead, "[a] plaintiff seeking application of the *per se* rule must present a

11  threshold case that the challenged activity falls into a category likely to have predominantly

12  anticompetitive effects." *Id.* at 298.

13  Facebook's actions fall squarely within the purview of the *per se* rule. Indeed, the facts of this

14  case mirror the classic example of a group boycott from *Fashion Originators*. Facebook, its Application

15  Developers, and Sambreel all compete in the market to sell advertising that will be displayed to social

16  networking users.[7]  In spite of the fact that they are competitors, Facebook and its Application

17  Developers joined together and threatened to withhold business from third parties (advertising providers)

18  unless they would help Facebook injure a directly competing rival (Sambreel). These facts are enough –

19  without further analysis – to demonstrate that Facebook and its Application Developers have engaged in

20  a group boycott that is *per se* illegal. *See, e.g., Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir.

21  2000) (noting that where an entity coerced its suppliers to boycott competing firms there was no need to

22  engage in a thorough analysis of the *Northwest Wholesale Stationers'* factors).

23  Even if the Court were to reach the *Northwest Wholesale Stationers* factors, Facebook's actions

24  are subject to *per se* analysis. First, Facebook has a dominant position in the market. Courts have made

25

26  [7] As set forth more fully below, there is some question whether the market will be defined to include only
27  social media advertising or display advertising on the internet more broadly. The choice between these
    potential relevant markets is irrelevant to Sambreel's group boycott arguments because Facebook,
28  Sambreel, and the Application Developers are competitors under either market definition.

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

clear that "dominant" does not require proof of monopoly power. *See Toys "R" Us*, 221 F.3d at 936 (stating that the Supreme Court's use of the term "dominant" is "plainly chosen to stand for something different from antitrust's term of art 'monopoly'"). Facebook is the most visited website among internet users in the United States, it has 90 percent market share in social networking, and it controls nearly 30 percent of the supply of display advertising impressions for internet users in the United States. Facebook has significant power and, even under the broadest market definition, it is the dominant firm. *Id.* at 937 (finding that a market share of 20 percent was sufficiently "dominant").

Second, the boycott is intended to deny Sambreel access to customers and facilities that are necessary to compete in the market. This factor does not require proof of a total denial of access, but instead may be met by facts demonstrating a foreclosure of an important portion of the market or evidence of discriminatory pricing. *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (concluding that the *per se* rule was appropriate where resorts were denied access to "referrals" and could not purchase ski lift tickets at a discounted price as a result of the boycott). The boycott here meets this standard as it is aimed at denying Sambreel access to some of the largest intermediaries in the internet advertising market, including partners who made up more than 80 percent of PageRage's advertising sales. The effect of this denial of access has been to create discriminatory pricing disadvantages for Sambreel – without access to those entities, the demand for advertising on PageRage has fallen dramatically and PageRage's advertising rates have declined by at least 50 percent.

Finally, there is not a plausible argument that the boycott enhances efficiency or competition. Facebook cannot articulate any legitimate explanation for controlling the advertising providers to whom the Application Developers can sell ads or controlling the companies from whom the advertising providers can purchase ads. Facebook has asserted that these restrictions are meant to "ensure[] compliance with the Advertising Guidelines." *See, e.g.*, Rubicon E-Mail. The facts demonstrate that this explanation is a pretext. The Advertising Guidelines relate to the content of the advertisements, not the party that places them. Instead of basing exclusions on the content of the ads, however, Facebook blacklists firms merely because they do business with PageRage. Facebook, for example, threatened a boycott of RubiconProject – a well known ad exchange – based purely upon the fact that it was

1   purchasing advertising impressions from Sambreel.  Facebook never asserted that RubiconProject was

2   using PageRage to place ads with inappropriate content.  Thus, Facebook's policies are not directed to

3   ensuring that the content of the advertisements is appropriate; the exclusionary policies are intended and

4   enforced to harm Facebook's competitors.

