Gregory P. Olson (Ca. Bar No. 177942)
LAW OFFICE OF GREGORY P. OLSON
501 West Broadway, Suite 1370
San Diego, CA 92101
Telephone: (619) 564-3650
Facsimile: (619) 233-1969
greg@olsonesq.com

Daniel Kotchen (*Pro Hac Vice Application Forthcoming*)
Daniel Low (*Pro Hac Vice Application Forthcoming*)
Robert Klinck (*Pro Hac Vice Application Forthcoming*)
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037
Telephone (202) 416-1848
Facsimile: (202) 280-1128
dkotchen@kotchen.com
dlow@kotchen.com
rklinck@kotchen.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No. 3:12-CV-00668-W-KSC <br><br> **DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hon. Thomas J. Whelan <br><br> Hearing Date: April 23, 2012 <br> Hearing Time: 10:00 a.m. <br> Dept: Courtroom 7 |

### DECLARATION OF ARIE TROUW

I, Arie Trouw, declare as follows:

1. I am the founder and Chief Executive Officer of Sambreel Holdings LLC. Yontoo LLC and Theme Your World LLC are wholly owned subsidiaries of Sambreel Holdings LLC. Throughout this declaration, I will refer to the companies collectively as "Sambreel" unless there is a reason to refer only to a specific entity. The entities that have evolved into Sambreel were formed in 2008.

## Sambreel's History

2. Sambreel developed the Yontoo Platform, which is a browser add-on (also known as a plug-in or extension). Users who have installed the Yontoo Platform can then install Sambreel applications that operate on the Yontoo Platform. These applications add functionality to a user's web browser.

3. Sambreel's first product was SanitySwitch, which was launched in early 2008. SanitySwitch allows users to alter the way Myspace pages appear on their internet browsers. A user who has installed SanitySwitch can view Myspace pages without the often overwhelming graphics that Myspace users have used to decorate their pages. SanitySwitch has since been renamed UnPageRage.

4. Sambreel's second product was PageRage, which was launched in mid-2008. PageRage allows Facebook users to alter the way Facebook pages appear on their browser. Specifically, PageRage users can add designs that they see on their browser when they access Facebook. The PageRage designs generally appear on the sides of the screen, but some layouts include themes that mimic the graphic designs that Myspace users had created.

5. PageRage initially included the application that ran on the Yontoo Platform and a control panel that operated through the Facebook Platform.

6. In mid-2009, Facebook asked Sambreel to remove the control panel that operated on the Facebook Platform. Sambreel agreed to remove the Facebook application and to operate PageRage independent of Facebook.

7. During the discussions that led to the removal of the PageRage control panel from the Facebook Platform, Facebook never asked Sambreel to discontinue PageRage. To the contrary, Facebook's representative expressly stated that it did not have an objection to PageRage operating as a stand-alone plug-in. Facebook's representative even offered suggestions on how Sambreel could operate PageRage without the control panel application.

8. Sambreel's products that operate on the Yontoo Platform do not alter the underlying source webpage or even interact with the computers operated by the internet websites. Instead, these products operate to add layers to the users' web browsers by modifying the browser's resulting

-2-

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Document Object Model ("DOM"). The customization is seen only by individuals who have downloaded the product. PageRage customization, for example, is seen only by users who have downloaded the Yontoo Platform and enabled PageRage. Facebook users who have not enabled PageRage will not see any changes.

9. Sambreel has since launched a number of additional products that operate on the Yontoo Platform. These products add functionality to a user's web browser when the user accesses other websites, including search and shopping websites.

10. Sambreel's products have a wide user base. During the fourth quarter of 2010, Sambreel had 3.5 million monthly active users (or "MAUs"). The number of monthly active users increased throughout 2011: 6.4 million MAUs in the first quarter, 14.5 million MAUs in the second quarter, 18.5 million MAUs in the third quarter, and 20.6 million MAUs in the fourth quarter.

11. Many Sambreel users have installed and actively use multiple Sambreel products.

12. PageRage has been one of Sambreel's most popular products. At its peak during the fourth quarter of 2011, PageRage had 13.2 million monthly active users.

13. Sambreel offers two versions of its products. The majority of users opt to download free versions of the products. The free versions of Sambreel's products are ad-supported. Sambreel sells advertising space to make money. Sambreel also offers premium versions of its products for a one-time fee of $1.99.

14. The supply of advertising is generally measured in term of the number of individuals who are shown an advertisement. This is known as an "advertising impression."

15. Sambreel has offered a significant number of advertising impressions. During first quarter of 2011, Sambreel offered nearly 64 billion display advertising impressions. This number grew to nearly 89 billion impressions in the second quarter, 139 billion impressions in the third quarter, and nearly 158 billion impressions in the fourth quarter.

