# Exhibit 1

S-1 1 d287954ds1.htm REGISTRATION STATEMENT ON FORM S-1

**Table of Contents**

As filed with the Securities and Exchange Commission on February 1, 2012

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form S-1
# REGISTRATION STATEMENT
### *Under*
### *The Securities Act of 1933*

# Facebook, Inc.
#### (Exact name of Registrant as specified in its charter)

| Delaware | 7370 | 20-1665019 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (IRS Employer Identification No.) |

**Facebook, Inc.**
**1601 Willow Road**
**Menlo Park, California 94025**
**(650) 308-7300**
**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**David A. Ebersman**
**Chief Financial Officer**
**Facebook, Inc.**
**1601 Willow Road**
**Menlo Park, California 94025**
**(650) 308-7300**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Please send copies of all communications to:*

| Gordon K. Davidson, Esq. | Theodore W. Ullyot, Esq. | William H. Hinman, Jr., Esq. |
|---|---|---|
| Jeffrey R. Vetter, Esq. | David W. Kling, Esq. | Daniel N. Webb, Esq. |
| James D. Evans, Esq. | Michael L. Johnson, Esq. | Simpson Thacher & Bartlett LLP |
| Fenwick & West LLP | Facebook, Inc. | 2550 Hanover Street |
| 801 California Street | 1601 Willow Road | Palo Alto, California 94304 |
| Mountain View, California 94041 | Menlo Park, California 94025 | (650) 251-5000 |
| (650) 988-8500 | (650) 308-7300 | |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 2

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights information contained in greater detail elsewhere in this prospectus. This summary is not complete and does not contain all of the information you should consider in making your investment decision. You should read the entire prospectus carefully before making an investment in our Class A common stock. You should carefully consider, among other things, our consolidated financial statements and the related notes and the sections entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.*

### FACEBOOK, INC.

Our mission is to make the world more open and connected.

People use Facebook to stay connected with their friends and family, to discover what is going on in the world around them, and to share and express what matters to them to the people they care about.

Developers can use the Facebook Platform to build applications (apps) and websites that integrate with Facebook to reach our global network of users and to build products that are more personalized, social, and engaging.

Advertisers can engage with more than 800 million monthly active users (MAUs) on Facebook or subsets of our users based on information they have chosen to share with us such as their age, location, gender, or interests. We offer advertisers a unique combination of reach, relevance, social context, and engagement to enhance the value of their ads.

We believe that we are at the forefront of enabling faster, easier, and richer communication between people and that Facebook has become an integral part of many of our users' daily lives. We have experienced rapid growth in the number of users and their engagement.



- We had 845 million MAUs as of December 31, 2011, an increase of 39% as compared to 608 million MAUs as of December 31, 2010.

- We had 483 million daily active users (DAUs) on average in December 2011, an increase of 48% as compared to 327 million DAUs in December 2010.

- We had more than 425 million MAUs who used Facebook mobile products in December 2011.

- There were more than 100 billion friend connections on Facebook as of December 31, 2011.

- Our users generated an average of 2.7 billion Likes and Comments per day during the three months ended December 31, 2011.

1

Table of Contents

For a description of how we calculate our MAUs and DAUs and factors that can affect these metrics, see "Industry Data and User Metrics" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Trends in Our User Metrics."

**How We Create Value for Users**

Our top priority is to build useful and engaging products that enable you to:

- *Connect with Your Friends.* With 845 million MAUs worldwide, our users are increasingly able to find and stay connected with their friends, family, and colleagues on Facebook.

- *Discover and Learn.* We believe that users come to Facebook to discover and learn more about what is going on in the world around them, particularly in the lives of their friends and family and with public figures and organizations that interest them.

- *Express Yourself.* We enable our users to share and publish their opinions, ideas, photos, and activities to audiences ranging from their closest friends to our 845 million users, giving every user a voice within the Facebook community.

- *Control What You Share.* Through Facebook's privacy and sharing settings, our users can control what they share and with whom they share it.

- *Experience Facebook Across the Web.* Through apps and websites built by developers using the Facebook Platform, our users can interact with their Facebook friends while playing games, listening to music, watching movies, reading news, and engaging in other activities.

- *Stay Connected with Your Friends on Mobile Devices.* Through the combination of our mobile sites, smartphone apps, and feature phone products, users can bring Facebook with them on mobile devices wherever they go.

**Foundations of the Social Web**

We believe that the web, including the mobile web, is evolving to become more social and personalized. This evolution is creating more rewarding experiences that are centered on people, their connections, and their interests. We believe that the following elements form the foundation of the social web:

- *Authentic Identity.* We believe that using your real name, connecting to your real friends, and sharing your genuine interests online create more engaging and meaningful experiences. Representing yourself with your authentic identity online encourages you to behave with the same norms that foster trust and respect in your daily life offline. Authentic identity is core to the Facebook experience, and we believe that it is central to the future of the web. Our terms of service require you to use your real name and we encourage you to be your true self online, enabling us and Platform developers to provide you with more personalized experiences.

- *Social Graph.* The Social Graph represents the connections between people and their friends and interests. Every person or entity is represented by a point within the graph, and the affiliations between people and their friends and interests form billions of connections between the points. Our mapping of the Social Graph enables Facebook and Platform developers to build more engaging user experiences that are based on these connections.

- *Social Distribution.* Over time, people are consuming and creating more kinds of information at a faster pace across a broader range of devices. The growing volume of information makes it challenging to find meaningful and trusted content and to effectively make your voice heard. Facebook organizes and prioritizes content and serves as a powerful social distribution tool delivering to users what we believe they will find most compelling based on their friends and interests.

2

Table of Contents

**How We Create Value for Developers Through the Facebook Platform**

The Facebook Platform is a set of development tools and application programming interfaces (APIs) that enables developers to easily integrate with Facebook to create social apps and websites and to reach our 845 million users. Platform developers build experiences that allow our users to connect and share with friends while engaging in a wide range of activities. Platform developers range from a student on his or her computer at home to teams of programmers at leading websites. We are focused on the growth and success of Platform developers by enabling:

- *Personalized and Social Experiences.* We enable Platform developers to create better products that are personalized and social and that offer new ways for our users to engage with friends and share experiences across the web and on mobile devices. For example, a Facebook user can visit the Pandora website and immediately begin listening to a personalized radio station that is customized based on the bands the user Likes on Facebook.

- *Social Distribution.* We enable Platform developers to reach our global user base and use our social distribution channels to increase traffic to their apps and websites.

- *Payments.* We provide an online payments infrastructure that enables Platform developers to receive payments from our users in an easy-to-use, secure, and trusted environment.

**How We Create Value for Advertisers and Marketers**

We offer advertisers and marketers a unique combination of reach, relevance, social context, and engagement:

- *Reach.* Facebook offers the ability to reach a vast consumer audience of over 800 million MAUs with a single advertising purchase.

- *Relevance.* Advertisers can specify that we show their ads to a subset of our users based on demographic factors and specific interests that they have chosen to share with us on Facebook or by using the Like button around the web. We allow advertisers to select relevant and appropriate audiences for their ads, ranging from millions of users in the case of global brands to hundreds of users in the case of smaller, local businesses.

- *Social Context.* We believe that the recommendations of friends have a powerful influence on consumer interest and purchase decisions. We offer advertisers the ability to include "social context" with their marketing messages. Social context is information that highlights a user's friends' connections with a particular brand or business, for example, that a friend Liked a product or checked in at a restaurant. We believe that users find marketing messages more engaging when they include social context.

- *Engagement.* We believe that the shift to a more social web creates new opportunities for businesses to engage with interested customers. Any brand or business can create a Facebook Page to stimulate an ongoing dialog with our users.

**Our Market Opportunity**

*Our Advertising Market Opportunity*

Advertisers' objectives range from building long-term brand awareness to stimulating an immediate purchase. We offer advertising solutions that are designed to be more engaging and relevant for users in order to help advertisers better achieve their goals. Facebook's combination of reach, relevance, social context, and engagement gives advertisers enhanced opportunities to generate brand awareness and affiliation, while also creating new ways to generate near-term demand for their products from consumers likely to have purchase

3

Table of Contents

- we adopt policies or procedures related to areas such as sharing or user data that are perceived negatively by our users or the general public;

- we fail to provide adequate customer service to users, developers, or advertisers;

- we, our Platform developers, or other companies in our industry are the subject of adverse media reports or other negative publicity; or

- our current or future products, such as the Facebook Platform, reduce user activity on Facebook by making it easier for our users to interact and share on third-party websites.

If we are unable to maintain and increase our user base and user engagement, our revenue, financial results, and future growth potential may be adversely affected.

***We generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business.***

The substantial majority of our revenue is currently generated from third parties advertising on Facebook. In 2009, 2010, and 2011, advertising accounted for 98%, 95%, and 85%, respectively, of our revenue. As is common in the industry, our advertisers typically do not have long-term advertising commitments with us. Many of our advertisers spend only a relatively small portion of their overall advertising budget with us. In addition, advertisers may view some of our products, such as sponsored stories and ads with social context, as experimental and unproven. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver ads and other commercial content in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. Our advertising revenue could be adversely affected by a number of other factors, including:

- decreases in user engagement, including time spent on Facebook;

- increased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content;

- product changes or inventory management decisions we may make that reduce the size, frequency, or relative prominence of ads and other commercial content displayed on Facebook;

- our inability to improve our analytics and measurement solutions that demonstrate the value of our ads and other commercial content;

- decisions by advertisers to use our free products, such as Facebook Pages, instead of advertising on Facebook;

- loss of advertising market share to our competitors;

- adverse legal developments relating to advertising, including legislative and regulatory developments and developments in litigation;

- adverse media reports or other negative publicity involving us, our Platform developers, or other companies in our industry;

- our inability to create new products that sustain or increase the value of our ads and other commercial content;

- the degree to which users opt out of social ads or otherwise limit the potential audience of commercial content;

- changes in the way online advertising is priced;

12

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 6

[Table of Contents](#)

We believe that we have the opportunity to continue to grow our DAUs around the world. Growth in DAUs depends on our ability to attract new users and increase the frequency of engagement for existing users. We aim to increase DAUs by developing products that are more compelling for our users, increasing the relevance of the information we display for each user, increasing the number of compelling Platform apps and website integrations, and improving the quality of our products across mobile platforms. We also believe that younger users have higher levels of engagement with the web and mobile devices in general and with Facebook specifically. We anticipate that demographic trends over the long term may contribute to growth in engagement as a greater number of users will come from demographic groups that have grown up with the web and mobile devices and who spend more time online every day.

- **Mobile MAUs.** We define a mobile MAU as a user who accessed Facebook via a mobile app or via mobile-optimized versions of our website such as m.facebook.com, whether on a mobile phone or tablet such as the iPad, during the period of measurement.

We had more than 425 million mobile MAUs in December 2011. In 2011, mobile usage of Facebook increased in markets around the world, including major developed markets such as the United States where smartphone penetration grew rapidly. Our mobile MAU growth was also driven by product enhancements across several mobile platforms. For example, we improved our product offering on feature phones following our acquisition of Snaptu in April 2011 and we launched the Facebook app for the iPad in October 2011. Improving our mobile products and increasing mobile usage of Facebook are key company priorities that we believe are critical to help us maintain and grow our user base and engagement over the long term. We expect consumers around the world will continue to increase the amount of time they spend and the information they share and consume through mobile devices.

We do not currently display ads to users who access Facebook via mobile apps or our mobile website. To the extent that increasing usage of Facebook through mobile apps or our mobile website substitutes for the use of Facebook through personal computers where we do show ads, the number of ads that we deliver to users and our revenue may be negatively affected unless and until we include ads or sponsored stories on our mobile apps and mobile website. We believe that people around the world will continue to increase their use of Facebook from mobile devices, and that some of this mobile usage has been and will continue to be a substitute for use of Facebook through personal computers.

## Factors Affecting Our Performance

Growth trends in MAUs, DAUs, and mobile MAUs are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show, the value of those ads, the volume of Payments transactions, as well as our expenses and capital expenditures.

In addition, changes in user engagement patterns also affect our revenue and financial performance. We believe that overall engagement as measured by the percentage of users who create content (such as wall posts, messages, or photos) or generate feedback (such as by Liking or Commenting on the content created) has remained stable or increased as our user base has grown. Moreover, the average amount of content and feedback created by each user has continued to increase over time.

Our revenue trends are also affected by ad inventory management changes affecting the number, size, or prominence of ads we display. For example, in the fourth quarter of 2010, we significantly increased the number of ads on many Facebook pages. As another example, in the fourth quarter of 2011, we increased the reserve price (i.e., the minimum price threshold) in our advertising auction system in order to reduce the frequency with which low quality ads are displayed to users. This change caused a reduction in the overall number of ads shown and increased the average price per ad as a result of factors including the removal of ads with bids that were below the reserve price and some advertisers raising their bids in response to this change. For this particular

46

**Table of Contents**

change, we estimate that the decrease in the number of ads displayed and the increase in average price per ad approximately offset each other such that the impact on total revenue was minimal.

We make ongoing product changes intended to enhance the user experience. In September 2011, at our f8 conference, we announced the launch of Timeline as an enhanced and updated version of the Facebook Profile to enable users to better organize and access the growing quantity of their updates, photos, comments, and other content. We expect Timeline to roll out broadly around the world in the first quarter of 2012. Also in September 2011, we announced the launch of the next iteration of Open Graph APIs, which enables Platform developers to create new types of social apps that facilitate sharing, self-expression, and serendipitous discovery across a broad variety of activities and interests. We expanded the Open Graph to include more types of sharing activities in the first quarter of 2012.

In 2011, we continued to make significant investments in our technical infrastructure to ensure that our growing user base can access Facebook rapidly and reliably. In April 2011, we began serving user traffic out of our first owned and built data center in Prineville, Oregon. We developed designs for data centers, server hardware, and software that were optimized for use in our new data center facilities, resulting in significant increases in energy efficiency while significantly reducing our server operation costs compared to the usage of traditional servers and leased data centers. We are investing in additional Facebook-owned data centers in the United States and Europe and we aim to deliver Facebook products rapidly and reliably to all users around the world.

At the end of 2011, we had 3,200 full-time employees, an increase of 50% from the year prior. Our employee headcount has increased significantly and we expect this growth to continue for the foreseeable future. We have also made and intend to make acquisitions with the primary objective of adding software engineers, product designers, and other personnel with certain technology expertise. While our organization is growing rapidly, we are focused on increasing our talent base at a rate that allows us to preserve our culture.

## Components of Results of Operations

### *Revenue*

We generate substantially all of our revenue from advertising and from fees associated with our Payments infrastructure that enables users to purchase virtual and digital goods from our Platform developers.

*Advertising*. Our advertising revenue is generated by displaying ad products on our website. Advertisers pay for ad products displayed on Facebook, either directly or through their relationships with advertising agencies, based on the number of impressions delivered or the number of clicks made by our users. We recognize revenue from the display of impression-based ads on our website in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad appears in pages displayed to users. We recognize revenue from the delivery of click-based ads on our website in the period in which a user clicks on an ad.

*Payments and other fees*. We enable Payments from our users to our Platform developers. Our users can transact and make payments on the Facebook Platform by using credit cards, PayPal or other payment methods available on our website. We receive a negotiated fee from our Platform developers when users make purchases from our Platform developers using our Payments infrastructure. We recognize revenue net of amounts remitted to our Platform developers. We have mandated the use of our Payments infrastructure for game apps on Facebook, and fees related to Payments are generated almost exclusively from games. To date, games from Zynga have generated the majority of our payments and other fees revenue. In addition, we generate other fees revenue in connection with arrangements related to business development transactions and fees from various mobile providers; in recent periods, other fees revenue has been immaterial.

47

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 8

**Table of Contents**

divided between display advertising, where the advertiser is seeking impressions, and performance-based advertising, where the advertiser is seeking clicks or conversions.

–   ***Display Advertising.*** Online display advertising typically includes banner ads, interstitials, video ads, and rich media ads that aim to reach large numbers of consumers within a particular audience segment. Display advertisers run impression-based campaigns on Facebook in order to reach our large user base and because of the amount of time that users spend with us. Since January 2011, Facebook.com has been the number one website worldwide as measured by total minutes spent and total page views, according to an industry source. On average, users in the aggregate spent more than 9.7 billion minutes per day on Facebook on personal computers during December 2011. Display advertisers also use Facebook in order to more precisely reach their target audiences among our users and to leverage social context and our social distribution channels to increase engagement. Examples of display advertising campaigns on Facebook include:

-   Walmart U.S. purchased advertising on Facebook targeting users in the United States between the ages of 18 and 49 during the days surrounding "Black Friday" in November 2011. The campaign, which encouraged users to download a Black Friday shopping map of their local Walmart U.S. store to help them find great prices faster, reached 60 million Facebook users.

-   Diageo, the world's largest producer of spirits, purchased advertising on Facebook for a portfolio of its brands, including Captain Morgan rum and Smirnoff vodka, in order to increase market share for its products by targeting users in the United States over the age of 21. The campaign reached 50 million Facebook users, drove a 20% increase in offline sales, and achieved a significant return on investment as measured by an industry source.

–   ***Performance-based Advertising.*** Performance-based online advertising has typically involved advertisers seeking a specific user behavior such as a click on a search ad or a keyword-based content ad, a response to an email campaign, or an online purchase. We enable new forms of performance-based advertising, where advertisers can connect with users who are likely to have demand for their products based on the information that our users have chosen to share. We believe that performance-based campaigns on Facebook allow advertisers to offer their products to users with inferred intent and enhance users' experiences by showing them relevant ads tailored to their specific interests. Examples of performance-based advertising on Facebook include:

-   A local concert promoter advertised available tickets for an upcoming concert to users who lived in the metropolitan area where the concert was to be held and who had also Liked the artist.

-   1-800-FLOWERS.COM purchased a Mother's Day advertising campaign on Facebook targeted at its fans and friends of its fans in order to drive traffic to its website and increase sales.

-   Social game developers including Disney, Electronic Arts, and Zynga purchased performance-based advertising on Facebook to drive player acquisition by promoting new game launches and existing games.

•   ***Mobile Advertising.*** The global mobile advertising market was $1.5 billion in 2010 and is expected to grow at a 64% compound annual rate to $17.6 billion in 2015 according to an industry source. According to a third-party report published in September 2010, the Facebook app is the most frequently downloaded app across all major smartphone platforms in the United States. We had more than 425 million MAUs who used Facebook mobile products in December 2011. We currently do not show ads or directly generate any meaningful revenue from users accessing Facebook through our mobile products, but we believe that we may have potential future monetization opportunities such as the inclusion of sponsored stories in users' mobile News Feeds.

