1  James F. Basile (SBN 228965)
   james.basile@kirkland.com
2  Elizabeth L. Deeley (SBN 230798)
   elizabeth.deeley@kirkland.com
3  Adam L. Gray (SBN 262557)
   adam.gray@kirkland.com
4  KIRKLAND & ELLIS LLP
   555 California Street
5  San Francisco, California  94104
   Telephone: (415) 439-1400
6  Facsimile: (415) 439-1500

7  Susan Davies (*Pro Hac Vice Application Forthcoming*)
   susan.davies@kirkland.com
8  Ian R. Conner (*Pro Hac Vice Application Forthcoming*)
   ian.conner@kirkland.com
9  KIRKLAND & ELLIS LLP
   655 Fifteenth Street, N.W.
10 Washington, D.C.  20005
   Telephone: (202) 879-5000
11 Facsimile: (202) 879-5200

12 Attorneys for Defendant
   FACEBOOK, INC.

13

14                **UNITED STATES DISTRICT COURT**

15               **SOUTHERN DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| 17  SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC, | CASE NO. 12-CV-00668-CAB-KSC |
| 18                    Plaintiffs, | **DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(3) AND 12(B)(6)** |
| 19             vs. | |
| 20  FACEBOOK, INC., | |
| 21                    Defendant. | |
| 22 | Judge:        Hon. Cathy Ann Bencivengo |
| 23 | Hearing Date: June 22, 2012  Hearing Time: 2:30 p.m.  Dept.:         Courtroom 2 |
| 24 | **ORAL ARGUMENT REQUESTED** |

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................5

    A.    Facebook's Popular Social Networking Service Is Available To Application Developers That Follow Its Policies ...........................................5

    B.    Operating Outside The Facebook Platform, Sambreel's "PageRage" Adware Makes Money Serving Ads To Facebook Users While They Are Browsing Facebook ..............................................................................6

    C.    Facebook Took Steps To Enforce Its Policies That Protect the User Experience ........................................................................................7

ARGUMENT ........................................................................................................7

I.    THIS COURT SHOULD DISMISS OR TRANSFER SAMBREEL'S COMPLAINT FOR IMPROPER VENUE ..........................................................7

II.    THE COURT SHOULD DISMISS SAMBREEL'S COMPLAINT FOR FAILURE TO STATE A CLAIM .......................................................................10

    A.    Legal Standard ................................................................................11

    B.    The Antitrust Laws Protect Facebook's Right To Control Its Product And Choose Whether And On What Terms It Will Do Business With Sambreel ........12

    C.    All Of Sambreel's Antitrust Claims Must Be Dismissed For Failure To Plead An Antitrust Injury.................................................................14

    D.    Sambreel Has Not Stated Per Se Group Boycott Or Tying Claims .......................16

        1.    Sambreel Has Not Adequately Pleaded A Group Boycott Claim In Count I .................................................................................16

        2.    Sambreel Has Not Properly Alleged A Per Se Tying Claim in Count II...19

    E.    All Of Sambreel's Antitrust Claims Must Be Dismissed For Failure To Plead A Cognizable Market ..............................................................21

        1.    Sambreel Has Not Adequately Alleged That "Online Display Advertising" And "Display Advertising to Social Media Users" Are Cognizable Antitrust Markets ................................................22

        2.    "Social Networking Services" Is Not A Cognizable Antitrust Market......23

    F.    Each Of Sambreel's Antitrust Claims Suffers From Additional, Independent Flaws ........................................................................................25

1.  Sambreel Has Not Stated A Section 2 Monopolization Claim (Count III) ....................................................................................25

2.  Sambreel Has Not Stated A Section 2 Attempted Monopolization Claim (Count IV) .........................................................................26

3.  Even Under A Rule Of Reason Analysis, Sambreel Has Not Adequately Alleged A Section 1 "Group Boycott" Claim (Count I).........27

4.  Sambreel Has Not Adequately Alleged A Section 1 Tying Claim (Count II) .............................................................................28

G.  Sambreel's Tack-On State Law Claims Must be Dismissed ................................28

1.  Sambreel's Claim for Violation of Section 17200 Is Deficiently Pleaded (Count V).........................................................................28

2.  Sambreel's Claim For Tortious Interference With Contract Must Be Dismissed (Count VI) .............................................................29

3.  Sambreel's Claim For Tortious Interference With Prospective Economic Advantage Fails (Count VII) ....................................................31

CONCLUSION.............................................................................................32

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) ................................................................................. 18

*Argueta v. Banco Mexicano, S.A.*,
87 F.3d 320 (9th Cir. 1996) ...................................................................................... 7

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ..................................................................................... 11, 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... *passim*

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) ................................................................................ 22

*Blind Doctor Inc. v. Hunter Douglas, Inc.*,
59 Fed. R. Serv. 3d 635, No. C-04-2678, 2004 WL 1976562 (N.D. Cal. Sept. 7, 2004) 2, 13, 14, 15

*Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) .................................................................................................... 10

*Brown Shoe Co. v. United States*,
370 U.S. 295 (1962) ................................................................................................ 12

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ............................ 9

*Calisher & Assocs., Inc. v. RGCMC, LLC*,
Nos. 08-cv-06523-MMM, et al., 2008 WL 4949041 (C.D. Cal. Nov. 17, 2008) .......... 10

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ....................................................................... 14, 15, 25

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ............................................................................ 22, 25

*Cyntegra, Inc. v. Idexx Labs., Inc.*,
520 F. Supp. 2d 1199 (C.D. Cal. 2007) ................................................................. 27

*Dist. No. 1, Pac. Coast Dist., M.E.B.A. v. State of Alaska*,
682 F.2d 797 (9th Cir. 1982) .................................................................................... 8

*Docksider, Ltd. v. Sea Tech., Ltd.*,
875 F.2d 762 (9th Cir. 1989) .................................................................................. 10

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................................................. 29

iii

*Doe 1 v. AOL LLC*,
    552 F.3d 1077 (9th Cir. 2009) ............................................................................... 8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................................. 21

*Facebook, Inc. v. Power Ventures, Inc.*,
    No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ..................... 9, 29

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) .......................................................................... 11, 26

*Gamayo v. Match.com LLC*,
    Nos. C 11-762 SBA, et al., 2011 WL 3739542 (N.D. Cal. Aug. 24, 2011) .................. 10

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) ............................................................................ 12, 14

*Goldwasser v. Ameritech Corp.*,
    222 F.3d 390 (7th Cir. 2000) ............................................................................... 13

*Green Country Food Markets v. Bottling Group, LLC*,
    371 F.3d 1275 (10th Cir. 2004) ........................................................................... 22

*Greer v. 1-800-Flowers.com, Inc.*,
    No. H-07-2543, 2007 WL 3102178 (S.D. Tex. Oct. 3, 2007) ............................... 9

*Ill. Tool Works  Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ............................................................................................... 19

*In re Facebook Privacy Litig.*,
    791 F. Supp. 2d 705 (N.D. Cal. 2011) ................................................................. 29

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3rd Cir. 2003) .............................................................................. 17

*J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care*,
    999 F. Supp. 1355 (S.D. Cal. 1998) ................................................................. 14, 15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................................ 19

*Jewelry 47, Inc. v. Biegler*,
    No. 2:08-cv-00174, 2008 WL 4642903 (E.D. Cal. Oct. 16, 2008) ....................... 30

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ............................................................................. 17

*Kinderstart.com, LLC v. Google, Inc.*,
    C-06-2059 JF(RS), 2007 WL 831806 (N.D. Cal. March 16, 2007) ...................... 24

*Kingray, Inc. v. NBA, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ............................................................... 13

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .................................................................................. 5

*Korea Kumho Petrochem. v. Flexsys Am. LP*,
    No. 07-1057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ...................................... 14

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .......................................................................................... 31

*Lancer Ins. Co. v. D.W. Ferguson & Associates*,
    Nos. 93-55789, 93-55750, 1995 WL 21705 (9th Cir. Jan. 19, 1995) ......................... 30

*LiveUniverse Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ..................................................................... *passim*

*LiveUniverse, Inc. v. Myspace, Inc.*,
    No. CV 06-6994 AHM, 2007 WL 6865852 (C.D. Cal. Jun. 4, 2007) ........... 24, 25, 26, 27

*Mark Coin. Co. v. General Mills, Inc.*,
    148 Cal. App. 3d 312 (1983) ................................................................................... 30

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ................................................................................. 11

*Morris Commc'n Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ..................................................................... 2, 14, 19

*Murphy v. Schneider Nat'l, Inc.*,
    362 F.3d 1133 (9th Cir. 2003) ................................................................................. 10

*N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*,
    69 F.3d 1034 (9th Cir. 1995) ................................................................................... 10

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) .......................................................................................... 19, 28

*New York Merc. Exch., Inc. v. Intercon. Exch., Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004) ....................................................................... 14

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ................................................................................. 27

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ..................................................................... 3, 16, 18

*Omnicell, Inc. v. Medacist Solutions Group, LLC*,
    272 F.R.D. 469 (N.D. Cal. 2011) ............................................................................... 7

*Pac. Bell Tel. v. Linkline Commc'n*,
    129 S. Ct. 1109 (2009) ..................................................................................... 13, 26

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3rd Cir. 1997) .......................................................................... 22, 23

*Ramco Int'l., Inc. v. Travex Corp.*,
   531 F. Supp. 796 (S.D. Fla. 1982)............................................................................ 13

*Real Page, Inc. v. Yardi Sys., Inc.*,
   No. 11-cv-690 ODW, 2012 WL 443730 (C.D. Cal. Feb. 13, 2012) ............................ 21

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)................................................................. 3, 19, 21, 23

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004)............................................................................................ 29

*Rickards v. Canine Eye Regis. Found., Inc.*,
   704 F.2d 1449 (9th Cir. 1983).................................................................................. 20

*Rick-Mik Enters., Inc. v. Equilon Enter. LLC*,
   532 F.3d 963 (9th Cir. 2008).................................................................................... 20

*Rodriguez v. Reich*,
   159 F.R.D. 38 (N.D. Cal. 1994) .................................................................................. 8

*San Francisco Design Center Assoc. v. Portman Cos.*,
   41 Cal. App. 4th 29 (1995)....................................................................................... 30

*SCFC ILC, Inc. v. Visa USA, Inc.*,
   36 F.3d 958 (10th Cir. 1994)..................................................................................... 27

*Sixty Two Street, LLC v. CapitalSource Finance LLC*,
   No. C 11-1920 WHA, 2011 WL 2182915 (N.D. Cal. June 6, 2011) ............................ 10

*Smalley & Co. v. Emerson & Cuming, Inc.*,
   808 F. Supp. 1503 (D. Colo. 1992) ........................................................................... 21

*Solis v. City of Fresno*,
   11-CV-00053 AWI GSA, 2012 WL 868681 (E.D. Cal. March 13, 2012) ...................... 30

*Starr v. Baca*,
   652 F. 3d 1202 (9th Cir. 2011).................................................................................. 30

