James F. Basile (SBN 228965)
james.basile@kirkland.com
Elizabeth L. Deeley (SBN 230798)
elizabeth.deeley@kirkland.com
Adam L. Gray (SBN 262557)
adam.gray@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Attorneys for Defendant
FACEBOOK, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | CASE NO. 12-CV-00668-CAB-KSC <br><br> **JOINT MOTION FOR DETERMINATION OF EXPEDITED DISCOVERY DISPUTE** <br><br> Judge:  Magistrate Karen S. Crawford |

## <u>TABLE OF CONTENTS</u>

**Page**

I.    **INTERROGATORIES**..................................................................................**1**
      Interrogatory No. 1:..............................................................................1
      Facebook's Reason To Compel Response:........................................2
      Sambreel's Basis for Objections:.......................................................3

II.   **DOCUMENT REQUESTS** .......................................................................**7**
      Request for Production of Documents No. 1:....................................7
      Facebook's Position on Request for Production No. 1:....................7
      Sambreel's Basis for Objections:.......................................................8

III.  **DEPOSITIONS** ............................................................................................**8**
      Deposition of Arie Trouw:..................................................................8
            Defendant's Reason to Compel Deposition:............................8
            Sambreel's Basis for Objections:.........................................16
      Deposition of Brad Miller:................................................................22
            Defendant's Reason to Compel Deposition:........................22
            Sambreel's Basis for Objections:.........................................27

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*American LegalNet, Inc. v. Davis*,
    673 F. Supp. 2d 1063 (C.D. Cal. 2009)............................................................ 1, 4

5

*Apple, Inc. v. Samsung Elec. Co., Ltd.*,
    No. 11-CV-01846-LHK, 2011 WL 1938154 (N.D. Cal. May 18, 2011)................................ 1, 3, 4

6

7

*AT & T Corp. v. Vision One Sec. Sys.*,
    914 F. Supp. 392 (S.D. Cal. 1995)................................................................ 15

8

*Berlin Media Art e.k. v. Does 1 through 146*,
    No. CIV. S-11-2039 KJM, 2011 WL 4056167 (E.D. Cal. Sept. 12, 2011) ................................ 3, 4

9

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962) .............................................................................. 9, 10

10

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) .............................................................................. 21

11

*Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*,
    296 F. Supp. 2d 1159 (C.D. Cal. 2003).......................................................... 13

12

*Hansen Beverage Co. v. Innovation Ventures, LLC*,
    No. 08-cv-1166, 2008 WL 3992353 (S.D. Cal. Aug. 28, 2008) ...................................... 4, 8, 16, 27

13

*Iconix, Inc. v. Tokuda*,
    457 F. Supp. 2d 969 (N.D. Cal. 2006) ............................................................ 2, 6, 9

14

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
    906 F.2d 679 (Fed. Cir. 1990).................................................................... 20

15

16

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997).................................................................... 18

17

*Kremen v. Cohen*,
    No. 5:11-CV-05411-LHK, 2011 WL 6113198 (N.D. Cal. Dec. 7, 2011) ................................ 15

18

*Quia Corp. v. Mattel, Inc.*,
    C10-01902 JF (HRL), 2010 WL 2179149 (N.D. Cal. May 27, 2010)................................ 3, 15, 26

19

20

*Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991)..................................................................... 21

21

*Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*,
    10-CV-02451-LHK, 2010 WL 3910178 (N.D. Cal. Oct. 5, 2010) ...................................... 2, 6

22

*Semitool, Inc., v. Tokyo Electron America, Inc.*,
    208 F.R.D. 273 (N.D. Cal. 2002) ................................................................ 4

23

*Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)..................................................................... 20

24

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2nd Cir. 1992)..................................................................... 11, 12, 13

25

**Statutes**

26

California Penal Code Section 502(c)............................................................... 11, 19

27

28

**Rules**

Federal Rule of Civil Procedure 26(d)(1) ............................................................................. 22

Pursuant to this Court's April 11, 2012 Order Following Discovery Hearing Re Defendant's Ex Parte Motion for Expedited Discovery, and having met and conferred on several occasions, the parties submit this Joint Motion for Determination of Expedited Discovery Dispute and request this Court's assistance in resolving the parties' remaining discovery disputes.

In its March 28 discovery requests, Facebook sought three types of discovery from Sambreel Holdings LLC, Yontoo LLC, and Theme Your World LLC (collectively, "Sambreel"): (1) interrogatories, (2) document requests, and (3) depositions.  Sambreel initially objected to providing any discovery and specifically objected to Facebook's discovery requests as grossly overbroad and burdensome.  Facebook disagreed that the requests were overbroad.  Nevertheless, following the April 10 hearing, the parties met and conferred in a good faith effort to resolve their discovery dispute without the need for the Court's intervention.[1]  Through this process, Facebook narrowed its requests and the parties were able to substantially narrow the matters in dispute. Consistent with the Court's instruction, the parties set forth their positions on the remaining discovery issues in dispute below and address the five factors for evaluating "good cause" for expedited discovery discussed in *Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 11-CV-01846-LHK, 2011 WL 1938154 (N.D. Cal. May 18, 2011) (hereinafter "the *Apple* factors").[2]

## I.    INTERROGATORIES[3]

**Interrogatory No. 1:** Identify all facts, documents and witnesses that Sambreel seeks to rely upon in support of its motion for a preliminary injunction, unless the use would be solely for impeachment.

---

[1] As required by the Court's Chamber Rules, lead trial counsel of each party has filed a declaration concurrently herewith describing the parties' compliance with the Court's meet and confer requirements.

[2] Those factors are: "'(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'"  *Id.* at *1 (quoting *American LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009)).

[3] Facebook's formal interrogatory request is attached to the Declaration of James F. Basile Re: Joint Motion for Determination of Expedited Discovery Dispute ("Basile Decl.") ¶ 8, Ex.C, filed concurrently herewith.

**Facebook's Reason To Compel Response:** Facebook has good cause to seek identification of these facts, documents and witnesses under the *Apple* factors. ***First***, Facebook seeks a response to this simple narrow interrogatory to ensure that it has a fair and meaningful opportunity to respond to any evidence Sambreel seeks to introduce in support of its preliminary injunction motion.  In short, Facebook does not want to be sandbagged with new evidence on reply or in an evidentiary hearing. Critically, during the meet and confer process, Facebook told Sambreel that it was "willing to forego its interrogatory requests provided Plaintiffs agree that they will not seek to introduce any additional evidence on those topics beyond the declarations and documents submitted with the opening memorandum."  Basile Decl. ¶ 5, Ex. B.  Sambreel was unwilling to agree, stating:  "Sambreel did not withhold information from its opening memorandum.  Sambreel will rely upon the information in its opening memorandum and will rely upon whatever information is necessary to respond to Facebook's opposition. Moreover, Sambreel anticipates that, should the court order an evidentiary hearing, facts will emerge in preparation for the hearing. Sambreel will inform Facebook of any facts it intends to rely upon at the hearing in a timely manner."  *Id*.  This response suggests that Sambreel will seek to introduce additional facts, documents or evidence to support its preliminary injunction motion after receiving Facebook's opposition, which courts prohibit as unfair sandbagging.  *See, e.g.*, *Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*, 10-CV-02451-LHK, 2010 WL 3910178, at *4, n.2 (N.D. Cal. Oct. 5, 2010) (disregarding evidence submitted for the first time in plaintiff's preliminary injunction reply brief because "new facts, evidence, and argument should not be submitted for the first time in a [r]eply"); *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 976 (N.D. Cal. 2006) (sustaining defendants' objection to new evidence and argument raised for the first time in plaintiff's preliminary injunction reply brief).  The time for Sambreel to set forth its evidence supporting its preliminary injunction is now so that Facebook has a fair and meaningful opportunity to respond.  Should Sambreel later seek to introduce facts, documents or witness testimony in support of its preliminary injunction motion, it should be excluded from consideration or at a minimum, Facebook should be given an additional opportunity to respond to the new documents or information and/or the opportunity to seek further discovery concerning the topics addressed by those documents.

1    **Second**, this request is narrowly tailored to seek only those facts, documents and witnesses

2    that Sambreel intends to introduce to support the specific arguments and assertions that it has made

3    in its preliminary injunction motion.  **Third**, the burden on Sambreel is low because it should already

4    have identified fact, documents and witnesses that support its preliminary injunction motion and

5    Facebook merely seeks full and fair disclosure of them.  **Fourth**, courts routinely recognize that a

6    pending preliminary injunction favors expedited discovery.  *See, e.g.*, *Berlin Media Art e.k. v. Does*

7    *1 through 146*, No. CIV. S-11-2039 KJM, 2011 WL 4056167, at *1 (E.D. Cal. Sept. 12, 2011)

8    ("[g]ood cause for expedited discovery is frequently found . . . in cases where the plaintiff seeks a

9    preliminary injunction.") (citations omitted); *Quia Corp. v. Mattel, Inc.*, C10-01902 JF (HRL), 2010

10   WL 2179149, at *1 (N.D. Cal. May 27, 2010) ("The good cause standard may be satisfied where a

11   party seeks a preliminary injunction") (citations and quotations omitted).  **Fifth**, Facebook seeks

12   discovery only 46 days before it could propound discovery in the normal course of proceedings.

