1  Gregory P. Olson (Ca. Bar No. 177942)
   LAW OFFICE OF GREGORY P. OLSON
2  501 West Broadway, Suite 1370
   San Diego, CA 92101
3  Telephone: (619) 564-3650
   Facsimile: (619) 233-1969
4  greg@olsonesq.com

5  Daniel Kotchen (*Pro Hac Vice*)
   Daniel Low (*Pro Hac Vice*)
6  Robert Klinck (*Pro Hac Vice*)
   KOTCHEN & LOW LLP
7  2300 M Street NW, Suite 800
   Washington, DC 20037
8  Telephone (202) 416-1848
   Facsimile: (202) 280-1128
9  dkotchen@kotchen.com
   dlow@kotchen.com
10 rklinck@kotchen.com

11 *Attorneys for Plaintiffs*

12

13                 IN THE UNITED STATES DISTRICT COURT

14                 SOUTHERN DISTRICT OF CALIFORNIA

15

16 SAMBREEL HOLDINGS LLC; YONTOO LLC;      Case No. 3:12-CV-00668-CAB-KSC
   and THEME YOUR WORLD LLC,
17                                          **PLAINTIFFS' OPPOSITION TO**
              Plaintiffs,                   **FACEBOOK'S MOTION TO DISMISS**
18                                          **COMPLAINT PURSUANT TO FEDERAL**
              vs.                           **RULES OF CIVIL PROCEDURE 12(B)(3)**
19                                          **AND 12(B)(6).**
   FACEBOOK, INC.,
20                                          Hon. Cathy Ann Bencivengo
              Defendant.
21                                          Hearing Date:  June 22, 2012
                                            Hearing Time:  2:30 p.m.
22                                          Dept:  Courtroom 2

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2   TABLE OF AUTHORITIES ............................................................................................ ii

3   INTRODUCTION........................................................................................................... 1

4   SUMMARY OF ARGUMENT ....................................................................................... 2

5   STATEMENT OF FACTS ............................................................................................. 4

6
7   LEGAL STANDARD .................................................................................................... 6

8   ARGUMENT.................................................................................................................. 7

9        A. Venue Is Proper Because Facebook's Forum Selection Clause Does Not Apply ...... 7

10       B. Facebook's "Refusal" To Deal Argument Is Inapposite.................................... 10

11       C. Sambreel Properly Alleges Antitrust Injury................................................... 12

12       D. Sambreel Alleges a *Per Se* Unlawful Group Boycott ...................................... 17

13       E. Sambreel Alleges a *Per Se* Unlawful Negative Tying Agreement........................... 19

14
15       F. Sambreel Properly Alleges Cognizable Relevant Markets................................ 25

16       G. Sambreel Properly Alleges A Monopolization Claim ..................................... 28

17       H. Sambreel Properly Alleges An Attempted Monopolization Claim ........................ 29

18       I.  Sambreel Properly Alleges A Violation of Sherman Act § 1 Under The
            Rule Of Reason.......................................................................................... 30
19
20       J.  Sambreel Properly Alleges A Claim Under Section 17200 ............................... 31

21       K. Sambreel Properly Alleges A Claim For Tortious Interference With Contract......... 33

22       L. Sambreel Properly Alleges A Claim For Tortious Interference With A Prospective
            Economic Advantage................................................................................... 35
23
24   CONCLUSION ............................................................................................................ 35

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) ....................20

*Alpha Biomedical and Diagnostic Corp. v. Philips Med. Sys. Netherland BV*, 828 F. Supp. 2d 425 (D. Puerto Rico 2011) ..............................................................................................................................18

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) ............................................13

*Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir. 1999)..........................................................14

*Armer v. Openmarket, Inc.*, No. C08-1731RSL, 2009 WL 2475136 (W.D. Wash. July 27, 2009) ..........18

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ............14

*Aurora Enter., Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689 (9th Cir. 1982)...............................................14

*B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-2864 JSW, 2007 WL 3232276 (N.D. Cal. Nov. 1, 2007) ....................................................................................................................................................10

*Berrett v. Life Ins. Co. of the Sw.*, 623 F. Supp. 946 (D. Utah 1985) ..........................................................9

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999.............................3, 14, 20

*Blind Doctor Inc. v. Hunter Douglas, Inc.*, No. C-04-2678 MHP, 2004 WL 1976562 (N.D. Cal. Sept. 7, 2004) ....................................................................................................................................................12

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ....................................................................13, 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................................22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .........................................................13

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir. 1996) .......................................................................7

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2007) ................................................24

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)...................................32

*Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199 (C.D. Cal. 2007)..............................................29

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010)................................22, 24

*Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir. 1984) ....................................................22

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997).....................13

*E. & J. Gallo Winery v. Encana Energy Serv., Inc.*, 388 F. Supp. 2d 1148 (E.D. Cal. 2005)................8, 9

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ..................................... passim

*Express Logistics Sys. Corp. v. Eagle Mountain Ventures LLC*, No. C 04-3071, 2004 WL 2445239 (N.D. Cal. Oct. 29, 2004) ..........................................................................................................................10

*Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................................................................................................33

*Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941)................................ passim

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)..............................................................2, 6, 30

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000) ...................................................11

*Graco Inc. v. PMC Global, Inc.*, No. 08-1304, 2012 WL 503672 (D.N.J. Feb. 15, 2012) ......12

*GTE Media Serv. Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27 (D.D.C. 1998)............................27

*Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ........................31

*In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008) ..............22, 24

*In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705 (N.D. Cal. 2011)........................................33

*Ingenieria Alimentaria Del Matatipac S.A. DE C.V. v. Ocean Garden Prods., Inc.*, 320 F. App'x 548 (9th Cir. 2009) ..........................................................................................................................8

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ..................................................24

*Jewelry 47, Inc. v. Biegler*, No. 2:08-cv-00174, 2008 WL 4642903 (E.D. Cal. Oct. 16, 2008) ..............34

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)...........................11, 15, 21, 25

*Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ..............................................................................................................32

*LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008) ......................16, 26, 32

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) .........................................................28

*Lowell v. Mother's Cake & Cookie Co.*, 144 Cal. Rptr. 664 (Cal. Ct. App. 1978) ....................34

*Macquarie Group Ltd. v. Pac. Corp. Group, LLC*, No. 08-cv-2113-IEF-WMC, 2009 WL 539928 (S.D. Cal. Mar. 2, 2009) ...............................................................................................3, 7, 25

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir. 1988)....................................2, 8

*McCalden v. Cal. Library Ass'n*, 955 F.2d 1214 (9th Cir. 1990) ...............................................34

*Measurement Specialties, Inc. v. Stayhealthy.com*, 275 F. Supp. 2d 638 (E.D. Pa. 2003).......10

*Miller v. Hambrick*, 905 F.2d 259 (9th Cir. 1990)........................................................................7

*Milliken & Co. v. CAN Holdings, Inc.*, No. 3:08-cv-578, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011).18

*Moore v. James H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977)......................................3, 14

*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004)............................12

*Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133 (9th Cir. 2003)..................................................6

1  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) ..................................................3, 14, 21

2  *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559 (S.D.N.Y. 2004) .........11

3  *NCAA v. Board of Regents*, 468 U.S. 85 (1984) ..................................................30

4  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) ......................3, 7, 25

5  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)........................19

6  *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir. 1984)........................................3, 14

7  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ..........................................11

8  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (Cal. 1990)..............................33

9  *People v. Lawton*, 48 Cal. App. 4th Supp. 11 (1996) ..................................................33

10  *Powerscreen USA, LLC v. D&L Equip., Inc.*, No. 3:07-cv-433-S, 2008 WL 2944994 (W.D. Ky. July 28, 2008) ........................................................10

11  *Quinonez v. Empire Today, LLC*, No. C 10-02049 WHA, 2010 WL 4569873 (N.D. Cal. Nov. 4, 2010)..9

12  *Ramco Int'l, Inc. v. Travex Corp.*, 531 F. Supp. 796 (S.D. Fla. 1982)........................................12

13  *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449 (9th Cir. 1983)................................23

14  *Robertson v. Sea Pines Real Estate Co.*, --- F.3d ---, 2012 WL 1672487 (4th Cir. May 14, 2012)..........18

15  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ..................................................29

16  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001)..................................................30

17  *Theme Promotions, Inc. v. News Am. FSI*, 35 F. App'x 463 (9th Cir. 2002) ............................34

18  *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ..................................16, 20, 21

19  *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) ..........................12

20  *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982) ...............29

21  *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956) ....................................26

22  *United States v. Microsoft, Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ......................................23, 26

23  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)........................................16

24  *Universal Grading Service v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ........................................................16, 17, 28

25

26  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)........................11

27  **Statutes**

28  28 U.S.C. § 1631 ..................................................7

California Business and Professions Code Section 17200 ................................................................31

California Penal Code Section 502(c)(7) ...........................................................................................32

**Other Authorities**

ABA Section of Antitrust Law, Antitrust Law Developments 1-6 (6th ed. 2008) ..........................26

David S. Evans, "The Antitrust Economics of Multi-Sided Platform Markets," 20 YALE J. ON REG. 325 (2003)...........................................................................................................................27

## I.   INTRODUCTION

This case stems from Facebook's scheme to eliminate a low-cost competitor to Facebook, thereby forcing advertisers to pay higher rates.  Facebook's scheme had two components each of which involved forcing third parties to do business with *either* Sambreel *or* Facebook.    First, Facebook coerced advertising partners to boycott Sambreel (by forcing them to choose to do business with *either* Sambreel *or* Facebook and its application developers), a practice that is a classic *per se* unlawful group boycott. *See, e.g., Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 465-68 (1941) (concluding a group boycott was *per se* illegal in spite of defendants' argument that the boycott was intended to prevent "the devastating evils growing from the pirating of original designs").  Second, Facebook coerced consumers to uninstall Sambreel's products (including PageRage) or no longer use Facebook, a practice that is a classic *per se* unlawful negative tie. *See, e.g., Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 463 (1992) (concluding that Kodak's requirement that would sell parts to customers only if they agreed to not use competing service companies was *per se* illegal).  Facebook's scheme worked.  By the end of 2011, key advertising partners would no longer do business with PageRage and more than one million users uninstalled Sambreel products so that they could continue to use Facebook.  Compl. ¶¶ 5-6.

Ignoring the Complaint, Facebook attempts to recast this case as a dispute concerning a business relationship between the parties. *See* Facebook, Inc.'s Memorandum of Points and Authorities in Support of Motion to Dismiss ("Def. Br.") at 1 ("Antitrust law protects Facebook's right to choose with whom it wishes to conduct business and on what terms[.]").  Facebook's characterization is false.  Sambreel does not seek a business relationship with Facebook.  Rather, Sambreel seeks redress for Facebook's actions to disrupt Sambreel's relationships with third parties:  advertising partners and consumers.  Facebook also attempt to recast this case by suggesting that its anticompetitive scheme was taken in "self defense" because PageRage "hijacks Facebook's design control and degrades the Facebook user experience." *Id.*    Again, this assertion is false.  PageRage operates on consumers' browsers independent of Facebook, consumers themselves choose to install the product, and consumer demand for PageRage grew exponentially until Facebook's anticompetitive scheme.  Compl. ¶¶ 2, 4, 23-24.  Consumers want a product that allows them to customize their social networking page using their own

computer, which is precisely why PageRage has been successful. Facebook may not like PageRage's success, but it has no right to dictate competitive alternatives available to consumers. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 462 (1986) (a party "is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.").