5         The facts demonstrate a strong likelihood of success on Sambreel's group boycott claim.

6               **b.        Facebook Has Engaged In *Per Se* Unlawful Tying.**

7         Courts have long held that certain types of "tying" agreements are *per se* unlawful.  A tying

8   agreement is "an agreement by a party to sell one product but only on the condition that the buyer also

9   purchases a different (or tied) product, or at least agrees that he will not purchase that product from any

10  other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958).  More recently, the Supreme

11  Court has expressly held that an agreement to sell a product only if the purchaser agrees not to use the

12  services of a competitor in a different market is a tying agreement.  *See Eastman Kodak Co. v. Image*

13  *Technical Servs., Inc.*, 504 U.S. 451, 463 (1992) ("Finally, respondents have presented sufficient

14  evidence of a tie between service and parts.  The record indicates that Kodak would sell parts to third

15  parties only if they agreed not to buy service from [independent service organizations.]").

16        Facebook required its users to agree to tying arrangements as part of the gating campaign.

17  Facebook agreed to offer its services only to users who would agree not to use the services of Sambreel –

18  an entity that competes with Facebook in the sale of display advertising.  The two markets at issue are:

19  (1) the market for social networking services in the United States[8] and (2) the market for applications and

20  add-ons that compliment or enhance social networking services.  The markets are distinct because the

21  products are not ready substitutes for each other – *i.e.*, a user could not opt to use PageRage instead of a

22  social networking site.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (holding that the

23  test for relevant markets is whether the products can be substituted for each other).  Indeed, courts have

24  often held that the market for complimentary products is separate from the market for the underlying

25  product.  *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996-99 (N.D. Cal. 2010)

26

27  [8] Courts have previously accepted social networking services as a market definition.  *See Liveuniverse,*
28  *Inc. v. Myspace, Inc.*, No. CV 06–6994 AHM, 2007 WL 6865852, at *7 (C.D. Cal. June 4, 2007).

(recognizing that the markets for the sale of gaming consoles and online gaming are separate from the market for gaming accessories); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1303-04 (N.D. Cal. 2008) (holding that markets for voice and data service and applications were distinct from market for sale of phone). Facebook has tied these two markets by conditioning its offer of social networking services to a user's commitment not to use any product on the Yontoo Platform, including PageRage. Facebook's motivation for the tying is simple – to eliminate an entity that competes for the sale of advertising and to drive traffic to applications in which Facebook has a financial interest.

Facebook's tying agreements are *per se* unlawful. A tying agreement is *per se* unlawful "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co.*, 504 U.S. at 462; *see also Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984). Facebook has appreciable economic power in the tying market – the market for social networking services. Specifically, Facebook currently has market share in excess of 85 percent among social networking sites – whether the metric is page views or time spent on the site. Users do not have a ready substitute that can offer them the benefits available on Facebook. As such, Facebook has the power to impose a tying arrangement.

There can be no question that the tying agreements affected a substantial amount of commerce in the tied market. Courts have made clear that this requirement is intended to ensure that the tying agreement affects more than a *de minimis* amount of commerce. *See Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977). The facts of this case meet that standard. Prior to the gating, PageRage was consistently selling more than $4 million of advertising per month. *See* Miller Decl. ¶ 9. This is sufficient to meet the "not insubstantial" requirement. *See Moore*, 550 F.2d at 1216 (noting that commerce totaling less than $100,000 was sufficient to meet the requirement).

Thus, Sambreel has a strong likelihood of success on its tying claims.

**2.    Facebook's Actions Violate Section 2 Of The Sherman Act.**

Section 2 of the Sherman Act makes it unlawful "to monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several states." 15 U.S.C. § 2. A plaintiff can succeed by demonstrating either that the defendant monopolized or attempted to monopolize the relevant market. To

-15-

succeed in a cause of action for monopolization, a plaintiff must prove that: (1) the defendant possesses monopoly power in the relevant market, and (2) the defendant acquired, enhanced, or maintained that monopoly power using exclusionary conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). To succeed in a cause of action for attempted monopolization, a plaintiff must prove that: (1) the defendant engaged in exclusionary conduct, (2) the defendant acted with the specific intent to monopolize, and (3) the defendant had a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1308 (9th Cir. 1982).