16. The majority of the advertising impressions offered by Sambreel were shown to users of PageRage.

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### Interactions with Facebook

17. In October 2010, Facebook's legal counsel sent a letter to Sambreel objecting to PageRage. Sambreel promptly retained counsel to address Facebook's concerns. After further communications, Sambreel understood that Facebook had two primary concerns about PageRage: (a) that users were confused about the source of PageRage ads and (b) that PageRage was displacing or covering Facebook content and advertisements.

18. In early 2011, Sambreel implemented a number of changes in an attempt to address the concerns expressed by Facebook.

19. Sambreel made a number of changes to clarify the source of PageRage ads. Sambreel began including an "About this ad" link with the advertisements published by PageRage. That link directs the user to a website that explains that PageRage is providing the advertisement and explains how a user may disable PageRage. Sambreel also strengthened the disclosure that is part of the download prompt. When a user downloads the PageRage application, the user is informed multiple times that the product is ad-supported, including with a boldface reminder that the product is ad-supported and that the ads are not the responsibility of Facebook. PageRage's terms of service also expressly say that Sambreel will show ads to users.

20. Sambreel did not believe that PageRage was covering any Facebook content or advertising but it took additional steps to ensure that PageRage did not obscure Facebook content. Particularly, Sambreel took steps to ensure that PageRage layouts would not interfere with the appearance of Facebook content that has a transparent background. Sambreel also removed layouts – and would not allow new layouts – that obscure Facebook ads or any other Facebook content.

21. Sambreel's counsel informed Facebook of the changes to PageRage in a letter dated March 23, 2011. Facebook did not respond to the March 23 letter or request any additional changes from Sambreel.

### Interference by Facebook

22. During the summer and fall of 2011, Sambreel heard from a number of its advertising partners that Facebook had contacted them to demand that these companies cease doing business with

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

PageRage.

23. Sambreel received a cease-and-desist letter from Facebook in early December 2011. In that letter, Facebook objected to PageRage based on a number of grounds. For the most part, Facebook had not raised these issues with Sambreel previously.

24. Soon after receiving the cease and desist letter from Facebook, Sambreel began to receive notices that its users were being denied access to Facebook until they certified that they had removed the Yontoo Platform. Within Sambreel, we refer to this denial of access as "gating."

25. Sambreel investigated the matter and determined that Facebook was causing its computers to run scans of the web browsers operated by Facebook's users to determine whether the user had installed PageRage. Based upon Sambreel's investigation, it appears that Facebook's computers were scanning the DOM of the users' web browsers to determine whether the browsers were showing content delivered by PageRage. The DOM is a representation of the operation of a user's computer that is not generally accessible to entities other than the user of a computer.

26. In response to the gating, Sambreel deactivated PageRage's functionality, hoping that Facebook would cease gating individuals who had installed PageRage.

27. Facebook continued to gate individuals who had downloaded PageRage even after Sambreel deactivated that application. Based on this fact, Sambreel concluded that Facebook must have been scanning users' computers for some time prior to beginning the gating. Sambreel concluded that Facebook had created a list of users who had downloaded PageRage and was gating them as they attempted to access Facebook, regardless of the fact that PageRage was no longer operating.

28. In response to the continued gating, Sambreel approached Facebook in an attempt to resolve the dispute. Facebook agreed to stop gating if Sambreel would cease advertising on PageRage, would agree to continue not to use any private information from users, and would agree to provide a response to the specific objections and technical issues raised in Facebook's cease-and-desist letter.

29. To avoid the continued loss of users, Sambreel agreed to Facebook's terms and removed advertising from PageRage.

30. Facebook agreed to stop gating Sambreel users late in the day on December 22, 2011.

-5-

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    31.    Facebook has continued to gate a small number of Sambreel users even after it agreed to
2  stop gating.

3    32.    Sambreel provided a letter addressing the technical issues and objections raised by
4  Facebook in its cease-and-desist letter. Sambreel generally demonstrated that the objections were based
5  upon misunderstandings of how PageRage operates. In other instances, Sambreel demonstrated that
6  Facebook's objections were without basis because PageRage operates in the same manner as applications
7  that are approved by Facebook.

8    33.    Among other things, Sambreel explained that PageRage does not create a security risk for
9  Facebook users. Facebook had asserted that PageRage created such a risk because the connections to the
10 advertising servers that place the ads were not secured. Sambreel explained that this is precisely the
11 model followed by Facebook's approved applications, including the games operated by Zynga.

12   34.    Facebook also asserted that PageRage mined Facebook data and mimicked Facebook
13 functionality. This assertion is not true. PageRage does not mine data from a user's Facebook page and
14 does not mimic Facebook functionality. In the past, PageRage had various functions that caused users to
15 send messages to their Facebook pages about PageRage. These functions were consistent with the
16 operation of Facebook's approved applications, but Sambreel has deactivated this functionality
17 nonetheless.