79

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 9

**Table of Contents**

phones. In addition, we are working across the mobile industry with operators, hardware manufacturers, operating system providers, and developers to improve the Facebook experience on mobile devices and make Facebook available to more people around the world. We had more than 425 million MAUs who used Facebook mobile products in December 2011. We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term, and we are actively seeking to grow mobile usage, although such usage does not currently directly generate any meaningful revenue.

- *Enable Developers to Build Great Social Products Using the Facebook Platform.* The success of Platform developers and the vibrancy of our Platform ecosystem are key to increasing user engagement. Social games have achieved significant levels of adoption by Facebook users, and we are also focused on enabling the development of apps in categories beyond games. For example, our latest enhancements to the Facebook Platform have enabled new types of social apps that facilitate sharing and serendipitous discovery of music, news, movies, television programming, and other everyday interests such as cooking and running. User engagement with our Platform developers' apps and websites creates value for Facebook in multiple ways: our Platform supports our advertising business because apps on Facebook create user engagement that enables us to show ads; our Platform developers purchase advertising on Facebook to drive traffic to their apps and websites; Platform developers use our Payment system to facilitate transactions with users; and users' engagement with Platform apps and websites contributes to our understanding of users' interests and preferences, improving our ability to personalize content. We continue to invest in tools and APIs that enhance the ability of Platform developers to deliver products that are more social and personalized and better engage users on Facebook, across the web, and on mobile devices. Additionally, we plan to invest in enhancing our Payments offerings and in making the Payments experience on Facebook as seamless and convenient as possible for users and Platform developers.

- *Improve Ad Products for Advertisers and Users.* We plan to continue to improve our ad products in order to create more value for advertisers and enhance their ability to make their advertising more social and relevant for users. Our advertising strategy centers on the belief that ad products that are social, relevant, and well-integrated with other content on Facebook can enhance the user experience while providing an attractive return for advertisers. We intend to invest in additional products for our advertisers and marketers, such as our recent introduction of sponsored stories in News Feed, while continuing to balance our monetization objectives with our commitment to optimizing the user experience. We also continue to focus on analytics and measurement tools to evaluate, demonstrate, and improve the effectiveness of ad campaigns on Facebook.

## Our Products for Users, Developers, and Advertisers

### Products for Users

Our product development approach is centered on building the most useful tools that enable users to connect, share, discover, and communicate with each other. Our products for users are free of charge and available on the web, mobile web, and mobile platforms such as Android and iOS.

- *Timeline.* We launched Timeline in September 2011 as an enhanced and updated version of the Facebook Profile to add structure and organization to the growing quantities of each user's activities and social content. Timeline allows users to organize and display the events and activities that matter most to them, enabling them to curate their memories in a searchable personal narrative that is organized chronologically. Users choose what information to share on their Timeline, such as their interests, photos, education, work history, relationship status, and contact information, and users can control with whom each piece of content is shared on their Timeline.

81

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 10

Table of Contents

identify photos of the account holder's friends. Our security team actively scans for security vulnerabilities using commercial tools, penetration tests, code security reviews, and internal and external audits. We also have a network of geographically distributed single-tenant data centers, and we take measures to protect the information stored in these data centers.

## Competition

We face significant competition in almost every aspect of our business, including from companies such as Google, Microsoft, and Twitter, which offer a variety of Internet products, services, content, and online advertising offerings, as well as from mobile companies and smaller Internet companies that offer products and services that may compete with specific Facebook features. We also face competition from traditional and online media businesses for a share of advertisers' budgets and in the development of the tools and systems for managing and optimizing advertising campaigns. We compete broadly with Google's social networking offerings, including Google+, which it has integrated with certain of its products, including search and Android. In addition, we compete with other, largely regional, social networks that have strong positions in particular countries, including Cyworld in Korea, Mixi in Japan, Orkut (owned by Google) in Brazil and India, and vKontakte in Russia. As we introduce new products, as our existing products evolve, or as other companies introduce new products and services, we may become subject to additional competition.

The areas in which we compete include:

- *Users and Engagement.* We compete to attract, engage, and retain users. Because our products for users are free of charge, we compete based on the utility, ease of use, performance, and quality of our products.

- *Advertising.* We compete to attract and retain advertisers. We distinguish our products by providing reach, relevance, social context, and engagement to amplify the effectiveness of advertisers' messages.

- *Platform.* We compete to attract and retain developers to build compelling apps and websites that integrate with Facebook. We compete in this area primarily based on the value of the tools and APIs we provide to developers to enable them to access our large global base of engaged users and their connections and to drive traffic to their apps and websites.

- *Talent.* We compete to attract and retain highly talented individuals, especially software engineers, designers, and product managers. Competition for employee talent is particularly intense in the San Francisco Bay Area, where we are headquartered. We compete for these potential employees by providing a work environment that fosters and rewards creativity and innovation and by providing compensation packages that we believe will enable us to attract and retain key employees.

While our industry is evolving rapidly and is becoming increasingly competitive, we believe that we compete favorably on the factors described above. For additional information, see "Risk Factors—Our business is highly competitive. Competition presents an ongoing threat to the success of our business."

## Technology

We have assembled a team of highly skilled engineers and computer scientists whose expertise spans a broad range of technical areas. We make significant investments in product and feature development, data management and personalization technologies, large-scale systems and scalable infrastructure, and advertising technologies, as follows:

- *Product and Feature Development.* We aim to continuously improve our existing products and to develop new products for our users, developers, and advertisers. Our product development philosophy is centered on continuous innovation in creating products that are social by design, which means that our products are designed to place our users and their social interactions at the core of the product experience.

89

# Exhibit 2

**ADWEEK**

HOME JOBS EVENTS & APPEARANCES TALENT GALLERY    SUBSCRIBE TO MAGAZINE NEWSLETTERS

**'Care Bears' Hit The Hub**
To bow later this year. Is a hug off with 'MLP' inevitable?

**Who Let the Hogs Out?**
Wieden + Kennedy introduces Lactofree's hedgehogs

**Fast Chat: Charlotte Beers**
Advertising icon discusses smashing

Search

Headlines: Press: 'ESPN The Magazine' Goes to Al...  TV: The Hub Seals the Deal for 'Ca...  Tech: Facebook Ads Get New Placement...  Ads & Brands: Portrait Womenkind

# Data Points: Social System Facebook is still the biggest social network, but its growth has spawned many smaller options

February 07 2012  Advertising & Branding

Social media has gone global. Facebook, the most widely used network, is now available in more than 70 languages, with three-fourths of its 800 million active users living outside the U.S. But usage varies widely by region, according to a report on global social media adoption by Forrester Research. U.S. adults have a longer history with online networking, but they tend to use it in passive ways, engaging in activities like creating social network profiles, listening to podcasts and reading others' content. Those in emerging markets, meanwhile, are more likely to actively participate in it by posting status updates, contributing to blogs and uploading content they created.





Infographic: Carlos Monteiro

Related Articles

Required: Please login below to comment.

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 14



**^^^^ BreakingNewsBlog.TV ^^^^**

but GFlop+ (the only real FB competitor) has already failed its goal

Trackback URL http://disqus.com/forums/

---

### News From newser

Limbaugh Rips Student Birth Control Advocate as 'Slut'

Inside Bankers' 'Malaise' Over Slashed Bonuses

James Murdoch Resigns From News International

Colbert Looks for GOP's Obama

13 Syrians Killed Saving Injured British Journalist

Limbaugh Slams Romney for 'Hair on Fire' Dig

### The Adweek Talent Gallery






### News From The Atlantic Wire

Jon Stewart Is Over Primary Season

Windows 8 is Coming, London Changing, and Building a Faster Internet

Olympia Snowe Becomes the Victim of 'Climate Change'

Ryan Lizza: What I Read

Republican Takeover of the Senate Looking Less Likely

Weather Gives Syrians a Reprieve, Britain Closes Its Damascus Embassy

---








The Hub Seals the Deal for 'Care Bears' CGI Reboot, Christopher Pike's 'Spooksville'

Let the Upfront Games Begin

'ESPN The Magazine' Goes to All-Themed Format

Ad of the Day: Lactofree

Charlotte Beers: Lonely at the Top

Time Warner CEO Pushes TV Everywhere as a Necessity for Cable Operators

| About Us | Billboard | Newspapers | Networks | Search | Agency |
|---|---|---|---|---|---|
| Contributors | Back Stage | Magazines | Cable | Social | Digital |
| Subscribe to Magazine | The Hollywood Reporter | Online | Satellite | Mobile | Creative |
| Advertising | | | Video | Telecomm | Accounts |
| Reprints | | | Ratings | Commerce | Marketing |
| Archive | | | | | |
| Special Advertising Sections | | | | | |

©2012 Adweek   All Rights Reserved   Terms of use   Privacy Policy    RSS    Facebook    Subscribe to Newsletter   Site Feedback   Contact Us

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 15

# Exhibit 3

Experian.com   Personal Services   Enterprise Services   Small Business   About Experian   Credit Education          United States | ⌐• Global Sites

**Experian™**
Hitwise

[Search]

**Services and Products     Resource Center     About Us     Contact Us     Hitwise Blog**

## Facebook was the top search term for third straight year

### Social network search term tops list for sixth straight year

**Justin Bieber and Kim Kardashian most popular public figure and top personality search**

**New York, N.Y., Dec. 21, 2011 -** Experian Hitwise, a part of Experian Marketing Services, has analyzed the top 1,000 search terms for 2011, and Facebook was the top-searched term overall in the US. This is the third year that the social networking Website has been the top search term overall, accounting for 3.10 percent of all searches, a 46 percent increase from 2010. Four variations of the term "facebook" were among the top 10 terms and accounted for 4.42 percent of searches overall, a 24 percent increase from 2010.

Among the top 10 terms, "youtube" moved up from the third spot in 2010 to the second spot in 2011. "Facebook login" was the third most-searched term in 2011, followed by "craigslist" and "facebook.com." Facebook.com moved up one spot in 2011 to be among the top five search terms. Analysis of the search terms revealed that social networking-related terms dominated the results, accounting for 4.18 percent of the top 50 searches. This is an increase of 12 percent compared with 2010. When combined, common search terms for Facebook - e.g., facebook and facebook.com - accounted for 3.48 percent of all searches in the United States among the top 50 terms, which represents a 33 percent increase compared with 2010. YouTube terms accounted for 1.36 percent, representing a 21 percent increase compared with 2010. Google terms (including YouTube) accounted for 1.59 percent - an increase of 27 percent compared with 2010. Yahoo terms accounted for 0.59 percent - an increase of 15 percent compared with 2010.

| Top 10 most-searched terms | |
|---|---|
| **2010** | **2011** |
| facebook | facebook |
| facebook login | youtube |
| youtube | facebook login |
| craigslist | craigslist |
| myspace | facebook.com |
| facebook.com | yahoo |
| ebay | ebay |
| yahoo | www.facebook.com |
| www.facebook.com | mapquest |
| mapquest | yahoo.com |
| **Source: Experian Hitwise** | |

New terms that entered the top 50 search terms for 2011 included addicting games, amazon.com, cnn, chase online, face, facebook sign up, hotmail, lowes, pandora, twitter and you.

"Navigational searches dominated the top search results as users typed in terms versus typing in the URL in the browser bar," said Simon Bradstock, general manager of Experian Hitwise. "Hitwise saw 11 percent growth of single-word searches in 2011 as terms like 'face' and 'you' made the top 50 searches. Marketers need to be particularly brand-savvy when managing their search optimization campaigns because of this behavior, which is a result of predictive search functionality across major search engines. Other top 2011 searches reflect ongoing fascination with celebrities online, and many of the top fast-moving searches centered on natural disasters or notable personalities passing away."

**Top-visited Websites in 2011**
Facebook was the top-visited Website for the second year and accounted for 10.29 percent of all U.S. visits between January and November 2011 - a 15 percent increase from 2010. Google.com ranked second, with 7.70 percent of visits - a 7 percent increase - followed by YouTube (3.17 percent), Yahoo! Mail (2.95 percent) and Yahoo! (2.47 percent).

The combination of Google properties accounted for 11.98 percent of all U.S. visits - a 22 percent increase compared with 2010. Facebook properties accounted for 8.93 percent, and Yahoo! properties accounted for 6.81 percent. The top 10 Websites accounted for 32 percent of all U.S. visits between January and November 2011, which was flat compared with 2010.

The fastest-moving search terms based on absolute change in 2011 included hurricane irene, bin laden wives, osama bin laden dead, les paul, nick ashford dies, apophis asteroid, sheen dumped, osama bin laden dead, hurricane irene path and amber cole.

**Top public figure searches -** Justin Bieber was the 92nd most popular overall search term in the United States in 2011:

| Top 10 most-visited Websites | |
|---|---|
| **2010** | **2011** |
| www.facebook.com | www.facebook.com |
| www.google.com | www.google.com |
| mail.yahoo.com | www.youtube.com |
| www.google.com | mail.yahoo.com |
| www.youtube.com | search.yahoo.com |
| www.msn.com | www.bing.com |
| www.myspace.com | search.yahoo.com |
| mail.live.com | www.gmail.com |
| search.yahoo.com | mail.live.com |
| www.bing.com | www.msn.com |
| *Note: Data is based on U.S. visits for January* | |
| *to November 2010 and 2011* | |
| **Source: Experian Hitwise** | |

1. Justin Bieber (92)

2. Casey Anthony (178)

3. Kim Kardashian (193)

4. Nicki Minaj (210)

5. Selena Gomez (244)

6. Charlie Sheen (292)

**Top personalities -** the top five searches from within the Personalities category (sites focused on celebrities and stars):

1. Kim Kardashian

2. Glenn Beck

3.Rush Limbaugh

4. Robert Pattinson

5. Khloe Kardashian

**Fastest-moving movie titles -** the top five searches from within the Movies category:

1. Star Wars

2. Transformers 3

3. (Twilight) Breaking Dawn

4. Harry Potter and the Deathly Hallows

5. Fast Five

**Music -** the top five searched-for artists/bands:

1. Lady Gaga

2. Justin Beiber

3. Beyonce

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 17

**Products**

| | | | |
|---|---|---|---|
| **Services and Products** | **Resource Center** | **About Us** | **I want to...** |
| Competitive Intelligence | Case Studies | Press Room | Read the latest Hitwise report |
| Search Intelligence | Research Reports | Hitwise Methodology | Contact Customer Support |
| Consumer Segmentation | Webinars | Management Team | Sign up for Press Releases |
| Conversion Intelligence | Data Center | Careers | See some current Internet statistics |
| Ad Effectiveness | | | Subscribe to the newsletter |
| | **Hitwise Blog** | | See how others use Hitwise |
| **Contact Us** | | | Read our Privacy Policy |
| Office Locations | | | |

4. Taylor Swift

5. Chris Brown

**Branded destinations -** the top five search terms:

1. Disney World

2. Disneyland

3. Great Wolf Lodge

4. Walt Disney World

5. Universal Studios Orlando

**Top TV show searches -** the top five from the Television category:

1. American Idol

2. Young and the Restless

3. Dora the Explorer

4. Dancing with the Stars

5. Days of our Lives

**Television -** The top generic search term was "hulu" within the Television category.

**Sports -** The top searched-for athletes were Tiger Woods, Danica Patrick and Brett Favre. The top searched for sports team was the Dallas Cowboys.

**News and Media -** The top-searched person among News and Media sites was Casey Anthony, followed by Charlie Sheen and Kim Kardashian in 2011.

*[1] Data is based on the top 500 unfiltered U.S. search terms and U.S. market share of visits for January to November 2011. The data does not include mobile searches or traffic.*

If you are interested in more top 2011 data visits and fastest-moving searches, visit: http://www.hitwise.com/us/registration-pages/top-online-trends-2011

**About Experian Hitwise**

Experian Hitwise helps digital marketers to reach, acquire and retain profitable customer segments by providing daily, online consumer behavior, search marketing and competitive insights. Our clients rely on Hitwise solutions to improve the effectiveness of search, display, affiliate, email and social marketing campaigns.

With the world's largest sample of internet users combined with unique offline lifestyle and life stage information our expert analysts, help companies build and optimize their online marketing campaigns for improved multichannel success.  Experian Hitwise has more than 1,500 clients across industry sectors, including retail, travel, financial services, advertising, media, technology and pharmaceuticals.

Experian Hitwise (FTS:EXPN), http://www.experianplc.com, operates in the United States, the United Kingdom, Australia, New Zealand, Hong Kong, Singapore, Canada and Brazil. More information about Experian Hitwise is available at http://www.hitwise.com. For up-to-date analysis of online trends, please visit the Hitwise Research Blog at www.ilovedata.com and the Hitwise Data Center at www.hitwise.com/datacenter

**About Experian Marketing Services**

Experian Marketing Services delivers best-in-breed data, analytics and platforms into multiple regions around the globe. It is focused on helping marketers more effectively target and engage their best customers through email, digital advertising, customer data management, customer and competitive insight, data enrichment and list rental, modeling and analytics, and strategic consulting. Through these capabilities, Experian Marketing Services enables organizations to encourage brand advocacy, create measurable return on investment and significantly improve the lifetime value of their customers.

**About Experian**

Experian is the leading global information services company, providing data and analytical tools to clients in more than 80 countries. The company helps businesses to manage credit risk, prevent fraud, target marketing offers and automate decision making. Experian also helps individuals to check their credit report and credit score and protect against identity theft.

Experian plc is listed on the London Stock Exchange (EXPN) and is a constituent of the FTSE 100 index. Total revenue for the year ended 31 March 2011 was $4.2 billion. Experian employs approximately 15,000 people in 41 countries and has its corporate headquarters in Dublin, Ireland, with operational headquarters in Nottingham, UK; California, US; and São Paulo, Brazil. For more information, visit http://www.experianplc.com.

*Experian and the Experian marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein are the property of their respective owners.*

# # #

---

**Enterprise Services**                                                                              © 2012 Experian Information Solutions, Inc. All rights reserved.

Legal Terms & Conditions     Privacy Policy     Press     Careers     Investor Relations     Online Community     Site Map     Contact Us

Experian and the Experian marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein are the property of their respective owners.

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 18

Exhibit 4

**All Analyst Weblogs**   North America   Europe   Asia Pacific   Insider

Bill Tancer   Heather Hopkins   Heather Dougherty

**About Hitwise**

Hitwise is the leader in online competitive intelligence.
Contact Hitwise to maximize your online marketing programs.