*Streamcast Networks, Inc. v. Skype Tech., S.A.*,
   No. CV 06-391 FMC, 2006 WL 5437323 (C.D. Cal. Sept. 14, 2006)...................... 22, 24

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001)........................................................... 11, 21, 23, 27

*Telex Corp. v. IBM Corp.*,
   510 F.2d 894 (10th Cir. 1975)................................................................................... 22

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2nd Cir. 1992).................................................................................... 12

*TV Commc'n Network, Inc. v. Turner Network Tel., Inc.*,
   964 F.2d 1022 (10th Cir. 1992)................................................................................... 4

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................... 3, 19, 20

*United States v. Syufy Enterp.*
  903 F.2d 659 (9th Cir. 1990) ..................................................................... 24

*Universal Grading Service v. eBay, Inc.*,
  No. C-09-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ........................................ 15, 25

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................... 2, 12, 27

**<u>Statutes</u>**

15 U.S.C. § 15(a) ....................................................................... 12

28 U.S.C. § 1406(a) ..................................................................... 2, 8

Cal. Bus. & Prof. Code § 17200 ......................................................... 28

California Penal Code § 502(c)(7) ....................................................... 28

**<u>Other Authorities</u>**

44B Am. Jur. 2d Interference § 22 (2008) ............................................... 31

**<u>Rules</u>**

Fed. R. Civ. P. 12(b)(3) ................................................................. 2

### INTRODUCTION

Self-defense against an illegitimate invasion of one's business is not an antitrust violation. The complaint alleges that the Sherman Act compels Facebook to let Sambreel, through its "PageRage" adware, inject its advertisements into Facebook's webpages to modify—or "customize" to use Sambreel's term—Facebook so that users see Sambreel advertisements when browsing Facebook.[1]  But Facebook is not required to make its business or website available to Sambreel—a self-proclaimed competitor—on any terms other than those Facebook chooses.  Nor is Facebook required to acquiesce to the use of adware that hijacks Facebook's design control and degrades the Facebook user experience.  Access to and control of Facebook are not entitlements of Sambreel under the antitrust laws.

Antitrust law protects Facebook's right to choose with whom it wishes to conduct business and on what terms, and, perhaps most importantly, the right to control the design, display, and appearance of its own service.  Facebook has attempted to protect these rights by resisting Sambreel's effort to inject whatever advertising or content it wishes onto Facebook webpages. Naturally, Sambreel objects to Facebook's self-defense because it wants to have free access to Facebook webpages on its own unilateral terms and for its own profit.  But Sambreel can find no solace in the antitrust laws.  The Sherman Act does not convert every commercial grievance into a competition issue, prohibit a company from enforcing its neutral terms, or require successful businesses to play host to parasitic free riders.

The essence of Sambreel's complaint is two assertions:  First, Facebook allegedly "gated" Facebook users with Sambreel's adware on their computers by requiring them to remove Sambreel's PageRage-enabling software before accessing Facebook's website.  Compl. ¶ 37.  Second, Facebook allegedly instructed certain third-party advertising networks that, pursuant to Facebook's policies, they could not advertise with Facebook if they also advertised through PageRage, a product

---

[1] The Plaintiffs in this case are Sambreel Holdings LLC, Yontoo LLC and Theme Your World LLC. Sambreel is the parent company of both Yontoo and Theme Your World.  Compl. ¶ 9.  Yontoo LLC operates the browser add-on software on which PageRage operates.  *Id.* ¶ 10.  Theme Your World LLC operates PageRage.  *Id.* ¶ 11.  All Plaintiffs are parties to all Counts in the complaint.  As Plaintiffs do in their complaint, throughout this brief we will refer to the Plaintiffs collectively as "Sambreel."

specifically designed to "layer" Sambreel's advertisements over Facebook webpages.  Compl. ¶ 32.  Sambreel further asserts that Facebook somehow "enlisted" certain third-party application developers in this "boycott."  *Id.* ¶ 5.  Thus, accepting all allegations as true, the core of Sambreel's complaint challenges Facebook's ability to prevent Sambreel's adware from injecting ads into Facebook webpages both directly by gating users and indirectly by "enforcing its restrictive agreements with [a]pplication [d]evelopers or [a]dvertising [p]artners[.]"   Compl. at 28:13-14.  Consistent with Federal Rule of Civil Procedure 12(b) and well-established precedent, the steps Facebook took to protect its business do not state a claim.  The complaint should be dismissed for the following reasons:

*First*, as a threshold matter before addressing the substantive allegations, this Court should dismiss the complaint for improper venue.  *See* Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406(a).  Sambreel is bound by Facebook's Statement of Rights and Responsibilities ("Terms of Use"), and thus must bring all of its claims relating to Facebook in Santa Clara County, California.  The forum-selection clause in the Terms of Use is mandatory; venue in this district is improper.

*Second*, no antitrust law supports Sambreel's demand to extract profit from Facebook's success on its own unilateral terms.   The antitrust laws are Facebook's shield:  they enshrine Facebook's right to control its product, select its partners, and choose the terms on which it will deal.  *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408-09 (2004).  Ignoring this principle, Sambreel asserts that Facebook must share its business with a company that hijacks and impairs the Facebook user experience and does not state if it will abide by Facebook's own neutral access rules regarding ad content and ad placement offered to third parties.  *See* Compl. ¶ 20.  Such restrictions are valid business judgments that do ***not*** violate the antitrust laws, but rather are fully sanctioned by them.  *See Morris Commc'n Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 195-96 (11th Cir. 2004) (holding that PGA's restrictions on the press's dissemination of golf scores in competition with its own were based on a valid business justification to prevent free riding); *Blind Doctor Inc. v. Hunter Douglas, Inc.*, 59 Fed. R. Serv. 3d 635, No. C-04-2678, 2004 WL 1976562, at *6 (N.D. Cal. Sept. 7, 2004) ("Defendant is free to set restrictions on retailer advertising and to terminate business ties with merchants who fail to abide by the restrictions.").

**Third**, Sambreel does not have standing because it has not pleaded antitrust injury, "an element of all antitrust suits." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). A plaintiff must allege injury to competition. Alleged harm to an individual competitor is of no moment. In this same general business context, the Ninth Circuit has recognized that there is no antitrust injury when a competitor is blocked from a social networking site. In *LiveUniverse Inc. v. MySpace, Inc.,* the Ninth Circuit summarily affirmed the dismissal of an "injured" competitor's claims that being barred from a specific social networking site, in that case MySpace, constituted antitrust injury. 304 F. App'x 554, 557 (9th Cir. 2008) ("[Plaintiff] does not explain how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on other social networking websites[.]"). Like its predecessor in *LiveUniverse*, Sambreel fails to plead antitrust injury and all of its antitrust claims under Counts I through IV should be dismissed.

**Fourth**, Sambreel has failed to plead the required elements of per se claims for either its Count I "group boycott claim" or its Count II "tying claim." "The Supreme Court has found that the per se rule for group boycotts should be limited to cases 'involving horizontal agreements among direct competitors.'" *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) (citation omitted). While Sambreel labels its claim as a "horizontal" conspiracy between Facebook and its third-party application developers, its only factual allegations state that Facebook unilaterally approached separate advertising networks ("advertising partners" as they are labeled in the complaint) that have a vertical relationship with Facebook. Likewise, the per se rule is inapplicable to software platforms and complementary products, such as those alleged in Sambreel's Count II tying claim. *See, e.g.*, *U.S. v. Microsoft Corp.,* 253 F.3d 34, 95 (D.C. Cir. 2001) ("[T]ying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived[.]"). Sambreel also does not allege that Facebook's social networking services are *sold*—a requirement for the alleged tying product.

**Fifth**, failing to state any per se claim, Sambreel's complaint does not survive under rule of reason analysis because it does not allege a cognizable antitrust market. Sambreel's claims boil down to a single market: Facebook. Sambreel asserts that Facebook is barring Sambreel's products

both directly and indirectly so that Sambreel cannot "compete" with Facebook for service of advertising on facebook.com.  To cloak the truism that a company cannot be a market unto itself, *see, e.g.*, *TV Commc'n Network, Inc. v. Turner Network Tel., Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992), Sambreel performs legal gymnastics to plead **four** different and contradictory "markets," none of which satisfies the necessary pleading standard.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**Sixth**, each of Sambreel's claims suffers from other equally fatal flaws.  Counts III and IV (monopolization and attempted monopolization) identify no "exclusionary conduct" under the Sherman Act.   As noted, the Ninth Circuit has already held that a social media website does not engage in improper "exclusionary conduct" by prohibiting its users from linking to or using a competitor's products on its own website.  *LiveUniverse*, 304 F. App'x at 556-57.  Count I (group boycott) does not allege Facebook has market power within a relevant market—Facebook's supposed 28% share of internet display advertising is insufficient as a matter of law to confer market power, even if "display ads" were a relevant market—and does not allege "significant anticompetitive effects."  Count II (tying) does not allege that Facebook forces anyone to purchase any other product, only that it *prohibits* the use of Sambreel's adware, which injects advertising and other disruptive functionality on facebook.com.  These pleading flaws separately bar the claims.

 **Seventh**, the tag-along state law claims also should be dismissed.  Because Sambreel fails to allege a claim under the Sherman Act, it cannot plead the required "unfair" conduct under California's Unfair Competition Law.  For its tortious interference with contract claim, Sambreel has failed to allege that Facebook had actual knowledge of any existing contract or that it intentionally and unlawfully sought to disrupt that contract.  Sambreel's tortious interference with prospective business advantage claims is deficient because it is derivative of and relies exclusively on the deficient Sherman Act and Section 17200 allegations.[2]   For these reasons and all the reasons discussed below, the complaint should be dismissed.[3]

---

[2]  For ease of reference, Facebook submits the chart on Attachment 1 summarizing Sambreel's claims, the necessary legal standard, and Facebook's dismissal arguments.

[3] Consistent with the local rules and this Court's standing orders, Facebook has noticed a hearing on this motion for June 22, 2012.  However, Facebook has also filed an application to expedite the

1

## BACKGROUND

2

3

**A.    Facebook's Popular Social Networking Service Is Available To Application Developers That Follow Its Policies**

4

Facebook designs, owns, and operates a social networking service that allows users to

5

connect and share information with their friends and family.  *See* Compl. ¶¶ 16, 17. Launched in

6

2004, Facebook now serves hundreds of millions of monthly active users.  *Id.*  As it grew, Facebook

7

broadened its services to include the Facebook Platform, which enables third-party application

8

developers to provide online services to Facebook users.  *Id.*   These third-party application

9

developers may make money in part by selling advertisements that appear within the applications

10

they provide to users.  *Id.* ¶ 18.