13   This is significantly shorter than Apple's requested discovery two-and-a-half months before it would

14   have ordinarily become available.  *See Apple Inc.*, 2011 WL 1938154, at *2.  And given the need for

15   full and fair disclosure of facts and evidence Sambreel intends to rely upon to support its motion, this

16   reasonably short period before full-blown discovery commences should not weigh against

17   discovery.[4]

18   **Sambreel's Basis for Objections:**  This Court should not grant Facebook leave to serve this

19   interrogatory.  In deciding whether to grant expedited discovery, courts consider whether the party

20   seeking the discovery has shown good cause.  In *Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 11-CV-

21   01846-LHK, 2011 WL 1938154 (N.D. Cal. May 18, 2011), the court set out a five factor test that

22   seek to balance the needs of the party requesting discovery (Factors 1 and 3) with the burden that

23   will be imposed on the responding party (Factors 2, 4, and 5).  In *Apple*, the Court balanced these

24   factors and allowed very limited discovery on an expedited basis.  Specifically, Apple sought three

25   categories of discovery:  (1) product samples with packaging and package inserts, (2) documents

26   related to copying or designing around its products, and (3) a Rule 30(b)(6) deposition.  The Court

27   _____

28   [4] These fourth and fifth factors supporting good cause for discovery apply equally to the other
     discovery sought and discussed below.

ordered the defendant only to produce the product samples, denying Apple's broader requests. *See Apple*, 2011 WL 1938154, at *3-*4 (requiring production of 5 product samples along with packaging and product inserts but denying request for other documents and denying request for a deposition). Other courts in the Ninth Circuit that have been faced with requests for expedited discovery have similarly granted only very narrowly tailored, limited requests. *See., e.g., Semitool, Inc., v. Tokyo Electron America, Inc.,* 208 F.R.D. 273, 277 (N.D. Cal. 2002) (requiring production of documents in response to a single request); *Berlin Media Art e.k. v. Does 1 through 146*, No. CIV. S-11-2039 KJM, 2011 WL 4056167, at *2 (E.D. Cal. Sept. 12, 2011) (requiring production of documents in response to a single request).

Sambreel has already agreed to considerably more discovery than these courts have generally granted on an expedite basis. Specifically, Sambreel has agreed to produce documents in response to 14 out of the 17 categories of documents that Facebook sought during the meet and confer process. While Sambreel has maintained from the outset that it does not believe that any discovery is necessary, its primary objection has always been to the burden that would be imposed by Facebook's requests and the delay that the discovery will cause. As soon as Facebook provided reasonably tailored document requests as opposed to requests that would require a complete collection and production of all potentially discoverable documents, Sambreel agreed to the vast majority of the requests. Although Sambreel continues to believe that Facebook does not "need" the documents it has requested, Sambreel has agreed to produce them to avoid further dispute. The three requests that Sambreel opposes at this point include two requests for which Sambreel is not aware of readily identifiable documents and one request that focuses on information that is readily available in the public domain.

Facebook's insistence on additional discovery should be considered in light of the ample information that Sambreel has already agreed to produce.[5]

---

[5] Factors 1 and 5 remain constant for all of Facebook's discovery requests. Factor 1 considers the existence of the motion for a preliminary injunction. Although this fact favors some discovery, the case law makes clear that the mere fact that there is a request for a preliminary injunction does not automatically entitle a party to discovery. *See American LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009); see also *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-cv-1166, 2008 WL 3992353, at *1-*2 (S.D. Cal. Aug. 28, 2008) (denying request for expedited discovery in spite of existence of a motion for preliminary injunction). Factor 5, on the other hand,

Factor 3 from *Apple* does not support Facebook's request because Facebook cannot demonstrate that it needs a response to this request to respond to the preliminary injunction. Facebook's sole justification for the interrogatory is its concern that Sambreel intends to "sandbag" Facebook.  There is no basis for this concern.  Sambreel's counsel has stated *on numerous occasions* that it included all the facts and arguments it believed were relevant to its argument in its initial filing.  Facebook has demanded that Sambreel state that it will not submit any additional evidence regardless of what is contained in Facebook's opposition.  Specifically, Facebook stated that it would forego its interrogatories "provided Plaintiffs agree that they will not seek to introduce any additional evidence on those topics beyond the declarations and documents submitted with the opening memorandum."  In response, Sambreel made absolutely clear that it had not withheld any information from its opening memorandum but that it might need to rely upon additional information to *reply* to Facebook's opposition:  "Sambreel will rely upon the information in its opening memorandum and will rely upon whatever information is necessary to respond to Facebook's opposition."[6]

Facebook's suggestion that it needs to serve the interrogatory is specious.  To begin, Sambreel has *agreed* that it does not intend to introduce evidence or arguments for the first time on reply *except to the extent necessary* to respond to Facebook's arguments.  That is precisely the role that a reply brief and any supporting material attached thereto are to serve.  Sambreel cannot specifically know what arguments that Facebook will make in its opposition, what facts Facebook will contest, or what evidence Facebook will submit in support of its arguments.  Without that information, Sambreel cannot possibly set forth all facts and arguments it will make in support of its motion for preliminary injunction.  Moreover, the cases cited by Facebook – *Rodan & Fields, LLC v. Estee Lauder Companies, Inc.*, 10-CV-02451-LHK, 2010 WL 3910178, at *4, n.2 (N.D. Cal. Oct. 5,

---

weighs against allowing any further discovery.  This case was filed one month ago, and Facebook sought expedited discovery less than two weeks after the case was filed.  This case is many months away from the start of discovery, so Facebook is seeking discovery well before it would normally be allowed.

[6] Sambreel's counsel also made clear that should the Court hold an evidentiary hearing, there was always the possibility that new facts would emerge in the lead up to such a hearing.  Sambreel's counsel stated that it would inform Facebook of any such new facts in a timely manner.

2010) and *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 976 (N.D. Cal. 2006) – actually undermine Facebook's argument that it needs a response to the interrogatory.  In *Iconix*, the defendant complained that the plaintiff had included new facts in its reply.  *Id.*  The Court resolved the dispute by allowing the defendants to submit supplemental declarations to address the matter.  *Id.*  Thus, should Sambreel introduce inappropriate new material in its reply, Facebook has a ready remedy – seeking to strike the evidence or seeking leave to make a supplemental filing.  Because it has this legal remedy available to it, there is no need to grant its request for expedited discovery.  Moreover, Facebook has asserted that it intends to seek a multiday evidentiary hearing on the motion for a preliminary injunction. To the extent that the Court grants this request, Facebook will have ample time to address the arguments and evidence contained in Sambreel's reply brief.  Accordingly, Facebook has not shown that it needs a response to the requested discovery.

Factors 2 and 4 weigh strongly against the proposed discovery because responding will impose a significant burden on Sambreel.  Because Sambreel does not know what issues will ultimately be in dispute or what Facebook's arguments will be, responding to this interrogatory would require Sambreel to identify every fact, witness, and document that would be relevant to any argument that Facebook *could* potentially make.  There are potentially tens of thousands of documents in Sambreel's possession that *could* be relevant depending upon Facebook's arguments.[7] Responding to this interrogatory would, therefore, require Sambreel to identify and produce *every* document that supports *any* factual contention that could be relevant, regardless of whether the fact is one that is likely to be in dispute.   Allowing Facebook to serve this discovery request would, therefore, involve just the type of extensive, merits discovery that is wholly inappropriate on an expedited basis.

---

[7] In its preliminary injunction filing, Sambreel sought to include documents relevant to the issues that it believed were most likely to be in dispute.  Sambreel did not, however, attach documents to support every factual assertion in the declarations because doing so would have required Sambreel to attach hundreds, if not thousands, of documents to its initial filing.  This would have been a waste of time and resources in light of the fact that a declaration is sufficient basis for the Court to find any facts necessary and the fact that the vast majority of facts will not be contested.  If Facebook seeks to challenge factual assertions that Sambreel did not envision being challenged, Sambreel should be given the opportunity to provide documentary evidence to support those allegations.

In light of the fact that Facebook has not shown that it has a need for the discovery – because its concern about sandbagging can be addressed through a motion to strike or supplement – and the considerable burden that would be involved in responding to this interrogatory, this Court should deny Facebook's request to propound the interrogatory.