## II. SUMMARY OF ARGUMENT

Facebook raises six principal arguments in support of its motion to dismiss, each of which lacks merit. Facebook's motion should be denied.

1. Venue is appropriate in this Court. Facebook's argument that its forum selection clause renders venue in this Court improper is frivolous. To support its argument, Facebook mischaracterizes its forum selection clause as applying to all disputes between Facebook and any party that ever used its website. Facebook is wrong. By its terms, Facebook's forum selection clause applies *only* to disputes regarding (a) the meaning of the Facebook Statement of Rights and Responsibilities ("Statement") and (b) claims concerning the "features and services" provided by Facebook.[1] Sambreel's claims arise from Facebook's interference with Sambreel's relationships with third parties, and not from Facebook's Statement or its features and services. Accordingly, the forum selection clause, by its clear language, does not govern this case. Moreover, under Ninth Circuit law, a forum selection clause applies to a non-contract claim only when resolution of the claim relates to interpretation of the contract containing the forum selection clause. *See Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) ("Whether a forum selection clause applies to tort claims depends on whether resolution of the claim relates to interpretation of the contract."). Resolution of Sambreel's claims will not relate to an interpretation of Facebook's Statement. Facebook's forum selection clause thus does not apply to this case.

2. This is not a "refusal to deal" case, as Facebook argues. This case does not involve a business relationship (or proposed business relationship) between Facebook and Sambreel. Instead,

---

[1] In its Motion to Dismiss, Facebook fails to inform the Court that the term "Facebook" contained in the forum selection clause is a defined term. According to Facebook's Statements of Rights and Responsibilities, the term "Facebook" is defined not as the corporate entity but instead as the "features and services" provided by Facebook, Inc.

Sambreel alleges that Facebook has violated the antitrust laws by interfering with Sambreel's relationships with third parties – advertising partners and users. While it is generally true that a party may decide with whom it will do business, the law is clear that Facebook may not recruit third parties (through either a group boycott or negative tying) to harm its competitor. As such, the unilateral refusal to deal cases cited by Facebook are irrelevant.

3.      Sambreel alleges antitrust injury, and Facebook's assertion to the contrary is frivolous. Direct targets of group boycotts and negative tying agreements have standing to sue under the Sherman Act. *See, e.g., Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) ("Plaintiffs . . . suffer an antitrust injury as the direct targets of the boycott."); *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 742-43 (9th Cir. 1984) (holding that an individual who was subjected to group boycott based on his refusal to participate in antitrust behavior could maintain action); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) (noting that tying agreements "deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market"); *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977) ("Competitors in the tied product market are injured if they cannot offer their products on an equal basis with the distributor of the tying product.").

4.      Sambreel alleges *per se* violations of the Sherman Act. Sambreel's allegations are indistinguishable from the seminal cases holding that group boycotts and negative tying agreements are *per se* illegal. *See, e.g., Fashion Originators'*, 312 U.S. at 465-67; *Eastman Kodak*, 504 U.S. at 462-63. Facebook either ignores these cases or mischaracterizes their holdings. Facebook also mischaracterizes or ignores factual allegations in the Complaint that are inconsistent with Facebook's arguments that Sambreel has failed to plead *per se* violations.

5.      Sambreel alleges cognizable relevant markets. The definition of a relevant market is a fact-intensive task, so a plaintiff's allegations are sufficient at the motion to dismiss stage unless they demonstrate a fatal legal defect. *See Macquarie Group Ltd. v. Pac. Corp. Group, LLC*, No. 08-cv-2113-IEF-WMC, 2009 WL 539928, at *7 (S.D. Cal. Mar. 2, 2009) (citing *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008)). Sambreel's alleged markets are supported by sufficient

1   factual detail.  Facebook's attacks of these market definitions are without merit.

2       6.      Facebook's complaints about Sambreel's individual claims are meritless.  Sambreel's

3   factual allegations support each of the requirements for proving its claims, and the facts are alleged with

4   sufficient particularity to put Facebook on notice of the nature of the claims.  As such, they are sufficient.

5   **III.    STATEMENT OF FACTS**

6       This case arises from Facebook's attempts to eliminate a direct, low-cost competitor in the market

7   for online display advertising impressions.  *See* Compl. ¶ 1.  Facebook operates a full-service social

8   networking website.  *Id.*  Facebook makes money by selling advertising that appears to users when they

9   visit Facebook's website.  *Id.* ¶¶ 18-19.  Facebook has captured more than 90 percent of the social

10  networking market and 98 percent of the market for full-service social networks.  *Id.* ¶¶ 51-52.

11  Facebook's clout is not limited to social networking, however, as it is the most heavily trafficked internet

12  site among internet users in the United States.  *Id.* ¶ 16.  Facebook also dominates the market for

13  advertising.  Facebook has a market share in excess of 70 percent in the market for advertising to social

14  network users.  *Id.* ¶ 64.  Among the broader market for online display advertising, Facebook captured 28

15  percent of the market and its market share has been increasing.  *Id.* ¶ 63. Facebook also allows third-

16  party developers to operate applications on the Facebook Platform.  *Id.* ¶ 17.    These application

17  developers compete with Facebook for the sale of advertising impressions.  *Id.* ¶ 18.  While it competes

18  with application developers for advertising dollars, Facebook also has a financial interest in the success

19  of their applications because Facebook is able to sell additional ads of its own while users are using these

20  applications.  *Id.* ¶ 19.

21      Sambreel offers software add-ons that add functionality to a user's web browser when the user

22  visits certain websites.  *Id.* ¶ 2.  One of Sambreel's major products is known as PageRage, which allows

23  users to add designs on their own web browser when they visit Facebook.  *Id.*  PageRage designs can

24  only be seen by other users who install the product on their computers.  *Id.*  PageRage does not interact

25  with Facebook's computers and does not alter the underlying website; it simply adds a layer on the user's

26  web browser.  *Id.*  Sambreel makes money by selling ad space on PageRage.  *Id.*  PageRage is a low-cost

27  competitor of Facebook.  *Id* ¶ 4.

28

When PageRage was first launched, it included a control panel that was operated through the Facebook Platform. *Id.* ¶ 24. After PageRage had been operating almost a year, Facebook asked Sambreel to operate PageRage independent of Facebook. *Id.* At the time, Facebook made clear that it did not object to PageRage so long as it was operated independent of Facebook. *Id.* In fact, Facebook encouraged Sambreel to send a message to PageRage users instructing them how to use the product independent of Facebook. *Id.* Sambreel complied with Facebook's request. *Id.*

In the year after it was made independent of Facebook, PageRage grew significantly to the point that it regularly had more than one million active users per day and was generating advertising revenues of more than $1 million per month. *Id.* ¶ 4. In October 2010, Facebook's outside counsel approached Sambreel to complain about the operation of PageRage. *Id.* Sambreel worked to address Facebook's purported concerns and made changes to the operation of PageRage; Sambreel informed Facebook of the changes. *Id.* ¶¶ 30-31. Facebook did not seek any additional changes from Sambreel at the time, but instead initiated its anticompetitive scheme. *Id.* ¶¶ 31-32.

Beginning in July of 2011, Facebook organized a group boycott of PageRage. *Id.* ¶ 32. Specifically, Facebook began to pressure Sambreel's advertising partners, threatening that they would not be allowed to do business with Facebook or the developers who operate Facebook applications if Sambreel's advertising partners continued to do business with PageRage. *Id.* Certain of Sambreel's advertising partners continued doing business with PageRage, and Facebook and the application developers then ceased doing business with these advertising partners. *Id.* ¶ 34. Other Sambreel advertising partners succumbed to Facebook's threats and ceased doing business with PageRage. *Id.* ¶ 33. The advertising partners who ceased doing business with PageRage had previously represented more than 80 percent of PageRage's revenues. *Id.*

In December 2011, Facebook escalated its anticompetitive scheme by initiating its gating campaign. *Id.* ¶ 37. Specifically, Facebook began accessing its users' computers, scanning to determine whether they had downloaded PageRage, and denying access to users who had downloaded PageRage until they certified that they had removed not only PageRage but also all other Sambreel products from their computer. *Id.* ¶¶ 37-38. Facebook conducted the scans without permission from its users. *Id.* ¶ 37.

As a result of Facebook's gating campaign, Sambreel lost more than one million users.  *Id.* ¶ 39.
Facebook agreed to stop the gating campaign only if Sambreel would agree to stop advertising on
PageRage.  *Id.*

Facebook's actions have led to significant anticompetitive effects.  Facebook's actions removed
PageRage as a readily-interchangeable, low-cost display ad alternative to Facebook.  *Id.* ¶ 41.  As a result
of Facebook's actions, advertisers did not have the option of purchasing lower cost advertisements from
Sambreel.  *Id.*  Moreover, because of the boycott, some of the largest advertising partners are not able to
purchase advertisements from Sambreel.  *Id.*  As a result, advertisers have been forced to pay supra-
competitive prices.  *Id.* ¶ 42.  Indeed, contemporaneously with its attempts to drive Sambreel from the
market, Facebook was increasing the minimum prices for its advertising.  *Id.*  Facebook's actions also
threaten consumer choice by threatening to eliminate PageRage as a product that is available in the
market.  *Id.* ¶ 45.  Millions of consumers like PageRage.  *Id.*[2]  Yet, as a result of Facebook's actions,
consumers have been – and may continue to be – denied access to PageRage.  *Id.*

Finally, Facebook's actions have devastated Sambreel.  PageRage advertising revenues have
plummeted as a direct result of Facebook's boycott.  *Id.* ¶ 43.  Sambreel also lost over one million users
(and the revenues it would have generated by selling advertising that would reach these users) as a result
of Facebook's gating campaign.  *Id.*  Sambreel has suffered losses, fallen into default on its line of credit,
terminated more than 50 percent of its workforce, and has been forced to shelve a number of new
products it was developing as a result of the lack of resources.  *Id.*

## IV.   LEGAL STANDARD

In deciding a motion to dismiss for lack of venue under Rule 12(b)(3), the Court may consider
facts beyond the pleadings.  *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2003).
In considering any contested facts, the Court "must draw all reasonable inferences in favor of the non-

---

[2] Facebook spends considerable time in its Motion to Dismiss arguing that users do not want PageRage.
*See* Def. Br. at 6 n.6.  These arguments disregard the allegations in the Complaint that users find
PageRage beneficial.  Moreover, Facebook is not entitled to make a determination for the market about
which products are beneficial and which are not.  *See, e.g., Ind. Fed'n of Dentists*, 476 U.S. at 462 (a
party "is not entitled to pre-empt the working of the market by deciding for itself that its customers do
not need that which they demand.")

moving party and resolve all factual conflicts in favor of the non-moving party." *Id.* at 1138.  Thus, a motion to dismiss for lack of venue should be granted only where there is no factual dispute regarding any material fact.[3]

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint.  *See Macquarie*, 2009 WL 539928, at *3.  The Court's review is limited to the allegations of the complaint, and the Court must accept all factual allegations pled in the complaint as true and draw all reasonable inferences in favor of the nonmoving party.  *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  To survive a motion to dismiss, "a complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Macquarie*, 2009 WL 539928, at *3.  And there is no requirement that the elements of an antitrust claim be pled with specificity.  *See Newcal*, 513 F.3d at 1045.  In fact, many of the elements are inherently factual, so an antitrust complaint will survive a Rule 12(b)(6) motion unless the complaint "suffers a fatal legal defect."  *Id.*

## V.    ARGUMENT

Facebook's motion to dismiss should be denied because Sambreel's legal theories are consistent with controlling law, and Sambreel has properly pled each of the elements of its causes of action.