Proof of clearly exclusionary conduct can be sufficient, standing alone, to establish attempted monopolization by a party with a significant market position:

> Thus, an attempted monopoly violation can be found with evidence of conduct alone. Where this analysis is used . . . all three elements may be proved with evidence of conduct that is either: (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary.

*Twin City*, 676 F.2d at 1309. In *Twin City*, the Ninth Circuit upheld a district court's finding that a party had attempted to monopolize the market for concessions franchises at major sporting and related venues. *See id.* at 1309. The evidence in that case demonstrated that the alleged wrongdoer held 24 percent market share and had used excessively long contract terms and "follow-the-franchise" clauses to increase its share and exclude competitors. *See id.* at 1297-98 (market share); *id.* at 1309 (exclusionary conduct). The Court concluded that specific intent to monopolize could be inferred from the contracts and the use of lavish loans and cash payments to secure long-term deals. *See id.* at 1309.

### a.    Facebook Has Significant Market Power.

As with any Section 2 claim, Sambreel's claim begins with a definition of the relevant market. In this case the relevant market will be limited geographically to the United States.[9] The product market will be either the market for the sale of display advertising impressions to social media users or the market for the sale of display advertising to internet users more generally. The Supreme Court long ago

---

[9] Because the internet allows for broad distribution, it is appropriate to include the entire United States in the market definition. *See, e.g., Liveuniverse*, 2007 WL 6865852, at *7.

-16-

recognized that the advertising market is a relevant market for antitrust purposes. *See, e.g., Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951). Internet advertising has a number of fundamental differences that set it apart from offline advertising. *See* Evans, *The Online Advertising Industry: Economics, Evolution, and Privacy* at 9-10 (attached as Ex. 22). As such, offline advertising does not provide an adequate substitute.

The market for internet advertising is segregated into discrete categories, including one category that encompasses display advertising (as opposed to search advertising). *See* Facebook S-1 at 79. Sambreel believes that the facts will ultimately demonstrate that the display advertising market is further segregated into distinct verticals that are not considered substitutes for each other and that one such vertical is the market for the sale of display advertising impressions on social networking services. *See, e.g.,* Interactive Advertising Bureau, *IAB Platform Status Report:  User Generated Content, Social Media, and Advertising – An Overview* (Apr. 2008) (attached as Ex. 23).[10] For the sake of deciding this motion, the Court does not need to decide whether there is a relevant submarket because Facebook has violated Section 2 under either market definition.

If the relevant market is ultimately limited to selling display advertising impressions to social networking users, Facebook is guilty of monopolization. Facebook has monopoly power in the market for the sale of display advertising to social networking users. Facebook currently represents 90 percent of all social networking traffic, allowing it to serve a similarly high number of advertisements. Courts have held that a fact finder can infer monopoly power from a much lower market share. *See, e.g., Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."). Accordingly, if the market is defined to be the market for advertising on social media sites, Facebook has monopoly power.

If the relevant market is ultimately defined to include all display advertising on the internet, Facebook has committed attempted monopolization. In *Twin City*, the Ninth Circuit concluded that there was sufficient evidence to sustain a finding that an entity with 24 percent of the relevant market had

---

[10] There is also ample evidence that marketing officials are increasingly considering spending on social media advertising as a specific portion of their advertising budgets. *See, e.g.,* The CMO Report at 31-35 (Feb. 2012) (attached as Ex. 24) (considering social media advertising plans for chief marketing officers).

1  committed attempted monopolization.  676 F.2d at 1301.  During 2011, Facebook accounted for 27.9

2  percent of the supply of display advertisements.  *See* comScore Digital Future at 18.  Thus, even in the

3  broader market, Facebook has sufficient market power to be liable for attempted monopolization.