18   35.    Facebook also asserted that PageRage was marketed as a means for advertisers to
19 circumvent Facebook's advertising policies. This assertion is false. Sambreel maintains advertising
20 policies that prohibit inappropriate content, and PageRage is not marketed as a means to post
21 inappropriate advertisement on Facebook. Instead, PageRage is marketed as a low-cost alternative to
22 purchasing advertisements from Facebook.

23   36.    By the end January 2012, it became apparent that Sambreel and Facebook would be
24 unable to reach a resolution of their dispute. Facebook has now revoked Sambreel's authorization to use
25 the Facebook Platform to operate any products.

26                    **The Impact of Facebook's Interference**

27   37.    Facebook's actions have had dire consequences for Sambreel. Because Sambreel was

28

-6-

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  forced to turn off advertising on PageRage, Sambreel posted a loss in December 2011.

2  38.  The loss in December 2011 and in the subsequent months has put Sambreel in default on its primary line of credit with Wells Fargo bank. As a result, Sambreel may no longer draw on that credit line. Thus, at present, Sambreel does not have positive cash flow and does not have access to a line of credit.

39.  On January 27, 2012, Sambreel was forced to terminate 124 of its 220 employees and contractors.

40.  Because of the lack of revenue from PageRage, Sambreel has also had to curtail its marketing of PageRage.

41.  Sambreel also has been forced to shelve a number of new products it was developing because it does not have the resources to develop them.

42.  Because Facebook has revoked Sambreel's permission to operate any products using the Facebook Platform, Sambreel has been forced to disable or modify certain existing products. Sambreel has also been forced not to launch one of its new products it was close to launching because the product would have utilized the Facebook Platform.

43.  Without revenue from PageRage, Sambreel cannot continue to operate that product. PageRage has been losing money since the advertising was turned off. Without injunctive relief, however, Sambreel cannot operate the product with advertising. Specifically, Sambreel faces the immediate risk that Facebook will renew its gating campaign in earnest at any time, which will lead to the loss of many millions of Sambreel users within a matter of weeks. Sambreel cannot withstand another round of lost users of that magnitude. As a result, if the Court denies the preliminary injunction, Sambreel intends to completely deactivate PageRage. Sambreel has reinitiated PageRage advertising contemporaneously with this filing. Should Facebook renew its gating campaign and Sambreel be unable to obtain immediate injunctive relief, Sambreel will be forced to deactivate PageRage entirely. Moreover, if Facebook – in response to the renewal of PageRage advertising – uses its policies to continue to threaten potential advertising partners, Sambreel faces the real risk that it will not be able to find reputable advertising partners for PageRage. This will make it hard for Sambreel to generate

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  meaningful revenue from PageRage while simultaneously ensuring that the advertisements it serves are
2  appropriate.

3      44.    Based on its current projections, Sambreel should be able to survive as a company. To
4  survive, however, Sambreel will have to continue the belt-tightening it has already put in place and will
5  not be able to launch a number of new products that it had in development. If Sambreel fails to achieve
6  its projections, however, it will likely be forced into another round of layoffs and will face the prospect
7  of bankruptcy.

## Exhibits

9      45.    Exhibit 11 to Sambreel's Notice of Lodgment is a true and correct copy of an e-mail I
10  received from Facebook's Platform Team on July 16, 2009. Exhibit 11 is a written communication
11  related to Paragraphs 6 and 7 of this declaration.

12      46.    Exhibit 12 to Sambreel's Notice of Lodgment is a true and correct copy of an e-mail chain
13  between Facebook's Platform Team and myself in July 2009. Exhibit 12 contains the written
14  communications that occurred after I received the e-mail set forth in Exhibit 11.

15      47.    Exhibit 13 to Sambreel's Notice of Lodgment is a true and correct copy of a letter from
16  Joseph Cutler – Facebook's counsel – to Yontoo Technology, Inc. dated October 20, 2010.

17      48.    Exhibit 14 to Sambreel's Notice of Lodgment is a true and correct copy of a letter from
18  Mark Radcliffe – Sambreel's counsel – to Joseph Cutler dated November 11, 2010.

19      49.    Exhibit 15 to Sambreel's Notice of Lodgment is a true and correct copy of a letter from
20  Joseph Cutler to Mark Radcliffe dated January 24, 2011.

21      50.    Exhibit 16 to Sambreel's Notice of Lodgment is a true and correct copy of a letter from
22  Mark Radcliffe to Joseph Cutler dated March 23, 2011.

23      51.    Exhibit 20 to Sambreel's Notice of Lodgment is at true and correct copies of a letter from
24  Joseph Cutler to Mark Radcliffe dated December 5, 2011.

DECLARATION OF ARIE TROUW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

52. Exhibit 21 to Sambreel's Notice of Lodgment is a screenshot of a gating message received by a PageRage user after Facebook began its gating campaign in December 2011.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of March 2012, at Carlsbad, California.

Arie Trouw