**Hitwise Data Centers**

Weekly Internet Trends at your fingertips.

**Hitwise Intelligence - Heather Dougherty - North America**

Analyst Weblog

« Romney leading in Florida per online visits | Super Bowl Game Time, Recipes, and Celebrity Bets Searches Rise as Giants-Pats Showdown Approaches »

**10 Key Statistics about Facebook**

**February 02, 2012**

As Facebook Inc. filed for its initial-public-offering yesterday afternoon, now is the perfect time to examine the website's performance online and how its audience compares with that of other social networks. Given the expected $75 billion to $100 billion initial valuation, we're all already aware of the magnitude of the business – below we reveal how much of a behemoth the website itself is in the US and other markets.

1. Facebook.com captures one in every eleven Internet visits in the US.



2. 1 in every 5 page views occurs on Facebook.com.

3. The average visit time on Facebook.com is 20 minutes.

4. Facebook.com's audience skews slightly more female than the online population as a whole.

**Heather Dougherty**
Director, Research at Hitwise.

**Archives** (view all posts)

**Categories**

**Blog roll**
Shop.org
TechCrunch
Search Engine Land
Comparison Engines
Freakonomics



5. The ages of Facebook.com visitors are indicative of the website's strength in the marketplace, with relative parity in distribution of its visit share by age vs. the online population.



6. Facebook.com under-indexes in visit share from the most affluent income group. With that said, Facebook's size more than makes up the difference; the site wins 499,949,430 visits from the most affluent income group versus YouTube's 223,732,591 visits and Twitter's 15,166,795 visits.



7. Facebook.com became the #1 ranked website in the US on March 9, 2010.

8. "Facebook" is the most searched term in the US and Facebook-related terms account for 14% of the top search clicks.



EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 21



9. Facebook.com users are highly loyal to the website; 96% of visitors to Facebook.com were returning visitors in January 2012.



10. Internationally, Facebook.com ranks in the top two websites in every market except China, where Sina Weibo, Baidu Zhidao and Renren are the dominant social networks.Facebook.com's largest footprint is in Canada, capturing almost 12% of all visits in that market. It also recently surpassed Orkut, placing it behind only Google Brazil in market share.





Facebook.com is the largest website in the US and a top performer in numerous international markets. The fan base of the site is loyal and spends a significant portion of their time online on the social network. Facebook's influence is seen in the presidential elections, digital shopping habits and beyond.

Thanks to Margot Bonner, Analyst on the Strategic Services team for today's analysis.

Please visit our Hitwise UK blog for additional Facebook data.

Posted by Heather Dougherty at 02:09 PM | (0)
In Categories Facebook | Social Media | Social Networking

Tweet  323

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 22

All material © Copyright 1998-2012 Hitwise Pty. Ltd. ABN 41 081 470 117 | Privacy Policy | Terms Of Use

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 23

Exhibit 5

February 2012

Key Insights from 2011 and What They Mean for the Coming Year



# U.S. DIGITAL FUTURE IN FOCUS 2012

comSCORE.

# Introduction

Sparked by a wave of innovation in digital device hardware and technology software platforms, accompanied by consumers' rapidly increasing digital consumption habits, 2011 marked an exciting year for the digital media industry and signaled an even more momentous year ahead. Amidst this constantly evolving landscape, successful digital strategies require insights into not only the current environment, but also into what trends will shape the future for digital consumers.

This report examines how the prevailing trends in social media, search, online video, digital advertising, mobile and e-commerce define the current United States marketplace and what these trends mean for the year ahead, as comScore helps bring the digital future into focus.

**FOR FURTHER INFORMATION, PLEASE CONTACT:**

**Sarah Radwanick**
comScore, Inc.
+1 206 268 6310
press@comscore.com

**Andrew Lipsman**
comScore, Inc.
+1 312 775 6510
press@comscore.com

Stay Connected







# Social Networking

**Social networking now accounts for approximately 1 out of every 6 minutes spent online**

## SOCIAL NETWORKING CONTINUES GROWTH IN 2011 AS ONE OF THE WEB'S TOP ACTIVITIES

Social Networking continued to gain momentum in 2011, as 9 out of every 10 U.S. Internet users visited a social networking site in a month. Social Networking now accounts for approximately 1 out of every 6 minutes spent online, with Facebook accounting for the lion's share of that engagement.

The world's most popular social networking site, which filed for its IPO on February 1, continued to gain visitors despite already reaching nearly 3 out of every 4 U.S. Internet users. Its more significant growth trend, however, was not in user growth but in average user engagement, which jumped 32 percent in the past year to just over 7 hours per visitor in December. Facebook now accounts for 15 percent of all time spent online and 16 percent of all page views.

Beyond Facebook's dominance in the social networking market, several interesting stories emerged among the second tier players. Myspace finally gave up its hold on the #2 position to LinkedIn in June, which was followed by Twitter and LinkedIn battling back and forth for that position during the second half of the year. By December, Twitter boasted the #2 spot in the category with 37.5 million unique visitors, while LinkedIn held the #3 position with 33.5 million. Myspace is still managing to hold onto the fourth position with just over 24 million visitors, though a couple of upstarts are beginning to nip at its heels.

**Facebook's Share of Total Time Spent Online**
*Source: comScore Media Metrix, Jun-2008 to Dec-2011, U.S.*




**Visitors (000) to Selected Social Networking Sites**
*Source: comScore Media Metrix, Dec-2010 to Dec-2011, U.S.*



comSCORE.



**Average Minutes per Visitor for Selected Leading Social Networking Sites**
*Source: comScore Media Metrix, Dec-2011, U.S.*

| Site | Minutes |
|---|---|
| FACEBOOK.COM | 423 |
| TUMBLR.COM | 151 |
| PINTEREST.COM | 80 |
| TWITTER.COM | 26 |
| LINKEDIN.COM | 15 |
| MYSPACE | 13 |
| GOOGLE.PLUS | 5 |

## SOCIAL NETWORKING

"In 2012 we're going to see social media define this election. It's going to influence how people get out the vote and how online fundraising occurs."

Hear more insights on the future of social media from Andrew Lipsman, comScore VP of Marketing and Industry Analysis at www.comscore.com/2012USDigitalFutureInFocus

Perhaps the most closely watched story in the social networking space this year was the June launch of Google+. With only about a half year in existence thus far, Google+ had already reached 20.7 million U.S. visitors in December. Clearly Google's big social play is already making its presence felt among the larger players in the space and will look to jump ahead of Myspace in the coming months. Not far behind Google+ is Tumblr with 18.8 million visitors. After years of slowly but steadily building traction within a core group of followers, 2011 marked a year in which Tumblr's audience moved beyond innovators into the early adopter user set. The service's popular tumblogs, which have become an Internet mainstay for people with specific interests, often feature funny or irreverent content. The critical test for Tumblr will come as it attempts to cross the chasm into the early majority and push its U.S. web penetration beyond 10 percent of the market. Another 2011 upstart worthy of mention is Pinterest, which has amassed an impressive audience of nearly 8 million visitors after barely registering on comScore's radar in the middle of the year. Defying the traditional profile of tech innovators, which tend to be 18-34 year old males living on the coasts, Pinterest has actually gained early traction among young adult and middle-aged women living in central regions of the country.

Where both Pinterest and Tumblr have also excelled is in generating strong visitor engagement. While Facebook exemplifies heavy visitor engagement with an average of 7 hours per visitor each month, Pinterest and Tumblr are the only two other sites that attract at least one hour of engagement per visitor on their primary web-based access points, though it should be noted that other social networks

– such as Twitter and Google+ – may see a significant portion of their users' engagement occur via mobile access, third-party apps and/or distributed content.

Pinterest's early success has the digital world watching intently as new trends in social behavior begin to emerge. While the social networking market has traditionally been characterized by its underlying social graph, in which the connecting nodes are represented by individual users, Pinterest offers a glimpse into the emergence of the interest graph, in which shared interest becomes the primary connecting points. 2012 will be a year in which networking around shared interests takes the main stage as one of the hot topics in the social space.

comSCORE.

18

# Digital Advertising

**An increasing number of large brand advertisers delivered at least 1 billion display ad impressions per quarter in 2011**

The past few years have seen a rapid evolution of the display advertising space with significant advancement in advertising technology, creative units and targeting capabilities, delivering more value for advertisers and publishers alike. As ad targeting improves and display ads reach consumers across the marketing funnel, this segment of the online display ad market is poised for continued growth as a strong second player to search advertising.

## FACEBOOK DELIVERS 1 OF EVERY 4 ONLINE DISPLAY ADS

Among the many beneficiaries of the growth and innovation in display advertising are web publishers. The leading U.S. publisher of display ads in 2011 was Facebook with more than 1.3 trillion impressions (27.9 percent market share), more than double that of #2 publisher Yahoo! Sites at 529 billion impressions. Microsoft Sites followed as the third largest display ad publisher with more than 215 billion impressions, while Google Sites delivered 173.9 billion impressions, the majority of which were seen on YouTube. Advertising on Facebook, which combines many of the attributes of search such as granular targeting, small ad formats and self-purchased ad buys, presents a unique offering for many marketers looking to bridge their search and display advertising.



**Top Ten U.S. Online Display Ad Publishers by Number of Impressions in Millions**

*Source: comScore Ad Metrix, Jan-2011 to Dec-2011, U.S.*

| Publisher | Impressions |
|---|---|
| FACEBOOK.COM | 1,343,170 |
| YAHOO! SITES | 528,993 |
| MICROSOFT SITES | 215,650 |
| GOOGLE SITES | 173,929 |
| AOL, INC. | 131,373 |
| TURNER DIGITAL | 73,588 |
| GLAM MEDIA | 54,810 |
| ESPN | 47,096 |
| VIACOM DIGITAL | 38,532 |
| EBAY | 34,464 |

comSCORE.

Exhibit 6



## Press Release

### U.S. Online Display Advertising Market Delivers 1.1 Trillion Impressions in Q1 2011

*Facebook Now Accounts for Nearly 1 in 3 Online Display Ads in U.S.*

| 437 | 5 | 79 | 16 |
|-----|---|----|----|
| Tweet | | Like | |

**RESTON, VA, May 4, 2011** – comScore, Inc. (NASDAQ: SCOR), a leader in measuring the digital world, today released an overview of the U.S. online display advertising market for Q1 2011 based on data from comScore Ad Metrix, indicating that nearly 1.11 trillion display ads were delivered to U.S. Internet users during the quarter. Facebook accounted for 346 billion impressions, nearly double the number it delivered in Q1 2010, and accounting for nearly one third of all display ad impressions delivered.

"The U.S. online display advertising market maintained its strong momentum from last year with a terrific first quarter," said Jeff Hackett, comScore executive vice president. "We are now seeing more than one trillion display ads delivered every single quarter and nearly 300 individual advertisers spending at least $1 million a quarter on display, numbers which underscore just how large and vibrant the online medium has become. And it's not just about the volume but about the quality of the advertising experience that can be delivered as we see continued investment in compelling, high-quality creative that helps cultivate long-term brand equity."

**Facebook Ranks as Top Display Ad Publisher in Q1 2011**

Popular social networking site Facebook.com led all online publishers in Q1 2011 with 346 billion display ad impressions, representing 31.2 percent market share. Facebook's market share has increased 15 percentage points from 16.2 percent in Q1 2010. Yahoo! Sites ranked second during the most recent quarter with 112 billion impressions (10.1 percent), followed by Microsoft Sites with 54 billion impressions (4.8 percent) and AOL, Inc. with 33 billion impressions (3.0 percent).

| Top 10 U.S. Online Display Ad* Publishers Q1 2011 Total U.S. – Home/Work/University Locations Source: comScore Ad Metrix | | |
|---|---|---|
| | **Total Display Ad Impressions (MM)** | **Share of Display Ad Impressions** |
| *Total Internet : Total Audience* | *1,110,448* | *100.0%* |
| Facebook.com | 346,455 | 31.2% |
| Yahoo! Sites | 112,511 | 10.1% |
| Microsoft Sites | 53,592 | 4.8% |
| AOL, Inc. | 33,454 | 3.0% |
| Google Sites | 27,993 | 2.5% |
| Turner Digital | 18,050 | 1.6% |
| Fox Interactive Media | 11,697 | 1.1% |
| Glam Media | 10,207 | 0.9% |
| CBS Interactive | 9,208 | 0.8% |
| Viacom Digital | 9,051 | 0.8% |

*\*Display ads include static and rich media ads; excludes video ads, house ads and very small ads (< 2,500 pixels in dimension)*

**AT&T Ranks as Top Display Advertiser in Q1 2011**

AT&T ranked as the top online display advertiser in the first quarter with 19.5 billion impressions, accounting for 1.8 percent of display ads. Experian Interactive ranked second with 16.6 billion impressions (1.5 percent), followed by Scottrade ranked third with 11.2 billion (1.0 percent) and Intuit with 11 billion (1.0 percent). Groupon entered the top ten display advertisers at #7 with 7.7 billion impressions (0.7 percent).

| Top 10 U.S. Online Display Advertisers Q1 2011 Total U.S. – Home/Work/University Locations Source: comScore Ad Metrix | | |
|---|---|---|
| | **Total Display Ad Impressions (MM)** | **Share of Display Ad Impressions** |
| *Total Internet* | *1,110,448,112* | *100.0%* |
| AT&T Inc. | 19,467,236 | 1.8% |
| Experian Interactive | 16,635,360 | 1.5% |
| Scottrade, Inc. | 11,225,895 | 1.0% |
| Intuit Inc. | 10,980,711 | 1.0% |
| Verizon Communications Inc. | 9,687,999 | 0.9% |
| Netflix, Inc. | 8,787,348 | 0.8% |
| Groupon | 7,681,414 | 0.7% |
| Toyota Motor Corporation | 7,043,887 | 0.6% |
| Progressive Corporation | 6,773,297 | 0.6% |
| Weight Watchers International, Inc. | 6,425,473 | 0.6% |

Additional findings from Q1 2011 include:

- The top advertisers in Q1 by estimated share of online display ad spending were: AT&T (2.1 percent), Experian (1.9 percent), Scottrade (1.6 percent), Toyota (1.2 percent), and Netflix (1.1 percent). Rounding out the top ten were Intuit, Verizon, Progressive, Sprint Nextel and ING, each with 1.0 percent.
- The top consumer goods advertisers ranked by display ad spending were: Procter & Gamble, Mars, Kellogg's, General Mills and Kraft Foods
- 95 different advertisers delivered at least 1 billion display ad impressions and 293 advertisers spent at least $1 million on display ads during the quarter.

**About comScore**

comScore, Inc. (NASDAQ: SCOR) is a global leader in measuring the digital world and preferred source of digital marketing intelligence. For more information, please visit www.comscore.com/companyinfo.

**Contact:**
Andrew Lipsman
Vice President, Industry Analysis
comScore, Inc.
+1 312 775 6510
press@comscore.com

Follow @comScore   60.6K followers

Forward to a Friend

Exhibit 7



You are here: Home > Press & Events > Press Releases > 2010 > May > Americans Received 1 Trillion Display Ads in Q1 2010 as Online Advertising Market Rebounds from 2009 Recession

## Press Release

**Americans Received 1 Trillion Display Ads in Q1 2010 as Online Advertising Market Rebounds from 2009 Recession**

*Facebook Was Top Display Ad Publisher in Q1, AT&T Ranked as Top Advertiser*

**RESTON, VA, May 13, 2010** – comScore, Inc. (NASDAQ: SCOR), a leader in measuring the digital world, today released an overview of the U.S. online display advertising market for Q1 2010, which showed strong gains following softness for much of 2009. Data from comScore's Ad Metrix services shows that U.S. Internet users received a record 1.1 trillion display ads during the first quarter, marking a 15-percent increase versus one year ago. Total U.S. display ad spending in Q1 reached an estimated $2.7 billion, with the average cost per thousand impressions (CPM) equal to $2.48.

| U.S. Online Display* Advertising Market Overview<br>Q1 2010 vs. Q1 2009<br>Total U.S. – Home/Work/University Locations<br>Source: comScore Ad Metrix | | | |
|---|---|---|---|
| | **Q1 2009** | **Q1 2010** | **Percent Change** |
| Total Display Ad Impressions (MM) | 944,446 | 1,089,732 | 15% |

*"Display ads include static and rich media ads; excludes video ads, house ads and very small ads (< 2,500 pixels in dimension)*

"Following a severe recession that began in late 2008 and continued through the first three quarters of 2009, we've been seeing a strong resurgence in the online display ad market," said Jeff Hackett, comScore senior vice president. "The first quarter of 2010 posted strong volume in online display ads, coinciding with increasing expenditure from advertisers and higher CPMs for publishers. This pickup in activity should bode well for the online advertising industry as we move forward in 2010."

**Facebook Ranks as Top Display Ad Publisher in Q1 2010**

Popular social networking site Facebook.com led all online publishers during Q1 with 176 billion display ad impressions, representing 16.2 percent market share. Yahoo! Sites ranked second with 132 billion impressions (12.1 percent), followed by Microsoft Sites with 60 billion impressions (5.5 percent) and Fox Interactive Media with 53 billion impressions (4.9 percent).

| Top 10 U.S. Online Display Ad* Publishers<br>Q1 2010<br>Total U.S. – Home/Work/University Locations<br>Source: comScore Ad Metrix | | |
|---|---|---|
| | **Total Display Ad Impressions (MM)** | **Share of Display Ad Impressions** |
| *Total Internet* | 1,089,732 | 100.0% |
| Facebook.com | 176,307 | 16.2% |
| Yahoo! Sites | 131,555 | 12.1% |
| Microsoft Sites | 60,187 | 5.5% |
| Fox Interactive Media | 53,823 | 4.9% |
| AOL LLC | 32,100 | 2.9% |
| Google Sites | 25,852 | 2.4% |
| Turner Network | 15,685 | 1.4% |
| Glam Media | 7,819 | 0.7% |
| eBay | 7,483 | 0.7% |
| Tagged.com | 6,804 | 0.6% |

*"Display ads include static and rich media ads; excludes video ads, house ads and very small ads (< 2,500 pixels in dimension)*

**AT&T Ranks as Top Display Advertiser in Q1 2010**

AT&T led competitor Verizon as the top online display advertiser in Q1 with 26.3 billion impressions, accounting for 2.4 percent of display ads. Verizon held the second position with 21.9 billion (2.0 percent), followed by Scottrade Inc. with 16.4 billion (1.5 percent) Experian Interactive with 15.6 billion (1.4 percent) and Sprint Nextel Corporation with 10.1 billion (0.9 percent).

| Top 10 U.S. Online Display Advertisers<br>Q1 2010<br>Total U.S. – Home/Work/University Locations<br>Source: comScore Ad Metrix | | |
|---|---|---|
| | **Total Display Ad Impressions (MM)** | **Share of Display Ad Impressions** |
| *Total Internet* | 1,089,733 | 100.0% |
| AT&T Inc. | 26,342 | 2.4% |
| Verizon Communications Inc. | 21,897 | 2.0% |
| Scottrade, Inc. | 16,406 | 1.5% |
| Experian Interactive | 15,638 | 1.4% |
| Sprint Nextel Corporation | 10,113 | 0.9% |
| Netflix, Inc. | 9,347 | 0.9% |
| eBay Inc. | 9,319 | 0.9% |
| Intuit Inc. | 8,719 | 0.8% |
| Privacy Matters 1-2-3 | 8,579 | 0.8% |
| IAC - InterActiveCorp | 8,202 | 0.8% |

**About comScore**
comScore, Inc. (NASDAQ: SCOR) is a global leader in measuring the digital world and preferred source of digital marketing intelligence. For more information, please visit www.comscore.com/companyinfo.