11

To use the Facebook Platform and offer advertising content to Facebook users, application

12

developers must agree to Facebook's policies.  *Id.* ¶ 20.  Those policies include: (a) the Facebook

13

Terms of Use, which apply to all users as well as third-party developers; (b) the Facebook Platform

14

Policies, which apply to developers; and (c) the Facebook Advertising Guidelines, which apply to all

15

parties seeking to display ads to Facebook users through the Facebook Platform.  In addition,

16

advertisers and advertising networks who seek to display ads on third-party applications on the

17

Facebook Platform must agree to Facebook's Platform Terms for Advertising Providers, which

18

incorporates the three sets of policies referenced above.

19

These guidelines and terms contain rules designed to protect the Facebook user experience

20

that are directly relevant to Sambreel's misconduct.  For example, the Terms of Use unequivocally

21

prohibit "***showing third party ads*** or web search boxes ***on facebook.com***."  *See* Declaration of Craig

22

Clark ("Clark Decl.") ¶¶ 2, Ex. A.[4]  The Terms of Use also prohibit all third parties from "[d]oing

23

anything that could disable, overburden, or impair the proper working of Facebook," "collecting user

24

briefing and hearing schedule on this Motion.  If the Court grants the application, Facebook will file a revised notice of motion.

25

[4] In its complaint, Sambreel expressly references the Advertising Guidelines and cites the Facebook

26

Platform Terms for Advertising Providers, which incorporates the Advertising Guidelines and Terms of Use.  *See* Compl. ¶¶ 20-21.  On a motion to dismiss, courts may "take into account documents

27

whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading."  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th

28

Cir. 2005) (punctuation and citation omitted).

data," or "[d]etermining on their own the size, placement, and positioning of their ads."  *Id.*  Similarly, the Advertising Guidelines prohibit ads that either "link directly or indirectly that contains spyware/malware" or contain content that is "sensational or disrespectful," "sexually suggestive," or otherwise "offend[s] users."  *See id.* ¶ 2, Ex. B.

Tellingly, Sambreel fails to state in the complaint that it ***complies*** with (or ***is even willing to comply*** with) any of these policies, which are designed to protect the Facebook user experience.[5]  Nor could Sambreel make such a claim.  As discussed in the next section, Sambreel seeks to advertise to Facebook users by injecting ads ***on*** facebook.com in direct violation of the Terms of Use.

> **B.    Operating Outside The Facebook Platform, Sambreel's "PageRage" Adware Makes Money Serving Ads To Facebook Users While They Are Browsing Facebook**

Sambreel operates "PageRage," a browser add-on created to embed "designs" and advertisements onto Facebook users' browsers.  *See* Compl. ¶¶ 24, 27.  Unlike hundreds of thousands of application developers and website operators who have developed integrations that they believe can enhance users' Facebook experience, PageRage ***does not operate through the Facebook Platform***.  *Id.* ¶¶ 2-3.  Instead, PageRage "layers" its designs and ads directly into Facebook's webpages.  *Id.* ¶ 2.  When PageRage is installed on users' browsers, users visiting facebook.com will see ads sold by Sambreel and not authorized by Facebook.[6]  *Id.* ¶ 30.  Thus, Sambreel makes its money (through PageRage) by selling ads displayed to Facebook users while they are browsing Facebook.  *Id.* ¶¶ 27, 43.  Sambreel does not deny that its business goal is to offer an "***alternative***

---

[5] While not necessary for the Court's consideration of this motion to dismiss, it is notably that Sambreel artfully avoids disclosing that it was not permitted to provide its PageRage application through Facebook Platform because it did not follow these policies.

[6] Sambreel alleges that users "choose" to use PageRage.  First, for the purposes of this Motion, the Court must accept Sambreel's well-pleaded factual allegations as true.  However, a major factual dispute between Facebook and Sambreel will be the extent to which Facebook users knowingly downloaded Sambreel's adware, understood what they were getting when they did, or wanted it in the first place.  Facebook will present substantial evidence that many of its users did not knowingly or purposely download this adware, did not want it, thought it was Facebook, and complained to Facebook about it.  Second, Facebook has the right to control the appearance of its webpages regardless.

*means*" for advertisers to place unauthorized "display advertising to individuals while they are *accessing the Facebook website*." *Id.* ¶ 2 (emphasis added).

### C.   Facebook Took Steps To Enforce Its Policies That Protect the User Experience

According to the complaint, Facebook took steps to defend itself from Sambreel's adware. Specifically, Sambreel alleges that Facebook approached advertising networks that purchased display advertising for Sambreel and informed them that they would be removed as Facebook-approved advertising networks if they continued to do business with PageRage. *Id.* ¶ 32. Sambreel further alleges that Facebook "gated" its users with PageRage adware on their computers by requiring them to remove Sambreel's PageRage-enabling products if they wished to use the Facebook website. *Id.* ¶¶ 37-38. In short, Facebook allegedly gave its users a choice between using the Facebook website pursuant to its standard terms and conditions or using other social networking websites that permit Sambreel's adware. *Id.* Sambreel now brings this antitrust action to usurp control over facebook.com and dictate with whom Facebook must do business and on what terms.

### <u>ARGUMENT</u>

### I.   THIS COURT SHOULD DISMISS OR TRANSFER SAMBREEL'S COMPLAINT FOR IMPROPER VENUE

As a threshold matter, Sambreel disregarded its acceptance of Facebook's Terms of Use by filing its complaint in this district. In Facebook's Terms of Use, Sambreel agreed to a mandatory forum selection clause, requiring Sambreel to bring all claims relating to Facebook in Santa Clara County, California. Venue here is improper; the Court should dismiss or, alternatively, transfer the complaint to the Northern District of California.

Federal courts treat the enforcement of a forum-selection clause as a Federal Rule of Civil Procedure 12(b)(3) motion to dismiss for improper venue. *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996). "Once the defendant has challenged the propriety of venue in a given court, the plaintiff bears the burden of showing that venue is proper." *Omnicell, Inc. v. Medacist Solutions Group, LLC*, 272 F.R.D. 469, 472 (N.D. Cal. 2011). If venue is improper, the court may dismiss the case, or transfer it to any district in which it properly could have been brought. 28

U.S.C. § 1406(a); *Dist. No. 1, Pac. Coast Dist., M.E.B.A. v. State of Alaska*, 682 F.2d 797, 799 (9th Cir. 1982).[7]

Facebook's Terms of Use govern all aspects of Facebook's relationships with its users, developers, and advertisers, including dispute resolution. *See* Clark Decl. ¶¶ 2-3.[8] Section 15 of the Terms of Use, "**Disputes**," states:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to this Statement or Facebook ***exclusively in a state or federal court located in Santa Clara County***. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions. You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

*Id.* ¶ 2, Ex. A § 15.1 (emphasis added). All Facebook users must agree to the Terms of Use as part of Facebook's registration process. *Id.* ¶ 3. Facebook conditions users' access on their ongoing assent to the Terms of Use: "[b]y using or accessing Facebook, you agree to this statement," *id.* ¶ 2, Ex. A, and the forum-selection clause survives termination of the Terms of Use, *id.* § 14.

On September 5, 2011, Sambreel agreed to the Terms of Use, including its mandatory forum selection clause, when a Sambreel employee created a Facebook Page to promote Sambreel Services LLC, a subsidiary of Plaintiff Sambreel Holdings LLC. *Id.* ¶¶ 4, 5. According to its LinkedIn webpage, Sambreel Services LLC's products include Plaintiff Theme Your World LLC, which operates PageRage, and Plaintiff Yontoo LLC, creator of Yontoo Layers. *Id.* ¶ 6, Ex. F. Arie Truow, the CEO of Sambreel, was made one of the three administrators of the Sambreel Services LLC Facebook Page. *Id.* ¶ 5. On September 20, 2011, a Sambreel employee also created a Facebook Page titled "Recruiting at Sambreel Services." *Id.* ¶ 5. Through the creation of these (and potentially other[9]) Facebook Pages, Sambreel has agreed to the forum-selection clause in the Facebook Terms of Use.

---

[7] "In contrast to discretionary transfers under 28 U.S.C. § 1404(a), the Court cannot consider factors of convenience or hardship when determining whether to transfer for improper venue under § 1406(a)." *Rodriguez v. Reich*, 159 F.R.D. 38, 39-40 (N.D. Cal. 1994).

[8] In considering a Federal Rule of Civil Procedure 12(b)(3) motion, "pleadings need not be accepted as true, and facts outside the pleadings may be considered." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009).

[9] Because Plaintiffs have refused to agree to a reasonable expedited discovery schedule, Facebook has been unable to determine the full extent of Plaintiffs' interactions with and access to Facebook.

1    Sambreel also agreed to Facebook's forum-selection clause through its use of facebook.com.

2    As part of its PageRage marketing efforts, Sambreel offers a series of tutorial videos on YouTube,

3    including on how to enable its adware, PageRage.   *See* Clark Decl. ¶ 8, 11; *see also*

4    http://www.youtube.com/user/PageRageTutorials/videos.   Many of these videos show a Sambreel

5    instructor accessing a facebook.com account using pageragefblayouts@gmail.com.  *See* Clark Decl.

6    ¶ 9, Ex. H.   For example, in the YouTube video, "How to Install PageRage for Facebook Layouts

7    Using Google Chrome," an instructor successfully accesses a facebook.com account using the email

8    address "pageragefblayouts.gmail.com."  *See id.* ¶ 8, Ex. H.    This instructor then displays a

9    facebook.com webpage and provides additional instructions on how to use PageRage.  *See  id.* ¶ 10,

10   Ex. I.

11    Sambreel's creation and accessing of a facebook.com account as part of its efforts to develop

12   and market PageRage are not surprising.  "From an engineering perspective, it would not be possible

13   to develop, test, maintain, and update the PageRage software without accessing facebook.com

14   through an active registered Facebook user account."  Declaration of Chris Palow ¶ 2.   Thus, to

15   even maintain its product, Sambreel repeatedly agrees to Facebook's terms and conditions.  Courts

16   have consistently held that "in the act of accessing or using the Facebook website alone, [plaintiffs]

17   acceded to the Terms of Use and became bound by them."  *Facebook, Inc. v. Power Ventures, Inc.*,

18   No. C 08-05780 JW, 2010 WL 3291750, at *7 n.20 (N.D. Cal. July 20, 2010); *accord Cairo, Inc. v.*

19   *Crossmedia Servs., Inc.*, No. C 04-04825 JW, 2005 WL 756610, at *4-5 (N.D. Cal. Apr. 1, 2005)

20   (website visits with constructive knowledge of the terms of use "constituted acceptance of the terms,

21   which accordingly are binding on [plaintiffs].");  *Greer v. 1-800-Flowers.com, Inc.*, No. H-07-2543,

22   2007 WL 3102178 at *2 (S.D. Tex. Oct. 3, 2007) ("Accessing the website constitutes the agreement

23   to be bound by the Terms of Use, including its forum selection clause.").

24    Mandatory forum-selection clauses are "presumptively valid" and "should be honored absent

25   some compelling and countervailing reason."  *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140

26

27   Facebook respectfully suggests that Plaintiffs should be required to disclose on what past and
     ongoing basis Elaine Low, Arie Trouw, and other of their employees have accessed Facebook on
28   behalf of plaintiffs.  Given the Terms of Use, each such accessing creates a separate, additional basis
     for venue in the Northern District of California.