## II. DOCUMENT REQUESTS[8]

Sambreel agreed to produce what it represented were the readily available documents sufficient to show the information requested by 14 out of 17 of Facebook's narrowed set of documents requests.  Based on its investigation to date, Sambreel has represented that certain documents that Facebook requested either do not exist or are not readily available.  A document that sets out Facebook's 17 categories of requested documents and each party's responses is attached hereto as Appendix A.  Thus, Facebook will not seek further expedited responses to these document requests at this time.  However, Facebook has made this decision relying upon Sambreel's representations concerning the existence and availability of documents as reflected in Appendix A. Should Sambreel later seek to introduce any documents in support of its preliminary injunction motion, which Facebook has sought through its original or narrowed document requests and which were not produced by Sambreel, Facebook maintains that such documents should be excluded from consideration or at a minimum, Facebook should be given an additional opportunity to respond to the new documents or information and/or the opportunity to seek further discovery concerning the topics addressed by those documents.  Following the meet and confer process, there remains one document request in dispute and it is related to Facebook's Interrogatory.

**Request for Production of Documents No. 1:**  Documents identified in Sambreel's response to Interrogatory No. 1.

**Facebook's Position on Request for Production No. 1:**  This document request is merely a corollary to Interrogatory No. 1.  Facebook has good cause to seek production of these documents under the *Apple* factors for all the same reasons supporting its good cause for a response to Interrogatory No. 1 set forth above.

---

[8] Facebook's formal document requests are attached to the Basile Declaration as Exhibit C.

**Sambreel's Basis for Objections:**  For the same reasons that this Court should deny Facebook's request to propound the interrogatory, it should deny Facebook's document request. Responding to this document request would require Sambreel to search for and produce every document that *could* be relevant to any issue that *could* arise out of the preliminary injunction request and proceeding.  This is precisely the type of extensive, merits discovery that is wholly inappropriate on an expedited basis.

## III.   DEPOSITIONS[9]

**Deposition of Arie Trouw:**  Facebook seeks a deposition of Arie Trouw limited to five on-the-record hours about the statements made in his declaration.

**Defendant's Reason to Compel Deposition:**  Facebook has good cause to depose Mr. Trouw under the *Apple* factors on the statements made in his declaration, which covers topics concerning (a) advertisements on Facebook; (b) PageRage's alleged lost advertisers and the alleged reasons for the loss; (c) Mr. Trouw's generalized "gating" allegations; (d) the "popularity" of PageRage; and (e) Sambreel's alleged irreparable harm.  Sambreel has referenced *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-cv-1166-IEG (POR), 2008 WL 3992353 (S.D. Cal. Aug. 28, 2008) for the proposition that Facebook is not entitled to depositions if it has any publicly available information concerning topics discussed in the deponents' declarations.  But in that case the defendant "fail[ed] to demonstrate an additional need" for its requested deposition beyond topics it could rebut with publicly available information.  *Hansen*, 2008 WL 3992353 at *2.  That is not the case here.  Nearly all of the assertions Mr. Trouw and Mr. Miller make in their declarations are based on their own understanding and interpretation of information that lies nearly exclusively in Sambreel's control and that is not publicly available.  Even to the extent Sambreel has agreed to produce a selected collection of its internal documents, Facebook has no way of testing the declarants' analysis of those documents in light of their other exclusive knowledge of Sambreel's information, any limitations of the underlying data, whether there is additional documentation or

---

[9] Facebook's formal deposition notices are attached to the Basile Declaration as Exhibit C.

analyses that would undercut Sambreel's selected documents, or other factors that are not reflected in what Sambreel has agreed to produce through the meet and confer process. Moreover, the documents Sambreel agreed to produce do not cover all of the information that Facebook should be allowed to explore so that it has a fair and meaningful opportunity to respond to Mr. Trouw's assertions. A narrowly focused deposition is appropriate under the *Apple* factors and is the only avenue at this junction that would allow Facebook to meaningfully probe the majority of Mr. Trouw and Mr. Miller's vague and non-specific assertions.

As described earlier, two *Apple* factors are constant and support expedited discovery: Sambreel's pending preliminary injunction and the short time in advance of normal discovery Facebook is making these requests. The additional three factors—purpose, breadth, and burden—are also satisfied.[10]

*First*, Sambreel has identified Mr. Trouw as its founder and CEO and Mr. Trouw submitted a declaration in support of Sambreel's preliminary injunction motion that covers topics relevant to *every* element of Sambreel's motion. Facebook seeks the opportunity to depose Mr. Trouw on the statements he made in his declaration, which relate to the following topics:

**Advertisements on PageRage:** Mr. Trouw claims that "PageRage is marketed as a low-cost alternative to purchasing advertisements from Facebook." Trouw Decl. ¶ 35 (Doc. No. 3-2). Pricing of like product to like product is a key element in an antitrust case, and thus critical to Sambreel's likelihood of success on the merits. *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Mr. Trouw's conclusory statement about being a "low-cost alternative" is the ***only*** evidence Sambreel has provided to support that fundamental antitrust allegation. *See* Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("PI Mem.") at 24 (Doc. No. 3-1). Yet Mr. Trouw provides no facts describing how the advertisements PageRage provides in type or nature

---

[10] To the extent the Court does not permit expedited depositions, Sambreel's declarants should be prohibited from adding further evidence in a supplemental declaration. *See Iconix, Inc.*, 457 F. Supp. 2d at 976 (sustaining defendants' objection to new evidence and argument raised for the first time in plaintiff's preliminary injunction reply brief).

1  compare with the advertisements Facebook provides (e.g., whether PageRage advertisements are

2  randomly displayed or targeted based on demographic data like Facebook targets its advertisements).

3  Mr. Trouw provides no description whatsoever of the product he claims competes with Facebook.

4  Not all ads, advertisers or ad prices are the same and Facebook should not be required to shadow box

5  against an antitrust claim in which the product is not even specifically alleged.  Facebook and the

6  Court need to compare the advertising PageRage offers and displays with Facebook's advertising to

7  determine whether Sambreel is truly a "low cost alternative" as Mr. Trouw claims and how it is

8  allegedly equivalent to Facebook advertising products.  While Sambreel has agreed to provide

9  certain "media kits," Mr. Trouw understands the kinds of advertisements he was talking about in

10  comparing them to Facebook advertising.  The media kids will not describe these comparisons or

11  Mr. Trouw's thinking in making them.  Facebook seeks to question Mr. Trouw on the types of

12  advertisements PageRage provides, including the size, placement, content, and targeting of those

13  advertisements.  Facebook should also be given the opportunity to probe the pricing of

14  advertisements to conduct an apples-to-apples comparison with its own products and pricing.  As

15  indicated by *Brown Shoe*, the basis on which Mr. Trouw is comparing PageRage's advertisements

16  with Facebook's advertisements is central to Sambreel's antitrust claim and Sambreel's ability to

17  support its market definitions.  *See Brown Shoe*, 370 U.S. at 325.

18      **PageRage's lost advertisers:**  Mr. Trouw states that "[d]uring the summer and fall of 2011,

19  Sambreel heard from a number of its advertising partners that Facebook had contacted them to

20  demand that these companies cease doing business with PageRage."  Trouw Decl. ¶ 22.  But Mr.

21  Trouw does not even identify the entities that he believes Facebook contacted or who stopped doing

22  business with Sambreel.  The entities involved and the details surrounding Mr. Trouw's blanket

23  statement are directly relevant to core allegations in Sambreel's group boycott claim, and thus

24  Sambreel's likelihood of success on the merits.  This is particularly true given Sambreel's

25  representation by its counsel that many of the Sambreel's conversations with advertising partners

26  occurred telephonically.  Facebook should be permitted to probe Mr. Trouw's knowledge of these

27  conversations, what was said, and what actions Sambreel took in response to the conversations.  Mr.

28  Trouw's declaration provides none of these details.

**Mr. Trouw's generalized "gating" allegations and Sambreel's efforts to circumvent Facebook's restrictions:**  Mr. Trouw asserts that "Facebook was causing its computers to run scans of the web browsers operated by Facebook's users to determine whether the user had installed PageRage."  Trouw Decl. ¶ 25.  He also states that "Facebook had created a list of users who had downloaded PageRage and was gating them as they attempted to access Facebook, regardless of the fact that PageRage was no longer operating."  Trouw Decl. ¶ 27.  But Mr. Trouw does not explain the basis for his statements, let alone his personal knowledge of the issues, or whether Sambreel conducted any tests or hired an outside company to reach this conclusion.  Presumably Mr. Trouw's conclusory assertions are meant to support Sambreel's preliminary injunction argument that Facebook violated Cal. Penal Code § 502(c)(7).  Facebook should have the opportunity to explore the undisclosed purported information upon which Mr. Trouw relied to reach his conclusions and the methods he used, to defend itself against Sambreel's arguments.