### A.    Venue Is Proper Because Facebook's Forum Selection Clause Does Not Apply.

Venue in this Court is proper.  Facebook represents to the Court that its forum selection clause applies to "all claims relating to Facebook."  *See Def. Br.* at 7.  This is false.  Facebook's forum selection clause applies only to claims concerning the "features and services" of Facebook's products or Facebook's Statement of Rights and Responsibility.  It does not apply to any other claims concerning the corporate entity itself.  In its Statement, "Facebook" is explicitly defined to mean the features and services the company makes available, not the company itself.  *See* C. Clark Decl. (Dkt. 22-3), Ex. A ¶ 17(1) ("*By Facebook we mean the features and services we make available*, including through (a) our

---

[3] If the Court concludes that venue lies in another federal district court, it should transfer the case rather than dismiss where doing so is "in the interest of justice."  *See* 28 U.S.C. § 1631; *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (noting that as a general matter "transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is time-consuming and justice defeating") (internal quotations and citations omitted).

website at www.facebook.com and any other Facebook branded or co-branded websites (including sub-domains, international versions, widgets, and mobile versions); (b) our Platform; (c) social plugins such as the like button, the share button and other similar offerings and (d) other media, software (such as a toolbar), devices, or networks now existing or later developed.") (emphasis added).   Thus, the reference to "Facebook" within the Statement's forum selection clause refers to Facebook's features and services, not to the corporation.   In its Memorandum, Facebook quotes the forum selection clause of its Statement, but – for obvious reasons – fails to refer the Court to the Statement's definition of "Facebook" that substantially limits the scope of the clause.   Because this case concerns Facebook's group boycott and gating campaigns, not the features and services of Facebook's products or its Statement, Facebook's forum selection clause is inapplicable by its clear language.[4]

Case law supports this conclusion.   A forum selection clause applies to a non-contract claim only if "resolution of the claim relates to interpretation of the contract."   *Manetti-Farrow*, 858 F.2d at 514 ("Whether a forum selection clause applies to tort claims depends on whether resolution of the claim relates to interpretation of the contract.").[5]   Applying this principal, Courts have regularly concluded that the types of claims alleged here are not subject to a forum selection clause.   *See, e.g., E. & J. Gallo Winery v. Encana Energy Serv., Inc.*, 388 F. Supp. 2d 1148, 1161-63 (E.D. Cal. 2005) (holding that claims under the Sherman Act and California's Unfair Competition Law were not subject to forum selection clause); *Ingenieria Alimentaria Del Matatipac S.A. DE C.V. v. Ocean Garden Prods., Inc.*, 320 F. App'x 548, 549-50 (9th Cir. 2009) (holding that district court abused its discretion in concluding that

---

[4] If this Court were to conclude that the language is ambiguous, it must be construed against Facebook, which is the entity that drafted the terms of service. *See, e.g., Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444, 448 (9th Cir. 1993) (noting that any ambiguity in a contract of adhesion is "strictly construed against" the drafting party).

[5] Courts in the Ninth Circuit have made clear that the limitation imposed by *Manetti-Farrow* applies to all forum selection clauses, regardless of the particular language of the clause. *See, e.g., Bagdasarian Prods., LLC v. Twentieth Century Fox Film Corp.*, No. 2:10-CV-02991-JHN-JCGx, 2010 WL 5154136, at *3 (C.D. Cal. Aug. 12, 2010) (rejecting argument that *Manetti-Farrow* is limited to the specific forum selection clause at issue there); *Androutsakos v. M/V PSARA*, No. 02-1173-KL, 2004 WL 1305802, at *6 (D. Or. Jan. 22, 2004) (holding that rule announced in *Manetti-Farrow* rule is a general proposition not limited to the particular forum selection clause); *Bender Shipbuilding & Repair Co. v. The Vessel Drive Ocean V*, 123 F. Supp. 2d 1201, 1207 (S.D. Cal. 1998) (applying *Manetti-Farrow* standard to forum selection clause that applied to claims "arising out of or in connection with" an agreement).

1  claims for intentional interference with existing contract and prospective economic advantage were

2  subject to forum selection clause); *Quinonez v. Empire Today, LLC*, No. C 10-02049 WHA, 2010 WL

3  4569873, at *2-3 (N.D. Cal. Nov. 4, 2010) (holding that dispute under California labor laws was not

4  subject to contractual forum selection clause); *Berrett v. Life Ins. Co. of the Sw.*, 623 F. Supp. 946, 949

5  (D. Utah 1985) (holding that tortious interference and defamation claims were not subject to contractual

6  forum selection clause).

7      Sambreel's claims do not relate to the interpretation of Facebook's Statement.   Rather,

8  Sambreel's claims concern Facebook's actions towards Sambreel's advertising partners and users.  These

9  actions occurred completely separate from any agreement that might have existed between Facebook and

10  Sambreel.   This is precisely the fact pattern under which courts have found forum selection clauses

11  inapplicable. *See E. & J. Gallo*, 388 F. Supp. 2d at 1161 ("In the instant case, the behavior alleged in the

12  complaint refers entirely to acts that occurred between Defendants and unnamed co-conspirators and

13  which occurred both before and during the term of the Agreement, but which are alleged to have

14  transpired *entirely outside the agreement*.") (emphasis added).

15      Moreover, Facebook's argument suffers from another fatal flaw.  If Facebook's forum selection

16  clause applies – which it does not – *so does Sambreel's*.   (In reality, neither forum selection clause

17  applies.)  The Terms of Service for www.pagerage.com call for all disputes to be resolved in San Diego

18  County.  Specifically, when Facebook began its anticompetitive scheme against Sambreel, the Terms of

19  Service for PageRage provided:

20          Any claim or dispute between you and Theme Your World that arises in
            whole or in part from the Service shall be decided exclusively by a court
21          of competent jurisdiction located in San Diego County, California.

22  *See* K. Hankinson Decl., Ex. A (PageRage Terms of Service).[6]   Facebook unquestionably visited

23  www.pagerage.com. *See, e.g.,* C. Clark Decl. (Dkt. 22-3) ¶ 7 (referring to material on pagerage.com);

24  Letter from J. Cutler to Yontoo Technology, Inc. (Oct. 20, 2010) (Dkt. 3-8 at 55) (referring to content on

25  the PageRage website).  As Facebook notes, visiting a website is sufficient to demonstrate acceptance of

26

27  ---
    [6] These Terms of Service were amended in December 2011, to include a forum selection clause that
28  requires all disputes to be arbitrated in San Diego County, California. *See* K. Hankinson Decl., Ex. B.

1  the terms of service.  There is also substantial reason to believe that Facebook downloaded and tested

2  PageRage.[7]  Thus, Sambreel's forum selection clause – which requires that the case be resolved in San

3  Diego – applies to this case with equal force as Facebook's.

4       Accordingly, if Facebook's argument regarding its forum selection clause were correct – which it

5  is not – the Court would be faced with conflicting forum selection clauses.  When faced with conflicting

6  forum selection clauses, courts have declined to transfer a case.  *See, e.g., B & O Mfg., Inc. v. Home*

7  *Depot U.S.A., Inc.*, No. C 07-2864 JSW, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007) (denying

8  motion to transfer in face of conflicting forum selection clauses); *Express Logistics Sys. Corp. v. Eagle*

9  *Mountain Ventures LLC*, No. C 04-3071, 2004 WL 2445239, at *2 (N.D. Cal. Oct. 29, 2004) (denying

10  motion to remand to state court based upon forum selection clause in light of conflicting forum selection

11  clause in another agreement); *Measurement Specialties, Inc. v. Stayhealthy.com*, 275 F. Supp. 2d 638,

12  643 (E.D. Pa. 2003) ("Applying the knock-out rule ... this court throws out both forum-selection

13  clauses, leaving the remainder of the contract.  In doing so, the court preserves the burden on the

14  Defendant to show why Plaintiff's choice of forum should be rejected."); *Powerscreen USA, LLC v.*

15  *D&L Equip., Inc.*, No. 3:07-cv-433-S, 2008 WL 2944994, at *2-3 (W.D. Ky. July 28, 2008) (concluding

16  that the conflicting forum selection clauses indicate the parties failed to reach a meeting of the minds on

17  that issue so neither should be enforced).

18       Because venue is appropriate, this Court should deny the motion to dismiss for lack of venue.

19      **B.**    **Facebook's "Refusal to Deal" Argument Is Inapposite.**

20       In Section II(B) of its Memorandum, Facebook ignores the actual allegations of Sambreel's

21  Complaint and argues that the "true nature of [Sambreel's] grievance against Facebook" is that Sambreel

22  is dissatisfied with the terms Facebook would require Sambreel to sign in order to "integrat[e] with

23  Facebook."  Def. Br. at 12.  Facebook then cites a series of "refusal to deal" cases that stand for the

24  proposition that a company can do business with whomever it chooses.  *See id.* at 12-14.

25  _____

26  [7] *See, e.g.*, K. Hankinson Decl. ¶ 3 (noting that multiple PageRage accounts have been set up with
"@fb.com" e-mail accounts); *id.* ¶ 2 (noting that Facebook would have needed to have downloaded

27  PageRage to make a number of the factual allegations contained in Facebook's prior correspondence); *id.*
¶ 4 (noting that publically available information indicates that PageRage was downloaded by a computer

28  with an IP address owned by Facebook).

Facebook grossly mischaracterizes this case. First, Facebook is wrong about Sambreel's factual allegations. Sambreel is not seeking to "integrat[e] with Facebook" and will continue to operate PageRage independent of Facebook. Sambreel's complaint stems from Facebook's interference with Sambreel's relationships with third parties – advertising partners and users. Specifically, Sambreel challenges Facebook's coercing advertising partners to boycott Sambreel or lose the opportunity to advertise with Facebook and application developers. Compl. ¶¶ 32-36. Such a practice constitutes a *per se* unlawful group boycott. *See, e.g., Fashion Originators'*, 312 U.S. at 465-68 (concluding a group boycott was *per se* illegal in spite of defendants' assertion that the boycott was intended to prevent "the devastating evils growing from the pirating of original designs"); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) ("This is not the case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer."). In addition, Sambreel challenges Facebook's coercing consumers to either uninstall Sambreel's products (including PageRage) or no longer use Facebook. Compl. ¶¶ 37-40. Such a practice constitutes a *per se* unlawful negative tie. *See, e.g., Eastman Kodak*, 504 U.S. at 463 (concluding that Kodak's requirement that would sell parts to customers only if they agreed to not use competing service companies was *per se* illegal).