4              **b.      Facebook Has Engaged In Exclusionary Conduct.**

5         Facebook has engaged in a number of practices that Courts have held to be "exclusionary" under

6  the antitrust laws.  First, as set forth in Section IV(A)(1), Facebook launched a group boycott that

7  targeted PageRage.  Specifically, Facebook forced advertisers to choose to do business with *either*

8  Facebook and its Application Developers *or* Sambreel.  The Supreme Court has long held that refusals to

9  deal with disloyal customers or suppliers constitute exclusionary conduct for Section 2 purposes.  *See,*

10  *e.g., Lorain Journal Co.*, 342 U.S. at 152 ("The publisher's attempt to regain its monopoly of interstate

11  commerce by forcing advertisers to boycott a competing radio station violated § 2.").

12         Second, Facebook's gating of Sambreel users constitutes exclusionary conduct.  Facebook

13  presented its users with a stark choice – use Facebook without PageRage or do not use Facebook at all.

14  Courts have held that conditioning a user's access to a product on agreeing *not to use* a competitor's

15  product is exclusionary conduct.  *See Eastman Kodak*, 504 U.S. at 463.  And Facebook's approach to the

16  gating campaign is particularly egregious.  Rather than instructing users to disable PageRage – an

17  available option – Facebook required its users to uninstall the entire Yontoo Platform before they would

18  be allowed to use Facebook.  Facebook has no plausible interest in the operation of Sambreel's products

19  that do not operate when users access other websites.  Facebook's use of its monopoly power in the

20  market for social networking to harm Sambreel in wholly separate markets is clearly exclusionary.

21         The interactions between Facebook and Sambreel further demonstrate Facebook's exclusionary

22  intent.  When Sambreel was a minor player in the market, Facebook had no objection to PageRage

23  operating as a plug-in.  Facebook only began to express concern once PageRage had grown into a serious

24  competitive threat.  At that point, Facebook began its course of conduct aimed at depriving PageRage of

25  its advertising suppliers and customers.  Facebook demonstrated its true intent when it agreed to stop the

26  gating *if* Sambreel would agree to cease advertising on PageRage.

27         The effect of the exclusionary conduct has been stark, creating a significant risk that Facebook

28

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  can eliminate competition.  Facebook's efforts forced Sambreel to stop advertising on PageRage,

2  effectively eliminating Facebook's primary competitor in the market for offering display advertising to

3  social network users and one of the major competitors in the broader market.  Moreover, Sambreel was

4  the only major competitor in the market other than Facebook that was experiencing meaningful growth.

5  Contemporaneously with its efforts to drive Sambreel out of business, Facebook raised its advertising

6  prices.  *See* Facebook S-1 at 46.  In light of Facebook's dominant market position, its exclusionary

7  conduct, and the effects of the conduct, Sambreel has a likelihood of success on its Section 2 claims.

8          **3.**     **Facebook's Actions Violate California's Unfair Competition Law.**

9         California's Unfair Competition law provides courts with the power to enjoin any "unfair

10  competition," which is defined to include "any unlawful, unfair or fraudulent business act or practice."

11  *See* CAL. BUS. & PROF. CODE § 17200 (defining unfair competition); *id.* § 17203 (stating that unfair

12  competition may be enjoined).

13              **a.**     **Facebook's Actions Constitute Unfair Business Practices.**

14         The California Supreme Court has explained that conduct is "unfair" if the action "threatens an

15  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its

16  effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or

17  harms competition."  *See Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187

18  (1999).  Thus, § 17200 allows a court to enter an injunction for acts that come close to violating the

19  antitrust laws, *e.g.,* where the plaintiff cannot meet the required *mens rea* requirement.  *See id.* at 189.

20  Facebook's actions, at a minimum, violate the policy or spirit of the antitrust laws.  Facebook has a

21  dominant market position, it has engaged in a series of actions that are aimed at limiting the ability of a

22  major competitor to continue to compete, and its actions have resulted in the elimination of competition

23  in the advertising market.  Even if the Court ultimately were to conclude that the actions did not subject

24  Facebook to liability for treble damages under the antitrust laws, the Court would have the authority to

25  enjoin Facebook from continuing its exclusionary conduct.