**Contact:**
Andrew Lipsman
Vice President, Industry Analysis
comScore, Inc.
+1 312 775 6510

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 33

Exhibit 8

facebook DEVELOPERS     Search      Documentation    Support    Blog    Apps        Log In

Getting Started

Core Concepts

Advanced Topics

SDKs & Tools

# Advertising Providers on Facebook Platform

## Ad Providers

In order to better serve your monetization needs while developing your application, below is a list of companies that provide advertising services on Facebook Platform. Advertising Providers displayed on this list have all signed the Platform Terms for Advertising Providers and are bound by all Facebook policies. Developers must only use services from companies that appear on this list. Any other provider is prohibited until they agree to the terms above.

These providers are not approved by nor affiliated with Facebook and, therefore, it is your responsibility as the developer to ensure compliance with Facebook's Advertising Guidelines even though the companies on this list have agreed to the policies as well.

We hope that by providing this list of companies that have acknowledged their commitment to advertising quality that we can all foster a better user experience.

Note: If a company you wish to work with is not on this list please direct them to the terms linked to above.

- 4w Marketplace
- ad:C media
- Ad4Game
- Adap.tv
- Adconion Media Group
- Adfunky
- AdJug
- Adknowledge - (Cubics)
- adnboost
- Admeld
- Adperio
- Adqueo
- ADTELLIGENCE
- Advert Stream - (AdsMarketPlace)
- Advertising.com
- AdWave
- Alfy Video Network
- Appatyze
- Applifier
- APP Prizes
- appssavvy
- BannerConnect
- BrightRoll
- Casale Media
- ClickForce
- CPX Interactive
- Criteo
- deal united
- DSNR Media Group
- DSNR Media Innovations (DMI)
- Ebuzzing
- Evonia (Affiz CPM)
- Fox Networks
- Harren Media
- Httpool
- igapi by Social Game Universe
- Improve Digital
- IndieClick
- Innity
- Intergi
- Jun Group
- La Cash Machine
- Lifestreet Media
- Live Gamer
- MakeMeReach
- Malepar
- MATOMY
- maudau
- Mediastay
- Memoriki
- Meta Network
- mobAVE

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 35

facebook DEVELOPERS                         Documentation    Support    Blog    Apps                    Log In



- One iota
- Open Inventory media
- OpenX
- Playnomics
- Peanut Labs
- Promote Clix
- Publicidad
- PubMatic
- Pulse 360
- RockYou
- Rubicon Project
- Secco Ads
- Selectable Media
- Sharethrough
- smartclip
- Smowtion
- Social Games Ad Network - SGA
- Social Reality
- SociaVibe
- SocialVideoBytes
- Specific Media
- SponsorPay
- SpotXchange
- SupersonicAds
- Trade The Futures (Fantasy Futures)
- TrialPay
- Tube Mogul
- Unified
- Unruly Media
- WildTangent
- XTEND
- Ybrant Digital

Like    Send    497 people like this.                              Report Documentation Bug

Updated about 2 weeks ago

Facebook © 2012 · English (US)                              About    Platform Policies    Privacy Policy

Exhibit 9

Email

[ ] Keep me logged in      **Log In**

## Facebook Advertising Guidelines

Date of Last Revision: August 23, 2011.

### Advertising Philosophy

At Facebook, we believe that ads should contribute to and be consistent with the overall user experience. The best ads are those that are tailored to individuals based on how they and their friends interact and affiliate with the brands, artists, and businesses they care about. These guidelines are not intended to serve as legal advice and adherence to these guidelines does not necessarily constitute legal compliance. Advertisers are responsible for ensuring that their ads comply with all applicable laws, statutes, and regulations.

### Advertising Guidelines

The following guidelines, as well as our Privacy Policy and Statement of Rights and Responsibilities, apply to all ads appearing on Facebook. Advertising appearing within applications on Facebook Platform must comply with all additional Facebook Platform Policies. Ads that contain, facilitate, promote, or reference a promotion, sweepstakes, contest or competition must also comply with the Promotions Guidelines.

We reserve the right to reject, approve or remove any ad for any reason, in our sole discretion, including ads that negatively affect our relationship with our users or that promote content, services, or activities, contrary to our competitive position, interests, or advertising philosophy. These guidelines are subject to change at any time.

**I. Data and Privacy**
- A. Ad creative may not contain user data received or derived from Facebook, even if a user consents to such use.
- B. User data received or derived from Facebook, including information collected from an ad or derived from targeting criteria, may not be used off of Facebook without users' prior express consent (and only to the extent such use isn't otherwise prohibited under applicable policies).
- C. Any permissible data collection or use of user data must be consistent with Facebook's privacy policy and the privacy policy of the landing page and advertised site.

**II. Ad Creative and Positioning**

All components of an ad, including any text, images, or other media, must be relevant and appropriate to the product or service being offered and the audience viewing the ad. Ads may not contain audio or flash animation that plays automatically without a user's interaction. Ads may not position products or services in a sexually suggestive manner. Ads may not contain content that exploits political agendas or "hot button" issues for commercial use. Additionally, ad text must include proper grammar and the use of all symbols, numbers, or letters must adhere to the true meaning of the symbol.
- A. **Accuracy**
  Ads must clearly represent the company, product, service, or brand that is being advertised and must not contain false, misleading, fraudulent, or deceptive claims or suggest false relevancy to generic offers. Products and services promoted in the ad copy must be clearly represented on the landing page, and the destination site may not offer or link to any prohibited product or service.
- B. **Attribution**
  Ad text may not assert or imply, directly or indirectly, within the ad content or by targeting, a user's personal characteristics within the following categories:
    - i. race or ethnic origin;
    - ii. religion or philosophical belief;
    - iii. age;
    - iv. sexual orientation or sexual life;
    - v. gender identity;
    - vi. disability or medical condition (including physical or mental health);
    - vii. financial status or information;
    - viii. membership in a trade union; and
    - ix. criminal record.
- C. **Destination Sites**
  Ads must lead to a functioning landing page that does not interfere with a user's ability to navigate away from the page.
- D. **Targeting**
  Ads must always apply appropriate targeting and never use targeting criteria to provoke users. Ads for regulated goods and services (e.g. alcohol and gambling), must abide by all applicable laws, regulations, and industry codes. Specific requirements for dating services, alcohol, gambling, contraceptives and subscription services must adhere to the requirements listed in the Help Center under the applicable content sections.

**III. Ad Content**

Advertisers must ensure that their ads comply with all applicable laws, regulations and guidelines. All claims in ads must be adequately substantiated. Ads must not offend users. Ads and any offers promoted within ads must not be false, deceptive or misleading or contain spam. Ads must not contain or promote illegal products or services. Ads must not violate the rights of any third parties. The following specific content guidelines apply:
- A. **Adult Products**
  Ads may not promote the sale or use of adult products or services, including but not limited to toys, videos, publications, live shows, or sexual enhancement products. Ads for family planning and contraception are allowed provided they follow the appropriate targeting requirements.
- B. **Alcohol**
    - i. Ads that promote or reference alcohol are prohibited in the following countries: Afghanistan, Brunei, Bangladesh, Egypt, Gambia, Kuwait, Libya, Norway, Pakistan, Saudi Arabia, United Arab Emirates, Yemen and any other jurisdiction where such ads are prohibited by law.
    - ii. Where permissible, ads that promote or reference alcohol must: (i) Comply with all applicable local laws, required or recommended industry codes, guidelines, licenses and approvals and (ii) apply age and country targeting criteria consistent with Facebook's targeting guidelines and applicable local laws. Where a user's age or country cannot be determined, the ad must not be displayed to the user.
    - iii. Please refer to the Help Center for specific guidance for alcohol-related ad content.
- C. **Dating**
  Ads for adult friend finders or dating sites with a sexual emphasis are not permitted. Ads for other online dating services must adhere to the dating targeting requirements and the name of the product or service must be included in the ad text or image.
- D. **Drugs and Tobacco**
  Ads may not promote or facilitate the sale or consumption of illegal or recreational drugs, tobacco products, or drug or tobacco paraphernalia.
- E. **Gambling and Lotteries**
    - i. Ads that promote or facilitate online gambling, games of skill or lotteries, including online casino, sports books, bingo or poker, are only allowed in specific countries with prior authorization from Facebook.
    - ii. Lottery operations licensed or sponsored by government entities may advertise on Facebook: provided that ads must be targeted in accordance with applicable law in the jurisdiction in which the ads will be served and may only target users in the jurisdiction in which the lottery is available.
    - iii. Ads that promote offline gambling establishments, such as offline casinos, in accordance with applicable laws and regulations, are generally permitted, provided that ads must be appropriately targeted.
- F. **Pharmaceuticals and Supplements**
    - i. Ads must not promote the sale of prescription pharmaceuticals. Ads for online pharmacies are prohibited except that ads for certified pharmacies may be permitted with prior approval from Facebook.
    - ii. Ads that promote dietary and herbal supplements are generally permitted, provided they do not promote products containing anabolic steroids, chitosan, comfrey, dehydroepiandrosterone, ephedra, human growth hormones, melatonin, and any additional products deemed unsafe or questionable by Facebook in its sole discretion.
- G. **Software**
  Ads may not contain or link directly or indirectly to a site that contains spyware/malware downloads or any software that results in an unexpected, deceptive or unfair user experience, including but not limited to software which:
    - i. "sneaks" onto a user's system;
    - ii. performs activities hidden to the user;
    - iii. may alter, harm, disable or replace any hardware or software installed on a user's computer without express permission from the user;
    - iv. is bundled as a hidden component of other software whether free or for an additional fee;
    - v. automatically downloads without Facebook's express prior approval;
    - vi. presents download dialog boxes without a user's action; or
    - vii. may violate or infringe upon the intellectual property rights of any third party, including copyright, trademark, patent or any other proprietary right.
- H. **Subscription Services**
  Ads for subscription services, or that promote products or services that include negative options, automatic renewal, free-to-pay conversion billing products, or mobile marketing are subject to the following requirements:

      i. Ad text must clearly and conspicuously disclose the recurring billing component (e.g. "subscription required").

      ii. The landing page must:

        a. display the price and billing interval wherever the user is prompted to enter personally identifiable information;

        b. include an unchecked opt-in checkbox; and

        c. include language informing users how to cancel their subscription or membership.

      iii. Each of the foregoing must be located in a prominent place on your landing page, as determined by Facebook in its sole discretion, and should be easy to find, read, and understand.

I. **Unacceptable Business Model**

    Ads may not promote a business model or practice that is deemed by Facebook in its sole discretion to be unacceptable or contrary to Facebook's overall advertising philosophy or to any applicable law, including but not limited to multi-level marketing schemes, or advertisements for scams.

J. **Weapons and Explosives**

    Ads may not promote the sale or use of weapons, ammunition, or explosives.

**IV. Community Standards**

    Ads, or categories of ads, that receive a significant amount of negative user feedback, or are otherwise deemed to violate our community standards, are prohibited and may be removed. In all cases, Facebook reserves the right in its sole discretion to determine whether particular content is in violation of our community standards.

A. **Illegal Activity**

    Ads may not constitute, facilitate or promote illegal activity.

B. **Harassment**

    Ads may not insult, attack, harass, bully, threaten, demean or impersonate others.

C. **Hate Speech**

    Ads may not contain "hate speech," whether directed at an individual or a group, based on membership within certain categories. These categories include, but are not limited to, race, sex, creed, national origin, religious affiliation, marital status, sexual orientation, gender identity, or language.

D. **Minors**

    Ads that are targeted to minors may not promote products or services that are illegal for use by minors in their jurisdiction, or that are deemed to be unsafe or inappropriate.

E. **Sex/Nudity**

    Ads may not contain adult content, including nudity, depictions of people in explicit or suggestive positions, or activities that are overly suggestive or sexually provocative.

F. **Shock Value**

    Ads may not be shocking, sensational or disrespectful, or portray excessive violence.

**V. Facebook References**

    Ads may not imply a Facebook endorsement or partnership of any kind. Ads linking to Facebook branded content (including Pages, groups, events, or Connect sites) may make limited reference to "Facebook" in ad text for the purpose of clarifying the destination of the ad. All other ads and landing pages may not use our copyrights or trademarks (including Facebook, the Facebook and F Logos, FB, Face, Poke, Book, and Wall) or any confusingly similar marks, except as expressly permitted by our Brand Usage Guidelines or with our prior written permission.

**VI. Rights of Others**

    Ads may not include content that infringes upon or violates the rights of any third party, including copyright, trademark, privacy, publicity, or other personal or proprietary rights.

---

Facebook © 2012 · English (US)        Mobile · Find Friends · Badges · People · Pages · About · Advertising · Create a Page · Developers · Careers · Privacy · Terms · Help

**EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 39**

Exhibit 10



Exhibit 11

On Thu, Jul 16, 2009 at 12:19 PM, Facebook Platform Policy Team <platform-policy+d00cowx@facebook.com> wrote:

Hi Arie,

Thanks for the quick reply. Glad to hear that you were able to quickly address the overlapping content issue.

I apologize for any confusion about next steps here. Like I mentioned, it's great that you and your team are trying to bring users a unique Facebook experience. Unfortunately, though, ultimately what you are trying to do (layer ads and skins over Facebook pages) is not permitted by our Platform policies. What this means is that we will need you to discontinue using Platform to provide this service.

We are not asking you to stop delivering this service via the plugin, but please entirely take down the Platform application (ID #25103566490) by 6 pm Pacific Time today (July 16, 2009). Again, I realize that many users have authorized the application, so please also feel free to adequately message your users within policy on how to continue using the plugin before taking down the application.

As I mentioned in my email yesterday, due to the severity of this issue, if you're unable to remove the application by 6 pm today, please be aware that we may be forced to remove it from the site in your stead.

Thanks,

Melissa
Platform Developer Operations & Support
Facebook

Exhibit 12

---------- Forwarded message ----------
From: **Arie Trouw** <arie@yontoo.com>
Date: Sat, Jul 18, 2009 at 10:00 AM
Subject: Re: PageRage Super Profile
To: Facebook Platform Policy Team <platform-policy+d00cowx@facebook.com>


Melissa,

I was referring to the App Box that a user could add to their profile from the PR App which showed their current selection.  They were still showing up after the app was gone.  I will ask my QA team on Monday to send me a screen shot if they still see it.

Thanks,

-Arie


On Fri, Jul 17, 2009 at 5:18 PM, Facebook Platform Policy Team <platform-policy+d00cowx@facebook.com> wrote:
> Hi Arie,
>
> Thanks for the reply, and for confirming that the user data issue isn't actually an issue. I'm sorry for the delay in replying to you. I'm not actually sure what you're referring to with respect to the Boxes - can you clarify and perhaps send some screenshots over?
>
> Thanks,
>
> Melissa
> Platform Developer Operations & Support
> Facebook

-----Original Message to Facebook-----
From: Arie Trouw (arie@yontoo.com)
To: Facebook Platform Policy Team (platform-policy+d00cowx@facebook.com)
Subject: Re: PageRage Super Profile

Melissa,
We do not store user data retrieved from the Platform API, so there is nothing to delete.  I did notice that the App Boxes from our app still shows on people's layouts, even without the app.  Please remove those, since they are now out of sync with the user's layout that they have selected.

As for it not "ending up as I would have liked it", I am only disappointed on what I feel is short sighted decision making on Facebook's behalf.  Taking away the cleanest tool to be able to validate Facebook user's identities just opens security holes, which we don't want either.

I am glad that you appreciate our cooperation.  I wish we could say the same.