(9th Cir. 2003) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)).  In the Ninth Circuit, "where venue is specified with mandatory language the clause will be enforced," even if venue elsewhere is otherwise proper.  *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989); *Calisher & Assocs., Inc. v. RGCMC, LLC*, Nos. 08-cv-06523-MMM, et al., 2008 WL 4949041, at *3 (C.D. Cal. Nov. 17, 2008) (A "mandatory . . . clause must be enforced and venue will lie in the designated forum **only**.").

The forum-selection clause here is mandatory because it designates Santa Clara County as the exclusive forum.  *N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995) (forum selection clause is mandatory if it "clearly designates a forum as the exclusive one."); *see also, e.g.*, *Sixty Two Street, LLC v. CapitalSource Finance LLC*, No. C 11-1920 WHA, 2011 WL 2182915, at *1-2 (N.D. Cal. June 6, 2011) (dismissing for lack of venue where agreement required plaintiffs to bring all claims "exclusively in any state or federal court . . . in Montgomery County, Maryland"); *Gamayo v. Match.com LLC*, Nos. C 11-762 SBA, et al., 2011 WL 3739542, at *1, *7 (N.D. Cal. Aug. 24, 2011) (treating as presumptively valid a similar forum-selection clause, finding that users agreed to the forum-selection clause by using the website, and transferring the action accordingly); *Person v. Google Inc.*, 456 F. Supp. 2d 488, 492-94 (S.D.N.Y. 2006) (enforcing mandatory forum-selection clause under Fed. R. Civ. P. 12(b)(3) against plaintiff asserting Sherman Act claims).

Thus, the Court should dismiss or, alternatively, transfer the complaint to the Northern District of California.

## II.   THE COURT SHOULD DISMISS SAMBREEL'S COMPLAINT FOR FAILURE TO STATE A CLAIM

The complaint should independently be dismissed for failure to state a claim.  Antitrust claims have certain threshold requirements designed to prevent plaintiffs from transforming frivolous business grievances such as this one into treble-damage competition suits.  Chief among these doctrinal limitations are the need to plead with sufficient specificity a cognizable antitrust market, significant anticompetitive effects, and an antitrust injury as defined in the case law.

1   Because Sambreel's allegations fail to satisfy *any* of these core antitrust elements, the complaint

2   should be dismissed.

3   **A.    Legal Standard**

4       To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state

5   a claim to relief that is *plausible* on its face," which "requires more than labels and conclusions, and

6   a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*,

7   550 U.S. 544, 555, 570 (2007) (punctuation omitted and emphasis added).  "Factual allegations must

8   be enough to raise a right to relief above the speculative level."  *Id.*  The court should "draw on its

9   judicial experience and common sense," and if the facts alleged "do not permit the court to infer

10  more than the mere possibility of misconduct," the claim must be dismissed.  *Ashcroft v. Iqbal*, 129

11  S. Ct. 1937, 1950 (2009).

12      Counts I and II allege violations of Section 1 of the Sherman Act, which requires a plaintiff

13  to "demonstrate: (1) that there was a contract, combination, or conspiracy; (2) that the agreement

14  unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and

15  (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062

16  (9th Cir. 2001) (citation and punctuation omitted).  Under a rule-of-reason analysis, a plaintiff must

17  plead that "the restraint produces 'significant anticompetitive effects' within a 'relevant market'"

18  where the defendant has market power.  *Id.* at 1063.

19      Counts III and IV allege violations of Section 2 of the Sherman Act.  A monopolization

20  claim requires a plaintiff to demonstrate that the defendant:  "(1) possessed monopoly power in the

21  relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and

22  (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir.

23  2004).  An attempted monopolization claim similarly requires "four elements:  (1) specific intent to

24  control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward

25  accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury."

26  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997).  "Resolution of this issue, like the

27  claim of actual monopolization, is dependent upon a definition of the relevant market."  *Id.*

28

1    Finally, a private party seeking to recover damages for an antitrust violation must have

2    standing under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).  As a result, even where a complaint

3    states an actionable claim under the Sherman Act, a plaintiff must separately allege a cognizable

4    "antitrust injury" to avoid dismissal.  *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367,

5    371 (9th Cir. 2003).  Antitrust injury is one "of the type the antitrust laws were intended to prevent."

6    *Id.* at 372 (citation omitted).  "[I]t is not enough for plaintiff to merely allege injury to itself as a

7    result of defendant's practices; competition within the industry itself must actually be restrained for

8    an actionable claim."  *Blind Doctor*, 59 Fed. R. Serv. 3d 635, 2004 WL 1976562, at *8.

9

10    **B.    The Antitrust Laws Protect Facebook's Right To Control Its Product And Choose Whether And On What Terms It Will Do Business With Sambreel**

11    Sambreel casts its complaint in the terms of antitrust law, but that is not the true nature of its

12    grievance against Facebook.  Apparently unwilling or unable to allege it would accept the standard

13    terms and conditions that Facebook offers developers integrating with Facebook, Sambreel tries to

14    contort its dissatisfaction with Facebook into a "competition" issue.  Sambreel contends that it has an

15    absolute right—free of charge—to sell and display ads directed to Facebook's users when they

16    browse facebook.com for Sambreel's own unilateral benefit, on its own unilateral terms, and in

17    violation of Facebook's neutral terms that apply to all third parties.  The antitrust laws will not

18    support such a demand; instead, they vindicate Facebook's rights to control its own product and

19    conduct its business on *its* own terms.  This fundamental notion is fatal to Counts I through IV.

20    Just as the antitrust laws protect competition, not competitors, *Brown Shoe Co.* v. *United*

21    *States,* 370 U.S. 295, 320 (1962), so too they safeguard a firm's right to design its own product and

22    choose its own business partners.  Even were Facebook a monopolist—which it is not—the Supreme

23    Court has explained that "the Sherman Act does not restrict the long recognized right of a trader or

24    manufacturer engaged in an entirely private business, freely to exercise his own independent

25    discretion as to parties with whom he will deal."  *Trinko*, 540 U.S. at 409 (affirming dismissal of

26    complaint alleging that Verizon improperly excluded competitors from using its own network); *see*

27    *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2nd Cir. 1992) (holding that even

28    with monopoly power, "[a] business may properly seek to maintain the image of its products by

1   controlling where those products are sold" and selecting only those partners "that are consistent with

2   the quality and image it wishes to project for its products").

3        And if a monopolist can simply refuse to deal with any party at its discretion, it certainly

4   follows that Facebook can create and enforce standard terms and conditions on which it contracts

5   with third parties and upon which it permits others to access and manipulate its own products.[10]   *See*

6   *Pac. Bell Tel. v. Linkline Commc'n,* 129 S. Ct. 1109, 1118 (2009) ("As a general rule, businesses are

7   free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of

8   that dealing."); *Blind Doctor*, 59 Fed. R. Serv. 3d 635, 2004 WL 1976562, at *6 ("Defendant is free

9   to set restrictions on retailer advertising and to terminate business ties with merchants who fail to

10  abide by the restrictions."); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000)

11  ("[E]ven a monopolist is entitled to compete; it need not lie down and play dead, as it watches the

12  quality of its products deteriorate and its customers become disaffected.") (citations omitted).[11]

13        Sambreel admits that Facebook allows application developers who wish to serve display ads

14  to Facebook's users to do so through the Facebook Platform in a manner that is mutually beneficial

15  to both Facebook and the application developers.  *See* Compl. ¶¶ 17-20.  Sambreel also admits that,

16  as a condition to receiving the ability to serve ads through the Facebook Platform, the application

17  developers agree to a series of neutral rules regarding ad content and ad placement.  *Id.*; *see* Clark

18  Decl. ¶ 2, Exs. A, B (attaching Facebook Advertising Guidelines and Terms of Use).   Here,

19  Sambreel does not allege—because it cannot—that it complies with those terms or is willing to

20  comply with those terms.

21

22

[10] While not salient for the Court's consideration of this motion to dismiss, the facts will show that
23  this is not a "refusal to deal" case because Facebook offered Sambreel the opportunity to work
through the Facebook Platform and ***Sambreel declined***.   Even accepting the allegations in the
24  complaint as true, however, Facebook's alleged refusal to deal with a self-proclaimed competitor to
protect its own business would be entirely legitimate under the case law.  *Trinko*. 540 U.S. at 408-09.
25
[11] *See also Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1188 (S.D. Cal. 2002) ("[I]t is a
26  longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from
unilaterally determining the parties with whom it will deal and the terms on which it will transact
27  business.") (citation omitted); *Ramco Int'l., Inc. v. Travex Corp.*, 531 F. Supp. 796, 800 (S.D. Fla.
1982) ("A refusal to deal is not actionable under the Sherman Act unless the party refusing to deal
28  does so by rejecting the same terms and conditions afforded to and tendered by other parties.").

Courts have consistently recognized the enforcement of such terms as legitimate, not an antitrust violation. *See, e.g.*, *Morris Commc'n*, 364 F.3d at 1290, 1295-96 (holding that PGA's restrictions on the press's dissemination of golf scores in competition with its own were valid business justifications under Section 2 of the Sherman Act to prevent free-riding); *Blind Doctor*, 59 Fed. R. Serv. 3d 635, 2004 WL 1976562, at *6 ("[I]n an effort to maintain consumer goodwill . . . defendant merely requires retailers to abide by certain advertising restrictions.  Courts have long recognized that such advertising restrictions do not rise to the level of an antitrust violation."); *New York Merc. Exch., Inc. v. Intercon. Exch., Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) (dismissing Section 2 claim based on an alleged monopolist's restrictions on the use of its product and explaining that the defendant "ha[d] a legitimate business interest in preventing its competitor, [the plaintiff], from free-riding on [defendant's product]" and "free-riding on [defendant's] reputation").  Even if Facebook's enforcement of its neutral conditions had a negative impact on Sambreel's ability to generate revenue from advertising displayed to Facebook users, the antitrust laws protect Facebook's right to choose with whom it will do business and on what terms.  Sambreel cannot twist Facebook's enforcement of its neutral conditions of use into an antitrust attack; the antitrust laws are Facebook's ***shield***, not Sambreel's sword.

## C.    All Of Sambreel's Antitrust Claims Must Be Dismissed For Failure To Plead An Antitrust Injury

A plaintiff must allege injury "of the type the antitrust laws were intended to prevent," *Glen Holly Entm't*, 352 F.3d at 372 (citation omitted), which is harm to competition itself—*not* harm to individual competitors.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008).  Accordingly, courts must be "particularly sensitive to the antitrust injury requirement" where, as specifically alleged here, the plaintiff "is a competitor, not a consumer."  *J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care*, 999 F. Supp. 1355, 1360 (S.D. Cal. 1998).  Whether a plaintiff has pleaded antitrust injury is appropriate for resolution on a motion to dismiss.  *See Korea Kumho Petrochem. v. Flexsys Am. LP*, No. 07-1057, 2008 WL 686834, at *3 (N.D. Cal. Mar. 11, 2008) ("Courts vet a plaintiff's ability to establish antitrust injury at the pleading stage, because a plaintiff's ability to establish antitrust injury depends less on the plaintiff's proof than on its

underlying theory of injury, and antitrust injury is necessary, but not sufficient, for antitrust standing.").