Moreover, all of Sambreel and Mr. Trouw's gating allegations are subject to Facebook's valid business justification defense.  *See Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2nd Cir. 1992) ("[a] business may properly seek to maintain the image of its products by controlling where those products are sold" and selecting only those partners "that are consistent with the quality and image it wishes to project for its products").  Facebook has taken a number of lawful steps to protect its website from the harmful effects of PageRage's unauthorized ad injections and is justified in its effort to do so previously **and** going forward.  Facebook believes that Sambreel has attempted to circumvent those efforts and has violated Facebook's terms and policies in the process.  For example, after Facebook used technical measures to prevent PageRage from initiating communications through facebook.com communication channels, PageRage began using IP proxy and link shortening tactics to continue that abuse to drive traffic to PageRage's website.  This is just an example of Sambreel's covert tactics, and the full extent of Sambreel's circumvention efforts is known only to Mr. Trouw and Sambreel.  Yet Sambreel has refused to produce **any** documents on this topic.  Facebook should be allowed to question Mr. Trouw about the ways Sambreel has tried to circumvent Facebook's technical measures to show that its efforts previously and going forward to restrict PageRage's circumvention of Facebook's protections is justified.

1    **The "popularity" of PageRage:**  Sambreel claims that "PageRage provides functionality

2    that its users view as beneficial," Compl. ¶ 45, and Mr. Trouw adds specifically that "PageRage has

3    been one of Sambreel's most popular products," Trouw Decl. ¶ 12.  In fact, Mr. Trouw touts

4    Sambreel's "wide user base" and the millions of "active" PageRage users.  Trouw Decl. ¶¶ 10, 12.

5    Facebook does not believe that users find PageRage's invasive ad-injection methods to be beneficial,

6    and has reason to believe that the number of "active" users Mr. Trouw alleges may be overstated

7    based on limitations in Sambreel's data collection and the fact that PageRage is exceedingly difficult

8    to uninstall.  These issues are relevant to Facebook's business justification defense to Sambreel's

9    antitrust claims as well as the balance of harms and public interest.  *See Trans Sport, Inc.*, 964 F.2d

10   at 190 ("[a] business may properly seek to maintain the image of its products by controlling where

11   those products are sold" and selecting only those partners "that are consistent with the quality and

12   image it wishes to project for its products").

13          Facebook should have the opportunity to test Mr. Trouw's assertions of PageRage versus

14   Facebook popularity by questioning him about Sambreel creating impediments to deleting or

15   uninstalling its adware (and thereby driving up its advertising revenue), any complaints Sambreel

16   has received about this issue, and whether Sambreel took any steps to respond to these complaints by

17   making PageRage easier to uninstall.  Similarly, as Sambreel's own counsel conceded in responding

18   to Document Request No. 6, "Sambreel receives a notification that the product is uninstalled only in

19   *limited circumstances*."  Basile Decl. ¶ 5, Ex. B (emphasis added).  Thus, the data supporting Mr.

20   Trouw's claims of active users may be overstated based on its collection limitations, and Facebook

21   has no way of probing those collection limitations from publicly available material or the

22   spreadsheets Sambreel has agreed to produce.

23          Facebook should also be permitted to ask Mr. Trouw about the reasons he believes PageRage

24   is beneficial to the public in addition to reasons why PageRage may not be beneficial to the public.

25   Facebook should have the opportunity to probe Mr. Trouw's knowledge of PageRage user

26   complaints, the topics of those complaints, and any steps Sambreel's management took to respond to

27   user complaints.  For example, Facebook should be permitted to ask Mr. Trouw whether users

28   complain about the obtrusive and offensive nature of advertisements that PageRage displays on

facebook.com, about being tricked into downloading PageRage,[11] and about PageRage displaying advertisements in a way that obscures or displaces content on facebook.com.  These topics are directly relevant to the public interest considerations that the court must consider as well as Facebook's ongoing justification for seeking to protect Facebook users and the quality of its own product.  *See Trans Sport*, 964 F.2d at 190.

**Sambreel's alleged irreparable harm:**  Irreparable harm "is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate."  *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1162 (C.D. Cal. 2003) (citation omitted).  Mr. Trouw vaguely describes ways that Sambreel has been harmed by Facebook's actions and how Sambreel will be purportedly harmed in the future without an injunction.  Trouw Decl. ¶¶ 37-44.  Facebook should be given the opportunity to test Mr. Trouw's unsubstantiated irreparable harm claims to determine whether Sambreel's alleged injury is remote, speculative, and whether money damages would provide adequate compensation.

Mr. Trouw states, for example, that "Facebook's actions have had dire consequences for Sambreel," Trouw Decl. ¶ 37, that Sambreel is "in default on its primary line of credit," *id*. ¶ 38, that "Sambreel also has been forced to shelve a number of new products it was developing because it does not have the resources to develop them," *id*. ¶ 41, and that "Sambreel has been forced to disable or modify certain existing products," *id*. ¶ 42.  All of these statements share three things in common: they are fundamental to Sambreel's alleged irreparable harm, they are completely conclusory, and the information and bases for these assertions lie exclusively in Mr. Trouw's control.

---

[11] Indeed, Sambreel even tricked technology blogger, Mike Holder, who wrote a scathing criticism of Facebook for introducing "big" and "gaudy" banner ads, which he criticized as contrary to Facebook's long-held policy against banner ads.  See Basile Decl., ¶ 9, Ex. D.  Holder attributed the ads to Facebook and concluded: "I joined Facebook 5 years ago to get away from MySpace's gaudy banner ads and layouts.  Why would I want them now on Facebook?  Right now MySpace is a breath away from folding into oblivion because of moves like what Facebook pulled today.  Why would you want to do the same things that drove people from your former competition to drive them to a new hot player on the social networking scene—Google+?"  *Id*.  The mistaken attribution of PageRage's ads to Facebook was later corrected by fellow technology blogger Whitson Gordon, who acknowledged: "What we originally thought to be an upcoming Facebook update has turned out to be a 3rd-party plugin that hijacks your Facebook" and "adds new big, obnoxious ads next to and inside their Facebook feeds."  *See* Basile Decl., ¶ 10, Ex. E.  He goes on to note that "this is a plugin you'll want to remove from your computer[.]"  *Id*.  This scenario simply illustrates why it is critical for Facebook to be given the chance to test Mr. Trouw's otherwise self-serving statements of high user rates and PageRage's popularity.  *Id*.

JOINT MOTION FOR DETERMINATION OF                    13                    CASE NO: 12-CV-00668-CAB-KSC
EXPEDITED DISCOVERY DISPUTE

1    Facebook should be given the given the opportunity to probe these statements to be able to

2    meaningfully respond to Sambreel's irreparable harm arguments.  For example, Facebook should be

3    allowed to inquire about the unspecified "dire consequences" Mr. Trouw references, including what

4    those consequences were, the extent of Sambreel's alleged harm, whether those consequences were

5    due to other factors, such as cease and desist demands from other people or entities and whether

6    monetary damages would adequately compensate Sambreel.  Facebook should be allowed to probe

7    Mr. Trouw's basis for attributing any of these "consequences" to Facebook, and whether Sambreel's

8    management took any steps to mitigate the alleged harm.  It should also be permitted to question Mr.

9    Trouw on other factors that have contributed to Sambreel's alleged harm.  None of the documents

10   that Sambreel has agreed to produce will shed light on any of these irreparable harm issues or allow

11   Facebook to probe Mr. Trouw's blanket assertions that Facebook is to blame for all of Sambreel's

12   harm.

13          Facebook should be able to ask Mr. Trouw about his claim that Sambreel defaulted on its line

14   of credit with Wells Fargo.  *See* Trouw Decl. ¶ 38.  While Sambreel has agreed to provide copies of

15   the Wells Fargo line of credit documents and the default letters sent by Wells Fargo to Sambreel,

16   Facebook should be given the chance to explore all of the reasons behind the default and any

17   communications from Sambreel to Wells Fargo (which Sambreel has not agreed to produce).

18   Moreover, the documentation Sambreel has agreed to provide will not reveal how Sambreel is

19   currently operating without this Wells Fargo line of credit, whether Sambreel has other lines of

20   credit that Mr. Trouw failed to disclose, or whether Sambreel has sufficient cash on hand to continue

21   operating.  These questions are crucial to probing Sambreel's self-serving irreparable harm

22   allegations and to determining whether monetary damages would sufficiently compensate Sambreel

23   for its alleged harm.