Second, Facebook is wrong about the case law that governs Sambreel's factual contentions. Facebook cites to a series of "refusal to deal" cases in which Courts have said that a party is generally not required to sell its services to direct competitors under the antitrust laws. *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000); *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 561 (S.D.N.Y. 2004). These cases are wholly inapposite because Sambreel is not asserting that Facebook has any obligation to do business with Sambreel. None of Sambreel's claims arise from Facebook "refusing to deal" with Sambreel (or dealing with Sambreel on unfavorable terms). Instead, Sambreel's claims relate to Facebook's interference with business relationships that Sambreel has with third parties. The cases cited

by Facebook do not address such a fact pattern and do not overrule or attempt to limit the long line of cases that make such interference illegal. *See Graco Inc. v. PMC Global, Inc.*, No. 08-1304, 2012 WL 503672, at *11 n.10 (D.N.J. Feb. 15, 2012) (noting that *linkLine* did not apply because it was a "refusal to deal" case as opposed to an "exclusive dealing agreement" aimed at excluding a rival).[8]

Facebook also cites cases involving unilateral, vertical refusals to deal – *e.g.*, a company refusing to deal with a customer. *See, e.g., Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992); *Blind Doctor Inc. v. Hunter Douglas, Inc.*, No. C-04-2678 MHP, 2004 WL 1976562, at *5 (N.D. Cal. Sept. 7, 2004) (noting that the case involved "a lone manufacturer acting independently"); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (framing the case as involving "a unilateral refusal to deal claim"); *Ramco Int'l, Inc. v. Travex Corp.*, 531 F. Supp. 796, 801 (S.D. Fla. 1982) (noting that the antitrust laws do not prohibit "refusal to deal where the same is characterized as unilateral"). These cases do not involve a defendant refusing to deal with customers if the customers continue to deal with the defendant's competitors. Indeed, the cases distinguish such a fact pattern. *See id.* at 801 n.9 (noting that the "right" to choose with whom to deal does not create immunity where "there are coercive tactics to secure customer acquiescence going affirmatively beyond a passive refusal to deal with those not conforming to announced policy, *e.g. enlistment of third parties to effectuate a policy*") (emphasis added); *see also Trans Sport*, 964 F.2d at 191-92 (analyzing "tying" claim separate from refusal to deal claim and without regard to the rule that a party has a "right" to choose with whom it will do business).

While Facebook generally has the right to decide the parties with whom it will do business, this does not give Facebook the right to engage in a group boycott or to impose negative tying agreements. Facebook's actions are *per se* unlawful.

### C.   Sambreel Properly Alleges Antitrust Injury.

Sambreel properly alleges that it has suffered an "injury of the type the antitrust laws were

---

[8] *Trinko, linkLine*, and *Goldwasser* address interplay between the Telecommunications Act of 1996 and the Sherman Act. These cases involved allegations that an incumbent local exchange carrier (*i.e.*, the local telephone company that owned the wire and facilities for delivering services) failed to sell its services to competitors on reasonable terms. These cases arise out of a very particular interplay of two federal statutes and provide little insight outside of their factual context.

1    intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*
2    *v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977).   Antitrust injury analysis focuses on the injury
3    suffered by the plaintiff and imposes an analysis akin to a "proximate cause" standard – a plaintiff must
4    demonstrate a link between the injury it has suffered and the defendant's illegal conduct.   Notably, the
5    antitrust injury element is about injury to the plaintiff, not injury to the market: "the antitrust laws do not
6    require a plaintiff to establish a market-wide injury to competition as an element of standing." *Doctor's*
7    *Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997); *see also Blue Shield*
8    *of Va. v. McCready*, 457 U.S. 465, 483 (1982) (noting that a "plaintiff need not prove an actual lessening
9    of competition in order to recover") (internal quotations and citations omitted).

10           The Ninth Circuit has set out a four-element test for judging antitrust injury:   "(1) unlawful
11   conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful,
12   and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel.*
13   *Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).   The Ninth Circuit has also made clear that "the
14   immediate victim of the breach of antitrust policy" is "the natural vindicator" and therefore has standing.
15   *Ostrofe*, 740 F.2d at 743.

16           Under this standard, Sambreel sufficiently alleges antitrust injury.   Sambreel alleges that
17   Facebook has engaged an anticompetitive scheme, including a group boycott and illegal tying
18   arrangements in violation of Sherman Act §§ 1 and 2.   *See* Compl. ¶¶ 5-6, 32-33, 37-38.   Sambreel
19   alleges that Facebook's actions were intended to drive Sambreel out of business because Sambreel serves
20   as a direct, low-cost alternative to Facebook for advertisers.   *See id.* ¶¶ 4, 35.   Sambreel has suffered
21   injuries as a direct, proximate result of Facebook's anticompetitive scheme.   *See id.* ¶¶ 43-44.   Finally,
22   Sambreel alleges that Facebook's conduct has resulted in injury to competition and the market more
23   generally.   *See id.* ¶ 41 (alleging that Facebook's actions have resulted in the removal of a direct, low-
24   cost competitor); *id.* ¶ 42 (alleging that, by removing PageRage as a low-cost alternative, Facebook's
25   actions have forced advertisers to pay supra-competitive prices); *id.* ¶ 45 (alleging that, by eliminating
26   PageRage, Facebook has reduced consumer choice).   These allegations meet the antitrust injury pleading
27   standard because Sambreel alleges that it has suffered an injury directly from Facebook's illegal conduct,
28

the alleged injury flows from the reason that Facebook's actions are illegal, and it is the type of injury the antitrust laws were intended to prevent.

The sufficiency of Sambreel's allegations is apparent in light of cases that have considered antitrust standing issues in group boycott and tying cases.   Courts have consistently held that a competitor targeted by a group boycott has standing to sue.  *See, e.g., Big Bear*, 182 F.3d at 1103 ("Plaintiffs are all non-members of the Resort Association and thus suffer an antitrust injury as the direct targets of the boycott.");[9] *Ostrofe*, 740 F.2d at 742-43 (holding that an individual who was subjected to group boycott based on his refusal to participate in antitrust behavior could maintain action); *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 274-75 (3d Cir. 1999) (holding that the competitor targeted by a group boycott has suffered antitrust injury).   Similarly, a company that is a competitor in the "tied" market (*i.e.,* who offers a product that is excluded by a negative tying agreement) is exactly the party that courts have concluded to have suffered antitrust injury.  *See, e.g., N. Pac. Ry.*, 356 U.S. at 6 (noting that tying agreements "deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market"); *Moore*, 550 F.2d at 1212 ("Competitors in the tied product market are injured if they cannot offer their products on an equal basis with the distributor of the tying product.").[10] Under these precedents, Sambreel has suffered antitrust injury and has standing to sue.

In spite of the fact that Sambreel was the direct target of Facebook's illegal conduct and the case law allowing such parties to sue, Facebook asserts that Sambreel has not alleged "antitrust injury."

---

[9] The Ninth Circuit believed this proposition was so apparent to not require explanation. *Big Bear*, 182 F.3d at 1103.  This is sensible because the Supreme Court has explained that competitors targeted by a boycott have standing. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, the Court faced a case involving an group boycott of unionized contractors. 459 U.S. 519, 520-21 (1983).  The union sued.  *Id.* at 521.  The Supreme Court concluded that the unions did not have standing but noted that the contractors and their customers clearly would have standing:  "If either [the contractors], or the immediate victims of coercion by defendants, have been injured by an antitrust violation, their injuries would be direct and, as we held in *McCready, supra,* they would have a right to maintain their own treble damages actions against the defendants." *Id.* at 541.

[10] Courts have taken it as a given that the producers of disfavored products in a tied market have standing.  In *Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, the district court concluded that standing was limited to the producers of disfavored products (and potentially consumers who purchased the tied product) but did not extend further, but the Ninth Circuit concluded that the district court's definition of those who had standing was too "narrow." 688 F.2d 689, 692-93 (9th Cir. 1982).

Facebook does not cite any cases that hold that the direct victim of a group boycott or negative tying agreement lack standing, but instead seeks to string together a series of out-of-context quotations to convince the court that the antitrust injury requirement is far more stringent than it is.  First, Facebook cites cases for the general proposition that the antitrust laws were meant to protect competition, not competitors.  *See* Def. Br. at 14-15.  While true, this assertion is irrelevant.  Although the antitrust laws are aimed at protecting competition, a competitor that is harmed by the anticompetitive element of an antitrust scheme can maintain a suit for damages without proving actual damage to competition.  *See McCready*, 457 U.S. at 483 (noting that a "plaintiff need not prove an actual lessening of competition in order to recover") (internal quotations and citations omitted).

In reality, Facebook is attempting to conduct an end-run around the *per se* illegality rule.  Facebook appears to confuse the "antitrust injury" inquiry with the "injury to competition" analysis that occurs as part of the rule of reason test for a Section 1 claim.  Adopting Facebook's argument would eviscerate the *per se* analysis that Courts have adopted for group boycotts and tying agreements.  In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, for example, the Supreme Court concluded that it was not a defense to a group boycott claim to assert that the boycott harmed only a single competitor and not competition more broadly.  359 U.S. at 212.  The Court concluded that the injury to a single competitor stemming from a group boycott is the type of harm that the antitrust laws are intended to prevent.  *Id.* at 213.  As such, Sambreel – as a competitor suffering harm as a result of a group boycott – has suffered antitrust injury.  Facebook's argument to the contrary is frivolous.[11]

But even if Facebook's incorrect legal standard – that Sambreel must plead harm to competition – were the law, there is no basis on which to dismiss Sambreel's Complaint.  Sambreel has pled harm to competition, including:  increased prices for advertisers, the elimination of a direct low-cost competitor, and reduced choice for consumers.  *See* Compl. ¶¶ 41-42, 45.  Courts have recognized all of these effects constitute injury to competition.  *See, e.g., United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir.

---

[11] To be sure, the fact that this case involves allegations of *per se* illegality does not relieve Sambreel of the requirement for showing antitrust injury.  But the antitrust injury requirement cannot be used as a tool to eviscerate the *per se* rule more generally.  Instead, the antitrust injury analysis is used simply to ensure that the plaintiff is suffering the type of injury that the *per se* rules are meant to prevent.  Here, in light of *Klor's*, there can be no question that Sambreel is precisely the party who has standing to sue.

1  2003) (concluding that reduction in credit card output, reduction in available features, and stunted price

2  competition amounted to anticompetitive effects); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir.

3  2000) (noting that agreements that resulted in reduction of output and price maintenance were

4  anticompetitive).

5      Facebook ignores Sambreel's allegations regarding the harm to advertisers stemming from

6  Facebook's practices. *See generally* Def. Br. at 14-16. These allegations alone warrant denial of

7  Facebook's motion to dismiss. Instead, Facebook argues only that a reduction of consumer choice is

8  insufficient to establish antitrust injury. *See id.* at 15-16. But the cases it cites – *LiveUniverse, Inc. v.*

9  *MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008) and *Universal Grading Service v. eBay, Inc.*, No. C-09-

10  2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) – do not support this proposition. In

11  *LiveUniverse*, the plaintiff's only allegation regarding wrongful conduct was its assertion that MySpace

12  was improperly deactivating links on the MySpace website to LiveUniverse's competing social

13  networking site. *See* 304 F. App'x at 556-57. MySpace's actions did not prevent LiveUniverse from

14  offering its product, it merely prevented it from advertising on MySpace's website. *Id.* Sambreel's

15  allegations are vastly different. Sambreel is not complaining that Facebook has refused to allow

16  Sambreel to promote its product on Facebook's website; Sambreel alleges that Facebook has interfered

17  with Sambreel's ability to operate its product *at all*. Moreover, Sambreel alleges that Facebook's actions

18  have foreclosed the ability of a direct, low-cost competitor to effectively compete in the market. This has

19  resulted in ad purchasers paying supra-competitive prices for advertising space.