26              **b.**     **Facebook's Actions Are Unlawful.**

27         Facebook's gating is also subject to an injunction because it violates California Penal Code

28

-19-

Section 502(c)(7), which provides that a person who "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network" has committed a crime. Courts considering this statute have analyzed two separate elements:  (a) whether the defendant accessed a computer, and (b) whether the defendant acted without permission.  Facebook has violated this statute.

First, Facebook "accesses" its users' computers to conduct the scans.  The term "access" is defined to mean "to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."  CAL. PENAL CODE § 502(b)(1).  California courts have concluded that where a party gains access to a level of software coding that is not generally available to the public, that party has accessed the computer.  *See People v. Lawton*, 48 Cal. App. 4th Supp. 11, 15 (1996) (holding that a defendant who used public terminals at a California library to gain entry to the software coding of the system had violated Section 502(c)(7)). Facebook unquestionably has gained access to its users' computers under this definition.  To determine whether a user's web browser was using PageRage, Facebook necessarily had to gain entry to the "logical, arithmetical, or memory functions" of the user's computers.

Second, Facebook does not have permission to access its users' computers.  Nothing in Facebook's Terms of Service provide it with the right to access its users' computers for any purpose, much less to scan the web browsers to check for software that Facebook blacklists.  Facebook far exceeded its authority when it scanned its users' web browsers for PageRage.  Like the defendant in *People v. Lawton*, Facebook has gone beyond the traditional "use" of the computer that is authorized to access the non-public portions of a computer without seeking or receiving permission.  *See Lawton*, 48 Cal. App. 4th Supp. at 15.

Because Facebook's conduct is unlawful, this Court has authority to enter an injunction to prevent Facebook's continued violation of Section 502.  *See* CAL. BUS. & PROF. CODE. § 17203.

**B.     Sambreel Will Be Irreparably Harmed In The Absence Of Injunctive Relief.**

As a direct result of Facebook's actions, Sambreel has suffered considerable harm.  And without injunctive relief, Sambreel will suffer irreparable harm going forward.  Sambreel cannot afford to continue to operate PageRage without advertising because that product is operating at a significant loss,

so the current position is untenable. As it currently stands – without injunctive relief – Sambreel has two options: (1) it can deactivate PageRage and shut down Theme Your World or (2) it can reinitiate PageRage advertising and risk a renewed gating campaign and boycott from Facebook. Either option leads to irreparable harm.

First, absent an injunction, Sambreel can deactivate PageRage and shut down Theme Your World. That would lead to certain irreparable harm. To begin, courts have held that a company being driven out of business qualifies as irreparable harm. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."). Accordingly, shutting down Theme Your World will, by definition, lead to irreparable harm.

Deactivating PageRage will lead to irreparable harm beyond the closing of Theme Your World. Sambreel is currently in default of its major line of credit with Wells Fargo, meaning that Sambreel may no longer draw on that credit line. *See* Trouw Decl. ¶ 38. Sambreel is, thus, facing a cash and credit shortage. *See id.* The cash and credit shortage has forced Sambreel to attempt to preserve cash – it has terminated 124 of its 220 employees and contractors, significantly reduced its spending on marketing, and shelved a number of new products that were in development. *See id.* ¶¶ 39-41. Without revenue from PageRage, Sambreel will be required to continue its attempts to preserve cash by limiting services. By limiting services and terminating a large portion of its staff, Sambreel has reached a position that should allow it to survive as an entity. *See id.* ¶ 44. But if it fails to meet its projections, Sambreel will be forced into another round of layoffs and might be forced out of business altogether. *See id.* Courts have had no trouble finding irreparable harm when faced with evidence that the plaintiff faces financial harms that threaten layoffs, result in default of lines of credit, force reductions in service, or necessitate changes in the fundamental operation of a company. *See also Redbud Hosp. Dist. v. Heckler*, No. C-84-4382-MHP, 1984 WL 2857, at *11 (N.D. Cal. July 30, 1984); *Bates Drug Stores, Inc. v. Holder*, No. CV-11-0167-EFS, 2011 WL 1750066, at *2 (E.D. Wash. May 6, 2011).