-Arie

On Thu, Jul 16, 2009 at 7:36 PM, Facebook Platform Policy Team < platform-policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> wrote:

> Hi Arie,
>
> I appreciate you letting me know. Thanks for your continued cooperation
> throughout this process. I know that this probably didn't end up how you
> would've liked it to, so we really appreciate your understanding - you've
> been great to work with.
>
> Please let me know when you're able to delete the user data that you
> received from Facebook.
>
> Thanks,
>
> Melissa
> Platform Developer Operations & Support
> Facebook
>
>
>
> -----Original Message to Facebook-----
> From: Arie Trouw (arie@yontoo.com)
> To: Facebook Platform Policy Team (platform-policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> )
> Subject: Re: PageRage Super Profile
>

> Melissa,
> I went ahead and deleted the application and all of our functionality is
> now
> available from our main site.
>
> -Arie
>
> On Thu, Jul 16, 2009 at 4:47 PM, Facebook Platform Policy Team <
> platform-policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> <platform-policy%2Bd00cowx@facebook.com<platform-policy%252Bd00cowx@facebook.com>
> >
> > wrote:
>
> > Hi Arie,
> >
> > Thanks for the replies. I know that this must be disappointing, so I just
> > want you to know that I really appreciate your understanding on all of
> this.
> >
> > As far as the procedure for removing the application goes, please use the
> > "Delete Application" link in the Developer application. Also, please be
> sure
> > to delete all data you received from Facebook as soon as possible after
> > deleting the application. People's bookmarks and links will take them to
> a
> > page that lets them know that the page they were requesting wasn't found.
> >
> > I do remember our previous correspondence on soliciting usernames and
> > passwords, and I appreciate you acting so quickly to make those changes.
> As
> > you no doubt know, you obviously would not be permitted to request
> usernames
> > and passwords on your site even outside of a Platform context, since this
> is
> > prohibited by our Statement of Rights and Responsibilities. With respect
> to
> > potential ways to change your implementation to function without
> Platform,
> > you might consider storing user customized settings locally on a user's
> > computer/browser or using cookies, machine cookies, and IP addresses
> > creatively to manage these settings.
> >
> > I hope this is helpful. Please let me know when you have deleted the
> > application (and the related user data).
> >
> > Thanks again for your understanding,
> >
> > Melissa
> > Platform Developer Operations & Support
> > Facebook
> >

> >
> >
> > -----Original Message to Facebook-----
> > From: Arie Trouw (arie@yontoo.com)
> > To: Facebook Platform Policy Team (platform-
policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> <platform-policy%2Bd00cowx@facebook.com<platform-
policy%252Bd00cowx@facebook.com>
> >
> > )
> > Subject: Re: PageRage Super Profile
> >
> > Melissa,
> > On another note, I was hoping you could provide some guidance on how we
> > should go about validating that we are applying the correct layout to the
> > correct user.  This was the primary reason we used a Facebook application
> > as
> > our configuration tool, so that people could not change other user's
> > layouts
> > and we did not have to request usernames and passwords from people to
> > validate them.  If you recall from our previous communication, we used to
> > request un/pw on our site to select layouts, which Facebook asked us to
> > stop
> > doing and which we then did, since we could use the Facebook application
> > for
> > this functionality.  Is there another way that we should be validating a
> > user's identity?
> >
> > Again, we are just trying to provide as enjoyable and safe an environment
> > for our users as possible and would appreciate some guidance on this
> issue.
> >  Also, we would prefer an on going relationship with Facebook to deal
> with
> > issues such as this.
> >
> > Thanks,
> >
> > -Arie
> >
> > On Thu, Jul 16, 2009 at 2:34 PM, Arie Trouw <arie@yontoo.com> wrote:
> >
> > > Melissa,
> > > I will disable the app this evening as you requested.  I do find it
> > > unfortunate that we have not found a away to cooperate better to allow
> > for a
> > > better and more secure experience for our and your users.
> > >
> > > As for the procedure, what exactly do you want me to disable?  The
> > setting
> > > in the Dev console?  Also, what will happen to people's bookmarks they
> > have
> > > set or links that point to apps.facebook.com/pagerage?
> > >

> > > Thanks,
> > >
> > > -Arie
> > >
> > > On Thu, Jul 16, 2009 at 1:54 PM, Facebook Platform Policy Team <
> > > platform-policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> <platform-policy%2Bd00cowx@facebook.com<platform-policy%252Bd00cowx@facebook.com>
> >
> > <platform-policy%2Bd00cowx@facebook.com<platform-policy%252Bd00cowx@facebook.com>
> <platform-policy%252Bd00cowx@facebook.com<platform-policy%25252Bd00cowx@facebook.com>
> >
> > >
> > > > wrote:
> > >
> > >> Hi Arie,
> > >>
> > >> No problem. I appreciate your quick reply. Unfortunately the
> application
> > >> will need to be removed. I recognize that there might be user
> confusion
> > >> surrounding the change when the application disappears, which is why
> you
> > >> should effectively message your users beforehand (for example, via
> > >> app-to-user notification or email) describing the change and directing
> > them
> > >> to the support system and how they should reach you afterwards.
> > >>
> > >> After the application comes down, it also seems like a good idea to
> > >> deliver the message and link you proposed to your users via the
> plugin.
> > >>
> > >> If you'd like any guidance on the messaging, please don't hesitate to
> > send
> > >> your plans over and we'd be happy to review them.
> > >>
> > >> Please be aware that the application needs to be removed from the site
> > at
> > >> 6 pm Pacific Time today, regardless of whether you've messaged your
> > users or
> > >> not. Please take the steps necessary to ease this transition for your
> > users
> > >> before this time.
> > >>
> > >> Thanks,
> > >>
> > >> Melissa
> > >> Platform Developer Operations & Support
> > >> Facebook
> > >>

> > >>
> > >>
> > >> -----Original Message to Facebook-----
> > >> From: Arie Trouw (arie@yontoo.com)
> > >> To: Facebook Platform Policy Team (
> platform-policy+d00cowx@facebook.com<platform-policy%2Bd00cowx@facebook.com>
> <platform-policy%2Bd00cowx@facebook.com<platform-policy%252Bd00cowx@facebook.com>
> >
> > <platform-policy%2Bd00cowx@facebook.com<platform-policy%252Bd00cowx@facebook.com>
> <platform-policy%252Bd00cowx@facebook.com<platform-policy%25252Bd00cowx@facebook.com>
> >
> > >
> > >> )
> > >> Subject: Re: PageRage Super Profile
> > >>
> > >> Melissa,
> > >> Thank you for the clarification.  I think my main question is what you
> > >> would
> > >> like us to do with the application.  I will be happy to remove the
> > content
> > >> from there which allows the user to control their layouts, but would
> > like
> > >> to
> > >> post content there that informs the users of the situation and that
> > they
> > >> should contact us directly if they have any support needs regarding
> > the
> > >> issue.  I am concerned that if the app just disappears at 6 tonight,
> > then
> > >> all the users will be forced to contact Facebook's support team in any
> > >> case
> > >> where they require support.  I think that would be bad for the users,
> > your
> > >> support team, and us.
> > >>
> > >> What I suggest is that we change the app's canvas page to just be a
> > >> message
> > >> and link to our support system and leave that active for the time
> > being
> > to
> > >> allow users to find it.  If that is fine with Facebook, then I can
> > have
> > >> that
> > >> changed this afternoon and you can review the content before 6pm.
> > >>
> > >> What are your thoughts on this?
> > >>
> > >> Again, I am just trying to figure out how to most smoothly make the
> > >> transition for everyone involved.

> > >>
> > >> Thanks again,
> > >>
> > >> -Arie
> > >>
> > >> On Thu, Jul 16, 2009 at 12:19 PM, Facebook Platform Policy Team <
> > >> platform-policy+d00cowx@facebook.com <platform-policy%2Bd00cowx@facebook.com>
> <platform-policy%2Bd00cowx@facebook.com <platform-policy%252Bd00cowx@facebook.com>
> >
> > <platform-policy%2Bd00cowx@facebook.com <platform-policy%252Bd00cowx@facebook.com>
> <platform-policy%252Bd00cowx@facebook.com <platform-policy%25252Bd00cowx@facebook.com>
> >
> > >
> > >> <platform-policy%2Bd00cowx@facebook.com <platform-policy%252Bd00cowx@facebook.com>
> <platform-policy%252Bd00cowx@facebook.com <platform-policy%25252Bd00cowx@facebook.com>
> >
> > <platform-policy%252Bd00cowx@facebook.com <platform-policy%25252Bd00cowx@facebook.com>
> <platform-policy%25252Bd00cowx@facebook.com <platform-policy%2525252Bd00cowx@facebook.com>
> >
> > >
> > >> >
> > >> > wrote:
> > >>
> > >> > Hi Arie,
> > >> >
> > >> > Thanks for the quick reply. Glad to hear that you were able to
> quickly
> > >> > address the overlapping content issue.
> > >> >
> > >> > I apologize for any confusion about next steps here. Like I
>

The rest of this message was truncated for length.
-----End Original Message to Facebook-----


--
Arie Trouw
arie@yontoo.com
Yontoo Technology, Inc.
760-266-5094

--
Arie Trouw
arie@yontoo.com
Yontoo Technology, Inc.
760-266-5094


--
Arie Trouw
CEO | Sambreel
5857 Owens Avenue
Suite 300
Carlsbad CA 92008
t: 760.266.5094
c.760-994-9537
e. arie@sambreel.com

Exhibit 13



Joseph P. Cutler
PHONE:  (206) 359-6104
FAX:     (206) 359-7104
EMAIL:  JCutler@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

October 20, 2010

**VIA E-MAIL**

Yontoo Technology, Inc.
PageRage
arie.trouw@gmail.com
arie@hekko.com

Dear Mr. Trouw:

We represent Facebook Inc., based in Palo Alto, California.  It has come to our attention that you have developed and are marketing technology that is designed to violate Facebook's Statement of Rights and Responsibilities ("Statement").  Specifically, your Yontoo Layers Technology is used to impose browser-based themes on Facebook Profiles and Pages that interfere with the proper rendering of Facebook pages by both obscuring parts of Facebook webpages, and by presenting unauthorized advertisements on Facebook Pages and Profiles.  These activities violate Facebook's Statement, which specifically prohibits:

- Doing anything that impairs the proper functioning of Facebook;

- Facilitating or encouraging violations of Facebook's Statement by others;

- Emulating Facebook site features; and

- Displaying misleading or unauthorized advertisements to Facebook users.

*See* http://www.facebook.com/terms.php; http://www.facebook.com/ad_guidelines.php.

Facebook takes the protection and proper working of its network very seriously and is committed to keeping Facebook a safe place for users to interact and share information.  Facebook developed its Statement to protect its users and to facilitate these goals.

In addition to breaching Facebook's Statement, your development and promotion of this Google Extension may violate a number of laws, including the Computer Fraud and Abuse Act, 18

LEGAL19437820.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DALLAS
DENVER · LOS ANGELES · MADISON · MENLO PARK · PHOENIX · PORTLAND
SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP

PageRage and Yontoo
October 20, 2010
Page 2

U.S.C. § 1030; the California Comprehensive Computer Data Access and Fraud Act, CA Penal Code § 502(c); as well as state law prohibiting interference with Facebook's business expectations and interests.

Please respond to me in writing no later than **Friday, October 22, 2010**, confirming in writing that you will:

1.   Immediately cease offering for download any and all Facebook themes or other technologies that are designed to interact with or overlay websites owned or operated by Facebook, including but not limited to the Facebook themes offered at http://www.pagerage.com and/or other sites that utilize the Yontoo Layers technology;

2.   Immediately stop and refrain from developing, promoting, selling, offering and/or using applications that interact with or overlay websites owned or operated by Facebook;

3.   Immediately remove references to Facebook from the http://www.pagerage.com and/or http://www.yontoo.com websites and other promotional material; and

4.   Strictly comply with Facebook's Statement.

Should you choose to ignore this letter and continue your current improper conduct, Facebook is continuing to evaluate its options and reserves the right to take whatever measures it believes are necessary to enforce its rights, maintain the quality of its site, and protect its users' privacy and information.

PageRage and Yontoo
October 20, 2010
Page 3


This letter is not intended by us, and should not be construed by you, as a waiver or relinquishment of any of our client's rights or remedies in this matter.  Our client specifically reserves all such rights and remedies whether at law or in equity, under applicable domestic and foreign laws.

Very truly yours,


Joseph P. Cutler

Exhibit 14



**DLA PIPER** LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2214
www.dlapiper.com

Mark F. Radcliffe
mark.radcliffe@dlapiper.com
**T** 650.833.2266
**F** 650.687.1222

November 11, 2010
*VIA EMAIL AND US MAIL*

Joseph Cutler, Esq.
Perkins Coie
1201 Third Avenue, Suite 4800
Seattle, WA  98101

**Re:**     **Response to your Letter dated October 20, 2010**

Dear Mr. Cutler:

We have received and reviewed the claims in your letter dated October 20, 2010. We are surprised by the claims in your letter.  You may not be aware that Facebook, Inc. and Yontoo Technology, Inc. discussed these issues several times last year. Yontoo responded very quickly to Facebook's requests and completely changed the manner in which they do business.  Yontoo removed the PageRage Super Profile application from the Facebook Application Platform and continued to provide the PageRage service via the browser plug-in. This approach was expressly approved by your Platform Policy Team in an email dated July 16, 2009 (see attached).

Any attempt by Facebook to change that approval after more than a year would violate Yontoo's reasonable expectations and result in significant damages to Yontoo. Furthermore, as there is no contractual relationship between Yontoo and Facebook, Yontoo is not subject to Facebook's Statement of Rights and Responsibilities.

We also do not understand your suggestion that the PageRage product violates the Computer Fraud and Abuse Act and the other statutes that you cited. We are not aware of any case law that prohibits consumers from rendering their own content in a manner they choose.

We believe that the most effective approach would be to discuss these matters and I will have my assistant set up a call.

Very truly yours,

**DLA Piper LLP (US)**

Mark F. Radcliffe
Partner

Admitted to practice in California

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 58



Joseph Cutler, Esq.
November 11, 2010
Page Two

**EXHIBIT A**

On Thu, Jul 16, 2009 at 12:19 PM, Facebook Platform Policy Team <platform-policy+d00cowx@facebook.com> wrote:

Hi Arie,

Thanks for the quick reply. Glad to hear that you were able to quickly address the overlapping content issue.

I apologize for any confusion about next steps here. Like I mentioned, it's great that you and your team are trying to bring users a unique Facebook experience. Unfortunately, though, ultimately what you are trying to do (layer ads and skins over Facebook pages) is not permitted by our Platform policies. What this means is that we will need you to discontinue using Platform to provide this service.

We are not asking you to stop delivering this service via the plugin, but please entirely take down the Platform application (ID #25103566490) by 6 pm Pacific Time today (July 16, 2009). Again, I realize that many users have authorized the application, so please also feel free to adequately message your users within policy on how to continue using the plugin before taking down the application.

As I mentioned in my email yesterday, due to the severity of this issue, if you're unable to remove the application by 6 pm today, please be aware that we may be forced to remove it from the site in your stead.

Thanks,

Melissa
Platform Developer Operations & Support
Facebook

Exhibit 15



1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

Joseph P. Cutler
PHONE:   (206) 359-6104
FAX:      (206) 359-7104
EMAIL:   JCutler@perkinscoie.com

January 24, 2011

**VIA E-MAIL AND U.S. MAIL**

Mark F. Radcliffe, Esq.
DLA Piper
2000 University Avenue
East Palo Alto, CA 94303-2214

mark.radclifffe@dlapiper.com

Dear Mr. Radcliffe:

This letter responds to your letter dated January 10, 2011 concerning Yontoo's insertion of advertisements during the display of Facebook pages to users who have downloaded Yontoo products.

Your response is insufficient.  Yontoo's products continue to (1) cause confusion among Facebook users, (2) disrupt the display of Facebook content to its users, and (3) interfere with Facebook's relationships commercial relationships.  Facebook has reviewed Yontoo's proposed solutions and does not agree that they will remedy the problems identified by our letter and subsequent conversations.  Yontoo's refusal to use the Facebook Platform in compliance with Platform Policies – and its decision instead to inject itself between Facebook and its users – is confusing Facebook's users, disrupting the proper rendering of Facebook, and interfering with Facebook's relationships with its users.

Facebook provides developers with Connect for the very purpose of allowing developers to innovate and add functionality that they believe will be attractive to Facebook users.  In contrast, the current and proposed Yontoo implementation free-rides on Facebook's goodwill and infrastructure, and, at the same time, confuses users.  The increased customer support required to address complaints about Yontoo's products has and will continue to injure Facebook, interfere with its commercial relationships, and tarnish its brand.

LEGAL20025594.2

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DALLAS
DENVER · LOS ANGELES · MADISON · MENLO PARK · PHOENIX · PORTLAND
SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 61

January 24, 2011
Page 2

We see no legitimate reason why Yontoo cannot pursue the addition of content, framing, and additional advertising using the solution made available by Facebook to developers who wish to integrate with Facebook.

**Unless and until Yontoo decides to pursue a Connect-compliant implementation, Facebook will continue to take steps to limit the confusion and damage caused by Yontoo's products and services.**

We are also repeating Facebook's demand that Yontoo remove any and all references to Facebook on Yontoo's site(s), advertising materials, or promotional materials, from which an inference of affiliation to, sponsorship, endorsement or authorization by Facebook may be made. Yontoo's products and services are unauthorized and are not approved by Facebook. The continued advertisement of these services using the Facebook marks infringes upon Facebook's rights and is causing confusion.

To be clear, Facebook wants to see its developers and Platform flourish and genuinely hopes that Yontoo will choose to pursue its business in a manner that does not confuse Facebook users, interfere with Facebook's relationships, or otherwise disrupt or burden its business.

We do not intend this letter as a relinquishment or waiver of any of our client's rights, and you should not construe it as a relinquishment or waiver of those rights. Our client specifically reserves all rights and remedies at law or equity.

Very truly yours,

Joseph P. Cutler

Exhibit 16



DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, California 94303-2214
www.dlapiper.com

Mark F. Radcliffe
mark.radcliffe@dlapiper.com
T 650.833.2266
F 650.687.1222

March 23, 2011

*VIA EMAIL AND US MAIL*

Joseph Cutler, Esq.
Perkins Coie
1201 Third Avenue, Suite 4800
Seattle, WA 98101

**Re:    Response to January 24, 2011 letter**

Dear Mr. Cutler:

This letter is a response to your letter dated January 24, 2011. While our client is not contractually bound to Facebook, they are interested in a positive and cooperative relationship with your client.

Recently, our client has made some changes in its PageRage product; this letter serves as notice of those changes:

1.  Theme Your World LLC, the owner of PageRage, has required its advertising providers to include an "About this ad" link on every ad PageRage publishes. Here is an example of the destination of one of those links: http://www.actaads.com/atapr.html.

2.  In addition to clarifying to users that our ads do not come from Facebook, the link referred to in point 1, above, is another way for PageRage users to find out more about how PageRage works and to disable it via a link on the page (http://www.pagerage.com/disable/). (Note: disable instructions have been available to users at PageRage.com since product launch.)

3.  The PageRage installer now contains additional disclosure to users that they may see additional advertisements placed by PageRage while browsing Facebook and that these advertisements are not the responsibility of Facebook. See screenshot attached hereto as Exhibit 1.

4.  PageRage layouts have been modified so that they do not interfere with the appearance of content that has a transparent background.  We no longer offer in our gallery, nor do we permit user generated versions of, layouts that obscure Facebook ads or other content on Facebook pages.

In addition, we want to assure Facebook that the PageRage website does not confuse users and that the site specifically notes that "PageRage is not affiliated with or endorsed by Facebook." The usage of Facebook's name complies with applicable law as well as Facebook's Usage Guidelines on referencing Facebook.



Joseph Cutler, Esq
March 23, 2011
Page Two

We request that Facebook modify its list of whitelisted properties so that links to the PageRage.com domain may be mentioned by users on Facebook in status updates, comments and any other such method that users may provide content or commentary on Facebook's systems, and so that the PageRage.com domain can provide links to and/or otherwise direct traffic from PageRage and related products to all Facebook sites.