Here, each of Sambreel's Sherman Act claims is accompanied by the allegation that Facebook's actions caused *Sambreel* "lost revenue" and "lost customers." *See* Compl. ¶¶ 71, 80, 87, 91. But that is not enough. *See Cascade Health*, 515 F.3d at 902 (explaining that "the antitrust laws' prohibitions focus on protecting the competitive process and not on the success or failure of individual competitors"); *Blind Doctor*, 59 Fed. R. Serv. 3d 635, 2004 WL 1976562, at *8 ("[I]t is not enough for plaintiff to merely allege injury to itself as a result of defendant's practices; competition within the industry itself must actually be restrained for an actionable claim."); *J. Allen Ramey*, 999 F. Supp. at 1364 ("While conduct that eliminates rivals reduces competition, reduction of competition does not invoke the Sherman Act until it harms consumer welfare."). Sambreel cannot contend that this purported harm to itself is an antitrust injury.

The only harm the complaint alleges to *consumers* is that Facebook users will be unable to use PageRage to change how Facebook appears to them. The Ninth Circuit has squarely rejected just such an injury argument in the context of another social networking service—MySpace—which forbade its users from using the company's website to benefit a competitor:

> LiveUniverse's allegation that MySpace's conduct in disabling links on MySpace.com to other social networking websites reduces consumers' choices in the relevant market, thereby diminishing "the quality of consumers' social networking experience," falls short [of pleading antitrust injury]. LiveUniverse does not explain how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on other social networking websites, which is the relevant market . . . . Consumers remain free to choose which online social networks to join, and on which websites they upload text, graphics, and other content.

*LiveUniverse*, 304 F. App'x at 557 (affirming dismissal of antitrust claims); *see also Universal Grading Service v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, *9 (N.D. Cal. Mar. 8, 2011) ("At bottom, plaintiffs do not explain how eBay's actions *on its own website* [by refusing to deal with certain coin-grading companies and preventing their access to eBay's users] can reduce consumers' choices or diminish the quality of their experience on *other* auction websites and thus cause antitrust injury.").

Just so here.  Sambreel is free to create and market a product that competes with Facebook's website—indeed, numerous companies do, including MySpace and many others.  In fact, Sambreel is free to create its own website with the functionality and advertising of its choosing and integrate that website with Facebook functionality, as many website operators currently do.  Just as MySpace could "prevent consumers from accessing [a competitor] through MySpace.com," *LiveUniverse*, 304 F. App'x at 557, Facebook can prevent consumers from using PageRage, a self-described competitive display advertising program, in connection with facebook.com.  Facebook's decision might harm Sambreel's business, but the antitrust laws do not exist for Sambreel's benefit or to allow Sambreel to unilaterally disregard Facebook's terms.  Because "[c]onsumers remain free to choose which online social networks to join," Facebook's conduct does not injure Sambreel for purposes of the antitrust laws.  *Id.*[12]

### D.     Sambreel Has Not Stated Per Se Group Boycott Or Tying Claims

Per se antitrust liability is reserved solely for that narrow band of claims that "relate to conduct that is manifestly anticompetitive . . . [*i.e.*, to] agreements or practices which because of their pernicious effect on competition and *lack of any redeeming virtue* are conclusively presumed to be unreasonable and therefore illegal."  *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1091 (9th Cir. 2000) (citation omitted).  Facebook's exercise of its rights to control the access and presentation of its product does not fall into this narrow band of prohibited conduct.  This is borne out by Sambreel's failure to plead the elements of the per se claims that it alleges.

### 1.     Sambreel Has Not Adequately Pleaded A Group Boycott Claim In Count I

Sambreel's Count I group boycott claim must be dismissed for three independent reasons: Sambreel (1) has not stated the claim with the specificity *Twombly* requires; (2) has not alleged the

---

[12]  Sambreel also alleges that Facebook's insistence on compliance with its neutral terms and conditions for Sambreel to integrate with the Facebook Platform resulted in "advertisers paying supra-competitive prices for display advertisements" directed towards Facebook users, *see* Compl. ¶ 42.  Not only does Sambreel lack antitrust standing to make such a claim for lack of antitrust injury, but it also lacks Article III standing, for it does not allege that it is an advertiser whose ads are directed at Facebook users.

1  required conduct between direct horizontal competitors; and (3) has not stated sufficient factual

2  allegations for three key factors the Ninth Circuit requires for group boycott claims.

3      **First**, Sambreel's vague assertion that "Facebook has agreed with . . . the [a]pplication

4  [d]evelopers . . . to withhold business from the [a]dvertising [p]artners unless they agree to help

5  injure Sambreel," Compl. ¶ 67, fails the pleading standard. *Twombly*, 550 U.S. at 555. Sambreel

6  does not explain which application developers (if any) Facebook approached and whether and how

7  any of them agreed to "withhold business" from any particular advertising network. A group

8  boycott claim under Section 1 requires sufficient specific factual allegations, "such as a 'specific

9  time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to

10  allegations of a conspiracy an idea of where to begin." *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d

11  1042, 1047 (9th Cir. 2008) (affirming dismissal for inadequate pleading of Section 1 conspiracy

12  claim).[13]

13      **Second**, Sambreel's factual allegations of group boycott assert vertical, not horizontal,

14  conduct. While Sambreel states that its goal is to take advertising revenue from Facebook as a

15  purported horizontal competitor in selling ads on facebook.com, Compl. ¶¶ 4, 27, its only specific

16  factual assertions of group boycott allege conduct of a vertical nature between Facebook and its

17  sanctioned advertising providers. Sambreel alleges that Facebook unilaterally "approached

18  [a]dvertising [p]artners"—a relationship Sambreel admits is vertical, *see id*. ¶ 18—and informed

19  them that Facebook would make the unilateral decision to stop doing business with them if they

20  continued to do business with Sambreel.[14]  *See id*. ¶ 32.  Notably, Sambreel does not allege an

21  agreement **among** the horizontally situated application developers or **among** the horizontally

22

23  [13] Even if Sambreel had alleged an agreement between Facebook and third-party application developers sufficient to withstand a *Twombly* analysis, the complaint suggests that Facebook and its application developers operate at different levels of distribution and thus the relationship is **vertical**, not horizontal, and therefore precludes a per se analysis.  *See* Compl. ¶¶ 17, 19 (alleging that Facebook "provides[s] a platform to host applications developed and marketed by third parties," and the application developers "distribute their Applications on the Facebook Platform").

24

25

26  [14] Such unilateral actions are not antitrust violations.  *See Twombly*, 550 U.S. at 566 (finding allegations consistent with "natural, unilateral reaction of each" competitor to be inadequate to state a conspiracy claim); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3rd Cir. 2003) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.").

27

28

situated advertising providers to stop using Sambreel.  Interpreted most favorably, Sambreel has either alleged (a) separate vertical agreements between Facebook and individual advertising networks to prohibit the use of Sambreel's product on the Facebook website or (b) that multiple companies made unilateral decisions to cease working with Sambreel.  *Id.* ¶ 33.  Either way, Sambreel's allegations are inadequate to implicate the horizontal boycott rule[15] because "[t]he Supreme Court has found that the per se rule for group boycotts should be limited to cases 'involving **horizontal agreements** among **direct competitors**.'"  *Nova Designs,* 202 F.3d at 1092 (emphasis added and citation omitted).

**Third**, Sambreel has not stated factual allegations regarding the three additional factors courts in the Ninth Circuit evaluate for per se group boycotts:  "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition."  *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998).

Sambreel's complaint is silent on whether an alleged Facebook-led group boycott would "cut[] off access to a supply, facility or market necessary" for Sambreel to compete.  *Id.*  Facebook is not the only social networking service available:  Twitter, Google+, Path, LinkedIn, MySpace, MessageIt, Flickr, Tumblr, Match.com, and eHarmony all provide social network services, as do many others.   To state a viable group boycott claim, Sambreel must plausibly allege that Facebook is "a supply, facility or market necessary" for Sambreel.  *Id.*

The complaint also does not explain how Facebook has a "dominant market position" in a relevant antitrust market, which Sambreel characterizes as the market for "online display advertising" and its submarket.  *See* Compl. ¶ 68.  Sambreel concedes that Facebook has at most a 28% share of this "display ad" market, which is insufficient as a matter of law to support an antitrust

---

[15] Sambreel also alleges that Facebook independently threatened Neverblue, an online advertising company that allegedly had no business relationship with PageRage, in order to prevent Neverblue from working with Sambreel.  *See* Compl. ¶ 36.  Aside from the vagueness of this allegation, it clearly does not suggest a "**horizontal agreement**[] among **direct competitors**" sufficient to plead a group boycott claim.  *Nova Designs*, 202 F.3d at 1092 (emphasis added).

1   claim.  *See* Compl. ¶ 63; *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.43 (1984)

2   ("[T]his Court has found that market shares comparable to [30%] do not create an unacceptable

3   likelihood of anticompetitive conduct."), abrogated in part on other grounds by *Ill. Tool Works  Inc.*

4   *v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Rebel Oil Co., Inc. v. Atl. Rich. Co.*, 51 F.3d 1421, 1438 (9th

5   Cir. 1995) ("[M]arket share of 30 percent is presumptively insufficient to establish the power to

6   control price.").

7           Finally, Sambreel makes no factual allegations regarding a lack of pro-competitive

8   justifications for Facebook's conduct; it simply asks the Court to accept its bald-faced assertion that

9   there are none.  Such unsupported legal conclusions fail to meet the pleading standard.  *Twombly*,

10   550 U.S. at 555.  Moreover, the rest of Sambreel's complaint reveals Facebook's pro-competitive

11   justifications.  As Sambreel acknowledges, the very purpose of its product is to reduce Facebook's

12   advertising revenue by operating as "an alternative to advertising" through Facebook for ads that are

13   delivered to users on facebook.com.  Compl. ¶ 68.  If parties were not allowed to prohibit such free

14   riding, then innovative firms like Facebook would have no incentive to develop new products in the

15   first place.  Prevention of free riding has been recognized as a legitimate business justification.  *See*

16   *Morris Commc'n*, 364 F.3d at 1295-96 (holding that PGA's restrictions on the press's dissemination

17   of golf scores in competition with its own were based on a valid business justification to prevent free

18   riding).

19                    **2.       Sambreel Has Not Properly Alleged A Per Se Tying Claim in Count II**

20           Tying for antitrust purposes is "an agreement by a party to ***sell*** one product but only on the

21   condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not

22   purchase that product from any other supplier."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6

23   (1958) (emphasis added).  Per se tying claims require separate "tying" and "tied" product markets.