24          Mr. Trouw should also be required to provide information about the "new products" that

25   Sambreel was "forced to shelve" and the unspecified "existing products" that Sambreel was forced

26   to disable or modify.  He asserts both as a basis for Sambreel's irreparable harm but provides no

27   details to substantiate his claim nor why Sambreel believed it could operate on Facebook when, in

28   fact, it was told in January 2011 that its products and services were unauthorized.  While Sambreel

has agreed to provide a *list* of products allegedly shelved as a result of Facebook's conduct and

costs, to the extent Sambreel has that, these documents will not provide the detail necessary to test

Mr. Trouw's irreparable harm allegations.  Facebook should be allowed to ask Mr. Trouw about the

nature, development stage, plans, and anticipated revenues for the each of the "new products" he

claims to have shelved.  Similarly, Facebook should be given the opportunity to probe what

"existing products" Mr. Trouw had to disable or modify, how they were operating on Facebook and

how much revenue those products were generating, or whether they were generating any revenue at

all.  Indeed, Mr. Trouw does not name a single product.  All of these inquires are directly relevant to

Mr. Trouw's unsupported assertion that Facebook caused Sambreel's irreparable harm, and the

information underlying his statements is not available in the documents Sambreel has agreed to

produce, nor available from any public source.

   ***Fourth***, Facebook has tailored the scope of Mr. Trouw's deposition to cover  the statements

he made in his declaration, and thus only those issues that Sambreel deemed important enough to

include in its moving papers.  *See Quia Corp. v. Mattel, Inc.*, C10-01902 JF (HRL), 2010 WL

2179149, at *2 (N.D. Cal. May 27, 2010) (granting defendant's request to depose two witnesses

about the declarations they submitted in support of plaintiff's preliminary injunction motion);

*AT & T Corp. v. Vision One Sec. Sys.*, 914 F. Supp. 392, 396-97 (S.D. Cal. 1995) (noting earlier

grant of defendant's *ex parte* application for expedited discovery, including depositions and

document requests, as "necessary to the Court's determination of the preliminary injunction

motion").

   Moreover, Facebook has agreed to forego the depositions of Mr. Sullivan, Mr. Levin, and a

Rule 30(b)(6) deponent.  Despite having good cause to conduct those depositions as well, *see Quia

Corp.*, 2010 WL 2179149, at *2; *Kremen v. Cohen*, No. 5:11-CV-05411-LHK, 2011 WL 6113198,

at *10 (N.D. Cal. Dec. 7, 2011) (granting request for depositions, including a 30(b)(6) deposition),

Facebook made a good faith effort to tailor its requests by seeking only to depose Mr. Trouw and

Mr. Miller.

   ***Fifth***, the burden to prepare Mr. Trouw will be minimal considering that the topics covered

in his deposition will be limited by the statements he made in his declaration.  Moreover, Facebook

1    has agreed to limit Mr. Trouw's deposition to a reasonable time of five hours on the record and will

2    work with Mr. Trouw to schedule a mutually convenient time and location for his deposition.

3         **Sambreel's Basis for Objections:**  Facebook should not be allowed to depose Mr. Trouw.

4    In *Hansen Beverage Co. v. Innovation Ventures, LLC*, this Court made clear that a party is not

5    entitled to a deposition on an expedited basis where the information it is seeking (or the ability to

6    challenge the statements in a declaration) is publicly available or otherwise already available to the

7    party seeking the deposition.  *See* No. 08-cv-1166-IEG (POR), 2008 WL 3992353, at *1-*2 (S.D.

8    Cal. 2008).  This decision makes sense in light of the "good cause" standard set forth in *Apple*.  A

9    deposition will always impose a significant burden on the witness and the party by whom the witness

10   is employed.  In light of the clear burden involved in a deposition, the party seeking the deposition

11   must demonstrate that it does not have other avenues to learn the information it seeks (or to

12   challenge the declarations in support of a preliminary injunction).  Facebook's request to depose Mr.

13   Trouw should be denied in light of this case law.  Facebook already had considerable evidence from

14   the public domain and from its own files to address (and challenge) the factual assertions in Mr.

15   Trouw's declaration.  And, Sambreel will be producing documents that provide additional

16   information on the relevant topics.  As such, Facebook cannot demonstrate that it needs to depose

17   Mr. Trouw.

18        *Advertising on PageRage.*  Facebook first asserts that it needs to depose Mr. Trouw regarding

19   the advertising available from PageRage so that it can compare the advertising offered by the two

20   parties.  This argument is specious in light of the documents that Sambreel has agreed to produce.

21   Sambreel has agreed to produce:  (1) documents that will show the placement and size of

22   advertisements available on PageRage, (2) Media Kits that contain information about advertising on

23   PageRage, and (3) data showing the average price per thousand impressions at which these

24   advertisements were ultimately sold.  Sambreel has also explained that advertisers that purchase

25   advertising from it can use industry-standard "cookie" technology to target advertisements.  This

26   information provides Facebook with ample information on which to judge – and potentially

27   challenge – the conclusion that PageRage is a "low cost competitor."  Facebook's assertion that it

28   needs to depose Mr. Trouw to investigate his "thinking" is frivolous.  Mr. Trouw's "thinking" is not

1   relevant; the relevant inquiry is whether PageRage provides a reasonably interchangeable avenue for

2   the placement of advertisements (*i.e.,* whether it is a competitor).  Facebook can use the data and

3   documents that Sambreel will produce to address this question.

4           *Lost Advertisers*.  Facebook does not need to depose Mr. Trouw to investigate the advertisers

5   that were lost as a result of Facebook's interference.  Facebook points to a single paragraph in Mr.

6   Trouw's declaration that simply asserts that Sambreel heard from a number of advertising partners

7   that Facebook was demanding that they cease doing business with PageRage.  *See* Doc. No. 3-2,

8   ¶ 22.  Facebook asserts it does not know which advertising partners Sambreel alleges Facebook has

9   contacted and therefore needs to depose Mr. Trouw.  This assertion is frivolous and misleading.

10  Sambreel has submitted a declaration of Andrew Sullivan, which specifically identified the seven

11  advertising partners who ceased doing business with PageRage as a result of threats from Facebook,

12  *see* Doc. No. 3-6, ¶ 3, and identified three advertising partners who refused Facebook's requests to

13  cease doing business and were then removed from the list of approved advertisers for the Facebook

14  Platform, *see id.* ¶ 4.  Sambreel's brief in support of its motion for preliminary injunction recited the

15  same number of advertising partners who were threatened.  *See* Doc. No. 3-1 at 8.  Sambreel has also

16  attached various communications with advertising partners that recounts Facebook's threats –

17  including one e-mail directly from Facebook to Rubicon Project.  And Sambreel has agreed to search

18  for and produce written communications with the other advertising partners it has identified.

19          Thus, Facebook clearly is aware of the entities that Sambreel contends have ceased doing

20  business with PageRage as a result of threats from Facebook.  Moreover, Facebook has all the

21  information it needs to challenge the Sambreel's factual assertions.  Facebook unquestionably knows

22  which advertising partners it contacted, knows how those advertising partners responded to

23  Facebook's demands, and knows the actions that Facebook took in response.  To the extent that

24  Facebook contends that it did not contact the advertising partners Sambreel has identified, Facebook

25  is fully capable of submitting a declaration to support its contention.[12]  Facebook does not need to

26  depose Mr. Trouw to investigate this issue.

27  ─────────────────────
    [12] Facebook's proposal to depose Mr. Trouw about this topic is also perplexing.  Sambreel's counsel
28  explained that Andrew Sullivan was the primary employee at Sambreel who interacted with the
    advertising partners on this issue and has therefore agreed to search his files for relevant

1    *Gating.*  Facebook should not be allowed to depose Mr. Trouw regarding the basis for the

2    allegations regarding the scans that Facebook ran on its users' computers.  Mr. Trouw specifically

3    identified the method that Sambreel believes Facebook used to conduct these scans.  *See* Doc. No. 3-

4    2, ¶ 25 (stating that Facebook appeared to be scanning the "DOM" of its users' web browsers).

5    Facebook asserts that it needs to depose Mr. Trouw to investigate the basis for this assertion but it

6    fails to explain why the basis for Mr. Trouw's conclusion is relevant.  The relevant inquiry is

7    *whether* Facebook was scanning its users' computers, and Facebook concedes that it was doing so

8    (and continues to do so today).  Facebook has filed a declaration *conceding* that it was scanning its

9    users' computers for Sambreel software.  *See* Doc. No. 21-1, ¶ 2 ("Facebook deployed scanning

10   technology to detect Facebook users running software operated by Sambreel Services LLC, Yontoo

11   LLC and/or Theme Your World LLC.").  In light of this concession, there is simply no reason to

12   depose Mr. Trouw to investigate how Sambreel concluded – correctly – that Facebook was

13   conducting the scans.  Facebook clearly has sufficient facts and information to make any argument

14   necessary regarding this topic.[13]

15       *Business Justification.*  Facebook should not be allowed to depose Mr. Trouw regarding

16   attempts to "circumvent" limitations imposed by Facebook.  Notably, contrary to Facebook's

17   assertion that the deposition is tailored to address only the issues raised in the declarations, Mr.