20      Similarly, *Universal Grading* is irrelevant. There, eBay instituted a policy of allowing

21  individuals to list coins as "certified" only if they were reviewed by one of a handful of grading

22  companies. Individuals who bought or sold coins on eBay brought a monopolization claim alleging they

23  paid a higher price as a result of this policy. *Universal Grading*, 2011 WL 846060, at *8. They alleged

24  that eBay was using the policy to ensure that no competitor could offer a "safer" online auction. *See id.*

25  Thus, they were asserting that the policy was exclusionary because it improved eBay's product to the

26  point that competitors could not offer a better product. *See id.* The court understandably concluded that

27  this theory was insufficient to state a claim. The court noted that there was no reason that other online

28

auction companies could not simply enact a similar policy and noted that the plaintiffs did not suffer any harm as a result of any anticompetitive conduct. *Id.* at *8-9. Sambreel is not alleging that Facebook's policy is inappropriate because it makes Facebook's product *too good*. Instead, Sambreel asserts that Facebook's policy is exclusionary in that it forces users and advertising partners to choose between doing business with Facebook or Sambreel. *Universal Grading* is irrelevant.

**D.    Sambreel Alleges A *Per Se* Unlawful Group Boycott.**

Sambreel alleges a classic group boycott that is indistinguishable from the conduct that the Supreme Court and Ninth Circuit have concluded is *per se* unlawful. Sambreel has alleged: (1) that Facebook and *every one* of its application developers agreed that they would use *only* the advertising partners that Facebook maintained on a list of approved advertisers (Compl. ¶ 32); (2) that Facebook and its application developers are horizontal competitors in the market for online display advertising (*id.* ¶ 18) ("Facebook and the Application Developers compete in selling display advertising."); (3) that Facebook maintained a policy that allowed it to remove an advertising provider from the list of approved advertisers if the advertising provider did business with any company that Facebook blackballed (*id.* ¶ 21); (4) that Facebook enforced its policy to require advertising partners to cease doing business with PageRage (*id.* ¶ 32); (5) that Sambreel's largest advertising partners ceased doing business with PageRage as a direct result of Facebook's threats (*id.* ¶ 33); and (6) that various advertising partners refused to stop doing business with PageRage and were subsequently removed from the list of approved advertisers (*id.* ¶ 34). These allegations make this case indistinguishable from the seminal case holding that group boycotts are *per se* illegal – *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 465-67 (1941).[12] As such, Sambreel has alleged a *per se* illegal group boycott. Facebook's arguments to the contrary are without merit.

First, Sambreel's allegations are sufficient under *Twombly*. Facebook asserts that Sambreel's

---

[12] Indeed, Facebook's assertion that it took action to prevent Sambreel from "hijack[ing] Facebook's design control," (Def. Br. at 1) is nearly identical to the argument made by the *Fashion Originators'* defendants. There, the defendants asserted their actions were reasonable because they were seeking to prevent fashion piracy, but the Supreme Court concluded that justification was irrelevant. *Fashion Originators'*, 312 U.S. at 467-68. This Court should similarly reject Facebook's "hijacking" defense. Notably, although Sambreel cited *Fashion Originators'* in its Preliminary Injunction Brief, Facebook fails to address this seminal case in its motion to dismiss.

allegations regarding the agreements between Facebook and its application developers are insufficiently detailed because Sambreel did not identify particular developers or identify the particular time and place of the agreement.  This argument is frivolous.  To begin, as the Fourth Circuit recently concluded, the *Twombly* analysis is not relevant where a plaintiff alleges that a particular written agreement constitutes an illegal restraint of trade.  *See Robertson v. Sea Pines Real Estate Co.*, --- F.3d ---, 2012 WL 1672487, at *7-8 (4th Cir. May 14, 2012) (rejecting *Twombly* argument about the lack of detail about the times and locations of meetings in case where the plaintiff alleged that rules of a MLS were an unreasonable restraint of trade).  Thus, because Sambreel points to the particular agreements at issue – the agreements by application developers to abide by Facebook's terms – there is no need for heightened pleadings to substantiate the assertion that there was an agreement.

Moreover, Sambreel's allegations are sufficient even under cases that have applied the heightened pleading standard.  Courts have routinely rejected the conclusion that a plaintiff *must* plead the date of an agreement or act that is part of a cause of action.  *See, e.g., Milliken & Co. v. CAN Holdings, Inc.*, No. 3:08-cv-578, 2011 WL 3444013, at *5 (W.D.N.C. Aug. 8, 2011) (noting that a plaintiff is not required to allege all of the "who, what, when and where" so long as it alleges sufficient facts to allow a court to conclude that there is a reasonable possibility that discovery will reveal evidence of illegal activity); *Armer v. Openmarket, Inc.*, No. C08-1731RSL, 2009 WL 2475136, at *1 (W.D. Wash. July 27, 2009) (holding that plaintiff was not required to allege the date and amount of particular overcharge so long as it "avoid[s] labels, conclusions, and formulaic recitations of the elements of a cause of action"); *Alpha Biomedical and Diagnostic Corp. v. Philips Med. Sys. Netherland BV*, 828 F. Supp. 2d 425 (D. Puerto Rico 2011) (rejecting argument that a plaintiff must allege dates and times of allegedly defamatory statements).  In its Complaint, Sambreel provides ample factual specificity under these cases.  Sambreel directs Facebook to the written terms of Facebook's agreement that it enters with each application developer, including the provision within each agreement that obligates application developers to use *only* the advertising partners on an approved list maintained by Facebook.  *See* Compl. ¶ 20 (noting that application[s] developers "must agree" to certain terms to be allowed to operate and noting that the limitation on advertising partners is part of the agreement).  Sambreel cannot know when each

1   application developer agreed to these terms, but Facebook's own records provide it with ample

2   information about the dates that the various application developers signed these agreements. Moreover,

3   Sambreel alleges the dates of the anticompetitive conduct. *See* Compl. ¶¶ 32, 37.

4        Second, Sambreel has alleged an agreement between horizontal competitors – Facebook and its

5   application developers. Facebook asserts that the allegations in the Complaint include "vertical, but not

6   horizontal, conduct." Def. Br. at 17. Facebook then focuses on the agreements between it and the

7   advertising partners. *See id.* at 17-18. In the body of its brief, Facebook simply ignores the allegation

8   that Facebook and its application developers are horizontal competitors who have entered into an

9   agreement, relegating its response to this allegation to a footnote. *See id.* at 17 n.13. Facebook asserts

10  that it cannot be a competitor with the application developer because they operate at a different level of

11  the distribution chain. *Id.* This argument is wrong. Both Facebook and the application developers sell

12  advertising space to advertisers and therefore compete. *See* Compl. ¶ 18. The fact that the application

13  developers distribute their product through the Facebook Platform is simply irrelevant. So long as

14  Facebook and its application developers compete in the market for the sale of display advertisements,

15  they are horizontal competitors.

16       Finally, Facebook's argument that Sambreel has not pled the necessary facts to warrant *per se*

17  treatment is wrong as matter of law and fact. Facebook argues that Sambreel has failed to allege "the

18  three additional factors courts in the Ninth Circuit evaluate for per se group boycotts." *See* Def. Br. at

19  18. The three factors cited by Facebook are factors that the Supreme Court noted as tending to indicate a

20  *per se* unlawful group boycott in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing*

21  *Company*, 472 U.S. 284 (1985). Facebook's position appears to be that Sambreel was *required* to allege

22  facts to support each of these factors to state a claim under the *per se* test. This is simply wrong. In

23  *Northwest Wholesale Stationers*, the Supreme Court set out a number of facts that have often been

24  present in group boycott cases in which it has applied the *per se* rule. *See id.* at 294. The Court *expressly*

25  stated that a plaintiff does not need to prove all of these facts to invoke the rule. *See id.* at 295. Since

26  that case was decided, courts have regularly applied the *per se* test to cases that fit the fact pattern here

27  without engaging in an in-depth analysis of the *Northwest Wholesale Stationers* factors. *See, e.g., Big*

28

1  *Bear*, 182 F.3d at 1103 (imposing the *per se* test citing only one factor); *Toys "R" Us*, 221 F.3d at 936

2  (noting that it is not necessary to consider the *Northwest Wholesale Stationers* factors when the facts

3  demonstrate a classic group boycott).[13]  Thus, Sambreel is not required to plead all of the factors noted in

4  *Northwest Wholesale Stationers* to invoke the *per se* rule.

5        Sambreel's allegations, nevertheless, satisfy each of the *Northwest Wholesale Stationers'* factors.

6  Sambreel has alleged that Facebook's group boycott prevented Sambreel from selling advertising

7  through its largest advertising partners, thereby foreclosing Sambreel from competing in a substantial

8  portion of the market.  The Ninth Circuit has made clear that the *Northwest Wholesale Stationers'*

9  foreclosure factor does not require total foreclosure from a market, but requires only that a plaintiff was

10 foreclosed from an important avenue of supply or demand.  *See, e.g., Big Bear*, 182 F.3d at 1103

11 (concluding that the *per se* rule was appropriate where resorts were denied access to "referrals" and could

12 not purchase ski lift tickets at a discounted price as a result of the boycott).  Sambreel's allegations are at

13 least as strong as those that the Ninth Circuit found sufficient in *Big Bear* – Sambreel has been denied

14 access to a number of the largest advertising intermediaries (including the partners that represented 80

15 percent of PageRage's revenue).  *See* Compl. ¶¶ 5 & 33.  As a result, the average prices for PageRage

16 advertising space have decreased significantly.  *Id.* ¶ 5.  Thus, Sambreel has alleged that Facebook's

17 actions have limited Sambreel's ability to effectively compete by foreclosing Sambreel from access to a

18 substantial portion of the market.[14]

19       Sambreel also alleges that Facebook possesses a "dominant" market position.  Rather than cite to

20 any case law that addresses a group boycott, Facebook attempts to recast the "dominant" market position

21

22 [13] Facebook cites *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998), to assert that each of the *Northwest Wholesale Stationers* factors must be pled.  *See* Def. Br. at 18.

23 But in *Adaptive Power* the Ninth Circuit stated only that the three factors noted are "indicative" of *per se* illegality.  *See Adaptive Power*, 141 F.3d at 950.  The Ninth Circuit *did not* state that all of these factors

24 are necessary and subsequently decided *Big Bear*, in which only one of the three *Northwest Wholesale Stationers'* factors was present.  Facebook's attempt to misconstrue *Adaptive Power* rather than cite the

25 Supreme Court's decision in *Northwest Wholesale Stationers* or *Big Bear* is perplexing considering that Sambreel specifically cited both of these cases in its Preliminary Injunction Memorandum.

26 [14] Facebook's argument to the contrary is premised upon a belief that the boycott must result in complete

27 foreclosure from the market.  *See* Def. Br. at 18 (suggesting that Sambreel could offer its services on other social networking websites).  Facebook does not cite authority requiring total foreclosure, and it

28 ignores *Big Bear*.

1   requirement with a "monopoly" requirement. *See* Def. Br. at 18-19 (citing tying cases which generally

2   require proof of a monopoly in the tying market). Courts have made clear that a "dominant" position in

3   the context of the group boycott case law does not require proof of monopoly power. *See Toys "R" Us*,

4   221 F.3d at 936 (stating that the Supreme Court's use of the term "dominant" is "plainly chosen to stand

5   for something different from antitrust's term of art 'monopoly'"). This holding makes good sense

6   because the Supreme Court has applied the *per se* illegality rule without evidence that defendants held

7   monopoly power. *See generally Fashion Originators'*, 312 U.S. at 465-67; *Klor's*, 359 U.S. at 212. In

8   fact, in *Klor's*, the Supreme Court expressly noted that there were numerous other competing firms in the

9   surrounding area (suggesting that the defendant did not have monopoly power). 359 U.S. at 212.