Similarly, if it deactivates PageRage, Sambreel will continue to lose goodwill and prospective customers. Without PageRage (and without revenue from PageRage), Sambreel has been unable to grow and obtain new customers. Courts have concluded that this represents irreparable harm. *Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *see also Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("However, we have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").[11]

Second, Sambreel can reactivate advertising on PageRage. Without a preliminary injunction, however, this avenue is untenable for Sambreel. Specifically, Sambreel will face the almost certain prospect that Facebook will renew its gating campaign. If Facebook renews its gating campaign, Sambreel will almost certainly lose millions of users within a matter of weeks. *See* Trouw Decl. ¶ 43. If it loses millions of users, Sambreel will not be able survive. *See id.* Moreover, Facebook could renew its boycott and impede Sambreel's ability to sell PageRage advertising to (or through) advertising partners. Thus, renewing advertising is not an option without injunctive relief.[12] Accordingly, the only means to avoid irreparable harm is for Sambreel to initiate PageRage advertising coupled with an injunction that prevents Facebook from gating and prevents Facebook from enforcing its boycott.

### C.   The Balance of Equities Favors Sambreel.

The balance of equities favors entry of a preliminary injunction. The proposed injunctive relief will not cause any harm – much less irreparable harm – to Facebook.[13]   In attempting to justify its

---

[11] Facebook's boycott will almost certainly prevent Sambreel from obtaining new advertising partners or keep existing partners.

[12] Sambreel has renewed advertising on PageRage contemporaneously with this filing. Should this Court deny Sambreel's motion for preliminary injunction and allow Facebook to renew its scheme, Sambreel will be forced to deactivate PageRage and suffer the irreparable harm associated with that decision.

[13] Because the entry of a preliminary injunction will not cause any harm to Facebook, there is no need for this Court to require Sambreel to post a security under Federal Rule of Civil Procedure 65(c). The Ninth Circuit has expressly held that a security is necessary only where there is evidence of a potential harm to the party enjoined. *See, e.g., Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). And the enjoined party bears the burden of coming forward with some evidence of damages it will suffer by entry of injunctive relief. *Id.* at 881-82.

PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

actions, Facebook has proffered a number of concerns, including that PageRage:  (1) causes consumer confusion about the source of the ads, (2) displaces Facebook's content, (3) interferes with Facebook's commercial relationships, (4) creates security risks, (5) mines data from Facebook, (6) automatically sends message or mimics Facebook functionality, and (7) allows advertisers to run ads that do not meet Facebook's Advertising Guidelines.  These arguments are without merit.

Sambreel specifically addressed the first three concerns in response to Facebook's prior expression of concern.  PageRage's webpage clearly states that it is ad-supported, the installation prompt informs the user multiple times that PageRage is ad supported, and PageRage includes an "About this ad" link with its advertisements.  *See* Trouw Decl. ¶ 19.  To avoid Facebook's concerns regarding the displacement of Facebook content and disruption of Facebook's commercial relationships, Sambreel modified PageRage to make absolutely sure that it does not obscure any Facebook-placed advertisements or content. *See id.* ¶ 20.

Facebook's assertion that PageRage represents a security threat is specious.  In discussions, Facebook explained that it based this assertion on the fact that some information is delivered to PageRage users via an unsecured connection.  This fact, while true, is irrelevant.  A number of its *approved* applications – including the games operated by Zynga – follow an identical pattern, in which the connection to Facebook and the Application Developer is secure but the connection to the advertising servers are standard connections. *See id.* ¶ 33.  As such, Facebook cannot legitimately rely upon this fact to justify its actions.