Should Facebook receive any complaints or other communications regarding PageRage, we request that it forward any such complaints or communications to usersupport@pagerage.com.  Facebook personnel should also feel free to contact Nick Urbani, CEO of Theme Your World LLC at 877-306-1803 or nick@pagerage.com information to discuss any other pertinent matters.

Again, we want to reiterate our client's desire to pursue a positive and cooperative relationship with Facebook.

Very truly yours,

**DLA Piper LLP (US)**

Mark F. Radcliffe

Partner

Admitted to practice in California



Joseph Cutler, Esq
March 23, 2011
Page Three

**EXHIBIT 1**



Exhibit 17

```
---------- Forwarded message ----------
From: Joe Prusz <jprusz@rubiconproject.com>
Date: 2011/8/17
Subject: FW: Notice re: Facebook Platform Terms for Advertising Providers
To: Brad Miller <brad.miller@sambreel.com>, Kai Hankinson <kai@yontoo.com>
```

Hey Brad and Kai,

As requested, here's the Facebook email we got on Monday (I thought it was Tuesday).

Thanks,
Joe

```
From: Sandy Parakilas [mailto:sparakilas@fb.com]
Sent: Monday, August 15, 2011 2:22 PM
To: Victor Papke
Subject: Notice re: Facebook Platform Terms for Advertising Providers
```

(As discussed on our call earlier today)

Dear Victor,

Thank you for your time today.  As discussed, kindly review Facebook's Platform Terms for Advertising Providers ('Terms') paying particular attention to section 2, which incorporates the Statement of Rights and Responsibilities, Facebook Platform Policies and Advertising Guidelines.

As also discussed, the only authorized means for serving advertising to Facebook users on facebook.com is via Facebook's advertising tools and/o developers' applications.  This ensures compliance with the Advertising Guidelines, which are in place to protect users, advertisers and the site.  Ad injection methods are unauthorized and violate the Statement of Rights and Responsibilities and Advertising Guidelines. Moreover, among other things, malicious adware programs are a source of user confusion, interfere with Facebook¹s agreements and relationships, disrupt the Facebook user experience, unfairly trade on and dilute Facebook¹s marks, introduce security vulnerabilities, and circumvent the Advertising Guidelines.


Your servicing of this traffic is inconsistent with your status as a Platform Advertising Provider.  To maintain that status, we look forward to your compliance on or before September 1, 2011.


Thank you and please let me know if you have any questions or concerns.


Sincerely,


Sandy Parakilas


facebook
Sandy Parakilas

Platform Operations Manager

1050 Page Mill Rd. | Building 1 | Palo Alto, CA | 94304

sparakilas@fb.com

# Exhibit 18



**Andrew Sullivan <andy.sullivan@jeetyetmedia.com>**

# Facebook Compliance

**Todd Rosenberg <todd.rosenberg@openx.com>**                    **Wed, Nov 23, 2011 at 10:24 AM**
To: Andrew Sullivan <andy.sullivan@jeetyetmedia.com>

Dear Andy,

We've been notified by Facebook that OpenX Market supply is appearing in applications that violate
the Facebook Platform Terms for Advertising Providers.  Implementations that violate third party terms are also a
violation of OpenX's terms for supply partners.  In the interest of good partnership, we can allow a wind-down
period ending November 30 - any apps that violate the Facebook terms must stop participating in the OpenX
Market by this date.

OpenX reserves all of its rights under our agreement, but we hope that the wind-down period makes it easier to
come into compliance.

Thank you for your understanding and compliance.
Todd

--


**Todd Rosenberg**  Senior Director, Publisher Development

(626) 466-1141 x6047  Fax (626) 204-0815

www.openx.com   |   follow us on:   Twitter  Facebook  LinkedIn

# Exhibit 19

**From:** Reed Pridy [mailto:reed.pridy@neverblue.com]
**Sent:** Monday, August 29, 2011 3:55 PM
**To:** Jen.Morris; Brianne Mactier
**Cc:** Marko Nikolic
**Subject:** RE: Follow up from Friday conversation

Jen,

To summarize our call, we've made the decision to discontinue the Page Rage advertising campaigns on our network because we have reason to believe that these campaigns are adversely affecting our ability, and the ability of our publishers, to advertise campaigns from our other clients on Facebook.com.

If you have any additional questions please give me a call at (250) 386-5323 x.212 and I'll be happy to discuss

Cheers,
-Reed

---

**From:** Jen.Morris [mailto:Jen.Morris@eboostconsulting.com]
**Sent:** August 29, 2011 10:02 AM
**To:** Brianne Mactier; Reed Pridy
**Cc:** Marko Nikolic; to (kai.hankinson@sambreel.com)
**Subject:** Follow up from Friday conversation

Brianne and Reed,

I didn't see a summary of our call in a follow up email last week and wanted to make sure I didn't miss it. I believe Brianne said you would send this over, Reed. I didn't have a pen handy at the time and do not want to misrepresent any element of our conversation. If you can send a summary over that would be great.

All the best,
Jen



Fastest  (p) 619.567.3502
         (c)  214-244-3399  *Do not hesitate to call my cell as I am often available only on my cell.
         (Yahoo)  sirromnej

|        | (GTalk)  jen.morris.eboost |
|--------|----------------------------|
| Faster | jen.morris@eboostconsulting.com |
| Fast   | (f)  619.374.1998 |
| Now    | http://www.eboostconsulting.com |
|        | http://www.linkedin.com/in/jennifermmorris |

This message is intended for the individual/entity to whom it is addressed only and is the property, in its entirety and including any attachments, of eBoost Marketing. If you are not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any copying, dissemination or distribution of this message is prohibited by law. Please notify the author immediately and then delete the original message. Thank you for your understanding and cooperation.

---

This electronic mail transmission and any accompanying attachments contain confidential information intended only for the use of the individual or entity named above. Any dissemination, distribution, copying or action taken in reliance on the contents of this communication by anyone other than the intended recipient is strictly prohibited. If you have received this communication in error please immediately delete the e-mail and either notify the sender at the above e-mail address or by telephone at +1 250.386.5323.

# Exhibit 20



Joseph P. Cutler
PHONE: (206) 359-6104
FAX:    (206) 359-7104
EMAIL: JCutler@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

December 5, 2011

**VIA E-MAIL**

Mark F. Radcliffe
DLA Piper LLP
2000 University Avenue
East Palo Alto, CA 94303-2214
mark.radcliffe@dlapiper.com

**RE:    DEMAND TO STOP ABUSE OF FACEBOOK – <mark>FINAL NOTICE</mark>**

Dear Mr. Radcliffe:

I write regarding your client's ongoing abuse with its "Page Rage" browser plugin.

It has come to our attention that your client continues to circumvent technical measures taken to prohibit its unauthorized activities.  In fact, your client appears to have escalated its efforts.

We have described and re-described several ways that your client's product and services violate Facebook's terms and intellectual property rights and how they interfere with Facebook's relationships.  Your client has apparently responded by altering functionality and implementing new ways to unfairly exploit Facebook's services.  We are disappointed that your client appears to have chosen to ignore Facebook's concerns and demands and instead focus on increasing its profit by exploiting Facebook and Facebook's users.

Your client's services are designed to deceive Facebook users into downloading a browser plugin that exposes them to security risks, prompts unsolicited commercial messages, hijacks Facebook users' accounts to run automated scripts without their knowledge, collects users' information without authorization, unfairly trades on Facebook's intellectual property rights and tortiously interferes with Facebook's interests.  Your client must immediately stop its injurious behavior.

LEGAL21344690.2

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DALLAS
DENVER · LOS ANGELES · MADISON · MENLO PARK · PHOENIX · PORTLAND
SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.
Perkins Coie LLP

December 5, 2011
Page 2

Your repeated representations that Facebook authorized your client's actions are wrong.  We understand that you rely on a purported statement from a staff member of Facebook Platform Operations that "we are not asking you to stop delivering this service [layering ads and skins over Facebook pages] via the plugin."  This statement did not condone any particular plugin behavior or functionality, nor did it contemplate the future evolutions of your client's service to which Facebook now objects.  Moreover, even assuming the purported statement at issue could be construed as approving the concept of layering skins over Facebook pages, it was plainly unreasonable for your client to rely on that purported statement as granting your client permission to take whatever action it wished to alter and disrupt Facebook's interaction with its users and customers and inject advertising in violation of Facebook's terms nor is it reasonable to assume that such a statement gave your client permission to deliver the service as it now functions.

Your client's services interfere directly with the Facebook site.

> Interference with Facebook Functionality.  Despite your assurances to the contrary, the Page Rage plugin drastically increases site load time and noticeably degrades the Facebook user experience.  For example, the plugin creates banner ads that cover and obscure Facebook functionality, e.g. the Facebook chat boxes and buddy lists.

> Security.  The plugin interferes with the secure connection of Facebook users using the "https" service enabled by Facebook, by breaking that secure connection without notice and thereby increasing the risk to Facebook users that their connections will be compromised.

> Scraping and Unauthorized Access.  Your client and its advertisers are automating the collection of Facebook user data from the Facebook site without Facebook's authorization, which is a direct violation of Facebook's Statement of Rights and Responsibilities ("Statement").  Furthermore, we have reason to believe that your client may be monetizing this data by selling it (or access to it) to data brokers and other third parties – all without Facebook's authorization, and without telling Facebook users.

> Unauthorized Automation and Scripting.  Your client has been told several times that Facebook's terms strictly prohibit automated access and scripting on its site, yet the toolbar continues to script the initiation of Facebook's "Like" button without Facebook's or Facebook users' permissions.  Similarly, despite the fact that Facebook has revoked its license to access Facebook or use its services, your client continues to utilize Facebook's Platform Integrations without Facebook's permission to initiate unsolicited commercial messages to other Facebook users by scripting the initiation of Facebook status updates and even pre-filling those updates with self-promoting content in violation of Facebook's terms.  *See e.g.*, Facebook Platform Policies, https://developers.facebook.com/policy/.

December 5, 2011
Page 3

Your client's service interferes with and unfairly trades on Facebook's good will and trademarks.

> Trademark and Tradedress.  Your client inserts advertising that is likely to confuse and actually confuses users as to its source, sponsorship or affiliation and the insertion dilutes and tarnishes the Facebook brand by both increasing the amount of advertising and materially changing the nature of the advertising presented when users visit Facebook. The recent addition of buttons and other functionality that mimics authentic Facebook features also creates the likelihood of confusion and dilutes Facebook's brand.  Not only do your client's actions blur the distinction between Facebook content and advertising delivered by Facebook with content inserted by your client's plugin, but even where it may be clear that the content comes from your client's service, the nature of the service tarnishes the Facebook brand and diminishes the user experience.

Your client's service tortiously interferes with Facebook's legitimate business interests.

> Interference with Facebook's control over its advertising environment.  Your client markets its service as a way for advertisers (some of whom it knows have been banned from advertising on Facebook) to circumvent Facebook's advertising guidelines and to run advertisements that are not permitted on Facebook, including deceptive money-making scams, sham "free" product offers, racy ads, and advertisements that violate the size, color, and artistic presentation restrictions set by Facebook.

> Interference with Facebook's commercial relationships with advertisers.  Ads served by your client either cover completely, or materially displace, the advertisements of Facebook's paying advertisers.

> Deception.  Your client deceptively hides the functionality of its plugin and fails to disclose that the service collects personal information, is banned by Facebook, impairs site performance, inserts ads that violate Facebook's terms, and presents security risks.

**Facebook again demands that your client immediately cease offering plugins or other software designed to interoperate with the Facebook site and interfere with the Facebook user experience, deactivate all prior distributed plugins, isolate, secure, and remove from outside access all information obtained from Facebook from access, and preserve all information related to your client's plug-ins.  Facebook will continue to take measures to prevent your client's activity.**

LEGAL21344690.2

December 5, 2011
Page 4


We do not intend this letter as a relinquishment or waiver of any of our client's rights, and you should not construe it as a relinquishment or waiver of those rights.  Our client specifically reserves all rights and remedies at law or equity.

We look forward to your immediate compliance with Facebook's demands.

Sincerely,


Joseph P. Cutler

Exhibit 21

## アカウントの安全を確保

It looks like you downloaded software that is affecting your Facebook account and showing you unauthorized ads. We'll walk you through a few steps that will remove the software and secure your account.

アカウントの安全を確保

モバイル・友達を検索・バナー・ユーザー・Facebookページ・Facebookについて・広告・ページを作成・開発者

# Exhibit 22

# The Online Advertising Industry: Economics, Evolution, and Privacy

**David S. Evans**

University College London and University of Chicago

Draft: April 2009

Forthcoming: *Journal of Economic Perspectives*

## Abstract

Online advertising accounts for almost 9 percent of all advertising in the United States. This share is expected to increase as more media is consumed over the internet and as more advertisers shift spending to online technologies. The expansion of internet-based advertising is transforming the advertising business by providing more efficient methods of matching advertisers and consumers and is transforming the media business by providing a source of revenue for online media firms that compete with traditional media firms. The precipitous decline of the newspaper industry is one manifestation of the symbiotic relationship between online content and online advertising. Online-advertising is provided by a series of interlocking multi-sided platforms (also known as two-sided markets) that facilitate the matching of advertisers and consumers. These intermediaries increasingly make use of detailed individual data, predictive methods, and matching algorithms to create more efficient matches between consumers and advertisers. Some of their methods raise public policy issues that require balancing providing consumers more valuable advertising against the possible loss of valuable privacy.

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 83

Electronic copy available at: http://ssrn.com/abstract=1376607

side" and with publishers on the "sell side." This results in an industry of interlocking multi-sided platforms. Some of these platforms have more "sides" than just buy and sell. Facebook, for example, operates a software platform (Evans, 2009) that encourages developers to write applications that also enlist advertisers and consumers.

As with advertising generally, a key feature of online advertising is that consumers are paid with content and services to receive advertising messages and advertisers pay to send these messages. A fundamental question, not addressed here, is why this particular pricing and reward structure has held over long periods of time and across many different types of advertising. Among other things, the answer would help to illuminate the extent to which advertising is a method for reducing transactions costs between buyers and sellers or a source of imperfection that distorts decision making (Bagwell, 2002).

## Online versus Offline Advertising

The fundamental differences between online and traditional advertising result from a combination of internet technologies and the nature of the web. The structure of online communications makes it easy for publishers and ad networks to learn considerably more about online users than has been possible with traditional media such as print, radio, and television. Online media or their ad networks typically know for certain from the internet technologies for linking people to sites that an individual is viewing their site. That is very different from a radio station, or a newspaper, which have limited ability to determine whether a particular individual is listening or reading. Online media can often learn valuable details about the individual that has signed on to the site. Each user has an IP (Internet protocol) address which typically identifies the location of the individual down to at least the zip code level in the United States. People who browse from home and from smaller companies typically have a unique IP address that remains the same over time. Using this address it is possible for online media and advertising networks to track other sites that users with that IP address have visited and to match up other details about the individual or household. (Some large companies change the IP addresses of individual users frequently so that the address cannot identify the user uniquely nor provide a

precise geographic location. As a result online media cannot determine much about people who browse from these companies.)In addition, individual websites, such as wsj.com and myspace.com, may have detailed information on registered users which they can also use for advertising.  Print, radio and television media generally do not know this level of information for individual users; cable systems with set-top boxes also have specific information on viewers (Lafayette, 2008) but do not have ready access to the browsing behavior of those individuals.

 Traditional media usually have static scheduled content. Television and radio shows are broadcast at a particular time, newspapers are published daily, and magazines weekly or monthly. Advertisers and their intermediaries have no way of knowing whether an individual can hear or see their advertisements. Television viewers may leave the room and radio listeners may switch the channel when the ads come on. Readers may not necessarily look at particular newspaper and magazine pages with advertising. Consumers have much greater control over the content they view on websites.  Advertisers and their intermediaries know with great confidence what content a consumer is viewing at a particular point in time.  These facts have two implications. First, advertisements can be targeted to the particular view that is taking place. The platform can determine the time of day and location of the view and may also be able to determine various other characteristics of the viewer. Most on-line advertising inventory is selected in "almost" real time and customized for the particular viewer. The technology makes decisions on the ad to insert in a particular space so quickly that when you look at web page you cannot detect that it has been designed in less than the blink of an eye. Thus, advertisers have the ability to customize their advertising purchases in a way that is not cost-effective offline. Second, the advertising platform can often discern the context of why the viewer has come to the publisher's web page. For example, search engines know the keywords a user requested, and publishers know the content of the page the user is looking at. Both may know recent search or browsing behavior. Ads can be customized based on this information.

 These features can make online advertising a more efficient matchmaking vehicle for advertisers and viewers than offline advertising. Advertisers can target their messages to those consumers for whom the messages are most relevant and who are most likely to buy as a result of receiving this message.  Viewers are more likely to receive messages that are relevant and valuable to them.  An implication of this observation is that there are economic incentives for advertising and viewing to move online.

# Exhibit 23



IAB Platform Status Report:

# User Generated Content, Social Media, and Advertising — An Overview

### April 2008

*A series of papers that will lead the way to a vigorous and healthy industry with commonly adopted terminology, practices and standards.*

## Contents

| | |
|---|---|
| **Executive Summary** | **1** |
| **What is User Generated Content?** | **1** |
| History | 1 |
| Today Review Sites | 1 |
| Blogs | 4 |
| Wikis | 5 |
| UGC & Online Advertising Networks | 5 |
| **What is Social Media?** | **5** |
| Social Media Platforms | 5 |
| Social Networks | 6 |
| Content Sharing | 6 |
| Widgets | 7 |
| **Impact on the Advertising Landscape** | **7** |
| Comparisons to other forms of advertising | 7 |
| **Trends in UGC Advertising** | **8** |
| "Overlay" Video Ads | 8 |
| Conversation Targeting | 8 |
| Custom Communities | 8 |
| Dedicated Channels | 9 |
| Brand Profile Page | 9 |
| Branding Wrappers | 10 |
| Widgets | 10 |
| **Challenges and Opportunities** | **12** |
| Empowering Marketers to Shape the Discussion | 12 |
| Identifying Rewards versus Risks | 12 |
| Experimentation | 13 |
| **Who is the IAB UGC & Social Media Committee?** | **14** |



## Executive Summary

In 2008, if you're not on a social networking site, you're not on the Internet. It's as true for advertisers as it is for consumers. Social networking is the ultimate manifestation of user generated content, and as such, holds more potential for growth than any other form of content on the Web today.