24   *U.S. v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001).  Here, Facebook allegedly tied its social

25   network service to its users' agreement not to use Sambreel's PageRage, its alleged social

26   networking-enhancing application.  Compl. ¶ 75.  Thus, the alleged tying product market is

27   described as the social networking services market, and the tied market is for applications that

28   "customize or enhance social networking."  *Id.*  Sambreel's claim fails because: (1) per se tying is

inapplicable in platform software markets; (2) the "tying" product must be sold, and Facebook is free; (3) per se tying requires independent demand for the tied products, and Sambreel's Facebook enhancement products have no demand without Facebook; and (4) negative tying does not fit.

**First**, per se tying is **inapplicable** to software platforms:

> [B]ecause of the pervasively innovative character of platform software markets, tying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived. . . . We fear that these efficiencies are common in technologically dynamic markets where product development is especially unlikely to follow an easily foreseen linear pattern. . . . [W]e cannot comfortably say that bundling in platform software markets has so little redeeming virtue, and that there would be so very little loss to society from its ban, that an inquiry into its costs in the individual case can be considered unnecessary.

*Microsoft Corp.,* 253 F.3d at 94 (citations and punctuation omitted).  "Facebook maintains a website for social networking and as a platform through which third-party developers distribute and operate applications[.]"   Compl. ¶ 1.   The per se rule is thus inapplicable because applying it would undermine the innovative and procompetitive conduct replete in the software space.

**Second**, Sambreel does not allege that Facebook's social networking services are **sold** to consumers—a requirement for the tying product.  *Rickards v. Canine Eye Regis. Found., Inc.,* 704 F.2d 1449, 1454-55 (9th Cir. 1983) (explaining that a tying claim requires a showing that the "sale of one (the tying product) has been conditioned upon the purchase of another (the tied product)").  Indeed, Facebook is free, as is Sambreel's self-described social-networking enhancement, if the user is willing to see ads.  By not alleging that both products were "sold," Sambreel's claim fails at the threshold.  *See id.* (finding no tying agreement where the "tied product" was provided free of charge).

**Third**, per se claims require separate and distinct markets for the tying and tied products.  The tied product must have sufficient independent demand to be considered part of a truly distinct market.  *Rick-Mik Enters., Inc. v. Equilon Enter. LLC*, 532 F.3d 963, 975 (9th Cir. 2008) ("[T]here must be a **sufficient demand** for the purchase of the tied product **separate from** the tying product to identify a distinct product market.") (emphasis added and punctuation and citation omitted).  Here, Sambreel has not alleged the necessary "independent demand" for the allegedly tied "products."  *See, e.g.*, Compl ¶ 75.  Instead, Sambreel alleges that the Facebook service is the tying product and

"products that customize or enhance" social networking are tied.  *Id.*  Specifically, Sambreel refers to PageRage, a product that "customizes" Facebook, and the products competing in that "market" are other applications that "enhance" Facebook.  *Id.*  But there can be no demand for "products that customize or enhance" the Facebook website without the website itself.  Sambreel's tied product is not distinct.

**Fourth**, Sambreel's negative tying claim does not fit.  A negative tie occurs when a party ties its product to the agreement not to buy **any other product** in the tied market.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 (1992); *Real Page, Inc. v. Yardi Sys., Inc.*, No. 11-cv-690 ODW, 2012 WL 443730 (C.D. Cal. Feb. 13, 2012) (interpreting *Kodak* and finding that a plaintiff had adequately alleged a "negative tie" where the prohibition barred use of services from **any** competing companies).  Here, Sambreel says Facebook tied its social networking service to users' agreement not to use **Sambreel's** supposed social networking "enhancement" products, not **all** social networking enhancement products.  Compl. ¶¶ 37-39, 73-75.  Sambreel does not allege the threshold requirements of its per se tying claim, and the claim should be dismissed.

### E.    All Of Sambreel's Antitrust Claims Must Be Dismissed For Failure To Plead A Cognizable Market

Without the cover of a per se claim, Sambreel's allegations must be evaluated under the rule of reason analysis, which requires pleading of a cognizable market.  A complaint that fails to plead such a market must be dismissed.  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.").  Sambreel has tried to gerrymander **four** separate antitrust markets to support its various claims.  Those contrived markets are inconsistent with each other and unsupported in the complaint.

"A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers." *Rebel Oil*, 51 F.3d at 1434. A "[p]laintiff cannot artificially create antitrust claims by narrowly defining the relevant market to create the appearance of an antitrust injury."  *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1512 (D. Colo. 1992), *aff'd*, 13 F.3d 366, 368 (10th Cir. 1993).  Instead, "to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a

rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008).  "Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997); *Streamcast Networks, Inc. v. Skype Tech., S.A.*, No. CV 06-391 FMC, 2006 WL 5437323, at *11 (C.D. Cal. Sept. 14, 2006) (granting motion to dismiss when plaintiff did not plead facts establishing lack of reasonable interchangeability of use between defendant's and other peer-to-peer file-sharing services).

Importantly, products within a market need not be identical.  If a "product is roughly equivalent to another for the use to which it is put," they are "reasonably interchangeable" and fall within the same market.  *Chapman*, 546 F.3d at 238; *see also Green Country Food Markets v. Bottling Group, LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004); *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 919 (10th Cir. 1975).  And if a complaint does not place reasonably interchangeable substitutes in the same market, it must be dismissed.  *See Chapman*, 546 F.3d at 238 (affirming 12(b)(6) dismissal); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (where complaint alleged existence of "product markets for lodging accommodations and ski packages," court properly dismissed antitrust claims because plaintiffs failed to allege "there are no other goods or services that are reasonably interchangeable with lodging accommodations or ski packages within [the] geographic market").

    **1.**    **Sambreel Has Not Adequately Alleged That "Online Display Advertising" And "Display Advertising to Social Media Users" Are Cognizable Antitrust Markets**

Sambreel's attempted monopolization and group boycott claims in Counts I and IV are premised on a market for "online display advertising," while its actual monopolization claim in Count III is based on a narrower alleged market for "display advertising to social media users."  *See* Compl. ¶¶ 68, 82, 89.  Sambreel alleges none of the necessary factual support to justify its assertion that display advertising (let alone "display advertising to social media users") is a cognizable market,

1    sufficiently distinct that there are no "reasonably interchangeable" alternatives. Sambreel baldly

2    asserts that advertisers treat these purported markets differently, without even attempting to describe

3    the cross-elasticity of demand with other forms of advertising. *Id.* ¶ 60. In doing so, Sambreel's

4    alleged market clearly does not encompass "all interchangeable substitute products even when all

5    factual inferences are granted in plaintiff's favor." *Queen City Pizza, Inc.*, 124 F.3d at 436.

6    Sambreel has not made the plausible allegations that these markets could be profitably monopolized

7    necessary to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

8    Furthermore, there is no logical basis for distinguishing "display advertising" from "display

9    advertising to social media users." Sambreel's allegation that Facebook users spend more time

10   looking at pages than other users is not a sufficient basis to describe a market, nor does it address

11   cross-elasticity or other obvious interchangeable competitors. In fact, Facebook does not and could

12   not have monopoly power over internet display advertising—as it is alleged to have only 28% of that

13   market, *see* Compl. ¶ 63—and to obscure that devastating fact, Sambreel has contrived a submarket

14   that is essentially "ads on Facebook." Accordingly, Sambreel's monopolization, attempted

15   monopolization, and group boycott claims in Counts I, III, and IV should be dismissed on this basis.

16   *See, e.g.*, *Tanaka*, 252 F.3d at 1063.

17              **2.      "Social Networking Services" Is Not A Cognizable Antitrust Market**

18   For its tying claim in Count II, Sambreel introduces a new pair of market definitions,

19   declaring that Facebook has monopoly power in a "social networking market" and uses that power to

20   affect the purported market for "products that customize or enhance social networking services."

21   *See* Compl. ¶¶ 50-52, 74, 56-58. To have a tying claim, Sambreel must plead two markets. Yet

22   "social networking services" is not a cognizable antitrust market over which Facebook has

23   monopoly power.

24   By definition, an antitrust market must be a "grouping of sales [by] sellers." *Rebel Oil*, 51

25   F.3d at 1434. When a product is provided for free, there can be no "grouping of sales" because there

26   are no sales. The Northern District of California has addressed this precise issue in a case raising the

27   question of whether Google had a monopoly over the "internet search" market. Because Google

28

offered its search services to the public for free, the court recognized that "search services" could not be a cognizable market:

> [Plaintiff] has failed to allege that the Search Market is a "grouping of sales." It does not claim that Google sells its search services, or that any other search provider does so. . . . [Plaintiff] cites no authority indicating that antitrust law concerns itself with competition in the provision of free services. Providing search functionality may lead to revenue from other sources, but [Plaintiff] has not alleged that anyone pays Google to search. Thus, the Search Market is not a "market" for purposes of antitrust law.

*Kinderstart.com, LLC v. Google, Inc.*, C-06-2059 JF(RS), 2007 WL 831806, at *5 (N.D. Cal. March 16, 2007).[16]   Similarly, because Facebook offers its social network to the public free of charge, "social networking services" alone cannot constitute an antitrust market. That Facebook's free service may "lead to revenue from other sources" does not change the analysis. *See id.*

Even if "social networking" offered for free could be construed as a separate antitrust market, Sambreel has not adequately alleged that Facebook has monopoly power. Sambreel relies on figures for Facebook's market share among what Sambreel's labels "full-service social networks." Compl. ¶ 51. In crafting this contrived market, Sambreel appears to exclude other social networking services such as Twitter, Tumblr, LinkedIn, MySpace, Path, Flickr, Pinterest, eHarmony, Match.com, and numerous others. Sambreel cannot draw a circle around Facebook's capabilities and call it a market. Because the complaint fails to allege Facebook's market share vis-à-vis the entire universe of social networking services, the allegations must fail. *Streamcast Networks, Inc.*, 2006 WL 5437323, at *11 (granting motion to dismiss when plaintiff did not plead facts establishing lack of reasonable interchangeability of use between defendant's and other peer-to-peer file-sharing services). Moreover, Sambreel ignores the highly volatile nature of the social networking "market." For example, several years ago, MySpace controlled over 80% of the purported market. *LiveUniverse*, 2007 WL 6865852, at *7. Given that social networking is a free service, Facebook's success vis-à-vis its competitors will only last as long as its product remains superior to users. *United States v. Syufy Enterp.*, 903 F.2d 659, 667 (9th Cir. 1990) (explaining that a plaintiff must

---

[16] Facebook acknowledges that the court reached the opposite conclusion in *LiveUniverse, Inc. v. Myspace, Inc.*, No. CV 06-6994 AHM, 2007 WL 6865852 (C.D. Cal. Jun. 4, 2007). However, for the reasons identified in *Kinderstart.com*, *Liveuniverse* appears to be wrongly decided on this point.

show "structural barriers" to market entry such as dependence on a "scarce commodity" and rejecting the notion that a defendant's "effectiveness as a competitor creates a structural barrier to entry"). Sambreel offers no plausible allegations on how Facebook could have monopoly power in this market. *See Chapman*, 546 F.3d at 237 (explaining that market allegations must be "plausible" to survive a motion to dismiss). Accordingly, Count II's tying claim must be dismissed.