18   Trouw did not include any discussion of attempts to "circumvent" limitations imposed by Facebook

19   in his declaration.  Thus, this is an independent area of inquiry that Facebook is affirmatively raising.

20   More fundamentally, however, Facebook cannot use a deposition *now* to build a business

21   justification for actions that it took *in the past*.  Facebook must *already* have evidence to support its

22   alleged business justification.  *Cf. Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d

23   1195, 1219 (9th Circuit 1997) (noting that a fact finder could conclude that a company's alleged

24   business justification was pretext when the issue had not occurred to the decision maker at the time it

25   ―――――――――――――

26   correspondence.  Facebook does not offer any explanation for why it seeks to depose Mr. Trouw on
     this topic.

27   [13] And if Sambreel's conclusion about how Facebook was conducting the scans is incorrect,
     Facebook can clearly submit a declaration explaining how it was conducting the scans (if Facebook

28   believes that issue is relevant).

took the action).  Any arguments regarding Facebook's business justification must be judged based on information already in its possession.  As such, Facebook – by definition – already has all the information it needs to set out its business justification defense.  If Facebook does not already have the evidence, its defense will fail.[14]

*The Popularity of PageRage*.  Facebook does not need to depose Mr. Trouw regarding the popularity of PageRage.  First, Facebook has indicated to this Court a number of times that it has evidence to demonstrate that users do not like PageRage.  In its initial *Ex Parte* Application, for example, Facebook asserted that Sambreel's users "complain loudly and repeatedly" to Facebook. *See* Doc. No. 10-1 at 1.  Similarly, Facebook has already represented that it has "substantial evidence" regarding the popularity of PageRage:  "Facebook will present substantial evidence that many of its users did not knowingly or purposely download this adware, did not want it, thought it was Facebook, and complained to Facebook about it."  *See* Doc. No. 22-1 at 6 n.6.  In light of these statements, it is perplexing how Facebook can argue that it needs to depose Mr. Trouw to learn whether PageRage was popular or not.  Facebook has asserted to this Court that it has evidence to challenge the popularity of PageRage, so it should not be allowed to depose Mr. Trouw on this issue.

Moreover, Facebook does not need to depose Mr. Trouw because Sambreel has agreed to produce documents and data that will allow Facebook to assess Sambreel's assertion that PageRage is a popular product.  Sambreel has agreed to produce:  (1) data showing the number of installations of PageRage, (2) data showing the number of uninstalls of PageRage, (3) data showing what percentage of PageRage installs were the result of various channels for user acquisition, (4) data showing the number of daily active users of PageRage, and (5) *all* e-mails that were sent to the

---

[14] Indeed, it seems likely that Facebook is actually seeking this discovery solely so that it can attempt to develop a counterclaim against Sambreel.  Specifically, Facebook's requests have focused on whether Sambreel engaged in actions that sought to overcome "technical or code-based barriers" imposed by Facebook.  This language is the legal standard that the Northern District of California has imposed as a requirement for proving violation of California Penal Code Section 502(c) when the allegations is that a party accessed a public website without permission.  Facebook has not explained why this technical requirement for violation of California Penal Code is relevant to its opposition to the preliminary injunction.  Thus, it appears that Facebook is attempting to use the preliminary injunction as an excuse to engage in discovery that is aimed at determining whether it should file counterclaims.

1   PageRage customer service e-mail address.[15]  This information will provide Facebook with

2   information regarding the popularity of PageRage and about the complaints about PageRage.

3          Between the documents and data Sambreel has agreed to produce and the information that

4   Facebook has represented to the Court that it already has, Facebook has ample evidence on this

5   point.  As such, it does not need to depose Mr. Trouw on this matter.

6          *Irreparable Harm*.  Facebook does not need to depose Mr. Trouw regarding the irreparable

7   harm that Sambreel will suffer in the absence of an injunction.  While Facebook attempts to

8   demonstrate that the irreparable harm issue will be hotly contested, it fails to note a critical fact for

9   the Court – Facebook concedes that it will renew its gating campaign if the Court does not enter an

10  injunction.  As such, without injunctive relief Sambreel will have no choice but to deactivate

11  PageRage during the course of the litigation to avoid the adverse effects of gating.[16]  Facebook

12  cannot plausibly argue that Sambreel (much less Theme Your World) will not be irreparably harmed

13  if it is forced to remove one of its most widely used products from the market for the pendency of

14  the litigation.  *Cf. Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990)

15  (noting that forcing an accused patent infringer to remove its product from the market pending trial

16  can be "devastating").  Indeed, courts have routinely concluded that less significant harms – *e.g.*,

17  harms to reputation, loss of goodwill, and the loss of an opportunity to grow – constitute irreparable

18  harm.  *See, e.g., Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)

19  ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of

20  the possibility of irreparable harm."); *see also Rent-A-Center, Inc. v. Canyon Tele. & Appliance*

21
22  [15] Facebook incorrectly asserts that it needs to depose Mr. Trouw because of potential inconsistency between the number of uninstalls reported to Sambreel and the number of active users.  Facebook
23  confuses the facts.  Sambreel's counsel explained that the data regarding the number of "uninstalls" will understate the number of actual uninstalls because only uninstalls performed in a certain manner
24  trigger a message to Sambreel.  Sambreel does not receive notices of users who disable PageRage in other ways (or who begin using a different web browser).  The understatement that will be present in the data regarding uninstalls has nothing to do with the data regarding the number of active users.
25  Sambreel measures active users based upon the number of computers that register with Sambreel's servers on a daily basis.

26  [16] Sambreel would face a Hobson's choice between deactivating PageRage or attempting to continue
27  operating the system until all of its users are forced to remove PageRage and all other Sambreel products.  Clearly, if the Court denies the preliminary injunction, the only real option is for Sambreel
28  to deactivate PageRage.

JOINT MOTION FOR DETERMINATION OF          20          CASE NO: 12-CV-00668-CAB-KSC
EXPEDITED DISCOVERY DISPUTE

*Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("However, we have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."). Thus, Facebook has effectively conceded that Sambreel will be irreparably harmed absent an injunction.[17]

Facebook's assertion that it needs the deposition to test the contours of Sambreel's irreparable injury is specious. The precise number of users that Sambreel lost as a result of Facebook's gating campaign is not relevant in light of the fact that it will lose *all* PageRage users without an injunction. Similarly, the precise number of products that Sambreel has shelved as a result of Facebook's interference is not relevant in light of the fact that Sambreel unquestionably will be forced to shelve its most profitable product absent an injunction. Put simply, all of the issues that Facebook suggests it needs to address during the deposition on the irreparable harm issue pale in comparison to the harm that Sambreel will suffer as a direct, proximate result of being forced to deactivate PageRage – a certain result of the denial of the preliminary injunction hearing.[18]

But even if the contours of the harms were relevant, Sambreel has agreed to produce ample evidence that will allow Facebook and the court to assess the issue. Sambreel has agreed to produce data regarding its number of active users, which will demonstrate a steep drop in users that coincides with Facebook's gating campaign. Sambreel will produce financial data that will show the average advertising rates PageRage was able to obtain, which will demonstrate the effects of the group boycott. Sambreel will produce financial data that will show the significant decrease in revenues that resulted from Facebook's actions. Sambreel will produce copies of its credit line with Wells

---

[17] Theme Your World, which operates PageRage and would be driven out of business entirely if PageRage is deactivated, unquestionably will suffer irreparable harm absent an injunction. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless.").

[18] The details and precise contours of the harms that Facebook's actions have caused in the past will certainly be relevant in this case, as they will be central to Sambreel's damages claims. In fact, Sambreel expects that these issues will be addressed at length during merits discovery and will be the subject of expert reports and depositions during that phase of the litigation. These issues are not proper topics for expedited discovery, however, because the precise contours of the prior harms will not decide the irreparable harm issue.