10  Facebook's presence in the market – constituting 30 percent of the advertising market and 70 percent of

11  the social media advertising market – is sufficient for it to constitute the dominant market participant.

12  *See Toys "R" Us*, 221 F.3d at 937 (holding that a firm with 20 percent market share was dominant).

13          Finally, Sambreel plausibly alleges that Facebook did not have any pro-competitive justifications

14  for its actions. *See* Compl. ¶¶ 35, 69, 79. For example, Sambreel alleges that Facebook was supportive

15  of its product until Sambreel became a competitive threat. *Id.* ¶¶ 3-4.

16          Sambreel's allegations are sufficient to state a claim for a *per se* unlawful group boycott. The

17  facts alleged by Sambreel represent a classic group boycott akin to that involved in *Fashion Originators'*

18  and its progeny. Moreover, Sambreel has alleged all the factors set out in *Northwest Wholesale*

19  *Stationers*, even though it was not required to do so. Facebook's motion to dismiss should be denied.

20          **E.      Sambreel Alleges A *Per Se* Unlawful Negative Tying Agreement.**

21          A tying agreement is "an agreement by a party to sell one product but only on the condition that

22  the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that

23  product from any other supplier." *N. Pac. Ry.*, 356 U.S. at 5-6. More recently, the Supreme Court has

24  expressly held that an agreement to supply a product only if a customer agrees not to use the services of a

25  competitor in a tied market is illegal. *See Eastman Kodak*, 504 U.S. at 463 ("Finally, respondents have

26  presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would

27  sell parts to third parties only if they agreed not to buy service from [independent service

28

1   organizations.]").   These types of agreements are often referred to as "negative" tying agreements.   A

2   tying agreement is *per se* unlawful "if the seller has 'appreciable economic power' in the tying product

3   market and if the arrangement affects a substantial volume of commerce in the tied market."   *Id.* at 462;

4   *see also Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1338 (9th Cir. 1984).

5         Under this standard, Sambreel sufficiently alleges that Facebook's gating campaign constituted

6   *per se* unlawful negative tying.   Facebook agreed to offer its website only to users who would agree not

7   to use the services of Sambreel – an entity that competes with Facebook in the sale of display advertising.

8   The two markets at issue are:   (1) the market for social networking services in the United States and (2)

9   the market for applications and add-ons that enhance social networking services.   *See* Compl. ¶¶ 50-58.

10   The markets are distinct because the products are not ready substitutes for each other – *i.e.,* a user could

11   not opt to use PageRage instead of a social networking site.   *See Brown Shoe Co. v. United States*, 370

12   U.S. 294, 325 (1962) (holding that the test for relevant markets is whether the products can be substituted

13   for each other).   Courts have consistently held that the market for complementary products is separate

14   from the market for the underlying product.   *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d

15   974, 996-99 (N.D. Cal. 2010) (recognizing that the markets for the sale of gaming consoles and online

16   gaming are separate from the market for gaming accessories); *In re Apple & AT & TM Antitrust Litig.*,

17   596 F. Supp. 2d 1288, 1303-04 (N.D. Cal. 2008) (holding that markets for voice and data service and

18   applications were distinct from market for sale of phone).   Sambreel also alleges that Facebook has

19   market power in the tying market (the market for social networking services), *see* Compl. ¶¶ 51-52, and

20   that the agreements involved a substantial amount of interstate commerce, *see* Compl. ¶ 27 (alleging that

21   Sambreel sold nearly 158 billion advertising impressions in the fourth quarter of 2011 alone).

22         Facebook nevertheless argues that Sambreel does not properly allege *per se* unlawful negative

23   tying.   Facebook's arguments are specious.   First, Facebook incorrectly asserts that the *per se* illegality

24   rule does not apply because this case involves a software platform.   *See* Def. Br. at 20.   To support its

25   argument, Facebook cites to the D.C. Circuit's decision in the *Microsoft* case.   *See id.*   That case is not on

26   point.   In the *Microsoft* case, the D.C. Circuit addressed the question of whether the *per se* rule should be

27   applied to *bundling* software with an operating system.   *United States v. Microsoft, Corp.*, 253 F.3d 34,

28

84 (D.C. Cir. 2001). The Court concluded that there was the potential for procompetitive efficiencies in such bundling, rendering the rule of reason test appropriate. *Id.* at 95. The Court expressly stated that its ruling was narrow and limited to its facts – "where the tying product is software whose major purpose is to serve as a platform for third-party applications." *Id.* Thus, *Microsoft* does not apply here. To begin, Facebook is not an operating system or "software whose major purpose is to serve as a platform." Facebook – like all social networking sites – serves primarily as a website that allows users to connect with friends, family, and colleagues. *See* Compl. ¶ 16. While Facebook has a platform that allows for the development of third-party applications, this is not its "major purpose." Moreover, the *Microsoft* case did not involve an allegation of *negative tying*. Here, Sambreel is not complaining that Facebook has bundled its product with add-on products (indeed, Facebook does not engage in such bundling). Instead, Sambreel's complaint is that Facebook requires its users to agree that they *will not use* the products of a direct, low cost competitor. Sambreel explicitly alleges that Facebook's negative tying has no procompetitive justification. *Id.* ¶¶ 35, 69, 79. Thus, neither the express holding nor the logic of *Microsoft* indicates that Facebook's negative tying agreement cannot be subject to a *per se* analysis. And Facebook's negative tying arrangement is far more pernicious than the bundling in *Microsoft*; Facebook prohibits its users from utilizing products of a direct competitor. Nothing in the *Microsoft* case could be construed to prevent the application of the *per se* rule to this case.

Second, Facebook incorrectly asserts that Sambreel's tying claim should be dismissed because Facebook does not "sell" its services to its users. *See* Def. Br. at 20. This argument is factually inaccurate. Facebook does not offer its product for free to users. As Facebook concedes, users are allowed to use the service "if the user is willing to see ads." *Id.* As such, the product is not "free;" instead, Facebook and its users agree to a market transaction – Facebook provides its services and users agree to allow Facebook to show them advertisements (for which Facebook receives a fee). These facts are wholly different from the facts of the case cited by Facebook – *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1454-55 (9th Cir. 1983). *Rickards* held that a defendant accused of engaging in tying must have some economic interest in the tied market. *Id.* Because the defendant did not have *any* economic interest in the tied market, it could not be held liable for tying. *Id.* at 1455. That

case did not turn on whether a particular person was charged a fee, the relevant fact was that the defendant did not benefit economically from the alleged tying. Here, on the other hand, Sambreel alleges that Facebook has an economic interest in the social networking enhancement market. *See* Compl. ¶¶ 18, 19. As such, *Rickards* does not apply.

Third, Facebook's suggestion that the market for social networking services and complementary products are not sufficiently "separate" to allow for a tying claim is frivolous. The Supreme Court has expressly noted that a tying claim may be stated for a primary product and complementary products. In *Eastman Kodak*, the Supreme Court rejected the argument that parts and services were not separate because there was not demand for parts without service:

> Kodak insists that because there is no demand for parts separate from service, there cannot be separate markets for service and parts. Brief for Petitioner 15, n. 3. By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires. That is an assumption we are unwilling to make. "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."

504 U.S. at 463 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984)). Lower courts have similarly recognized that complementary products and services represent separate relevant markets for tying analysis. *See Datel*, 712 F. Supp. 2d at 996-99 (recognizing that the markets for the sale of gaming consoles and online gaming are separate from the market for gaming accessories); *In re Apple*, 596 F. Supp. 2d at 1303-04 (holding that markets for voice and data service and applications were distinct from market for sale of phone).[15]

Finally, Facebook incorrectly asserts that Sambreel's negative tying claim is inappropriate because Sambreel has not alleged that Facebook prohibited the use of all potentially competing products. This argument is without merit. Tying agreements – whether positive or negative – are forbidden because they allow a party with power in one market to leverage that power to gain an unfair advantage in another market. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2007).

---

[15] In fact, Facebook cites a case that clearly recognized that complementary products (including those for which there would be no demand absent the main product) represent a separate market. *See Microsoft*, 253 F.3d at 95-97 (concluding that the plaintiff could potentially state a tying claim involving the markets for operating software and web browser software as distinct markets).

1 Sambreel alleges that Facebook has forced its users to agree to negative tying agreements that target one

2 of Facebook's largest competitors in the sale of online display advertising. *See* Compl. ¶¶ 4, 6, 37-39,

3 75. Sambreel alleges that Facebook has leveraged its monopoly position in the market for social

4 networking services to exclude competition in the market for products that complement social

5 networking services. Facebook's suggestion that a negative tie is illegal only if it excludes *all*

6 competitors makes no sense. If Facebook were correct, a monopolist could avoid antitrust liability by

7 targeting all but one of its competitors. This is not the law, and it should not be the law.[16]

8       **F.**    **Sambreel Properly Alleges Cognizable Relevant Markets.**

9       Sambreel has properly pled relevant markets. The definition of the proper relevant market "is

10 typically a factual rather than a legal element." *See Macquarie*, 2009 WL 539928, at *7 (citing *Newcal*,

11 513 F.3d at 1045). As such, "[a] complaint survives a Rule 12(b)(6) motion 'unless it is apparent from

12 the face of the complaint that the alleged market suffers a fatal legal defect.'" *Id.* Under this standard,

13 Sambreel has properly pled the relevant markets.

14       *The Advertising Markets.* Sambreel properly alleges that a relevant market exists for online

15 display advertising. *See* Compl. ¶¶ 59-60. Sambreel alleges that online advertising is not

16 interchangeable with offline advertising, *id.* ¶ 59, and that display advertising is a discrete market within

17 online advertising for which advertisers have no ready substitute, *id.* ¶ 60. Sambreel further alleges that a

18 distinct submarket exists consisting of online advertising for social media users. *See id.* ¶ 61. Sambreel

19 alleges that market participants consider social media advertising as distinct, *id.*, and alleges specific

20 economic reasons why market participants consider this a distinct market, *id.* ¶ 62. These allegations are

21 clearly sufficient at the pleading stage to set out a relevant market and submarket. *See Macquarie*, 2009

22 WL 539928, at *7 (noting that the standard for pleading a relevant market is low and rejecting a

23 challenge based upon defendant's divergent view about the proper market definition).

24       Facebook asserts that these allegations are insufficient. The crux of Facebook's assertion is that

25

---

26 [16] *See Klor's*, 359 U.S. at 213 ("Monopoly can as surely thrive by the elimination of such small

27 businessmen, one at a time, as it can by driving them out in large groups."). The cases cited by Facebook did not hold that a negative tie was legal if it targeted only some competitors. Instead, Facebook seeks to

28 elevate loose language in a way that would frustrate the purpose of the prohibition against negative tying.