Facebook's assertions about PageRage mining Facebook data and automatically sending messages and mimicking Facebook functionality are likewise without merit.  PageRage does not mine Facebook data.  *See id.* ¶ 34.  Similarly, PageRage does not currently cause a user's computer to automatically send messages or mimic Facebook functionality. *See id.*[14]

Finally, Facebook's suggestion that PageRage is marketed to advertisers as a way to post advertisements that do not meet Facebook's Advertising Guidelines is without merit.  Sambreel does not

---

[14] In the past, PageRage was programmed to send messages or prompt users to send messages about the product to their Facebook page. Trouw Decl. ¶ 34. These practices were consistent with the practices of the applications operating on Facebook at the time. *See id.*

market its services as a means to get around Facebook's content requirements. *See id.* ¶ 35. In fact, Sambreel maintains its own strict advertising policy that prohibits inappropriate advertising. *See id.* The value proposition that PageRage offers advertisers is that it provides a low cost alternative to Facebook. *See id.*

The course of dealings between the parties demonstrates that Facebook's only real concern with PageRage is precisely that it provides advertisers with a low-cost alternative to purchasing advertisements from Facebook. Indeed, Facebook has had no objection to PageRage's continued operation since December 22, 2011 so long as it is operated without ads. Facebook cannot claim legitimate concern arising from PageRage's lower prices – the Sherman Act was designed to encourage competition on precisely these grounds.

### D.   The Public Interest Will Be Served By A Preliminary Injunction.

In antitrust cases, courts have repeatedly held that the elimination of a potential competitor is necessarily against the public interest. *See, e.g., Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698-99 (2d Cir. 1973) (noting that the public interest is served by a preliminary injunction in antitrust actions); *Christian Schmidt Brewing Co. v. G. Helleman Brewing Co.*, 600 F. Supp. 1326, 1332-33 (E.D. Mich. 1985) (noting that preserving the existence of an independent competitor in the marketplace serves the public interest); *Paschall v. Kansas City Star Co.*, 441 F. Supp. 349, 359 (W.D. Miss. 1977) (noting that the public interest is best served by enjoining antitrust violations); *Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88, 97 (D. Haw. 1974) ("Courts should be particularly concerned with threats to the existence of a moving party's business in the area of antitrust. An award of only money damages in lieu of preserving a competitor disserves the public interest."). The facts of this case demonstrate the logic of these decisions. Absent a preliminary injunction, Facebook will be free to reinitiate its anticompetitive practices, which will – at a minimum – force Sambreel to remove PageRage from the market. This result will reduce competition and will reduce consumer choice. The public has a strong interest in protecting the existence of PageRage as a competitor in the industry.

Moreover, Facebook's own policies suggest that the public interest supports allowing PageRage

-24-

to connect with users who want to use it.  Facebook maintains a list of its core principles, and the very first principle provides:  "People should have the freedom to share whatever information they want, in any medium and any format, and have the right to connect online with anyone – any person, organization or service – as long as they both consent to the connection."  *See* www.facebook.com/principles.php. Thus, Facebook apparently recognizes that the public interest is best served by allowing users to make their own decisions about the entities with whom they wish to connect.  Granting a preliminary injunction in this case will serve this purpose by preserving PageRage as a product offered to consumers.

## V.    CONCLUSION

For the reasons set forth herein, this Court should enter a preliminary injunction that:  (a) prevents Facebook, Inc. ("Facebook") from enforcing or threatening to enforce the portions of its advertising and platform development policies that require Facebook's partners to boycott competing companies and (b) prevents Facebook from requiring Sambreel users to uninstall any Sambreel product before accessing www.facebook.com.

Dated: March 19, 2012                          LAW OFFICE OF GREGORY P. OLSON

                                               By: _s/  Gregory P. Olson_
                                                   Attorney for Plaintiffs
                                                   E-mail: greg@olsonesq.com

                                               and

                                               KOTCHEN & LOW LLP
                                                   DANIEL KOTCHEN
                                                   DANIEL LOW
                                                   ROBERT KLINCK