User Generated Content (UGC) and Social Networks are transforming the media ecosystem. Gone are the days when power rested in the hands of a few content creators and media distributors. Gone are the days when marketers controlled the communication and path between advertisement and consumer. Today's model is collaborative, collective, customized and shared. It's a world in which the consumer is the creator, consumer and distributor of content. Today there are over a billion content creators and hundreds of millions of distributors. The proliferation of quality, affordable technology and the popularity of social networks and UGC sites have forever changed the media landscape.

Yet fears and unanswered questions keep brands and agencies from taking full advantage of this dynamic, prosperous new environment. This paper will set out to alleviate as many of those fears, and answer as many of those questions, as possible. First, we will explore the development and examples of UGC, then move on to explain the various social media models available today and how some brands have explored these unique consumer experiences.

## What is User Generated Content?

User Generated Content (UGC), also known as consumer-generated media (CGM), refers to any material created and uploaded to the Internet by non-media professionals, whether it's a comment left on Amazon. com, a professional-quality video uploaded to YouTube, or a student's profile on Facebook. UGC has been around in one form or another since the earliest days of the Internet itself. But in the past five years, thanks to the growing availability of high-speed Internet access and search technology, it has become one of the dominant forms of global media. It is currently one of the fastest growing forms of content on the Internet.

UGC is fundamentally altering how audiences interact with the Internet, and how advertisers reach those audiences. In 2006, UGC sites attracted 69 million users in the United States alone, and in 2007 generated $1 billion in advertising revenue. By 2011, UGC sites are projected to attract 101 million users in the U.S. and earn $4.3 billion in ad revenue[1]. Still, obstacles remain that prevent advertisers from taking advantage of this dynamic new medium.

### History

*Early Forms of UGC*

UGC has been a staple of the peer-to-peer experience since the dawn of the digital age. The earliest forms arrived in 1980 with Usenet, a global discussion network that allowed users to share comments and experiences of a given topic. Early versions of Prodigy, a computer network launched in 1988, also facilitated user discussions and comments, as did early versions of AOL.

The late 1990s saw the rise of "ratings sites," which allowed users to rate subjects based on any number of criteria, from physical appearance (ratemyface.com and hotornot.com) to professional competence (ratemyprofessors.com). These spread quickly across the Internet, and brought with them controversy over the impact they could have on the lives of private people often unwittingly exposed to public scrutiny. Such controversies have increased as UGC sites have become more common and influential.

Another early form of UGC are forums; areas within content websites that allow readers to communicate with each other around topics related to the content. Even in this era dominated by social media sites, forums continue to be robust, controlled areas of user content. For example, CondeNet sites incorporated forums as early as 1995, and they are still excellent areas for marketers to research opinions and general trends.

### Today Review Sites

One of the more relevant types of UGC sites for consumer brands is review sites, where consumers share their brand experiences in order to help others make more informed purchasing decisions. Most of these

---

1      EMarketer, "User Generated Content: Will Web 2.0 Pay its Way?" June 2007



sites are grouped by category, such as electronics, automotive and tourism, to name a few. They are generally well moderated and can be very brand friendly to the company that respects their culture and is willing to participate.

In October 2007, a Nielsen study found that consumer recommendations are the most trusted form of advertising around the world. Over three-quarters of respondents from 47 markets across the world rated recommendations from consumers as a trusted form of advertising. Compare that to 63% for newspapers, 56% for TV and magazines, and 34% for search engine ads[2]. Review sites are frequently where consumers go to find those recommendations, making them an important place for marketers to have a voice.


Figure 1 - Example of a Review Site: men.style.com

Following are some examples of prominent review sites:

<u>CNet</u>

Founded in 1993, CNet is a Web site designed to help consumers make more informed electronics purchasing decision. Its editors provide their own reviews and post videos that aim to "demystify" everything from cell phones to digital cameras to DVD players. Alongside that professional content, however, are user reviews. Users are asked to rate products on a scale of 1-10, and are also invited to compose their own reviews, which are compiled into a separate section. The average user ratings are compiled by the site and displayed on a product's front page.

As the Christmas shopping season got under way in November 2007, CNet ranked as the 15th most visited site on the Web, according to comScore Media Metrix, suggesting that huge numbers of consumers are consulting peer reviews before making major electronics or technology purchases.

<u>Edmunds.com</u>

Edmunds follows a similar model as CNet, but for automobiles. The editors of Edmunds post their own auto reviews, as well as pictures and specifications (see Fig 2). Meanwhile, a separate link takes readers to its "community areas," where users share their automotive ownership and purchasing experiences. Edmunds has maintained this online community since 1996, and it is moderated. All content posted to the site is reviewed by Edmunds' staff within 24 hours, and offending material is immediately removed.

According to a 2007 CapGemini study, 29% of Web surfers use consumer-to-consumer (C2C) sites such as Edmunds, blogs or Internet discussion groups when researching information during the vehicle shopping process, up from 21% in 2006[3].

---

2       The Nielsen Company, "Online Global Consumer Study," October 2007

3       Cap Gemini, "Cars Online 07/08: Understanding Consumer Car Buying Trends," October 2007



*Platform Status Report: USER GENERATED CONTENT, SOCIAL MEDIA, AND ADVERTISING*



Figure 2

Both sites represent attractive advertising opportunities for obvious reasons: consumers are there because they are in the market for a particular product, and they are interested in learning more. However, the free-flowing opinions provided by members of the general public–who are as likely to dislike any given product as they are to praise it—can be intimidating.

This is why it's important to understand that most reviews sites don't allow anyone to submit content without agreeing to certain standards or "user agreements." A typical user agreement includes a promise to post no defamation, profanity, threats, or illegal or inappropriate content. Users are told that they are legally responsible for whatever content they post, and are warned to behave accordingly.

It is also important to know that review sites like CNet.com and Edmunds.com do not rely on the honor system. Both sites include moderators who review uploaded content, either before it is posted or within 24 hours, and immediately remove anything that can be construed as a violation of the user agreement. Other users are also given the opportunity to easily submit complaints about others' comments that they feel may be out of line.

According to an Edmunds executive, less than 1/10 of 1 percent of all user comments are deleted, and only a small percentage of those are for profane or derogatory language (most are the result of salespeople posing as customers).

So while review sites by nature foster an honest, consumer-led discussion about product and service experiences, they are not the "wild, wild West". While advertisers cannot be guaranteed they won't be advertising alongside a negative comment about their brand, they can reasonably assume their ad will not sit next to profane or defamatory content.

Epicurious.com

According to a CondeNet executive, of the almost 100,000 recipes in Epicurious.com's database, 92% have ratings and/or comments. In addition to these reviews, over half of the recipes in the Epicurious database are



Figure 3

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 91


Interactive Advertising Bureau

user submitted—a fine example of user generated content where questionable content isn't a consideration (see Fig 3). This passionate group of foodies can now connect with each other via a section of the site called My Epi; a place for chocolate-lovers, for example, to unite, share recipes, ingredients and ideas. Self-formed communities such as this provide advertisers with unique targeting opportunities providing natural relevance.

## Blogs

The advent of blogs was considered a tipping point for UGC.  It was the moment when UGC went from a small but significant component of the Internet experience to a predominant source of entertainment, information, and debate.

Although blogs had been around in one form or another since the mid 1990s, it was the 1998 launch of Open Diary that turned them into a UGC phenomenon. Open Diary was one of the first providers of blogging software, and the first to facilitate user comments. Allowing readers to reply to blog entries allowed for the kind of freewheeling interaction that is today the hallmark of blogging and UGC in general.

Blog is short for Weblog, a term that denotes a personal diary or journal maintained on the Web. In its purest form, a blog is just that, a personal journal maintained by an individual, updated frequently, and viewable by anyone on the Internet. The entries generally appear in reverse chronological order, meaning the most recent is at the top of the page and others can be found by scrolling down, with archived entries available through links at the bottom or sides of the page. Blogs have always spanned a wide range of content. Some consist of little more than weekly updates about one's pets, while others become hotbeds of political discussion, even influencing debate on a national scale.

But as "pure" blogs gained popularity, media companies and corporations began to appropriate their style and themes. Publications like The New York Times and Newsweek launched blogs on which their reporters shared casual observations. Soon even CEOs of major corporations were blogging, usually as a form of public relations.

As of December 2006, 19% of the fastest-growing private companies in the U.S. reported use of blogging as a form of communication[4].

Today, some of the most popular blogs are maintained by corporations that make a profit through advertising. Perhaps the best example is Gawker, a network of blogs that include some of the Web's most popular sites. Its namesake, Gawker.com, is a running commentary on New York media, celebrities, and culture, written in an acerbic, often profane tone, that's become a must-read for New York media professionals. The Gawker network also boasts Deadspin (sports), Consumerist (packaged goods), Wonkette (politics), and Fleshbot (adult industry).

While it is sometimes argued that sites like Gawker.com, or the Huffington Post are not true UGC because they use salaried contributors or take submissions from media professionals, they do retain one hallmark of blogs that mark them as a major UGC platform: user comments. Because users are invited to leave remarks below each post, they foster freewheeling conversations that frequently take on a life of their own. These conversations become a permanent addendum of the original posts, and are often as much of the entertainment as the post itself (some sites, like Gawker, allow comment by invite only in an effort to ensure a higher level of discourse). While these comments are usually moderated, and slanderous or overly profane material can be edited out, most of the more popular blogs are hesitant to use that authority.

A 2007 study found that 38.4% of Internet users believe that expressing personal opinions is the key element in separating blogs from other online media. Other factors include: writing style (28.2%), editorial freedom (26.3%) and layout (25.8%). That same study found that 30.8% of blog readers read more than three blogs regularly – and of the blogs they read most often, 68.3% of respondents said they read them daily[5].

---

4       EMarketer, "User Generated Content: Will Web 2.0 Pay its Way?" June 2007

5       Vizu Answers/Advertising Age "Blog Readership Report." March 2007



## Wikis

In its most basic sense, a Wiki is collaboration, a Web site built through the contributions of many individuals. Though not all wikis are open to everyone—indeed, many require some kind of membership or qualification to contribute—they are in many ways the most democratic manifestation of UGC. These individuals may never meet, or live in the same country, or even communicate, but the principle behind wikis is simple: All the world's expertise, knowledge, and creativity can be harnessed through Internet collaboration.

The most instructive and well-known example of a wiki is Wikipedia, the free online, publicly editable encyclopedia. Launched in 2001, it has quickly become one of the most prominent—even trusted—reference sites on the Web. As of December 2007, it boasted more than 2 million articles in 253 languages, making it the largest encyclopedia ever. Nearly every article on Wikipedia is publicly editable, and changes appear immediately, though only registered users can create new articles. For the most part, accuracy and "neutrality," a key principle behind Wikipedia, are enforced by the community. There is, however, a hierarchy of volunteer editors, who, at the top levels, have the authority to delete content and lock articles.

## UGC & Online Advertising Networks

Online media consumption is increasingly dispersed across a variety of web sites.  One result is the movement of some online advertising dollars to an increasing number of vertical sites. For example, Avenue A/Razorfish's 2007 spend was distributed across 1,832 websites—more than double the 863 properties on which the agency purchased media in 2006[6].  User-generated content sites—predominantly blogs and "owned and operated" sites—play an important role in niche ad networks such as Glam Media, iVillage's Sugar Network, and MarthaStewart's Lifestyle Network. Social networking sites and user-generated content destinations have great potential for a network's demographic, behavioral, or psychographic targeting, providing the quality audience reach that advertisers demand and allowing for a greater degree of inventory monetization.

As AvenueA/Razorfish's 2008 Digital Outlook Report states, "One related area to watch closely is the growth of vertical ad networks. Martha Stewart Living's lifestyle network and Forbes' Audience Network are two recent examples of strong brands extending their reach by building out ad networks. It is a reasonable extension for brands and helps the smaller sites and blogs within a vertical network gain needed exposure with large advertisers. Look for more vertical ad networks in the year ahead

## What is Social Media?

The promise of UGC is now being hyper-realized with social media. Sites like MySpace, Facebook, and YouTube represent the convergence of user commentary with video, photos, and music sharing, all presented in a simple, user-friendly format, allowing participation on a mass scale.

According to an April 2007, iProspect/Jupiter Research study, the most frequently visited social networking sites are visited by approximately one out of every four Internet users at least once a month.[7]

## Social Media Platforms

Facebook pushed the door open wider to User Generated Content when it launched its application platform on May 24, 2007. Facebook's platform is an API that developers can use to create widgets that can easily be distributed on Facebook. To encourage take-up, Facebook's platform strategy allows developers to keep the revenue they generate through traffic to their applications. Almost a year later, there are nearly 20,000 applications available on Facebook, most created by thousands of 3rd party developers.

Developers include individuals working out of bedrooms and dorms as well as venture-funded production companies such as Slide, RockYou, and iLike. While these applications themselves are a form of UGC, many are also designed to allow individual users to express themselves—their favorites, likes, dislikes, recommendations, etc. In November 2007, Facebook took another significant step by further opening its platform so these applications, previously only available on Facebook, could also run on other social networking sites, such as competitor Bebo.

6  Avenue A | Razorfish 2008 Digital Outlook Report

7  iProspect/Jupiter Research, "iProspect Social Networking User Behavior Study," April 2007



In October 2007, Google debuted a social media platform initiative called OpenSocial. OpenSocial is described as a common set of APIs for building social applications across multiple sites. Sites including MySpace, Orkut, Linked-in, Hi5, and Plaxo have joined this initiative. OpenSocial hopes to attract developers and applications based on the vast distribution potential of its combined members' user base of more than 200 million users. Many Facebook developers are working to adapt their applications to OpenSocial, while others are developing apps specifically for OpenSocial. In February 2008, MySpace launched its platform, based on OpenSocial; Hi5 has also done so and others are expected to follow.

Social bookmarking allows consumers to share their favorite Web destination or content with others by submitting links to a public or semi-public forum. Three widely known social bookmarking sites are Digg, Delicious, and Reddit.  Here consumers can browse (and comment on) links and content submitted by others, giving greater exposure to the most frequently shared items. As publishers and portals add these features to their content and in turn, those preferences can be tied to a user's profile page, it becomes one more way that users can express their interests to their peers.

### Social Networks

Online networks like MySpace, Facebook, Bebo, and LinkedIn represent some of the most dynamic and promising manifestations of social media yet. These sites allow for networking on a grand scale, where individuals can connect with others based on offline friendships, shared interests, common professional objectives, or mutual acquaintances.

When users join a social networking site, they are given a page on which they can create a profile. They are urged to enter personal information such as hometown, work history, hobbies, favorite movies, interests, etc. They can then upload photos or link to other Web pages that interest them. This information is displayed on their profile page, and users are given the option of making the page public, or viewable only to those within their network.

Profile pages serve as launching pads from which users explore these social networking sites. They can search for other individuals, or find people with common interests. Users who identify others they want as part of their networks invite one another to be "friends," and such networks are displayed for others to see and browse. In this way, global networks of people with friends or interests in common are born.

Like blogs and review sites, social networks allow users to place comments, photos, videos and Web links on each others' pages, thereby sharing information and interests with dozens, hundreds, or thousands of people—depending on the size of one's network—with a single click.

### Content Sharing

Where social networks allow users to share all manner of content and media with one another, sites like YouTube and Flickr allow them to share a specific kind of content. For example, YouTube is a site where users can upload and view videos of almost any kind. Flickr serves the same purpose for photos. Here, content is the focal point, where users don't need to create a page to participate, and if they do, those pages need not contain much, if any, personal information.



Figure 4

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 94



Like many other UGC sites, YouTube and Flickr allow users to post comments regarding others' content. This again fosters a freewheeling exchange of ideas and opinions—sometimes polite, sometimes not.

### Widgets

Widgets, portable applications that allow both users and sites to have a hand in the content, have recently become a popular form of brand or news distribution. The publisher is able to control the content and the user is afforded the luxury of placing that content on his or her page, be it a blog or social networking profile. Users can also simply pass the widget on to friends. (See Fig 4 for example)

Publishers have started to recognize the value of this new type of content syndication. Widget distribution platforms, such as Clearspring, provide the publisher with the infrastructure and distribution channels in the form of a plug-and-play system, rendering lengthy contracts and syndication partner deals unnecessary. A publisher who has created a widget can upload the widget onto Clearspring and elect to which sites and formats (e-mail, social networking sites such as Facebook or MySpace) they wish to make the widget available.  The platform then manages code conversion and listing the widget in application directories.

 Just as the widget and content is portable, so too is the advertising on the widgets.  Generally, a publisher can elect to pay a usage fee to the platform distributor and sell the advertising or they can elect to have the platform distributor sell the advertising for a revenue share. Alternative to advertising in and around widgets embodying content, widgets can be the advertising message itself.  For examples of how advertisers are developing their own widgets, see section IV.

### Impact on the Advertising Landscape

UGC and social networking as a major force on the Internet represents the greatest opportunity and challenge to marketers since the advent of the Internet itself.

In the larger eco-system, social networking and UGC sites have provided high-value advertising inventory and audience segments needed to capture more of the market share and targeted audience reach that advertisers demand, e.g. Microsoft's investment in Facebook, Google's acquisition of YouTube, and News Corps.' acquisition of MySpace.

### Comparisons to other forms of advertising

Traditionally, marketers have been able to buy time or space on fixed media in a controlled context. They knew where their ad would appear, what it would look like, and perhaps most important, in what context it would be seen. In other words, they could be guaranteed their message wasn't being delivered in a hostile or inappropriate environment. Today, such guarantees are harder to make, and that lack of control can be a source of great anxiety for marketers. But it also represents an unrivaled opportunity. …

Advertising in UGC requires marketers to alter their approach. Instead of broadcasting one-way messages at their audiences, advertisers are compelled to engage in a conversation. Doing so carries risks, but failure to do so carries more.

#### How does UGC offer something unique?

While all advertising on the Web is interactive by nature, but UGC sites offer a unique and more complex level of engagement. Instead of inviting individual consumers into an environment of their own making, marketers advertising on UGC sites are entering a conversation initiated, maintained, and "owned" by consumers themselves. This requires those marketers to behave differently, or risk what can be very vocal disapproval from those consumers.

UGC and Social Networking isn't all "child's play" either.  A Fall 2006 analysis by comScore Media Metrix showed that more than half of MySpace users were over 35 years old, and that 25-year-olds accounted for 71% of Friendster users. Separately, executive networking site LinkedIn, reports that its average user is 39 years-old and has an annual income of $139,000.