### F.   Each Of Sambreel's Antitrust Claims Suffers From Additional, Independent Flaws

In addition to the global deficiencies discussed above, each of Sambreel's antitrust claims fails for the independent reasons discussed below.

#### 1.   Sambreel Has Not Stated A Section 2 Monopolization Claim (Count III)

Sambreel alleges that Facebook violated Section 2 of the Sherman Act by engaging in "exclusionary conduct" in the purported market for "display advertising to social media users." *See* Compl. ¶¶ 81-87 (Third Claim for Relief). Anticompetitive or exclusionary conduct "is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health*, 515 F.3d at 894. Accepting all of Sambreel's allegations as true, the complaint alleges only that Facebook imposed limitations on its users—not Sambreel—and instructed certain advertising networks that they could not a serve ads on third-party applications running on the Facebook Platform if they served advertising on facebook.com via PageRage. Such limitations such are permissible. *See Universal Grading*, 2011 WL 846060, at *9 (holding that eBay's policy prohibiting the use of certain coin-grading companies on its website did not violate Section 2).

The Ninth Circuit's decision in *LiveUniverse* is dispositive of this claim. There, LiveUniverse alleged that MySpace, a social networking website, engaged in improper "exclusionary conduct" by prohibiting MySpace users from linking to or using LiveUniverse's products on the MySpace website. *LiveUniverse, Inc.*, 2007 WL 6865852, at *11. The district court dismissed the complaint, explaining that MySpace had a right to choose who could advertise on its own website and to prevent potential competitors from "free riding" on its success:

Social networking websites derive the bulk of their income from advertising

displayed on their sites, with revenue directly related to the number of visits to the site. Every time a user "travels" from the MySpace site to the vidiLife site by clicking on a link, vidiLife's advertising revenue stands to grow. Assuming that advertisers' budgets are not unlimited, that could lead to a diminution in MySpace''s revenue. Looked at another way, by eliminating any references to vidiLife.com and by deleting links to that site, MySpace may be viewed as merely preventing LiveUniverse from advertising its website free of charge on the MySpace site.

*Id.* at *13.   The Ninth Circuit affirmed, agreeing that MySpace had not engaged in improper exclusionary conduct because the antitrust laws impose no duty to assist an alleged competitor by allowing it to advertise on MySpace's own website.  304 F. App'x at 556-57.

While *LiveUniverse* is the most directly applicable case to the facts before this Court, its teaching is a familiar one.  Courts have repeatedly affirmed the right of businesses—even alleged monopolists—to protect the integrity of their products and to choose their business partners.  *See Pac. Bell,* 129 S. Ct. at 1118 ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *see also supra* at 12-13. As the innovator of a popular product, Facebook had a well-settled right to prevent a competitor from hijacking its website to poach its advertising revenue.  *See id.*; *LiveUniverse*, 2007 WL 6865852, at *11.  This does not constitute exclusionary conduct.  Accordingly, Sambreel has failed to adequately plead the elements necessary to support the Count III monopolization claim, which thus must be dismissed.

**2.      Sambreel Has Not Stated A Section 2 Attempted Monopolization Claim (Count IV)**

Sambreel's Section 2 claim for attempted monopolization of the purported "market for internet display advertising" must also fail.  *See* Compl. ¶¶ 88-91 (Fourth Claim for Relief).  To prevail on this claim, a plaintiff must demonstrate (in part) both "a dangerous probability of success" and "predatory or anticompetitive conduct."  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997).  Sambreel has alleged that Facebook controlled only 28% of the purported "display ad market," which is insufficient as a matter of law to create such a probability of success.  *See supra* at

19.[17]   Nor has Sambreel adequately pleaded "predatory or anticompetitive conduct," for the same reasons that it failed to plead actionable "exclusionary conduct."  *See LiveUniverse*, 2007 WL 6865852, at *16 (analysis of deficiencies in "exclusionary conduct" allegations for monopolization claim applies equally to "anticompetitive conduct" allegations in attempted monopolization claim). Accordingly, Sambreel's Count IV attempted monopolization claim must be dismissed.

### 3.    Even Under A Rule Of Reason Analysis, Sambreel Has Not Adequately Alleged A Section 1 "Group Boycott" Claim (Count I)

Sambreel's group boycott claim under Section 1 of the Sherman Act fails as well.  *See* Compl. ¶¶ 65-71 (First Claim for Relief).  Because the allegations do not meet the per se standard (*see supra* at 16-19), Sambreel must adequately plead the additional requirements for a group boycott claim under a rule-of-reason analysis:  (a) "market power within a relevant market" and (b) "significant anticompetitive effects" in that market.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008); *Tanaka*, 252 F.3d at 1063.  The complaint fails to allege "market power within a relevant market" because "internet display ads" is not a relevant market and Sambreel's allegation of a 28% market share is insufficient as a matter of law.  *See supra* at 22-23. Moreover, Sambreel has failed to plead "significant anticompetitive effects." Sambreel alleges that Facebook is blocking its efforts to offer "display advertising to individuals while they are accessing the Facebook website," Compl. ¶ 2, but the exclusion of one competitor fails to state a claim under the antitrust laws.  *See, e.g.*, *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) (holding that Visa's refusal to allow a competitor to issue Visa cards was not a violation of Section 1 of the Sherman Act and explaining that "[t]o impose liability on Visa USA for refusing to admit Sears or revise the bylaw to open its membership to intersystem rivals, we think, sucks the judiciary into an economic riptide of contrived market forces.").  Facebook has a right protected by the antitrust laws to prevent a competitor from profiting from its own product, so there can be no antitrust violation. *See Trinko*, 540 U.S. at 408.

---

[17]  *See also Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210 (C.D. Cal. 2007) (dismissing an attempted monopolization claim in part because the defendant's "market share is less than 40%").

### 4.     Sambreel Has Not Adequately Alleged A Section 1 Tying Claim (Count II)

Sambreel's "tying" claim in violation of Section 1 makes no sense and should also be dismissed.  *See* Compl. ¶¶ 72-80 (Second Claim for Relief).  It is not a per se claim (*see supra* at 19-21), and even under a rule-of-reason standard, Sambreel does not allege the tying of separate, independent products for sale.   As discussed above, there can be no tying claim here because Facebook is offered to users for free.  *See supra* at 20; *N. Pac. Ry. Co.*, 356 U.S. at 5-6 (explaining that a tying claim requires "an agreement by a party to ***sell*** one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier") (emphasis added).   Furthermore, Sambreel has failed to plead the additional requirements of a rule-of-reason claim because "social networking services" is not a cognizable market over which Facebook has market power, and the exclusion of one competitor from advertising on Facebook's website does not establish significant anticompetitive effects.  *See supra* at 23-24.   Accordingly, Sambreel's "tying" claim under Section 1 must fail because the complaint does not allege that separate "products" were improperly "tied" in relevant antitrust markets.

### G.     Sambreel's Tack-On State Law Claims Must be Dismissed

### 1.     Sambreel's Claim for Violation of Section 17200 Is Deficiently Pleaded (Count V)

To state a cognizable claim under Section 17200 of the California Business & Professions Code, a plaintiff must adequately plead an "unlawful, unfair or fraudulent business act" within the meaning of the statute.  *See* Cal. Bus. & Prof. Code § 17200.  Sambreel alleges that Facebook's actions to protect its website were "unfair" because they violated the policy and spirit of the antitrust laws or threatened competition, *see* Compl. ¶ 94, and that Facebook's "gating" of its users was "unlawful" because it violated California Penal Code § 502(c)(7), *see* Compl. ¶ 95.   Neither allegation supports a claim for relief.

The allegedly "unfair" activity Sambreel challenged is the same conduct alleged to support its Sherman Act claims.  *See id.* ¶ 94.  Where "the same conduct is alleged to support both a

plaintiff's federal antitrust claims and a state-law unfair competition claim, a finding that the conduct is not an antitrust violation *precludes* a finding of unfair competition." *LiveUniverse, Inc.*, 304 F. App'x at 558 ("Because LiveUniverse fails to state a claim under the Sherman Act, it also fails to state a claim under § 17200."); s*ee also DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1147 (N.D. Cal. 2010) (plaintiff failed to allege facts showing that defendant's conduct violated the Sherman Act, so claims asserted under the UCL's unfair prong necessarily failed as well).

Sambreel's allegation that Facebook "unlawfully" accessed its users' computers in violation of state law also fails to support a Section 17200 claim. To adequately plead a violation of Section 502(c)(7), a plaintiff must allege how the defendant accessed a user's computer without permission "in a manner that *overcomes technical or code-based barriers*." *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010) (emphasis added); *see In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 716 (N.D. Cal. 2011) (holding that a defendant can "only be held liable for a violation of Section 502 if the plaintiff [can] prove that the defendant 'circumvented . . . technical barriers' that had been put in place to block defendant's access to the plaintiff's website"). But Sambreel does not allege that Facebook wrongly "over[came] technical or code-based barriers" that had been "put in place to block defendant's access." *In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 716. In fact, Sambreel is careful not even to allege that Facebook violated any of its own terms of service with its users. This vague attempt does not plead a violation of Section 502(c)(7), and Sambreel's Section 17200 claim must be dismissed as a result.

### 2.   Sambreel's Claim For Tortious Interference With Contract Must Be Dismissed (Count VI)

Sambreel has also not pleaded an actionable claim for tortious interference with contract. *See* Compl. ¶¶ 97-104 (Sixth Claim for Relief). To prevail on such a cause of action, a plaintiff must adequately plead, *inter alia*, the defendant's knowledge of a valid contract between the plaintiff and a third party, as well as the defendant's intentional acts designed to breach or disrupt that contractual relationship. *Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004). Here, Sambreel has alleged only that Sambreel had contracts with eight advertisers and that "[u]pon information and belief, Facebook was aware of" those contracts. *See* Compl. ¶¶ 99-100. An assertion on "information and belief" is

insufficient, *Solis v. City of Fresno*, 11-CV-00053 AWI GSA, 2012 WL 868681, at \*8 (E.D. Cal. March 13, 2012) ("In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim.").  Merely reciting the element of a claim is similarly insufficient under *Twombly*.  *See, e.g.*, *Starr v. Baca*, 652 F. 3d 1202, 1216 (9th Cir. 2011) ("[T]o be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"); *Jewelry 47, Inc. v. Biegler*, No. 2:08-cv-00174, 2008 WL 4642903 (E.D. Cal. Oct. 16, 2008) (citing *Twombly* in rejecting similar conclusory recitation of element of cause of action in support of a tortious-interference claim).  The Count VI claim for intentional interference with a specific contract does not satisfy the pleading standard.  *See Jewelry 47, Inc*, 2008 WL 4642903, at \*3-4.