Fargo and the notices of default Sambreel received.  Sambreel has agreed to produce information regarding the products that it has been forced to shelve.  The documents that Sambreel will produce will provide Facebook with ample information regarding the irreparable harm issue.[19]

The proposed deposition will also impose a significant burden on Sambreel.  Facebook asserts that its request is narrowly tailored because it seeks to depose Mr. Trouw only on issues in his declaration and will limit the deposition to five hours.  Facebook's arguments are without merit.  To begin, limiting a deposition to five hours hardly makes it non-burdensome.  Under Federal Rule of Civil Procedure 26(d)(1), a full merits deposition of Mr. Trouw would be presumed to last no more than seven hours.  Facebook's offer to limit its deposition to just over 70 percent of the time allowed for a merits deposition hardly demonstrates that it will not create a burden.  Similarly, limiting the deposition to the topics included in the declaration – which Facebook does not actually do – would not eliminate the burden on preparing Mr. Trouw for the deposition.  As the Court is no doubt aware, preparing any witness for a deposition is a time consuming task.  In light of the fact that Facebook suggests five hours of deposition but only identifies a handful of topics, Mr. Trouw will be required to spend considerable time preparing for potential tangents that Facebook apparently intends to address.  In light of the fact that Facebook has not demonstrated its need for the deposition – much less a strong showing of need – the burden that will be involved outweighs any benefits to Facebook.  As such, the Court should deny Facebook's request to depose Mr. Trouw.

**Deposition of Brad Miller:**  Facebook seeks a deposition of Brad Miller limited to five on-the-record hours about the statements made in his declaration.

**Defendant's Reason to Compel Deposition:**  Facebook has good cause to depose Mr. Miller under the *Apple* factors on the statements made in his declaration, including topics concerning (a) Sambreel's "consistent growth" prior to Facebook's alleged conduct, and (b) Sambreel's alleged

---

[19] Facebook posits that there may be other explanations for the harm suffered by Sambreel but offers no basis for these suggestions.  Moreover, the data that Sambreel will produce will demonstrate that the reduction in average advertising rates for PageRage coincided with the departures of advertising partners as a result of the boycott and that the Sambreel noticed a significant reduction in the number of daily active users that coincided with the gating campaign.  This evidence will be sufficient to demonstrate that Sambreel has a high likelihood of success in demonstrating a link between the harms it suffered and the actions of Facebook.

irreparable harm.  As described earlier, two *Apple* factors are constant and support expedited

discovery:  Sambreel's pending preliminary injunction and the short time in advance of normal

discovery Facebook is making these requests.  The additional three factors—purpose, breadth, and

burden—are also satisfied.

**First**, Mr. Miller is Sambreel's Chief Revenue Officer and submitted a declaration

supporting Sambreel's preliminary injunction motion.  (Doc. No. 3-4).  In his declaration, he

discusses issues that are highly relevant to Sambreel's alleged irreparable harm—one of the four

elements Sambreel must demonstrate to obtain an injunction.  For the reasons explained below,

Facebook should have the opportunity to probe the statements in his declarations, which cover the

following topics:

**<u>Sambreel's "consistent growth"</u>:**  A critical factual question underpinning Sambreel's

alleged irreparable harm is how Sambreel generally, and PageRage specifically, performed

financially before Facebook's alleged "boycott" and "gating" conduct.  Sambreel must demonstrate

that Facebook's conduct—and not other outside factors—caused Sambreel's alleged harm.  Mr.

Miller discusses what he describes as Sambreel's "consistent growth" prior to Facebook's

"interference."  *See* Miller Decl. ¶ 2.  Yet his conclusions are largely unsubstantiated and do not

provide the underlying bases for Facebook or the Court to evaluate his irreparable harm allegations.

Thus, Facebook seeks to probe the gaps in his discussion to unearth a full and complete picture of

Sambreel's irreparable harm allegations, the bases for which are not available from the documents

Sambreel has agreed to produce, and are within Mr. Miller and Sambreel's sole control.

To begin, Facebook should be allowed to test Mr. Miller's claims about the number of its

active users and advertisement impressions served to those users.  *See* Miller Decl. ¶¶ 2-10.  His

statements on these topics are meant to support Sambreel's purported "consistent growth" to show

that Sambreel was on an upward trajectory prior to Facebook's "interference."  They are thus critical

for comparing Sambreel's later alleged irreparable harm.  But Mr. Miller does not explain how

Sambreel tracks the number of active PageRage users or advertising impressions on PageRage.  He

does not explain which other products were serving advertisements that accounted for Sambreel's

total 57 billion advertisements impressions in November 2011.  And he does not discuss any

1    limitations on Sambreel's tracking capabilities that might limit his conclusions.  Facebook should be

2    allowed to probe these omissions to fully understand Sambreel's usage rates and advertising

3    impressions and to determine the extent to which Sambreel has suffered any harm, let alone any

4    irreparable harm.

5          Mr. Miller also discusses the average advertising rates Sambreel was able to charge before

6    Facebook's alleged "boycott" and "gating" activities.  Average advertising rates are relevant to

7    Sambreel's revenue and profits before and after Facebook's alleged "interference," including the

8    extent to which Facebook's actions have caused any harm.  Mr. Miller says that "[d]uring the spring

9    and summer of 2011, Sambreel was charging average advertising rates of 10 and 15 cents per

10   thousand impressions delivered by PageRage."  Miller Decl. ¶ 6.  Yet he does not describe why its

11   rates fluctuated, what factors influenced that fluctuation, what advertising rates it was charging for

12   non-PageRage products, or any limitations to its "average advertising rates" data.  The bases for Mr.

13   Miller's statements are in his sole control and are necessary for a full and fair picture of Sambreel's

14   financial history and to evaluate whether Sambreel was harmed or will be irreparably harmed in the

15   future.

16         Finally, Mr. Miller also mentions that "Sambreel's consistent profitability allowed it to

17   continuously develop and launch new products."  Miller Decl. ¶ 10.  According to him, these

18   unspecified new products "continued to fuel Sambreel's overall growth and allowed Sambreel to

19   diversify its revenue stream."  *Id.*  Sambreel's new products and revenue diversification are relevant

20   to whether Sambreel will suffer irreparable harm due to decreased usage rates for only *one* of its

21   products—PageRage.  If Sambreel has other products that provide revenue diversification, it is

22   difficult to see how it can claim to be irreparably harmed by decreased usage rates for only one of its

23   products.  But Mr. Miller does not explain what new products Sambreel developed, how successful

24   those products have been in terms of revenue growth and profit, or the extent to which the new

25   products were able to diversify Sambreel's revenue stream to make Sambreel less dependent on the

26   PageRage product at issue in this case.  Facebook should be permitted to question Mr. Miller about

27   what appears to be an important hole in Sambreel's irreparable harm theory.

28

1    **Sambreel's alleged irreparable harm:**  Like Mr. Miller's discussion of Sambreel's

2    "consistent growth," his follow-on statements concerning irreparable harm are largely conclusory

3    and do not provide the bases for evaluating Sambreel's irreparable harm allegations.  There are many

4    gaps in his discussion that Facebook should be allowed to probe, including (a) his tendency to blur

5    the distinction between Sambreel as a whole and the PageRage product specifically, (a) any

6    limitations on the data he relies on, and (c) factors contributing to Sambreel's success and decline

7    that are unrelated to Facebook's conduct.

8         Mr. Miller discusses the number of users that Sambreel allegedly lost as a result of

9    Facebook's "gating" activities.  Miller Decl. ¶ 15 ("Sambreel has concluded that it lost more than 1

10   million users as a direct result of the gating.").  Sambreel's decreased usage rates are relevant to its

11   alleged harm, but Mr. Miller does not provide any basis for his conclusion that Sambreel lost 1

12   million users.  Facebook intends to probe Mr. Miller on how many users uninstalled or stopped using

13   PageRage as opposed to other Sambreel products, the bases for his conclusion that Sambreel lost 1

14   million users, and any limitations on his data, including, for example, how Sambreel measures when

15   a user stops using PageRage but does not physically uninstall the product (i.e., when a user buys a

16   new computer but does not uninstall PageRage from his or her old computer).  Only Mr. Miller can

17   answer the unresolved questions in his declaration, and none of these issues can be clarified with the

18   limited selection of documents Sambreel has agreed to produce.

19        Mr. Miller also discusses decreased advertising rates, which are relevant to evaluating

20   Sambreel's alleged harm.  But Mr. Miller blurs the distinction between Sambreel and PageRage in a

21   way that makes his conclusions meaningless without further explanation.  He states earlier in his

22   declaration that Sambreel was charging average advertising rates of 10 and 15 cents per thousand

23   impressions ***delivered by PageRage***.  Miller Decl. ¶ 6.  But when discussing advertising rates after

24   Facebook's "interference," he refers only to rates charged by ***Sambreel***, saying that "[b]y December

25   2011, the average rates that Sambreel could charge had fallen to approximately 5 cents per thousand

26   impressions."  *Id.* ¶ 13.  Facebook should be allowed to probe this difference.