1   Sambreel has not included allegations regarding the "cross-elasticity of demand." *See* Def. Br. at 22-23.

2   This argument is specious.  The Supreme Court's precedents make clear that defining a relevant market

3   focuses on the question of the "interchangeability" of various products.  *See, e.g., United States v. E.I.*

4   *duPont de Nemours & Co.*, 351 U.S. 377, 399 (1956) ("That market is composed of products that have

5   reasonable interchangeability for the purposes for which they are produced – price, use and qualities

6   considered.").  Courts have developed a number of tests for considering whether various products are

7   "interchangeable," and cross-elasticity of demand is merely one of these tests.  *See generally* ABA

8   Section of Antitrust Law, Antitrust Law Developments 1-6 (6th ed. 2008) (discussing market definition

9   issues).  Sambreel included allegations in its complaint regarding the interchangeability of various forms

10  of advertising, alleging that online display advertising is not interchangeable with other types of

11  advertising (and that there are submarkets within that category).  *See* Compl. ¶¶ 59-62.  The fact that

12  Sambreel did not specifically allege "cross-elasticity of demand," is simply irrelevant.

13       *The Social Networking Market.*  Sambreel properly alleges that a relevant market exists for social

14  networking services.  Sambreel alleges what constitutes a social networking service, and provides a

15  number of examples of such services.  *See* Compl. ¶ 50.  Sambreel also alleges that there are "full-service

16  social networks" and "niche services."  *See id.*  Sambreel alleges specific examples of services that fall

17  within each of these groupings.  Sambreel includes market share allegations whether the market is

18  defined to include only full-service social networks or is extended to include the niche services as well.

19  *See id.* ¶ 51 (alleging market share among full-service social networking services); *id.* ¶ 52 (alleging that

20  Facebook accounts for 90 percent market share among all social networking services).

21       Facebook argues that Sambreel's allegations are insufficient for two reasons.  First, Facebook

22  asserts that "social networking services" cannot constitute a relevant market because it is offered to users

23  for free.  This argument is a specious and flawed attempt to convince this court to reject the conclusion of

24  the one case in which a court has considered whether (and ultimately accepted that) "social networking

25  services" constitute a relevant market – *LiveUniverse*, 2007 WL 6865852, at *7.  And other courts have

26  defined relevant markets in which the end user of a product is not charged a direct fee for a product.  *See,*

27  *e.g., Microsoft*, 253 F.3d at 84-85 (considering tying claim involving internet web browsers); *GTE Media*

28

1  *Serv. Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27 (D.D.C. 1998) (denying motion to dismiss antitrust

2  action involving a relevant market for internet Yellow Pages).

3      Facebook's error (and the error of the district court opinion it cites) is that it focuses exclusively

4  upon one side of what is known as a multi-sided market.  A multi-sided market is a market in which an

5  intermediary (Facebook) serves to connect at least two separate categories of economic actors (here, the

6  users and the advertisers).  *See generally* David S. Evans, "The Antitrust Economics of Multi-Sided

7  Platform Markets," 20 YALE J. ON REG. 325 (2003) (defining multi-sided markets and discussing the

8  application of antitrust law to them).  It is a mistake to focus on only one side of a multi-sided market.

9  *See id.* at 358.  The transactions on the multiple sides of these markets are inextricably coupled.  Indeed,

10  it is not uncommon for participants on one side of a multi-sided market to pay nothing for the product or

11  service because the fee is borne by the parties on the other side of the transaction.  *See id.*  In these cases,

12  the parties on the "free" side of the market have nevertheless entered into a market transaction; their fee

13  is subsidized by other market participants.  Here, Facebook users agree to allow Facebook to "sell" them

14  to advertisers in exchange for being allowed to use the service.

15      Second, Facebook asserts that Sambreel's market definition allegations are insufficient because

16  Sambreel failed to allege Facebook's market share among all social networking services.  Facebook is

17  wrong and ignores the allegations in Paragraph 52 of the Complaint, which relate specifically to

18  Facebook's market share among "all social networking services."  *See* Compl. ¶ 52.  Sambreel alleges

19  that Facebook maintains market share in excess of 90 percent among all social networks.  *Id.*[17]

20      Facebook also disputes Sambreel's allegation that Facebook has market power by suggesting that

21  the market is volatile and that Sambreel is required to demonstrate barriers to entry.  *See* Def. Br. at 23-

22  24.  Again, however, Facebook ignores the factual allegations in the Complaint.  Sambreel alleges

23  barriers to entry, including network effects and high switching costs.  *See* Compl. ¶¶ 53-54.  Sambreel

24  also alleges that the barriers have forced a number of other social networking services to cease trying to

25

26  [17] Facebook's argument is also legally flawed.  It is plausible to conclude that niche social networking
services are not a substitute for a full-service social networking site.  There would be nothing legally

27  inappropriate with concluding that the market includes only full-service social networking service, even
if that means that Facebook has 98 percent market share.  *See* Compl. ¶ 51.  The fact that Facebook has

28  achieved an almost 100 percent monopoly does not render the market definition improper.

1   compete with Facebook and to serve as complements to Facebook. *See id.* ¶ 55. These allegations are

2   sufficient to provide a "plausible" theory of market power held by Facebook.[18]

3        **G.    Sambreel Properly Alleges A Monopolization Claim.**

4        Sambreel properly alleges a monopolization claim under Sherman Act § 2. Sambreel alleges that

5   Facebook has monopoly power in the relevant market – display advertising for social media users – that

6   it has engaged in exclusionary conduct, and that the exclusionary conduct has led to anticompetitive

7   effects. *See* Compl. ¶¶ 61-62, 64 (relevant market and monopoly power); *id.* ¶¶ 32-40 (exclusionary

8   conduct), *id.* ¶¶ 41-45 (anticompetitive effects).

9        Facebook argues that Sambreel does not allege exclusionary conduct, but it fails to cite a single

10  case that involved an alleged boycott or tying agreement by a monopolist. *See* Def. Br. at 25-26.

11  Instead, Facebook relies most heavily on the *LiveUniverse* case, where the alleged exclusionary conduct

12  was limited to MySpace's policy of not allowing posts that advertise a competitor's website on

13  MySpace's own website. *See id.*[19] Refusing to allow advertising for a competitor on a defendant's

14  website is one thing; requiring advertisers and users who do business with you to boycott and agree not

15  to use a competing product is a very different case. *See Lorain Journal Co. v. United States*, 342 U.S.

16  143, 152 (1951) (holding that boycott was exclusionary conduct); *Eastman Kodak*, 504 U.S. at 483-84

17  (holding the defendant's actions, which included negative tying, were exclusionary). Facebook's failure

18  to address the *actual facts alleged* in this case dooms its argument. Sambreel properly alleges a

19

---

20  [18] Facebook also seeks to make a factual challenge regarding the "volatile" nature of the market.
    Facebook relies on MySpace's prior dominance and decline. *See* Def. Br. at 23. This argument is

21  inappropriate at the motion to dismiss stage. Facebook's argument also ignores relevant differences in
    the market at the time when MySpace had a dominant market share versus the current market. Notably,

22  when MySpace was dominant, the market was relatively new and there were ample opportunities for
    competitors to reach new customers. That is no longer the case, and a competitor must now challenge

23  Facebook's dominance directly.

24  [19] Facebook also mischaracterizes the holding in *Universal Grading*, 2011 WL 846060, at *9. Facebook
    asserts that eBay prohibiting the use of certain coin-grading companies on its website. *See* Def. Br. at 25.

25  Those were not the facts of that case. eBay did not prohibit the use of any coin-grading services, it
    simply prohibited the listing of a coin as "certified" unless it had been graded by one of the grading firms

26  selected by a panel. 2011 WL 846060, at *2. In reaching its decision, the Court expressly noted that
    eBay did not prohibit the use of any coin grading services and also noted that eBay was not a competitor

27  with the parties that were allegedly disfavored. *See id.* at *5. Here, on the other hand, Facebook has
    expressly stated that its users and advertising partners may not do any business with PageRage, a

28  company with which Facebook competes directly.

1    monopolization claim.

2    **H.     Sambreel Properly Alleges An Attempted Monopolization Claim.**

3    Sambreel properly alleges an attempted monopolization claim under Sherman Act § 2.    An

4    attempted monopolization claim requires proof of three elements:    (1) the defendant engaged in

5    exclusionary conduct, (2) the defendant acted with the specific intent to monopolize, and (3) the

6    defendant had a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v.*

7    *McQuillan*, 506 U.S. 447, 456 (1993); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d

8    1291, 1308 (9th Cir. 1982).   The Ninth Circuit has made clear that *all* of these elements may be proven

9    based upon the proof of exclusionary conduct alone. *See Twin City*, 676 F.2d at 1309.   In *Twin City*, the

10   Ninth Circuit concluded that a party with 24 percent market share could be found to have engaged in an

11   attempted monopolization based upon its exclusionary conduct. *See id.* at 1297-98 (market share); *id.* at

12   1309 (exclusionary conduct).

13   Sambreel's attempted monopolization allegations meet this standard.   Facebook's alleged market

14   share of nearly 30 percent exceeds the level that the Ninth Circuit deemed sufficient for an attempted

15   monopolization claim in *Twin City*. *See* 676 F.2d at 1297-98 (discussing market share).[20]   Moreover,

16   Facebook's conduct is more clearly exclusionary than the conduct at issue in *Twin City*.   In *Twin City*,

17   the exclusionary conduct consisted of entering into long-term contracts that included provisions that

18   allowed the alleged wrongdoer to maintain and expand its market share. *See id.* at 1309.   Here, on the

19   other hand, Facebook has engaged in conduct that forecloses Sambreel from critical market participants:

20   advertising partners and users.   Moreover, Facebook's actions fall within long-recognized categories of

21   exclusionary conduct – tying and group boycott.   Sambreel has also alleged facts that, if proven,

22   demonstrate Facebook's specific intent to monopolize.   Sambreel has alleged that Facebook did not

23

24   [20] Facebook cites *Cyntegra, Inc. v. Idexx Labs., Inc.*, 520 F. Supp. 2d 1199, 1210 (C.D. Cal. 2007), for
     the proposition that a 40 percent market share is insufficient for an attempted monopolization claim. *See*
25   Def. Br. at 27 n.17.   The portion of that case that Facebook cites addresses whether the defendant had
     "monopoly" power. *See Cyntegra*, 520 F. Supp. 2d at 1210.   Although the plaintiff had alleged an
26   attempted monopolization claim, the Court did not address that claim directly.   Instead, the Court
     addressed only whether the plaintiff had stated a claim for monopolization. *See generally id.* at 1208-10
27   (discussing whether plaintiff had sustained burden to demonstrate the requirements for proving a
     monopolization claim).
28

become concerned (and did not begin its attacks on Sambreel) until Sambreel had grown into a major threat in the advertising markets. *See* Compl. ¶¶ 24, 27-28.  Moreover, Sambreel has alleged facts upon which a party could conclude that Facebook's motivation was to eliminate a low cost competitor in the market. *See id.* ¶ 39 (alleging that Facebook agreed to cease the gating if Sambreel agreed to cease advertising).  These allegations are sufficient to sustain a claim for attempted monopolization.