Figure 5

## Trends in UGC Advertising

Although many advertisers and publishers are still experimenting with ways to reach consumers on UGC sites, many techniques have become common practice. There are two ways for brands to leverage the UGC/Social Networking platform: by placing commercial messaging in and around the content or by becoming a part of the content itself.  Following are a few prevailing methods for advertising on UGC sites.

## "Overlay" Video Ads

Both publishers and marketers have long struggled with a way to incorporate advertising into UGC video. One common early method was "pre-roll" video, a short ad that would run before the video itself. Although pre-roll video ads are still common, some UGC sites, including YouTube, now prefer "overlay" ads, such as the example in Fig 5. These are ads that pop up about 15 seconds into a video and only cover the bottom 1/5 of the screen, and disappear after a few seconds if the user doesn't click on them. If the user does select the ad, the video he or she was watching will pause, and the ad will play. The video will resume once the ad has ended. The idea behind overlay ads is to include advertising that doesn't interrupt, clutter, or delay the user's experience. See the IAB's Digital Video Platform Status Report or Digital Video Ad Format Guidelines for more information.[8]

## Conversation Targeting

A number of firms now offer services that allow you to place your Web ads next to relevant conversations, or identify those blogs and Web sites that most frequently discuss your product or category in the most favorable terms. For example, an SUV manufacturer could place banner ads next to conversations about 4-wheel-drive vehicles, or identify the most relevant blogs to send press releases to. These services vary in process and technology, but are all quickly becoming more accurate and nuanced. Many now even specialize in finding not only the most relevant conversations, but the most influential.

### Harlequin

Famous for its romance novels, Harlequin regularly issues "Romance Reports," polls that reveal interesting tidbits about the public's views on dating and love. When a recent report didn't drive the interest the company wanted, Harlequin recruited SEO-PR and Buzzlogic to help it focus more specifically on UGC sites with the most relevant conversations. Harlequin soon re-released the report to roughly 80 bloggers identified as having significant influence in the category. The report quickly became a major topic of conversation across these sites, until the Pink Heart Society, the leading romance blog, ended up publishing a 4-part series on the survey.

## Custom Communities

Custom communities provide a hub for brands to entertain and engage users through interesting content, unique assets, games, polls, quizzes, or contests. Off-site advertising drives consumers to these communities, where they can participate and pass along content they find interesting or valuable.

---

8    http://www.iab.net/iab_products_and_industry_services/1421/1488/DVPlatform



## Adidas

Launched in 2006, the Adidas custom soccer community on MySpace allows visitors to align themselves with one of Adidas' two models of elite soccer cleats. Users can post comments extolling—or defending—their chosen brand, and access product reviews, graphics, and information about professional soccer players who are on their "team." By giving consumers a chance to align themselves with a brand "team," Adidas forges a profound connection based on identity and personality.



Figure 6 - Adidas

## Dedicated Channels

Another version of a custom community is a dedicated channel. This is when an advertiser creates their own community on a content-sharing site like YouTube. Consumers can visit these sites and engage in all manner of branded activity, same as a custom community.



Figure 7 - Pepto-Bismol / YouTube

### Pepto Bismol

In 2007, Pepto Bismol introduced its own channel on YouTube called "Be the Next Pepto Star." (YouTube.com/PeptoBismol) The company asked users to create one-minute videos of themselves singing about the ailments the product counteracts (heartburn, nausea, etc.) The site even provided graphics and music to help people create the best videos they could. Other users could then view the videos and leave comments. In 2008, the winner will be given $15,000. Pepto Bismol is just one example of an advertiser creating its own interactive community on YouTube by inviting consumers to have fun with its brand.

## Brand Profile Page

Perhaps the most common method of advertising on social networking sites is creating a profile page. An advertiser simply creates a page for its product, much as an individual would for himself. This page can be used to provide all sorts of materials and information, from demonstration videos to graphics that other users can use to decorate their own pages. This also allows other members to include your page in their "friend" network, or tag themselves as a "fan."



### Fred Claus

To promote its November 2007 movie Fred Claus, Warner Brothers created a profile page on Facebook. Visitors to the page could watch the trailer, play games, join a discussion group, enter a sweepstakes, and download graphics to decorate their own profile pages. They could also post comments to the page. Most of the comments were users saying they liked the movie, though some expressed their disappointment. Still others used it to find answers to questions, such as the name of songs from the movie, or release dates overseas.



Figure 8

### Branding Wrappers

One surefire way to get noticed on a UGC site is a branding wrapper or "skin." (See Fig 8) These wrappers transform a social network's landing page into a 360-degree branding experience, complete with wallpaper, photos, video, music, and links. A user logging onto MySpace, for example, would find the home page fully dedicated to a single brand or product, and could easily engage with that marketer even before entering her password. On Bebo, one click allows users to make the sponsored community skin their own, turning them into a true advocate of the brand to their personal network with every interaction.

This method guarantees that each of the millions of users who log onto a social networking site on a particular day will be greeted by your advertisement. And because it does not impose obstacles or extra steps to reaching one's profile page, it is considered a non-intrusive social networking advertising platform.

### Widgets

Widgets are small programs that users can download onto their desktops, or embed in their blogs or profile pages, that import some form of live content. For example, a basketball blogger can place an ESPN.COM widget on his blog that displays up-to-the-minute NBA rankings. Or a skiing blogger can embed a widget from Weather.com that always displays weather conditions in Aspen. Widgets first became prominent in 2007, and are still rapidly gaining popularity. The key is helping UGC enthusiasts offer their readers some unique content. Most are eager to identify themselves with a brand that can make their blogs or profiles more dynamic.





Figure 9 - 1-800-Flowers.com

### 1-800-Flowers.com

1-800-Flowers.com offers a widget on Facebook called "Gimme Love." Users can embed this small application on their profile page and use it to send "virtual bouquets" to friends, or link directly to the retailers' Web site. The widget also links Facebook pages with 1-800-Flowers.com accounts so that the two can share information and rewards points.

### General Mills

The General Mills widget allows users on CafeMom to share what they are making for dinner each evening and get inspiration from other moms who are also in evening meal planning model.  The widget also features a recipe of the day from General Mills.



Figure 10 - General Mills



*Platform Status Report: USER GENERATED CONTENT, SOCIAL MEDIA, AND ADVERTISING*

### Challenges and Opportunities

Today, brands of all sizes are eager to jump into the UGC/social networking environment. But doing so blindly—without clear objectives in mind—can lead to an unsatisfying experience. As with any new environment, it's important first to understand where you want to go and how you can get there before diving in. UGC/social networking offers brand-building opportunities far beyond what's available through traditional advertising, but taking advantage of those opportunities means first grasping some basics.

### Empowering Marketers to Shape the Discussion

Advertising in a UGC environment requires a radically different mindset from traditional advertising. Instead of controlling the environment in which consumers see their ads, advertisers must now become a part of it. UGC sites are by nature in constant flux, a freewheeling exchange of opinions and points of view, in which the advertiser is expected to be just another participating voice. Advertisers on UGC sites must be prepared to talk with, not to, its target audience, which means surrendering a degree of control over their brands.

<u>Coca-Cola</u>

Coca Cola's introduction to the world of UGC advertising was a rocky one. In June of 2006, a pair of performance artists scored a bona fide hit with a video featuring a series of geysers they created by dropping Mentos in bottles of Diet Coke. They were not the first to discover the chemical reaction that comes from dropping the mints into the soft drink, but they took the stunt to another, rather spectacular level using music, choreography, and well-timed explosions. Originally posted on Eepybird.com, the video became a major hit on YouTube. When the media started taking notice, the two brands had very different reactions. Mentos embraced the spirit of the video, and held a popular contest asking to see consumers' best Mentos/Diet Coke geyser videos. Meanwhile, a Coke spokesperson dismissively told the Wall Street Journal that the "craziness with Mentos…doesn't fit with [our] brand personality." Coke quickly came to understand consumer's enthusiasm for the performance and embraced it by helping to drive viral distribution of the video and securing major media coverage on late night TV and elsewhere. In addition to generating high value/low cost media coverage, Coke was also able to identify a positive impact on sales. As Brandweek magazine later wrote, "For those looking to separate brands that understood the UGC movement from those who don't, it was a watershed moment. Consumers were shaping the brand personality independently of Coke."[9]

### Identifying Rewards versus Risks



Figure 11 - US Army

For some advertisers, creating a brand page on MySpace and inviting the general public to upload whatever it desires is akin to arming passersby in Times Square with spray paint to leave "comments" on their new billboard. But such fears fail to take into account the controls and regulations now commonly available to advertisers on UGC sites. Take for example the U.S. Army's experience with Mi Pagina, a social network launched in early 2006 by Univision.

<u>U.S. Army</u>

One of the U.S. Army's digital initiatives in 2007 was to create

---

9    Brandweek, January 22, 2007



a "MiPagina" profile on Univision in order to communicate with the Hispanic community. However, due to the nature of user generated content platforms it was necessary to make sure the content could be filtered to ensure the quality of the program. Univision offers individual moderating services for clients with such concerns but for much higher budget levels. As a result, Univision arranged for all submitted content to go first to Sensis, the agency in charge of managing the project. This gave the U.S. Army full control over its advertising environment without sacrificing the authenticity and interaction of user generated content

## Experimentation

A major obstacle to doing anything new is fear of the unknown. Many advertisers simply aren't clear on how to go about UGC advertising, or are unsure of which solution will best fit their objectives. But advertisers who approach publishers with a desire to get started will find no shortage of eager, accommodating partners (see examples above).

One prevailing method of UGC advertising is to produce content that borrows the esthetic, the attitude and sometimes the distribution modes of actual UGC. This can be a tricky proposition, one that demands full transparency (i.e., not trying to pass off your content as actual UGC) and respect for the culture of UGC. But done correctly, it can help brands weave themselves seamlessly into conversations online.

### Ray Ban

In May 2007, Ray Ban scored a massive YouTube hit with a video simply titled "Guy Catches Glasses with Face." The grainy, amateur-looking video features a man repeatedly catching a pair of sunglasses with his face after his friend throws them from increasing heights and speeds. The video—which made no secret of its connection to Ray Ban or ad agency Cutwater—drew thousands of comments from users debating how the trick was pulled off. The 1 and 1/2 minute video was viewed more than 1.7 million times on YouTube in its first week, and inspired legions of satires and tribute videos.

Josh Warner, president of The Feed Company, Los Angeles, a viral "seeding" firm that helped circulate the video, explained the appeal of the video to Adweek in May. "You're saying, 'Am I getting tricked or not?' So you watch the video to the end, maybe even one more time, and then pass it onto your friend for a second opinion. That's true viral. It was fun to watch, like watching a tsunami of social conversation."

The Ray Ban video shows how UGC audiences are receptive to brand initiatives that speak their language. By challenging the YouTube crowd without insulting their intelligence, RayBan became a very positive part of the conversation. Consumers sought out the video, passed it along and even contributed to it with their own videos. That's the kind of engagement made possible only through UGC sites.

While Ray Ban's effort speaks to the success possible when marketers speak the language of UGC, another effort from a fast food giant shows the pitfalls of not speaking their language--literally.

### Burger King

In October 2006, Burger King and rap mogul Sean "P. Diddy" Combs launched their own "channel" on YouTube, DiddyTV. But in an early video, Combs misspoke when he said Burger King was "buying" the channel. The video received a torrent of dismissive comments calling both Burger King and Combs "clueless" and clearly interested only in exploiting YouTube for advertising purposes. Burger King quickly removed the video.



### Who is the IAB UGC & Social Media Committee?

The User-Generated Content & Social Media Committee is dedicated to helping develop and expand the user-generated content and social networking space as viable and effective advertising platforms. They have been instrumental in shaping this report and will continue to help educate the marketplace on the strength of this interactive channel.

Chairperson:  Heidi Browning, FOX Interactive Media

| Member Companies | |
| --- | --- |
| Ad Infuse | DoubleClick, Inc. |
| Adify | Edmunds.com |
| Adobe Systems Inc. | Emmis Interactive |
| Adtegrity | Eyeblaster |
| Agency.com | Facebook |
| Akamai | Federated Media Publishing |
| AMC Group Online Media Services | Forbes.com |
| American Express Publishing | FOX Interactive Media |
| AOL | Friendster |
| Associated Content | Geary Interactive |
| Atlas | Gemstar - TV Guide International, Inc. |
| Audit Bureau of Circulations (ABC) | Glam Media |
| Aurix LTD | Google, Inc. |
| Autotrader.com | Grandparents.com |
| Batanga | Hachette Filipacchi Media |
| Bebo | Hanley Wood e-Media |
| BIA Information Network, Inc. | Hearst Magazines Digital Media |
| BlackArrow | HowStuffWorks |
| Blue Lithium | Idearc Media Corp.'s SuperPages.com |
| Bonneville International | Innovid |
| Break Media | Internet Broadcasting Systems |
| Brightcove | Interpolls |
| BuzzLogic | Jordan Edmiston Group, Inc. |
| Caring.com | Kaboose.com |
| Casale Media | Keibi Technologies |
| Cellfish Media | Kontera Technologies, Inc. |
| Cisco Media Solutions Group | Leapfrog Online |
| Claria | LexisNexis Martindale-Hubbell |
| Clearspring Technologies | Lifetime Entertainment Services |
| CNET Networks, Inc. | Local.com |
| CNN.com | M:Metrics |
| Cognizant Technology Solutions | Martha Stewart Living Omnimedia |
| Collective Media | Media Math |
| Compete, Inc. | Meredith Interactive Media |
| CondéNet | Metacafe |
| ContextWeb, Inc. | Metro Corp. |
| Cox Newspapers, Inc. | Microsoft Digital Advertising Solutions (MSN) |
| Critical Mass | Millennial Media |
| Dotomi | Millward Brown USA Inc. |



| Member Companies, continued | |
|---|---|
| MIVA Media | Scripps Network |
| Motive Interactive Inc | ShoZu |
| MSG Interactive | Sony Pictures Television |
| NBC Universal Digital Media | SourceForge Inc. |
| Net Pickle Inc. | SpotXchange |
| Newspaper Association of America | Steak Media |
| Nielsen Online | Taboola |
| NuRun | Tacoda |
| Oddcast | Terra Networks USA |
| Omniture | The Fifth Network |
| Orbitz Worldwide | The Sales Athlete |
| Origin Digital | Theorem, Inc. |
| Panache Technologies | Time Inc. |
| PBJS | Transpera |
| PerfSpot.com | True North, Inc. |
| PointRoll | Turn, Inc. |
| PricewaterhouseCoopers LLP | Univision Online |
| PureVideo | Video Egg |
| Q Interactive | VMIX |
| Quantcast | Weather Channel Interactive (Weather.com) |
| Range Online Media, Inc. | WeatherBug |
| Rapt | WebMD |
| Reed Business Information US | Whitepages.com |
| Reuters | World Wrestling Entertainment, Inc. |
| Revenue Science | WorldNow |
| Revolution Health Group | YuMe Networks |
| ROO | Zango |
| Sapient Corporation | Zeta Interactive |
| ScanScout | |

# Exhibit 24

www.cmosurvey.org







# Highlights and Insights
## February 2012

© Christine Moorman

**Predicting** *the Future of Markets*

**Tracking** *Marketing Excellence*

**Improving** *the Value of Marketing*







# Topic 5:
# Marketing and Social Media



Predicting the Future of Markets
Tracking Marketing Excellence
Improving the Value of Marketing











31



# Social media spending growth continues:
## Expected to be 19.5% of marketing budgets in five years

Marketplace | Growth | Spending | Performance | **Social Media** | Jobs | Organization | Leadership | Analytics

**Figure 5.1.  Social Media Spending as a Percentage of Marketing Budgets Over Time**

Percentage of Total Marketing Budget (%)

- 7.4% — Current Levels
- 10.8% — Next 12 Months
- 19.5% — Next 5 Years





© Christine Moorman

32

© Christine Moorman

# Sector differences in social media spending; B2C-Product companies lead al industry sectors

Marketplace  Growth  Spending  Performance  **Social Media**  Jobs  Organization  Leadership  Analytics

**Table 5.1.   Sector Differences in % Change in Social Media Spending**

| | | August 2011 | February 2012 |
|---|---|---|---|
| Current Social Media Spending | B2B - Product | 4.2% | 6.2% |
| | B2B - Services | 8.6% | 7.4% |
| | B2C - Product | 10.5% | 9.6% |
| | B2C - Services | 5.9% | 8.4% |
| | Overall | 7.1% | 7.4% |
| Social Media Spending in the next 12 months | B2B - Product | 7.0% | 9.4% |
| | B2B - Services | 11.5% | 10.1% |
| | B2C - Product | 13.6% | 15.3% |
| | B2C - Services | 9.4% | 11.7% |
| | Overall | 10.1% | 10.8% |
| Social Media Spending in the next 5 years | B2B - Product | 13.4% | 18.5% |
| | B2B - Services | 18.3% | 19.1% |
| | B2C - Product | 24.0% | 23.0% |
| | B2C - Services | 17.3% | 19.0% |
| | Overall | 17.5% | 19.5% |



© Christine Moorman

# Social media integration gap not closing

Marketplace | Growth | Spending | Performance | **Social Media** | Jobs | Organization | Leadership | Analytics

**Question:** How effectively is social media integrated with your firm's marketing strategy? 7-point scale (1=not integrated, 7=very integrated)

**Results:** Social media remains poorly integrated with marketing strategy:

• Feb, 2012:  Mean = 3.8, SD = 1.9
• Feb, 2011: Mean = 3.8, SD = 2.0

**Table 5.2.   Integration Scores by Sector**

|  | Mean (SD) Feb-2012 |
|---|---|
| B2B-Product | 3.6 (2.1) |
| B2B-Services | 3.6 (1.9) |
| B2C-Product | 4.4 (1.5) |
| B2C-Services | 4.5 (1.6) |



**Figure 5.2.    How Effectively Social Media is Integrated with Strategy**

% of Respondents

1 Not at all Integrated — 18.4%
2 — 11.9%
3 — 8.6%
4 — 17.8%
5 — 22.0%
6 — 14.1%
7 Very Integrated — 7.0%



THE CMO SURVEY.ORG

EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION -- PAGE 109



# Social media employment doubles inside and outside the company

**Figure 5.3: Number of Employees In-House and Outsourced Performing Social Media for Company**



© Christine Moorman