In any event, Facebook's alleged actions are protected as a matter of law under two California privileges:  the competition privilege and the privilege to enforce one's own contracts.

> The California courts recognize the privilege of competition as set forth in the Restatement of Torts, Second §768:  (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or ***not to continue an existing contract terminable at will*** does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

*Lancer Ins. Co. v. D.W. Ferguson & Associates*, Nos. 93-55789, 93-55750, 1995 WL 21705, at \*4 (9th Cir. Jan. 19, 1995) (citing *A-Mark Coin. Co. v. General Mills, Inc.*, 148 Cal. App. 3d 312, 323 (1983).  The "wrongful means" standard requires a plaintiff to plead that the defendant's interfering "conduct violated a statute or constituted a tort such as fraud or unfair competition."  *San Francisco Design Center Assoc. v. Portman Cos.*, 41 Cal. App. 4th 29, 43 (1995).

Sambreel is silent on whether any of its contracts with advertisers could ***not*** be terminated at will.  *See* Compl. ¶ 101 (suggesting that Facebook wanted the advertisers to "with[draw] from their contractual relationships with Sambreel"); *id.* ¶ 102 (complaining that the contracts "were actually breached and/or disrupted").  Thus, the competition privilege applies on the face of the complaint

unless Sambreel adequately pleads that Facebook's conduct constituted an unlawful restraint of trade, violated a statute, or constituted a tort. Because Sambreel has failed to plead a Sherman Act or Section 17200 claim, its tortious interference claim cannot stand.

Independently, the tortious interference claim also fails because Facebook was enforcing its own contractual rights with its advertising networks. *See* 44B Am. Jur. 2d Interference § 22 (2008) ("[T]he following acts do not constitute unjustifiable interference with another's contract:  (1) enforcing or complying with one's own valid contract; (2) exercising a legal right to terminate an agreement by a contracting party; (3) and protecting one's contractual right."). According to Sambreel's allegations, Facebook entered "agreements" with its advertising networks that allow Facebook to limit the partner's operation on the Facebook Platform if the partner associates with a third party that is prohibited from operating on the Facebook Platform. *See* Compl. ¶¶ 21-22. Accordingly, the "threats" upon which Sambreel bases its tortious interference claim, *see id.* ¶ 101, are Facebook's enforcement of its own contracts. For all these reasons, Count VI's claim for intentional interference with contract must be dismissed.

### 3.  Sambreel's Claim For Tortious Interference With Prospective Economic Advantage Fails (Count VII)

Finally, Sambreel has failed to plead an actionable claim for tortious interference with prospective economic advantage. *See* Compl. ¶¶ 105-113 (Seventh Claim for Relief). To prevail on such a cause of action, a plaintiff must adequately plead facts that show not only the economic relationship and its disruption, the defendant's knowledge and intention, and the harm suffered by the plaintiff, but importantly, "that the defendant's conduct was wrongful by some legal measure other than the fact of interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (citations and quotation marks omitted); *see also id.* at 1157 (act of interference must be independently "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard"). Sambreel attempts to satisfy this independent wrongfulness requirement solely by citing to its Sherman Act and Section 17200 allegations, *see* Compl. ¶ 109, but because those claims are themselves deficient, Sambreel's derivative claim of interference with prospective economic advantage must also fail.

## CONCLUSION

For all of the foregoing reasons, this Court should dismiss the complaint.


DATED:  April 4, 2012                    Respectfully submitted,

                                          KIRKLAND & ELLIS LLP


                                          */s/ James F. Basile*
                                          James F. Basile
                                          james.basile@kirkland.com
                                          Elizabeth L. Deeley
                                          elizabeth.deeley@kirkland.com
                                          Susan Davies (*Pro Hac Vice Application Forthcoming*)
                                          susan.davies@kirkland.com
                                          Ian R. Conner (*Pro Hac Vice Application Forthcoming*)
                                          ian.conner@kirkland.com
                                          Adam L. Gray
                                          adam.gray@kirkland.com

                                          Attorneys for Defendant
                                          FACEBOOK, INC.

# ATTACHMENT 1

**Summary of Claims, Legal Standards and Defenses**
**for *Sambreel v. Facebook, Inc.* Motion to Dismiss**

| Count | Claim | Legal Standard | Defenses |
|---|---|---|---|
| I-IV | All Sherman Act claims asserted by Sambreel, a private party | A private party seeking to recover damages for an antitrust violation must have standing under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).  Even where a complaint states an actionable claim under the Sherman Act, a plaintiff must separately allege a cognizable "antitrust injury" in order to avoid dismissal.  *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003).<br><br>"[I]t is not enough for plaintiff to merely allege injury to itself as a result of defendant's practices; competition within the industry itself must actually be restrained for an actionable claim." *Blind Doctor Inc. v. Hunter Douglas, Inc.*, 59 Fed. R. Serv. 3d 635, No. C-04-2678, 2004 WL 1976562, at *8 (N.D. Cal. Sept. 7, 2004). | • No allegation of harm to competition itself—*i.e.*, of the type the antitrust laws were intended to protect.<br><br>• Sambreel's alleged lost revenue and customers are not enough; harm to itself is not an antitrust injury.<br><br>• Ninth Circuit has rejected the argument that Sambreel's only alleged injury to consumers is an antitrust claim.  *LiveUniverse Inc. v. MySpace, Inc.*, 304 F. App'x. 554, 557 (9th Cir. 2008). |
| I | Group boycott in violation of Section 1 of the Sherman Act | For a Section 1 claim, a plaintiff must demonstrate: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (citation omitted).<br><br>"[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). The Ninth Circuit considers three additional factors for per se group boycotts:  "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition."  *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, | *Per Se*<br>• Sambreel's allegation regarding the application developers fails *Twombly*.  Sambreel has not alleged who agreed to do what to whom.<br><br>• No per se boycott because factual allegations suggest a vertical, not horizontal, relationship with Facebook's advertising partners.<br><br>• No per se boycott because Sambreel has not adequately pled three Ninth Circuit factors:  Alleged boycott does not cut off access to essential supply or facility; Facebook does not have dominant market position; and the practice is justified by pro-competitive policies.<br><br>*Rule of Reason*<br>• No rule-of-reason claim because "display ads" are not a market and Facebook's alleged 28% share |

## Summary of Claims, Legal Standards and Defenses
### for *Sambreel v. Facebook, Inc.* Motion to Dismiss

| Count | Claim | Legal Standard | Defenses |
|---|---|---|---|
| | | 950 (9th Cir. 1998).<br><br>Under a rule-of-reason claim, a plaintiff must plead that "the restraint produces 'significant anticompetitive effects' within a 'relevant market'" where the defendant has market power. *Tanaka*, 252 F.3d at 1063. | does not create market power. |
| II | Illegal product tying in the purported market for "social networking services" in violation of Section 1 | Per se tying for antitrust purposes is "an agreement by a party to ***sell*** one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958) (emphasis added). *Per se* tying claims require separate "tying" and "tied" product markets. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001). | *Per Se*<br>• Per se rule is inapplicable to software markets per *Microsoft Corp.*, 253 F.3d at 85.<br><br>• Tying product (social networking) is not "sold," so no per se claim.<br><br>• Tying product and tied products are not distinct products for antitrust purposes; no separate markets and demand.<br><br>• Negative tie claim requires the defendant to preclude the use of *all* competitors' products; here, allegations only go to Sambreel's products.<br><br>*Rule of Reason*<br>• "Social networking services" is not a cognizable market—Facebook is free to the public. |
| III | Actual monopolization of "display advertising to social media users" in violation of Section 2 | A monopolization claim requires a plaintiff to demonstrate that the defendant: "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). | • "Display advertising to social media users" is not a properly pleaded market.<br><br>• No improper exclusionary conduct alleged—Facebook is allowed to protect its own website. *LiveUniverse, Inc v. Myspace, Inc.*, 304 F. App'x at |

**Summary of Claims, Legal Standards and Defenses**
**for *Sambreel v. Facebook, Inc.* Motion to Dismiss**

| Count | Claim | Legal Standard | Defenses |
|-------|-------|----------------|----------|
| | | | 556-57. |
| IV | Attempted monopolization of "internet display advertising" in violation of Section 2 | An attempted monopolization claim requires "four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997).  "Resolution of this issue, like the claim of actual monopolization, is dependent upon a definition of the relevant market." *Id.* | • "Internet display advertising" is not a properly pleaded market. <br><br> • Alleged 28% of market does not create a "dangerous possibility of success."  30% is "presumptively insufficient" under the case law. <br><br> • No "predatory or anticompetitive conduct"— Facebook is allowed to protect its own website. *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *16 (C.D. Cal. Jun. 4, 2007). |
| V | Unfair competition in violation of Cal. Bus. & Prof. Code Section 17200 | To state a cognizable claim under Section 17200, a plaintiff must adequately plead an "unlawful, unfair or fraudulent business act" within the meaning of the statute.  *See* Cal. Bus. & Prof. Code § 17200. | <u>No Unfair Conduct</u> <br> • UCL claims must be dismissed if premised on Sherman Act claims that are also dismissed. *LiveUniverse, Inc.*, 304 F. App'x at 558. <br><br> <u>No Unlawful Conduct</u> <br> • To plead a 502(c)(7) violation, must allege how the defendant accessed a user's computer without permission "in a manner that overcomes technical or code-based barriers."  *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010). Sambreel has not done so. |
| VI | Intentional interference with contract | A plaintiff must adequately plead, *inter alia*, the defendant's knowledge of the existence of a valid contract between the plaintiff and a third party, as well as the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship.  *Reeves v.* | • Sambreel's lack of factual allegations regarding Facebook's awareness of any specific contracts fails to satisfy *Twombly*. <br><br> • Under the Competition privilege under California |

**Summary of Claims, Legal Standards and Defenses
for *Sambreel v. Facebook, Inc.* Motion to Dismiss**

| Count | Claim | Legal Standard | Defenses |
|-------|-------|----------------|----------|
| | | *Hanlon*, 33 Cal. 4th 1140 (2004). | law, Facebook is allowed to interfere with an alleged competitor if the contract is terminable at will. Sambreel does not allege that any contract was not terminable at will.<br><br>• Enforcing Facebook's own preexisting contracts is not tortious interference as a matter of law. |
| VII | Intentional interference with prospective economic advantage | A plaintiff must adequately plead facts that show not only the economic relationship and its disruption, the defendant's knowledge and intention, and the harm suffered by the plaintiff, but also importantly, "that the defendant's conduct was wrongful by some legal measure other than the fact of interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1152 (2003) | • This tort depends entirely on an illegal act outside of the alleged interference. Sambreel's claim relies on its Sherman Act and UCL claims. Because those claims fail, so must Count VII. |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 4, 2012, I electronically filed the foregoing **DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(3) AND 12(B)(6)** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Court's Electronic Mail Notice List.

Dated:  April 4, 2012

/s/ *James F. Basile*
James F. Basile