27        Mr. Miller discusses harm suffered in the form of unrealized user growth.  He makes

28   sweeping assertions about the number of users Sambreel never acquired because of Facebook's

alleged "gating" activity.  Miller Decl. ¶ 16 ("Sambreel estimates that there were approximately 300,000 users that were never acquired" as a result of Sambreel's "significantly reduced [] marketing spend in direct response to the gating campaign.").  His allegations of unrealized user growth are relevant to Sambreel's alleged harm, and Facebook should be given the opportunity to test the basis of his unsupported "estimate."  He does not describe how he reached this estimate, what data he relied on, what Sambreel's marketing spend was before Facebook's "gating," or what its marketing spend was after Facebook's gating.  In short, he provides no way for the Court or Facebook to test his claims that are based on information solely within his control.

On the same note, Mr. Miller claims that Sambreel's loss of 300,000 potential users also "resulted in a significant decrease in the number of advertising impressions that Sambreel had available to sell across its product line."  Miller Decl. ¶ 17.  This claim is critical to Sambreel's alleged irreparable harm but is based on several layers of unsubstantiated conclusions, the bases for which Mr. Miller has omitted from his declaration.  Facebook has no way to test Mr. Miller's claims absent a reasonable opportunity to depose him.  Facebook should be allowed to probe how Mr. Miller tied Sambreel's decreased marketing spend to a specific number of lost users and, in turn, how he tied the "estimated" number of lost users to an unspecified "significant decrease in the number of advertising impressions."

In sum, Mr. Miller provides fundamental statements underpinning Sambreel's irreparable harm arguments but provides nearly none of the data from which Facebook or the Court can test those claims.  Facebook requests the opportunity to conduct a reasonably tailored deposition to probe the gaps that Mr. Miller has failed to fill.

**Second**, Facebook has tailored the scope of Mr. Miller's deposition to cover the statements made in his declaration.  *See Quia Corp.*, 2010 WL 2179149, at *2 (granting defendant's request to depose two witnesses about the declarations they submitted in support of plaintiff's preliminary injunction motion).

**Third**, the burden to prepare Mr. Miller will be minimal considering the topics covered in his deposition will be limited to the statements he has already made in his declaration.  Moreover, Facebook has agreed to limit Mr. Miller's deposition to a reasonable time of five hours on the record

1    and will work with Mr. Miller to schedule a mutually convenient time and location for his

2    deposition.

3        **Sambreel's Basis for Objections:**  Facebook should not be allowed to depose Mr. Miller.

4    As with the proposed deposition of Mr. Trouw, Facebook's request to depose Mr. Miller does not

5    meet the standard adopted by this Court in *Hansen Beverage Co. v. Innovation Ventures, LLC*, No.

6    08-cv-1166-IEG (POR), 2008 WL 3992353, at *1-*2 (S.D. Cal. 2008).  Sambreel will be producing

7    documents and data that address the topics on which Facebook proposes to depose Mr. Miller and

8    other information is self evident (*e.g.*, that the loss of 300,000 users will result in a reduction in the

9    number of advertising impressions available for sale).  As such, Facebook cannot demonstrate that it

10   needs to depose Mr. Miller.

11       *Sambreel's Consistent Growth*.  Facebook should not be allowed to depose Mr. Miller

12   regarding the consistent growth of Sambreel.  Sambreel has agreed to produce:  (1) data showing the

13   number of daily active users of PageRage specifically and all of Sambreel's products generally,

14   (2) data showing the number of advertising impressions served on a daily basis by PageRage

15   specifically and all of Sambreel's products generally, (3) data showing the revenues generated on a

16   daily basis by PageRage specifically and all of Sambreel's products generally, (4) data showing the

17   average daily rates that Sambreel obtained for advertising on PageRage specifically and all of

18   Sambreel's products generally,[20] (5) data showing the number of people who installed PageRage on

19   a daily basis, (6) data that shows "uninstalls" of PageRage,[21] (7) documents showing a timeline of

20   when new products were launched, (8) documents about products that were in development but were

21   shelved after Facebook's interference, and (9) communications with advertising partners who ceased

22   doing business with PageRage.  These documents and data will provide Facebook with ample

23

24   _____

     [20] Facebook's assertion that it needs to depose Mr. Miller to determine the reason that the rates
25   fluctuated is without merit.  Facebook is a participant in the online advertising markets and surely
     knows that rates fluctuate for a number of reasons, including, for example, seasonality and real-time
26   bidding systems.  Because Facebook already understands the reasons for fluctuations, there is no
     reason for it to be granted an "expedited" deposition of Mr. Miller to ask questions on this topic.

27   [21] Sambreel has already explained that Sambreel's data regarding "uninstalls" is not complete as
     Sambreel receives notifications about uninstalls only if a user uninstalls in one specific way.
28

JOINT MOTION FOR DETERMINATION OF              27              CASE NO: 12-CV-00668-CAB-KSC
EXPEDITED DISCOVERY DISPUTE

evidence to assess Mr. Miller's contention that Sambreel was experiencing consistent growth during the relevant time period and to assess whether the reversal was related to Facebook's actions.

*Irreparable Harm*.  Facebook does not need to depose Mr. Miller to investigate the issues related to irreparable harm.  As with Mr. Trouw, Facebook fails to explain how the issue of irreparable harm can possibly be in dispute in light of Facebook's plan to gate PageRage users if the preliminary injunction is denied.  As set forth above, the gating will force Sambreel to remove PageRage from the market, which will lead to irreparable harm to Sambreel generally and Theme Your World specifically.  Facebook does not even attempt to argue that this will not cause irreparable harm.[22] In light of the fact that Sambreel will be required to completely deactivate PageRage if the preliminary injunction is denied, the issues that Facebook suggests it wishes to depose Mr. Miller about are simply irrelevant.  The precise number of users lost as a result of the prior gating campaign and the number of users that were not acquired in the past do not matter at this point because PageRage will lose *all* of its users without a preliminary injunction.  Similarly, the precise amount of the decrease in the advertising rates will not matter if the preliminary injunction is denied because PageRage will no longer exist, meaning it will not include *any* advertising.

The issues that Facebook is seeking to depose Mr. Miller about will be relevant to the damages case, but there is simply no need for Facebook to investigate the particular edges of the harm caused to Sambreel at this point in the litigation.  Facebook's position that it will renew the gating campaign has established, unequivocally that Sambreel faces a serious risk of irreparable harm without injunctive relief.  The contours of past damages are best left to merits discovery (and will likely be the subject of considerable expert testimony).

As with the request to depose Mr. Trouw, the proposed deposition of Mr. Miller would impose a significant burden on Sambreel.  Although it has noted only two areas of inquiry, Facebook has suggested that it be given five hours to depose Mr. Miller. This will impose a significant burden in preparing for and attending the deposition.  In light of the fact that Facebook does not need the

---

[22] Facebook's silence speaks volumes.  During the meet and confer process, Sambreel's counsel specifically pointed out that Facebook's plan to renew gating if the preliminary injunction is denied establishes irreparable harm.  Facebook's failure to discuss this issue in this Joint Motion suggests that it does not have a good-faith basis to challenge this argument.

deposition, the burden outweighs any interest Facebook has in taking the deposition.  As such,

Facebook should not be granted leave to take the deposition.


DATED:  April 20, 2012                    Respectfully submitted,

                                          KIRKLAND & ELLIS LLP


                                          *s/ James F. Basile*
                                          James F. Basile
                                          james.basile@kirkland.com
                                          Elizabeth L. Deeley
                                          elizabeth.deeley@kirkland.com
                                          Adam L. Gray
                                          adam.gray@kirkland.com

                                          Attorneys for Defendant
                                          Facebook, Inc.

                                          *s/ Robert Klinck*
                                          Robert Klinck (*Admitted pro hac vice*)
                                          rklinck@kotchen.com
                                          Gregory P. Olson
                                          greg@olsonesq.com
                                          Daniel Kotchen (*Admitted pro hac vice*)
                                          dkotchen@kotchen.com
                                          Daniel Low (*Admitted pro hac vice*)
                                          dlow@kotchen.com

                                          Attorneys for Plaintiff
                                          Sambreel Holdings LLC; Yontoo LLC; and Theme
                                          Your World LLC


## ATTESTATION

     I, James F. Basile, attest that concurrence in the filing of this document has been obtained

from the signatories. I declare under penalty of perjury that the foregoing is true and correct.

     Executed on April 20, 2012 in San Francisco, California.



                                          *s/ James F. Basile*
                                          James F. Basile

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2012, I electronically filed the foregoing **JOINT MOTION FOR DETERMINATION OF EXPEDITED DISCOVERY DISPUTE** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Court's Electronic Mail Notice List and by overnight mail delivery to the following:

Daniel Kotchen
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037

DATED:  April 20, 2012                    By: _s/ James F. Basile_____
                                                James F. Basile