**I.   Sambreel Properly Alleges a Violation of Sherman Act § 1 Under the Rule of Reason.**

In addition to being *per se* illegal, Sambreel alleges that Facebook's group boycott and negative tying agreements are illegal under both the "quick look" and full rule of reason analysis. *See* Compl. ¶¶ 68, 78.   Under a "quick look" rule of reason analysis, "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the business practice at issue. *NCAA v. Board of Regents*, 468 U.S. 85, 109 (1984).  A "quick look" analysis requires "proof of actual detrimental effects," which can "obviate the need for an inquiry into market power[.]" *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (1986).  Under a full rule of reason analysis, an agreement is illegal if its "harm to competition outweighs its procompetitive effects" within a relevant market. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).  Under this test, the plaintiff bears an initial burden of showing that the restraint produces "significant anticompetitive effects" within a relevant market.  *Id.*   Plaintiff does not bear a burden of challenging the potential procompetitive effects until *after* the defendant comes forward with evidence of any such procompetitive effects. *Id.*

Sambreel's allegations meet the standard for both a "quick look" and full rule of reason analysis.  Specifically, Sambreel alleges that:  (a) Facebook's actions have resulted in actual detrimental effects – *e.g.,* the reduction of consumer choice, the elimination of a direct low-cost competitor, and an increase in prices for advertisers (*see* Compl. ¶¶ 41-45); (b) Facebook's actions do not have a business justification or any procompetitive effects (*see id.* ¶¶ 35, 69, 79); and (c) Facebook has market power in the social networking market and the market for advertising to social networking users. *See id.* ¶¶ 50-52, 64.  Moreover, Sambreel alleges that agreeing to Facebook's terms is against the business interests of application developers, unless these policies are used as a means to drive a competitor out of the market to increase prices. *See id.* ¶ 35.

Facebook does not dispute Sambreel's "quick look" rule of reason allegations. Instead, Facebook argues that Sambreel's group boycott claim should be dismissed under a full rule of reason analysis because Sambreel has not alleged that Facebook has market power in a relevant market. *See* Def. Br. at 27. As it does throughout its motion, Facebook ignores the allegations of the Complaint. Sambreel has specifically alleged that there is a relevant submarket for advertising to social media users and that Facebook has 70 percent market share in that market. *See* Compl. ¶ 61, 64. These allegations must be taken as true, and they are sufficient to state a claim that Facebook has market power. *See, e.g., Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."). And in light of Sambreel's allegations that the purpose and effect of Facebook's anticompetitive scheme is to drive a major, low-cost competitor out of the market, to increase prices for advertisers, and to reduce consumer choice, Sambreel has clearly alleged that the anti-competitive effects outweigh any procompetitive effects.[21]

Facebook's assertion that Sambreel's allegations regarding the tying claims are insufficient under a full rule of reason analysis is likewise without merit. Facebook's arguments rehash the arguments it made with respect to the *per se* claim. *See* Def. Br. at 28 (arguing that the tying claim is insufficient because Facebook offers the product for free, the products are not independent, and exclusion of one competitor does not establish anticompetitive effects). These arguments are without merit. *See supra* at pages 21-25.

**J.     Sambreel Properly Alleges A Claim Under Section 17200.**

Sambreel properly alleges a violation of California Business and Professions Code Section 17200. Specifically, Sambreel alleges that Facebook's actions are unfair and illegal. Facebook's motion to dismiss this claim is based upon misconstructions of the applicable law.

---

[21] Facebook's citation to *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994), is misplaced. That case does not stand for the general proposition that the elimination of one competitor cannot satisfy the rule of reason analysis. Instead, the case involved a review of a post-trial judgment and the court concluded that the facts did not support a finding of harm to competition. *Id.* at 960. The facts of that case were also vastly different, as there were thousands of companies that competed in the market and there was not a single dominant competitor. *Id.* (stating that there are 6,000 credit card issuers); *id.* at 967 (noting that there were ten large competitors that collectively held 48 percent of the market and that the largest individual issuer represented only 15.8 percent of the market).

First, Facebook incorrectly asserts that, if Sambreel does not state a Sherman Act claim, it cannot state a claim under Section 17200's prohibition on unfair practices. *See* Def. Br. at 28-29. This argument ignores controlling precedent from the California Supreme Court. In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company*, the California Supreme Court explained that conduct is "unfair" if the action "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." 20 Cal. 4th 163, 187 (Cal. 1999).[22]   In *Cel-Tech*, the California Supreme Court expressly held that the plaintiff can demonstrate a violation of Section 17200 without proving a violation of the underlying antitrust laws. *Id.* at 189 (holding that a plaintiff could prove a Section 17200 violation where the *mens rea* for an antitrust violation was not present). Federal courts have similarly recognized that certain claims that are insufficient under the antitrust laws – *e.g.,* because of a failure to allege antitrust injury – are cognizable under Section 17200. *See Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (holding that plaintiff's allegations of injury in fact were sufficient to state a claim under Section 17200 even without an allegation of antitrust injury).[23]   Thus, even if Sambreel's allegations do not state a claim under the Sherman Act – which they do – its allegations state a Section 17200 claim.

Second, Facebook argues that to demonstrate a violation of California Penal Code Section 502(c), Sambreel was required to allege that Facebook accessed its users' computers "in a manner that overcomes technical or code-based barriers." *See* Def. Br. at 29. This argument is wrong. The California Penal Code Section 502(c)(7) provides that a person commits a crime if he "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." California courts have concluded that where a party gains access to levels of software on a

---

[22] That Facebook ignores this controlling precedent even though it was cited in Sambreel's Preliminary Injunction Memorandum speaks volumes. *See* Dkt. 3-1 at 19.

[23] The *LiveUniverse* case is not relevant here. In that case, the Court concluded that the plaintiff had not alleged any "exclusionary" conduct. 304 F. App'x 554, 556-57 (9th Cir. 2008). Where a party has failed to allege any exclusionary conduct, it cannot establish any unfair conduct.

1  computer that are not generally accessible, he has violated this statute. *See People v. Lawton*, 48 Cal.

2  App. 4th Supp. 11, 15 (Cal. App. Dep't Super. Ct. 1996) (holding that a defendant who used public

3  terminals at a California library to gain entry to the software coding of the system had violated Section

4  502(c)(7)).

5         Facebook seeks to import a requirement that the Northern District of California adopted for

6  proving violation of Section 502(c) as a result of accessing a *publicly accessible* website. *See Facebook,*

7  *Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010);

8  *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 716 (N.D. Cal. 2011).  The court concluded that it

9  was necessary to impose the requirement that a user "overcomes technical or code-based barriers" in that

10  context in light of the rule of lenity. *See Power Ventures*, 2010 WL 3291750, at *10-11.  The concerns

11  that motivated that case do not apply here, where a company accessed individuals' *private* computers

12  without permission.  The rule of lenity does not provide any barrier to imposing liability on an entity that

13  accesses a private computer when it has not been given authority to do so.[24]  There is a clear distinction

14  between what constitutes accessing a public website "without permission" and what constitutes accessing

15  a private computer "without permission."  Here, Sambreel has alleged that Facebook accessed its users'

16  private computers without their permission (or knowledge).  This is a violation of Section 502(c).

17         **K.      Sambreel Properly Alleges A Claim For Tortious Interference With Contract.**

18         To state a claim for intentional interference with contract, a plaintiff must plead:  (1) a valid

19  contract, (2) defendant's knowledge of the contract, (3) defendant's intentional acts designed to induce a

20  breach or disruption of the contract, (4) actual breach or disruption of the contractual relationship, and

21  (5) resulting damages.  *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (Cal.

22  1990).  Here, Sambreel alleges each of these elements.  *See* Compl. ¶ 32 (Facebook's intentional acts to

23  interfere with contractual relations); *id.* ¶ 33 (existence of contracts and actual disruption of contractual

24  relationships); *id.* ¶¶ 41, 43, 44 (damages); *id.* ¶ 100 (Facebook's awareness of contracts).   These

25  allegations are sufficient to state a claim.  Facebook's arguments to the contrary are meritless.

26

27  [24] Indeed, Facebook's argument proves too much.  According to Facebook, an individual who physically gained access to a computer that was not password protected would not be guilty of a violation of Section

28  502(c) regardless of what that individual did once gaining access to the computer.

First, Facebook asserts that Sambreel's allegations regarding Facebook's knowledge of Sambreel's contracts with advertising partners are insufficient under the relevant pleading standards. In making this argument, Facebook ignores the allegations in the Complaint. Sambreel's allegations are not limited to information and belief. Instead, Sambreel alleges explicitly that Facebook targeted advertising partners who were engaged in business relationships with Sambreel. *See* Compl. ¶¶ 32-34. These factual allegations are sufficient when coupled with the direct allegation (upon information and belief) that Facebook was aware of the contractual relationships. Facebook does not cite a case that rejected similar pleadings. Indeed, the only case it cites involving a tortious interference claim is *Jewelry 47, Inc. v. Biegler*, No. 2:08-cv-00174, 2008 WL 4642903 (E.D. Cal. Oct. 16, 2008). Facebook wrongly asserts that the *Jewelry 47* court's decision was based upon the fact that the allegations were "conclusory." Def. Br. at 30. The decision in *Jewelry 47* was based upon the fact that the plaintiff had affirmatively pleaded itself out of court, by alleging that the party to the contract had falsely denied the existence of the contractual relationship. *See Jewelry 47*, 2008 WL 4642903, at *4. Sambreel's allegations, on the other hand, are sufficient, and Sambreel has not pleaded itself out of court.

Second, Facebook asserts that Sambreel's claim is barred by two privileges: the competition privilege and the privilege to enforce one's own contracts. These privileges do not provide a basis to dismiss the case. To begin, these privileges are affirmative defenses and are therefore not the proper basis for a motion to dismiss. *See, e.g., McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990) (noting that for a complaint to be dismissed based on an affirmative defense, "the defense clearly must appear on the face of the pleading"). In the context of the competition privilege, courts have noted that it is nearly impossible to determine whether the defendant's actions are wrongful based upon a complaint. *See Theme Promotions, Inc. v. News Am. FSI*, 35 F. App'x 463, 468 (9th Cir. 2002); *see also Lowell v. Mother's Cake & Cookie Co.*, 144 Cal. Rptr. 664, 669-70 (Cal. Ct. App. 1978) (noting that the determination of whether a defendant's conduct is privileged "comprises a factual issue to be decided upon all the circumstances of the case"). As such, Facebook's request that the Court dismiss the complaint based upon its assertion that fact-intensive affirmative defenses will ultimately bar the claim is inappropriate. Moreover, as Facebook notes, the privileges do not apply where the defendant has

engaged in "wrongful means" or an "unlawful restraint of trade."  Def. Br. at 30.  Because Sambreel has alleged that Facebook's actions are independently unlawful, the privileges do not apply.

**L.    Sambreel Properly Alleges A Claim For Interference With Prospective Economic Advantage.**

Sambreel properly states a claim for interference with prospective economic advantage. Facebook's sole argument to the contrary is its assertion that Sambreel has not properly alleged independent "wrongful" conduct.  As set forth *supra*, Sambreel properly alleges ample wrongful conduct – *i.e.*, Facebook's group boycott and gating campaigns.  As such, its claim for interference with prospective economic advantage is properly pled.

**VI.    CONCLUSION**

For the reasons set forth herein, this Court should deny Facebook's motion to dismiss.


Dated: June 8, 2012                                    LAW OFFICE OF GREGORY P. OLSON

                                                       By:  s/  Gregory P. Olson
                                                            Attorney for Plaintiffs
                                                            E-mail: greg@olsonesq.com

                                                       and

                                                       KOTCHEN & LOW LLP
                                                            DANIEL KOTCHEN
                                                            DANIEL LOW
                                                            ROBERT KLINCK

1

**CERTIFICATE OF SERVICE**

2      The undersigned hereby certifies that all counsel of record who have consented to electronic

3  service are being served with a copy of:  PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION

4  TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(3)

5  AND 12(B)(6) via the CM/ECF system on June 8, 2012.

6

7  Dated:  June 8, 2012                              By:  s/  Gregory P. Olson
                                                       Attorney for Plaintiffs
8                                                      E-mail: greg@olsonesq.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28