James F. Basile (SBN 228965)
james.basile@kirkland.com
Elizabeth L. Deeley (SBN 230798)
elizabeth.deeley@kirkland.com
Mark E. McKane (SBN 230552)
mark.mckane@kirkland.com
Adam L. Gray (SBN 262557)
adam.gray@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Susan Marie Davies (*Admitted pro hac vice*)
susan.davies@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Attorneys for Defendant
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | CASE NO. 12-CV-00668-CAB-KSC <br><br> **DEFENDANT FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(3) AND 12(B)(6)** <br><br> Judge:  Hon. Cathy Ann Bencivengo <br> Hearing Date: June 22, 2012 <br> Hearing Time: 2:30 p.m. <br> Dept.:  Courtroom 2 <br><br> **ORAL ARGUMENT REQUESTED** |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................4

I.    SAMBREEL HAS NOT MET ITS BURDEN OF ESTABLISHING
VENUE .......................................................................................................4

II.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
STATE A CLAIM ......................................................................................6

      A.    Sambreel Has Identified No Allegations that Differentiate this Case
from a Lawful Refusal to Deal (Counts I-IV)...........................................6

      B.    Sambreel Fails to Distinguish Ninth Circuit Case Law Requiring
Dismissal of this Complaint for Lack of Antitrust Injury (Counts I-IV).......................9

      C.    Sambreel Has Not Pled a Per Se Claim under Section 1 (Counts I & II)...................11

            1.    Sambreel Has Not Pled a Group Boycott between Horizontal
Competitors................................................................................11

            2.    Sambreel Has Not Pled a Negative Tying Agreement...................................14

      D.    Sambreel Has Not Justified Its Failure to Plead a Market (Counts I-IV)...................15

      E.    Sambreel's Antitrust Claims Remain Deficient for a Variety of Other
Reasons .....................................................................................16

            1.    Sambreel Has Not Stated a Section 2 Monopolization Claim
(Count III).................................................................................16

            2.    Sambreel Has Not Stated a Section 2 Attempted
Monopolization Claim (Count IV)......................................................17

            3.    Neither the Rule of Reason Nor the "Quick Look" Doctrine Can
Save Sambreel's Section 1 Claims (Counts I & II) .................................17

      F.    None of Sambreel's State Law Claims Survive Facebook's Motion to
Dismiss......................................................................................18

            1.    Sambreel Has Not Properly Pled A Violation of Section 17200
(Count V) ..................................................................................18

            2.    Sambreel Has Not Pled a Tortious Interference Claim (Counts
VI & VII) ..................................................................................20

CONCLUSION .......................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1998) ................................................................................. 13

*Androutsakos v. M/V PSARA*,
2003 WL 23538012 (D. Or. July 7, 2003) .............................................................. 6

*Apple, Inc. v. PsyStar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................................ 16

*B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*,
2007 WL 3232276 (N.D. Cal. Nov. 1, 2007) ......................................................... 6

*Blind Doctor, Inc. v. Hunter Douglas, Inc.*,
59 Fed. R. Serv. 3d 635, 2004 WL 1976562 (N.D. Cal. Sept. 7, 2004) ............................ 9

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) ........................................................................................ 7, 9

*Bus. Elec. Corp. v. Sharp Elec. Corp.*,
485 U.S. 717 (1988) .......................................................................................... 12

*California ex rel. Brown v. Safeway, Inc.*,
615 F.3d 1171 (9th Cir. 2010) ......................................................................... 4, 18

*Carter v. Variflex, Inc.*,
101 F. Supp. 2d 1261 (C.D. Cal. 2000) ................................................................ 18

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ............................................................................... 9

*Cel-Tech Commc'n, Inc., v. L.A. Cellular Tele. Co.*,
20 Cal. 4th 163 (Cal. 1999) ........................................................................... 19, 20

*Chang Wei Lee v. XO Commc'ns, LLC*,
2012 WL 164080 (C.D. Cal. Jan. 13, 2012) ............................................................ 6

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ............................................................................... 16

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ................................................................................ 20

*Chrisman v. City of Los Angeles*,
155 Cal. App. 4th 29 (2007) ............................................................................... 19

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*,
123 F.3d 301 (5th Cir. 1997) ................................................................................ 9

*E. & J. Gallo Winery v. Encana Energy Serv., Inc.*,
    1:03-cv-05412-LJO-DLB (S.D. Cal. Feb. 9, 2005) ........................................................ 5

*E.g. Serv. & Training, Inc. v. Data Gen. Corp.*,
    963 F.2d 680 (4th Cir. 1992) ........................................................................................ 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................................................... 3, 14, 15

*Express Logistics Sys. Corp. v. Eagle Mountain Ventures, LLC*
    2004 WL 2445239 (N.D. Cal. Oct. 29, 2004) ............................................................... 6

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ....................................................... passim

*Fashion Originators' Guild of Am., Inc. v. FTC*,
    312 U.S. 457 (1941) ....................................................................................... 3, 11, 12

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) ....................................................................................... 10

*Hairston v. Pacific 10 Conf.*,
    101 F.3d 1315 (9th Cir. 1996) ..................................................................................... 10

*Hard Rock Cafe Intern. (USA) Inc. v. Morton*,
    1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) .................................................................. 2

*Harris v. Safeway, Inc.*,
    2011 WL 2684942 (9th Cir. July 12, 2011) ................................................................ 18

*Head-Wear Techs., LLC v. Oticon, Inc.*,
    551 F. Supp. 2d 1272 (N.D. Okla. 2008) .................................................................... 16

*In re ATM Fee Antitrust Litig.*,
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ................................................................... 4, 15

*In re Beer Antitrust Litig.*
    2002 WL 1285320 (N.D. Cal. Apr. 3, 2002) ............................................................... 13

*In re Facebook Privacy Litig.*,
    791 F. Supp. 2d 705 (N.D. Cal. 2011) ........................................................................ 19

*In2 Networks, Inc. v. Honeywell Intern.*,
    2011 WL 4842557 (D. Utah 2011) .............................................................................. 15

*Ingenieria Alimentaria Del Matatipac S.A. DE C.V. v. Ocean Garden Prods., Inc.*,
    3:06-cv-02400-WQH-POR (S.D. Cal. Dec. 22, 2006)................................................... 5

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................... 13, 14, 17

*Kinderstart.com, LLC v. Google, Inc.*,
    2007 WL 831806 (N.D. Cal. March 16, 2007) ........................................................... 16

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................................ 11

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ................................................................... passim

*LiveUniverse, Inc. v. MySpace, Inc.*,
    2007 WL 6865852 (C.D. Cal. June 4, 2007) ........................................ 8, 10, 16, 17

*Manetti-Farrow, Inc. v. Gucci Amer., Inc.*,
    858 F.2d 509 (9th Cir. 1988) ................................................................................ 5

*McCalden v. Cal. Lib. Ass'n*,
    955 F.2d 1214 (9th Cir. 1990) ............................................................................. 20

*Measurement Specialties, Inc. v. Stayhealthy.com*,
    275 F. Supp. 2d 638 (E.D. Pa. 2003) .................................................................... 6

*Morris Commc'n Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004) ............................................................................. 7

*Murphy v. Schneider Nat'l, Inc.*,
    362 F.3d 1133 (9th Cir. 2004) ............................................................................... 4

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................. 18

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ............................................................................. 12

*Pac. Bell Tel. v. Linkline Commc'n*,
    129 S. Ct. 1109 (2009) ........................................................................................... 7

*People v. Lawton*,
    48 Cal. App. 4th Supp. 11 (1996) ....................................................................... 19

*Perry v. AT&T Mobility LLC*,
    2011 WL 4080625 (N.D. Cal. Sept. 12, 2011) ..................................................... 5

*Powerscreen USA LLC v. D&L Equip., Inc.*,
    2008 WL 2944994 (W.D. Ky. July 28, 2008) ....................................................... 6

*Rebel Oil Co., Inc. v. Atl. Rich. Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 13, 16, 17

*Rick-Mik Enters., Inc. v. Equilon Enter. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................................... 14

*SC Manuf'd Homes, Inc. v. Liebert*,
    162 Cal. App. 4th 68 (2008) ................................................................................ 20

*Solis v. City of Fresno*,
    2012 WL 868681 (E.D. Cal. March 13, 2012) .................................................... 20

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) .......................................................... 18

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...................................................................... 14

*Universal Grading Service v. eBay, Inc.*
    2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ............................. 8, 10, 12, 17

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..................................................................................... 2

*Washington Post Co. v. Gator Corp.*,
    No. civ-02-00909-A (E.D. Va. July 16, 2002) ............................................ 2

## **STATUTES**

28 U.S.C. § 1404 ..................................................................................................... 6

Fed. R. Civ. P. 12(b)(3) ........................................................................................... 6

# **INTRODUCTION**[1]

Sambreel's Opposition is founded upon twin fallacies: that PageRage is a "competitor" to Facebook, and that this case involves anything more than Facebook's lawful enforcement of its Terms of Use.  Labels and legal conclusions cannot mask the true nature of the parties' relationship or the three undisputed facts at the heart of this case:

1. Facebook provides a free social networking service, and its Terms of Use preclude the display of unauthorized third-party ads on that service.

2. Sambreel operates PageRage, an adware program designed ***exclusively*** for use on Facebook that "layers" unauthorized third-party ads over Facebook's service before it is displayed to users.

3. In 2011, Facebook enforced its Terms of Use by refusing to provide its service to users or to do business with advertising providers who used the PageRage adware to "layer" unauthorized third-party ads into Facebook.

Thus, while Sambreel's Complaint is dressed in the trappings of antitrust law, this is not an antitrust case.   No amount of repetition of antitrust buzzwords ("group boycott," "product tying," "anticompetitive") can transform Facebook's attempt to control its own product into anything other than what it was—a protected unilateral refusal to deal with a maker of adware and its enablers.

Sambreel does not even dispute that antitrust law permits Facebook to require third parties, like Sambreel, to follow Facebook's Terms of Use.  Indeed, Sambreel concedes that it was thrown off of the Facebook Platform because "the PageRage functionality was not permitted," Compl. ¶ 24, and it claims no legal wrong from the ouster.  Its Opposition instead retreats to the remarkable proposition that while antitrust law permitted Facebook to refuse to deal with Sambreel directly, Facebook now is somehow barred from enforcing its Terms to prevent the same activity indirectly by denying access to advertising providers and users that facilitate Sambreel's adware.  The law provides for no such thing. Courts in this circuit have ***three times*** rejected antitrust claims based on a website's efforts to block its users from using a third party's products or services.  Sambreel cites ***not one case*** to the contrary.

Sambreel's last line of defense appears to be the claim that Facebook's unilateral refusal to deal is somehow suspect because the PageRage adware program allegedly resides on the end user's computer rather than directly hacking into Facebook's servers.  This is a distinction without a

---

[1] All capitalized and defined terms are given the meaning provided in Facebook Inc.'s Memorandum of Points and Authorities in Support of Motion to Dismiss ("Motion").

difference.  Sambreel's scheme of "indirect dealing" is the equivalent of inserting unauthorized ads and content into the *New York Times*.  It does not matter whether Sambreel tampers with the *Times'* printing press, hijacks its delivery truck, or doctors its newspaper on a subscriber's doorstep.  Similarly, in this case, the only way a Facebook user can interact with Facebook's product is for its webpages to display correctly on the user's computer browser.  That Sambreel alleges its "layering" occurs near the end of the delivery process has no bearing on its legality,[2] and it certainly does not prevent Facebook's actions against those users and advertising providers who ignore binding terms and facilitate prohibited malware and adware.  No legal principle requires Facebook to carry parasitic free-riders, whether they attack directly or indirectly.

Sambreel's frivolous attempt to turn Facebook's garden-variety enforcement of its Terms of Use into a federal antitrust case should be dismissed for the following reasons:

***First***, Sambreel has alleged no facts that remove this case from the realm of a lawful refusal to deal.  *See Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) ("The Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").  In its Opposition, Sambreel attempts to avoid this principle by arguing that (a) it no longer wants a direct, legitimate relationship with Facebook and (b) its Complaint does not use the term "refusal to deal," but rather "group boycott" and "tying agreement."  However, the law disregards Sambreel's labels and assesses the actual conduct alleged, and courts in this circuit have repeatedly affirmed a website's right to refuse to deal with a third party in this context.  *E.g. Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13-14 (N.D. Cal. July 20, 2010) (dismissing antitrust claims and affirming Facebook's right to prohibit users from using a third-party product to access Facebook's service pursuant to its Terms of Use).

***Second***, Sambreel has still failed to identify any antitrust injury to support Counts I-IV.  The

---

[2]  While not necessary for resolving this Motion, Sambreel's admitted "layering" of its own advertisements into a modified version of Facebook's webpage violates the Lanham Act.  *See Hard Rock Cafe Intern. (USA) Inc. v. Morton*, 1999 WL 717995, at *25 (S.D.N.Y. Sept. 9, 1999) (holding that the defendant's attempt to "advertise or sell CDs" in an internet window "framed" within the Hard Rock website violated Hard Rock's trademark rights); *Washington Post Co. v. Gator Corp.*, No. civ-02-00909-A (E.D. Va. July 16, 2002) (enjoining an adware maker from "[a]ltering or modifying" the plaintiffs' website "in any way, including its appearance or how it is displayed").

Ninth Circuit has held that prohibiting the use of a third-party product in connection with one's own online service does not create antitrust injury. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) ("[Plaintiff] does not explain how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on other social networking websites[.]") (emphasis in original). Sambreel attempts to distinguish *LiveUniverse* by suggesting that PageRage suffered greater harm than the plaintiff's product in that case, but this borders on the absurd and can be explained quite succinctly: The product in *LiveUniverse* was designed to be something more than a parasite on *one* social networking service; PageRage was not. The extent of PageRage's alleged injury does not transform it into an antitrust injury and does not reverse the Ninth Circuit's teaching.

*Third*, Sambreel's putative per se claims are square pegs fighting round holes. Contrary to Sambreel's overreaching argument, the facts underlying its group boycott claim (Count I) and product tying claim (Count II) are not "*indistinguishable*" from the facts in *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941) and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), respectively. *Fashion Originators* involved a classic boycott in which 176 competing apparel manufacturers agreed to boycott any retailer nationwide that did not agree to boycott certain other apparel manufacturers. 312 U.S. at 465-67. Here, Sambreel has not alleged that Facebook organized any type of boycott with its horizontal competitors such as MySpace, Google+, or other websites. Stripped of the "boycott" label, Sambreel merely alleges that *Facebook alone* refused to allow users or advertising providers to use or serve ads *on Facebook* if they continued to violate its neutral terms by facilitating Facebook-specific adware like PageRage.

And in *Eastman Kodak*, the Supreme Court invoked the per se rule for product tying because Kodak refused to sell its copier parts unless customers agreed not to buy copier service from *any party besides Kodak*. 504 U.S. at 462-463. Here, Facebook does not force any customer to buy any product, Sambreel admits that Facebook allows numerous third parties to offer what Sambreel defines as "social networking enhancement products," and Sambreel does not allege that Facebook sells any of these so-called "enhancement" products. The heart of Sambreel's "tying" argument is simply an assertion that Facebook cannot exclude *PageRage alone*, which would expand antitrust liability

beyond any known bounds.  *See Power Ventures, Inc.*, 2010 WL 3291750, at *13-14 ("Defendants cite no authority for the proposition that Facebook is somehow obligated to allow third-party websites unfettered access to its own website[.]").

*Fourth*, Sambreel has still failed to allege sufficient facts to support the antitrust "markets" alleged in support of Counts I-IV.  While its Opposition suggests that a plaintiff's burden is merely to *say* that the alleged product market lacks interchangeability, this is not the law.  *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 994-95 (N.D. Cal. 2009) ("Plaintiffs must **plead facts** showing that their product market bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.") (punctuation and alteration omitted).[3]

*Fifth*, Sambreel has not addressed the myriad other reasons its antitrust claims are deficient. Its attempt to rely on the "quick look" doctrine to excuse these basic pleading failures is misplaced. *Cal. ex rel. Brown v. Safeway, Inc.*, 615 F.3d 1171, 1178 (9th Cir. 2010) (explaining that the limited circumstances in which the quick look doctrine may apply).

*Sixth*, none of Sambreel's follow-on state law claims should survive the motion to dismiss. Sambreel ignores federal and state court decisions that have consistently held that allegations which fail under the Sherman Act also fail under California's Section 17200 of the Business and Professions Code ("Section 17200").  Sambreel's tortious interference claims fail because of pleading deficiencies as well as a contract-enforcement privilege apparent from the face of its Complaint.

Finally, for the reasons discussed immediately below, Sambreel's attempt to avoid the scope of Facebook's forum selection clause is meritless.

## ARGUMENT

## I.    SAMBREEL HAS NOT MET ITS BURDEN OF ESTABLISHING VENUE

Sambreel does not deny that it agreed to Facebook's Terms of Use.  And it offers no "compelling and countervailing reason" for refusing to honor Facebook's forum selection clause even though Sambreel "bear[s] a heavy burden" in challenging it.  *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004).  The clause encompasses "any claim, cause of action or dispute

---

[3] All emphases added unless otherwise noted.

(claim) you have with us arising out of or relating to this Statement or Facebook," defined as "the features and services we make available, including through (a) our website at www.facebook.com." *See* Clark Decl. (Doc. No. 22-3), Ex. A §§ 15.1, 17.1.   Sambreel contrives a distinction between claims relating to Facebook's "features and services"—which Sambreel admits fall within the scope of the clause—and its claims concerning group boycott and "gating."   *See* Opp'n at 7-8.   But Sambreel's claims plainly relate to Facebook's "features and services" because the crux of this dispute is about who gets to control Facebook's features and services:   Facebook or Sambreel.

Sambreel admits that its product alters the presentation of Facebook's service.   *See* Compl. ¶¶ 2, 24; Opp'n at 4.   Indeed, the entire premise behind Sambreel's PageRage product is "to display advertising to individuals while they are accessing the Facebook website."   *See* Compl. ¶ 2.   This dispute arises directly from Sambreel's efforts to free-ride on Facebook features and services by "adding layers" of ads and designs when users visit the Facebook website.   Because Sambreel's "antitrust" claims challenge Facebook's response to Sambreel's ad-layering, the claims are directly related to Facebook and thus fully encompassed by the forum selection clause.   Moreover, Sambreel's claims are directly related to the Terms of Use themselves because the purported "group boycott" and "gating" claims are premised on Facebook's enforcement of its Terms.   Sambreel also does not dispute that it agreed to the Terms of Use by accessing Facebook to develop PageRage.

Sambreel's next argument, that forum selection clauses encompass non-contract claims only if their resolution relates to contract interpretation, is similarly unavailing.   *See* Opp'n at 8-9.   "The scope of the claims governed by a forum selection clause depends [on] the language used in the clause."   *Perry v. AT&T Mobility LLC*, 2011 WL 4080625, at *4 (N.D. Cal. Sept. 12, 2011).   In the cases on which Sambreel relies, the forum selection clauses were limited to claims about the particular agreements at issue.[4]   Facebook's clause, conversely, is broad and extends beyond claims relating to the Terms of Use to include "any claim . . . relating to . . . [Facebook's features and services]."   *See*

---

[4]   *See, e.g.*, *Manetti-Farrow, Inc. v. Gucci Amer., Inc.*, 858 F.2d 509, 511 (9th Cir. 1988) (forum-selection clause was limited to "any controversy regarding interpretation or fulfillment of the present contract"); *E. & J. Gallo Winery v. Encana Energy Serv., Inc.*, 1:03-cv-05412-LJO-DLB, Doc. No. 374-3 at 6 (S.D. Cal. Feb. 9, 2005) ("Any legal action, suit or proceeding with respect to this Agreement "); *Ingenieria Alimentaria Del Matatipac S.A. DE C.V. v. Ocean Garden Prods., Inc.*, 3:06-cv-02400-WQH-POR, Doc. No. 5-4 at 10 and Doc. No. 5-5 at 10 (S.D. Cal. Dec. 22, 2006) (identifying the specific agreements for which the clause applied).

*supra* at 4-5.  This language amply covers Sambreel's non-contractual claims.  *See Androutsakos v. M/V PSARA*, 2003 WL 23538012, at *5 (D. Or. July 7, 2003); *Chang Wei Lee v. XO Commc'ns, LLC*, 2012 WL 164080, at *2, *4 (C.D. Cal. Jan. 13, 2012) (holding that clause reached tort claims where its language "[was] not limited to only contract disputes.").

Finally, Sambreel's assertions about its own purportedly conflicting forum selection clause are meritless.  The www.pagerage.com forum-selection clause allegedly in effect when Sambreel filed this action[5] states: "any controversy, claim or dispute arising out of or relating in any way to your use of the Site and Services shall be resolved by final and binding *arbitration*."  Hankinson Decl., Ex. B at 9 (Doc. No. 34-3).  Even were this provision to apply, it offers no reason to avoid dismissal.  First, because it calls for arbitration of disputes, it still provides no basis for venue in this Court.  That Sambreel never asserted the clause reveals the make-weight nature of its invocation in the Opposition.  Second, the terms of this provision plainly exclude Sambreel's claims against Facebook.  It only reaches claims "relating . . . to your [*i.e.*, Facebook's] use of [Sambreel's] Site and Services."  *Id.*  But Sambreel's claims are entirely unrelated to Facebook's alleged use of *Sambreel's* "Site and Services," and instead challenge the way that *Facebook* provides its own service and features.  Sambreel's purported forum selection clause has no application to claims in this case, and this action should be dismissed or transferred to the Northern District of California.[6]

## II.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

### A.  Sambreel Has Identified No Allegations that Differentiate this Case from a Lawful Refusal to Deal (Counts I-IV)

In the Motion, Facebook explained that the antitrust laws protect Facebook's rights to control its product and choose its business partners.  *See Mot. at 12-14.  A key component of these rights is

---

[5]  Sambreel asserts that venue is proper in this Court under the Terms of Service that allegedly remained in effect until December 2011.  *See* Opp'n at 9-10 & 9 n.6.  But the Terms of Service provide that any revisions are incorporated automatically by continued use of the service.
[6]  The cases Sambreel cites are inapposite.  *See* Opp'n at 10.  Three involve motions for a *discretionary* transfer under 28 U.S.C. § 1404—transfer that applies a standard entirely different from that under Fed. R. Civ. P. 12(b)(3), which requires the non-moving party to establish that venue is proper.  *See B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007); *Powerscreen USA LLC v. D&L Equip., Inc.*, 2008 WL 2944994, at *1 (W.D. Ky. July 28, 2008); *Measurement Specialties, Inc. v. Stayhealthy.com*, 275 F. Supp. 2d 638, 640 (E.D. Pa. 2003).  The fourth, *Express Logistics Sys. Corp. v. Eagle Mountain Ventures, LLC*, is an equally irrelevant dispute over a motion to remand.  2004 WL 2445239, at *1 (N.D. Cal. Oct. 29, 2004).

the ability to establish neutral terms and conditions for the use and distribution of its product, and to enforce those terms against violators and free-riders.  *See id.; Pac. Bell Tel. v. Linkline Commc'n,* 129 S. Ct. 1109, 1118 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *see Morris Commc'n Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 195-96 (11th Cir. 2004) (holding that an alleged monopolist's restrictions on the dissemination of its product were valid to prevent free riding).

Sambreel does not seriously dispute these principles, but argues that they are "inapposite" because Sambreel chose to label Facebook's conduct as "group boycott" and "product tying."  *See* Opp'n at 12.  But "[e]specially in the area of antitrust law, labels do not suffice when analysis is necessary." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 492 (1982) (J. Rehnquist, dissenting). The case-dispositive allegations are apparent on the face of Sambreel's Complaint and the documents it references:

- Facebook allows users, application developers, and advertising providers to use its social network if they abide by its Terms of Use.  Compl. ¶ 20; Clark Decl. ¶ 2, Ex. A.[7]

- Facebook can deny access to any party that "violate[s] the letter or spirit of [the Terms of Use]," including "*facilitat[ing]*" any violation.  Clark Decl. ¶ 2, Ex. A.

- The Terms of Use prohibit "show[ing] third-party ads . . . on Facebook" and "do[ing] anything that could . . . impair the proper working of Facebook."  Clark Decl. ¶ 2, Ex. A.

- Sambreel's PageRage adware "layers" unauthorized advertisements into the webpages that users see "while they are accessing the Facebook website."  Compl. ¶ 2.

- Facebook instructed Sambreel that "the PageRage functionality was not permitted as part of the Facebook Platform."  Compl. ¶ 24.

- Sambreel altered its PageRage adware to operate outside of the Facebook Platform.  *Id.*

- In 2011, Facebook allegedly informed advertising providers that they would not be permitted to use Facebook if they used PageRage to "layer" third-party ads.  Compl. ¶ 32.

- In 2011, Facebook allegedly informed users they would not be permitted to access Facebook if they used PageRage to "layer" third-party ads.  Compl. ¶ 38.

Based on Sambreel's own Complaint, Facebook has done nothing more than unilaterally refuse to deal with Sambreel directly (by refusing to allow PageRage on the Facebook Platform) and indirectly (by refusing to provide access to users and ad providers who modify Facebook's service with prohibited

---

[7]   The Clark Declaration attaches Facebook's Terms of Use and related policies, which are incorporated by reference in Sambreel's complaint.  *See* Mot. at 5 n. 4.

adware).  Attaching a different legal label does not change the conclusion.

To avoid dismissal, Sambreel attempts to conjure up a distinction that the case law protects *only* Facebook's refusal to deal with Sambreel directly, not its refusal to deal with "third parties" or "customers" that use PageRage on Facebook.  *See* Opp'n at 12-13.  Sambreel ignores a triad of cases in this circuit holding the opposite in this very industry.  *First*, in *LiveUniverse, Inc. v. MySpace, Inc.*, the plaintiff alleged that MySpace prohibited its users' choice to use the plaintiff's products by "destroy[ing]" *its users*' ability to upload the plaintiff's video products and "delet[ing]" all references and links to the plaintiff's website on the users' MySpace pages.  2007 WL 6865852, at *11 (C.D. Cal. June 4, 2007).  Even assuming that MySpace was an actual monopolist, the court concluded that MySpace's action on its own service was fully sanctioned under the antitrust laws.  *Id.* at *13 ("MySpace may be viewed as merely preventing LiveUniverse from advertising its website free of charge on the MySpace site."), *aff'd* 304 F. App'x 559, 556-57 (9th Cir. 2008).

*Second*, in *Universal Grading Service v. eBay, Inc.*, eBay prevented users from selling coins as "certified" unless one of five approved coin-grading services had graded them, and actively removed *users' listings* for "certified" coins graded by other coin grading services.  2011 WL 846060, at *2 (N.D. Cal. Mar. 8, 2011).  In response to a class complaint on behalf of blacklisted grading services, users with excluded listings, and consumers claiming increased coin prices, the court dismissed all antitrust claims.  *Id.* at * 3.  Even assuming that eBay was a monopolist, the court explained:  "eBay's Policy could be described generally as eBay's refusal to deal with coin grading companies who attempt to list coins as 'certified' although they have not been so designated under eBays' Policy.  But a refusal to deal by itself cannot establish an antitrust injury."  *Id.* at *9.

*Third*, in *Power Ventures*, Facebook users sought to use a third-party product from Power.com that purported to allow them to aggregate their social networking data through a single portal.  2010 WL 3291750, at *13.  After Facebook enforced its Terms of Use that "prohibit[ed] *users* from logging into Facebook through third-party websites, such as Power.com," Power.com brought antitrust claims against Facebook.  *Id.* at *13.  Relying specifically on *Facebook's* "*right to manage access to and use of its website*," the district court dismissed the claims and affirmed Facebook's enforcement of its Terms of Use.  *Id.* at *14 ("Defendants cite no authority for the proposition that Facebook is somehow

obligated to allow third-party websites unfettered access to its own website simply because some other third-party websites grant that privilege to Facebook.").

**B.    Sambreel Fails to Distinguish Ninth Circuit Case Law Requiring Dismissal of this Complaint for Lack of Antitrust Injury (Counts I-IV)**

Antitrust injury requires injury to competition, and the inability to use PageRage to modify and impair Facebook's service simply does not qualify under Ninth Circuit law.  *See* Mot. at 14-16; *LiveUniverse*, 304 F. App'x at 557.  In response, Sambreel argues (a) that antitrust injury does not actually require injury to competition; (b) that asserting a boycott or tying agreement removes the need to plead antitrust injury; and (c) that Sambreel has adequately alleged "increased prices for advertisers, the elimination of a direct low-cost competitor, and reduced choice for consumers."  *See* Opp'n at 12-17.  None of these arguments hold water.

*First*, Sambreel's suggestion that requiring "harm to competition" is the "incorrect legal standard" is puzzling given that courts in this circuit have repeatedly endorsed it.  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008) ("[T]he antitrust laws' prohibitions focus on protecting the competitive process and not on the success or failure of individual competitors."); *LiveUniverse*, 304 F. App'x at 557 ("Antitrust injury is injury of the type the antitrust laws were intended to prevent, which means harm to the process of competition and consumer welfare, not harm to individual competitors.") (citations and punctuation omitted); *Blind Doctor*, 59 Fed. R. Serv. 3d 635, 2004 WL 1976562, at *8 (N.D. Cal. Sept. 7, 2004); *see also* Mot. at 14-15.[8]

*Second*, Sambreel cannot avoid pleading antitrust injury by merely attaching labels to Facebook's conduct.  Sambreel spends several paragraphs arguing the following tautology:  (a) courts have found that group boycotts and product tying cases involve antitrust injury; (b) Sambreel has alleged both of those claims; (c) thus, Sambreel has pled antitrust injury.  *See* Opp'n at 14-15.  But

---

[8] Sambreel cites two cases for its argument in favor of a different legal standard based on mere "injury to the plaintiff."  *See* Opp'n at 13.  The Supreme Court's decision in *McCready,* 457 U.S. at 482-83 stated only that a plaintiff need not show a "lessening of competition" in the form of being "driven from the market" or raised prices, and then described in detail how the anticompetitive scheme at issue reduced the plaintiff's options for selecting among medical practitioners.  The Fifth Circuit's decision in *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) held specifically that the standing inquiry entails a check on whether the lawsuit would serve antitrust law's goal of "assist[ing] competition, not competitors."  *Id.*  ("Otherwise ordinary tort and contract actions have inspired 'antitrust' lawsuits that do not fulfill these goals.").

even where a plaintiff has adequately pled an antitrust claim, courts must independently analyze whether the alleged injury is the type of harm that Congress intended to remedy with the antitrust laws.  *See LiveUniverse*, 304 F. App'x at 557; *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003).  Antitrust injury serves the gate-keeping role of ensuring that standard contract and tort disputes are not improperly elevated to treble-damages federal antitrust cases.

**Third**, Sambreel cannot escape the *LiveUniverse* and *Universal Grading* decisions applying the doctrine of antitrust injury in ***this specific context***.  Like Sambreel, the plaintiff in *LiveUniverse* alleged that MySpace—an assumed monopolist—harmed its business and reduced consumer options by refusing to allow MySpace users to upload the plaintiff's videos or share its links.  *LiveUniverse*, 304 F. App'x at 557; *LiveUniverse*, 2007 WL 6865852, at *11.  The Ninth Circuit affirmed the complaint's dismissal, explaining that "LiveUniverse does not explain how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on *other* social networking websites[.]"  304 F. App'x at 557 (emphasis in original).  Sambreel argues that its theory of antitrust injury is "vastly different" because "MySpace's actions did not prevent LiveUniverse from offering its product," while "Sambreel alleges that Facebook has interfered with Sambreel's ability to operate its product *at all*."  *See* Opp'n at 16 (emphasis in original).  Of course, the only basis for this "distinction" is that LiveUniverse created a standalone product and website, while Sambreel designed PageRage to be a Facebook-exclusive adware parasite with no independent utility.  This is not the type of "competition" the Sherman Act was intended to foster; *LiveUniverse* is controlling.[9]

**Fourth**, Sambreel does not have standing to assert its claimed injury for "increased prices for advertisers."  Sambreel does not claim to be an advertiser whose ads are directed at Facebook users, and it is thus not the proper party for such a claim.  *See* Mot. at 16, n. 12; *Hairston v. Pacific 10 Conf.*, 101 F.3d 1315, 1322 (9th Cir. 1996) (explaining that "the existence of other, more appropriate

---

[9] Sambreel also suggests that the *Universal Grading* decision is distinguishable because it was about an exclusionary policy that rendered eBay "safer" and "too good."  *See* Opp'n at 16.  While Sambreel's reasoning is hard to follow, the *Universal Grading* court was less ambiguous about the significance of antitrust injury: "eBay's Policy could be described generally as eBay's refusal to deal with coin grading companies who attempt to list coins as 'certified' although they have not been so designated under eBays' Policy. . . . [P]laintiffs do not explain how eBay's actions *on its own website* can reduce consumers' choices or diminish the quality of their experience on other auction websites and thus cause antitrust injury."  2011 WL 846060, at *9.

plaintiffs" weighs against antitrust standing).  Moreover, the purported injury is still tied to advertising *on facebook.com*, which again implicates the heart of the Ninth Circuit's reasoning in *LiveUniverse*: Nothing about Facebook's attempt to limit adware on *its own website* prevents Sambreel, consumers, or advertisers from using such adware on "*other* social networking websites" or other websites generally.  *LiveUniverse,* 304 F. App'x at 557.  Any impairment to Sambreel's Facebook-specific scheme is not the type of injury that the antitrust laws were intended to remedy.

### C.  Sambreel Has Not Pled a Per Se Claim under Section 1 (Counts I & II)

Separate and independent from the dispositive issues above, Sambreel has not pled a per se claim for group boycott (Count I) or product tying (Count II).  *See* Mot. at 16-21.  While Sambreel asserts that this case is "indistinguishable" from the classic cases in those categories, *see* Opp'n at 3, even a superficial analysis reveals otherwise.  In truth, Sambreel is asking this Court to expand the range of conduct deemed per se illegal far beyond currently recognized bounds.  *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and *lack* . . . *any redeeming virtue*.").

### 1.  Sambreel Has Not Pled a Group Boycott between Horizontal Competitors

Sambreel has not alleged a per se group boycott, and a simple comparison with the boycott case that Sambreel claims to be indistinguishable, *Fashion Originators*, 312 U.S. 457, shows why.

In *Fashion Originators*, the Supreme Court confronted a true group boycott.  *Id.* at 461-62. The boycott involved *176 competing manufacturers* of high-end women's clothing that banded together and agreed not to sell their products to any retail stores that stocked lower-priced garments. *Id.* "As a result of their efforts, approximately *12,000 retailers* throughout the country [] signed agreements to 'cooperate' with the [high-end manufacturers'] boycott program," which was rigorously monitored and enforced.  *Id.*  The Court explained that the cartel of manufacturers "is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations[.]" *Id.* at 465.  To put it mildly, Facebook's unilateral regulation of access to *its own website* is "distinguishable," and it does not implicate the per se rule for the following reasons.

*First*, Sambreel has failed to allege a horizontal boycott among direct competitors as found in

*Fashion Originators*.  *See Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("The Supreme Court has found that the per se rule for group boycotts should be limited to cases 'involving horizontal agreements among direct competitors.'").  Unlike those 176 competing apparel manufacturers, Facebook has not entered into any type of agreement with its direct competitors:  MySpace, Google+, or any other website.  Facebook has merely set neutral terms for how third parties may use Facebook's own website.  Sambreel attempts to plead around this glaring fact by arguing that application developers that offer their applications through the Facebook Platform are actually Facebook's "direct competitors" for purposes of per se liability because they also serve advertisements.[10]  But using Sambreel's example of *Fashion Originators*, it defies common sense to suggest that Facebook and application developers are horizontal competitors like the adversarial garment manufacturers in that case.  Sambreel's Complaint admits that Facebook offers a platform for developers to "**distribute**" their products, Compl. ¶ 19, and even alleges that Facebook and the developers operate in separate product markets, *id* ¶¶ 74-75.  Labels aside, Sambreel has alleged a classic **vertical** relationship in which Facebook provides a forum, the developers use that forum, and both parties benefit.  *See Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730 (1988) (holding that alleged restraints "imposed by agreement between firms at different levels of distribution [are] **vertical**").

**Second**, Sambreel still has not identified a boycott agreement sufficient to withstand a *Twombly* analysis.  In the Opposition, Sambreel suggests the agreements in question are "the agreements by application developers to abide by Facebook's terms."  *See* Opp'n at 18.  But Facebook's Terms of Use bear no passing resemblance to the group boycott agreement in *Fashion Originators* involving hundreds of manufacturers and thousands of retail stores.  Sambreel appears to be relying solely on the allegation that Facebook's Terms require application developers to use advertising providers on a list approved by Facebook for advertising within their applications on ***facebook.com***.  But it is not a "group boycott" agreement to establish terms of use for one's website; it is a fully protected right under antitrust law.  *E.g. Universal Grading*, 2011 WL 846060, at *7

---

[10] Sambreel's complaint arguably suggests that advertising providers are also Facebook's horizontal competitors.  However, Facebook's Motion explained how the relationship between Facebook and advertising providers is vertical, *see* Mot. at 17, which Sambreel did not dispute, *see* Opp'n at 19.

(dismissing group boycott claim premised on eBay's policy against listing coins as "certified" on its website if graded by grading services not approved by eBay); *see also Power Ventures*, 2010 WL 3291750, at *13-14.

**Third**, even if Sambreel had identified a true group boycott agreement between horizontal competitors, its theory plainly does not fit the Ninth Circuit's additional *Adaptive Power* factors for the per se rule.[11]   *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co*., 141 F.3d 947, 950 (9th Cir. 1998).   Sambreel has not alleged that the "boycott" had the effect of "cut[ting] off access to a supply, facility, or market necessary to enable [Sambreel] to compete."  *Id.*   Moreover, while Sambreel alleges that seven advertising providers constituting 80% of PageRage's revenues **at the time** agreed to stop "layering" ads on Facebook, it does **not** allege that the networks that elected to discontinue their status as advertising providers or other networks were unable to immediately replace this revenue and maintain Sambreel's scheme—an omission that appears to be deliberate.[12]

Sambreel has also failed to plead that Facebook had a "dominant market position" by allegedly holding only a 28 percent share of the purported market for "display advertising."  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 (1984) (finding that a 30 percent market share "does not establish the kind of **dominant market position** that obviates the need" for a rule-of-reason analysis); *Rebel Oil Co., Inc. v. Atl. Rich. Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[M]arket share of 30 percent is presumptively insufficient to establish the power to control price.").   Contrary to Sambreel's presumptuous suggestion, neither the *Jefferson Parish* court nor the *Rebel Oil* court confused the 30 percent threshold with monopoly power.  *Id.*

Finally, Sambreel has no response to the argument that Facebook's enforcement of its Terms of Use has a pro-competitive justification on the face of the Complaint.  *See* Mot. at 19; Opp'n at 21.

---

[11] Tellingly, Sambreel strenuously argues that the *Adaptive Power* factors are optional.  Of course, the *Adaptive Power* court itself said that "[a]bsent such a showing, the category of activities comprising group boycotts is not to be expanded indiscriminately," 141 F.3d at 950, and none of the subsequent cases cited by Sambreel reverse that instruction.  *See also In re Beer Antitrust Litig.* 2002 WL 1285320, at *5 (N.D. Cal. April 3, 2002) (citing *Adaptive Power* for the proposition that "**an essential element** of a per se boycott claim is that the boycott cuts off access to a supply, facility or market necessary to enable the victim firm to compete").

[12] If this case were not dismissed, the evidence would show Sambreel's characterization of its "boycott" injury in the complaint to be misleading, as its internal documents show that PageRage revenues actually ***increased*** from July through November 2011 throughout the "boycott" period.

Facebook prevented an adware maker from "layering" ads into its own service.  If such "boycotts" were not permissible, then true competition on the internet would be stifled because legitimate websites would have no incentive to develop and improve their un-protectable products.  Indeed, the fact that Sambreel has **no response** to this obvious pro-competitive justification for Facebook's conduct underscores how very far removed this case is from the Sherman Act's true concerns.

### 2.     Sambreel Has Not Pled a Negative Tying Agreement

Sambreel also has not alleged per se illegal tying, and a comparison with the tying case that Sambreel claims to be indistinguishable, *Eastman Kodak*, 504 U.S. 451, again shows why.[13]

In that case, the Supreme Court addressed a true "negative tying" agreement.  *Id.* at 462-63.  As the Court explained, "[a] tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or ***at least agrees that he will not purchase that product from any other supplier***."  *Id.*  After reviewing the record, the Court found sufficient evidence for the application of the per se illegality rule because Kodak conditioned its sale of copier parts on the customer's agreement not to buy service from any other supplier besides Kodak.  *Id.*

By contrast, Sambreel does not allege that Facebook prohibited users from purchasing "social networking enhancement products" from "any other supplier."  Sambreel readily admits that Facebook allows numerous third-party application developers to provide "social networking enhancement products"[14] to Facebook users.  *See* Compl. ¶¶ 56-58, 73-75.  But instead of acknowledging that this critical distinction with *Eastman Kodak* defeats its claim, Sambreel dismisses the existing limitation

---

[13] As discussed in the Motion, the per se rule is not even applicable to this case pursuant to *U.S. v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001).  *See* Mot. at 20.  Sambreel attempts to distinguish that case by suggesting Microsoft's conduct (forcing consumers to buy tied software) is somehow less coercive or problematic for antitrust purposes than Facebook's alleged conduct (enforcing its rules to preclude the use of one adware product on its own service).  *See* Opp'n at 23.  If anything, these factual differences further support the inapplicability of the per se rule.

[14] Sambreel's attempt to gerrymander separate product markets for "social networking enhancement products" (whatever those may be) and "social networks" must also fail.  While Sambreel relies heavily on the *Eastman Kodak* court's statement that complementary products *can* constitute separate markets, the Court in fact endorsed its earlier decision in *Jefferson Parish*, which established the "character of demand" test for tying claims.  *See Rick-Mik Enters., Inc. v. Equilon Enter. LLC*, 532 F.3d 963, 975 (9th Cir. 2008).  Here, because no reasonable consumer would buy Sambreel's "Facebook layouts" if those same layouts were offered as part of Facebook itself, there is no independent demand and no separate product markets. *See id.*  Stripped of its labels, Sambreel is actually arguing that *a modified version of Facebook* (Sambreel's unauthorized version) competes in a separate product market from Facebook itself, which is nonsensical.

on per se liability as mere **"loose language" by the Supreme Court**.  *See* Opp'n at 25 n. 16.  In attributing such carelessness to the Court, Sambreel does not identify a single case holding that the refusal to allow customers to use one supplier's "complementary" product is a per se tying agreement, nor does it address the many cases that continue to follow the Supreme Court's rule.[15]  Sambreel simply asks this Court to break new ground by expanding per se illegality beyond *Eastman Kodak* in a way that would have profound consequences for the internet and other industries.[16]

More generally, this is simply not a product tying case.  Stripped of legal conclusions and labels, the Complaint does not allege that Facebook used its social network to force users (or anyone else) to buy any product from Facebook like the defendant did in *Eastman Kodak*.  Facebook has simply established neutral rules for use of its online service, and enforced those rules against users who seek to use products that violate them.  This Court need not ignore the reality of the situation when it is so apparent on the face of the Complaint.  *See* Compl. ¶ 2 (admitting that PageRage adware "layers" advertisements not approved by Facebook into the webpages that users see "while they are accessing the Facebook website").  This is not a per se illegal tying of products.

### D.   Sambreel Has Not Justified Its Failure to Plead a Market (Counts I-IV)

As discussed in the Motion, Sambreel has not adequately pled any of its various gerrymandered markets.  *See* Mot. at 21-25.  Nothing in the Opposition changes this conclusion.

**Advertising "Markets"**:  According to Sambreel, because the Complaint **says** that advertising within the alleged markets for "online display advertising" and "display advertising impressions to social media users" is not reasonably interchangeable with other advertising, this Court must accept the existence of separate antitrust markets.  *See* Opp'n at 25-26.  Not so.  "Plaintiffs must **plead facts** showing that their product market bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, **and it must be plausible**."  *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d at 994-95

---

[15] *E.g. Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 685 (4th Cir. 1992) ("[A]ntitrust conspiracy requires evidence of a tying agreement pursuant to which . . . the buyer at least agrees that he will not purchase [repair services] **from any other supplier.**"); *In2 Networks, Inc. v. Honeywell Intern.*, 2011 WL 4842557, at *8 (D. Utah 2011) ("This type of 'negative tie' can be the basis of a tying claim if the buyer agrees that he will not purchase [the tied product] **from any other supplier**.").

[16] For example, under Sambreel's interpretation, any time a website-owner blocks users with malicious software from accessing its website, the operator of the malicious software would have an antitrust claim for per se product tying sufficient to withstand a motion to dismiss.

(punctuation and citation omitted).  This requires "***factual allegations*** detailing the distinct nature of the relevant product market, the relevant product's difference from other products, and the relevant product's consumer base[.]"  *Head-Wear Techs., LLC v. Oticon, Inc.*, 551 F. Supp. 2d 1272, 1278 (N.D. Okla. 2008).

Sambreel has failed to plead such facts.  Sambreel offers no factual allegations suggesting ***why*** a price increase in online display advertising would not result in advertisers shifting their budgets to online search advertising or offline display advertising, and it certainly provides no explanation of how attaching the vague "social media" label to some websites prevents other websites from acting as ***reasonable*** substitutes for advertising.  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (rejecting a proposed market on the pleadings and explaining that if a "product is ***roughly equivalent*** to another for the use to which it is put," those products are "reasonably interchangeable" and fall within the same market).  Sambreel's labels and conclusions do not survive *Twombly* because "they merely restate a commonly used test for market definition without providing any factual basis for the claim."  *Apple, Inc. v. PsyStar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).

**Social Networking "Market"**:   Social networking is not an antitrust market because social networks are offered for free.  By definition, an antitrust market must be a "grouping of sales [by] sellers," *Rebel Oil*, 51 F.3d at 1434, and providing free online services does not qualify, even if the services "may lead to revenue from other sources."  *Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at *5 (N.D. Cal. March 16, 2007).  The antitrust laws are concerned with consumer welfare in the form of product pricing.  Extending them to regulate completely free products on the internet does not make economic sense.

**E.    Sambreel's Antitrust Claims Remain Deficient for a Variety of Other Reasons**

**1.    Sambreel Has Not Stated a Section 2 Monopolization Claim (Count III)**

Sambreel argues that the necessary "exclusionary conduct" element of a monopolization claim is ***always*** satisfied in cases involving "an alleged boycott or tying agreement."  *See* Opp'n at 28.  Once again, this is impermissible pleading-by-label.  The factual allegations in this case are nearly identical to the allegations of "exclusionary conduct" previously ***rejected*** by the courts.  *E.g. LiveUniverse*, 2007 WL 6865852, at *11 (finding no exclusionary conduct where MySpace "destroyed" its users'

ability to upload the plaintiff's video products and share the plaintiff's links on the MySpace service).[17]   Sambreel tries to distinguish *LiveUniverse* by suggesting that it only sanctions prohibitions against a third party's "advertising" on the defendant's website, not prohibitions against the use of a third-party's product.  *See* Opp'n at 28.  But the facts of *LiveUniverse* were not so limited, *see* 2007 WL 6865852, at *11 (noting that MySpace "destroyed" its users' ability to upload the plaintiff's video products); nor is the rest of the case law, s*ee Power Ventures*, 2010 WL 3291750, at *13-14 (finding no exclusionary conduct and affirming Facebook's right to prohibit users from using a third-party product to access Facebook).  Controlling access to one's own website based on neutral terms and conditions is not exclusionary conduct under the antitrust laws. *Id.* Accordingly, Sambreel's Count III monopolization claim must be dismissed for failure to plead (a) antitrust injury, *see supra* at 9-11; (b) a cognizable market, *see supra* at 15-16; and (c) exclusionary conduct.

### 2.  Sambreel Has Not Stated a Section 2 Attempted Monopolization Claim (Count IV)

Because Sambreel does not dispute that an attempted monopolization claim also requires a showing of exclusionary conduct, s*ee* Opp'n at 29, its Count IV claim fails for each of the reasons listed above.  Separately and independently, Sambreel's allegation that Facebook possessed only a 28 percent share of the purported market likewise bars the claim.  *See* Mot. at 19, 27; *Jefferson Parish*, 466 U.S. at 27 n.43 ("[T]his Court has found that market shares comparable to [30 percent] do not create an unacceptable likelihood of anticompetitive conduct."); *Rebel Oil*, 51 F.3d at 1438 (9th Cir. 1995) ("[M]arket share of 30 percent is presumptively insufficient to establish the power to control price [for attempted monopolization].").   In its Opposition, Sambreel **ignores** these controlling decisions and attempts to rely on one **earlier** case that arguably suggests, without actually holding, that a lower market share is sufficient.  Opp'n at 29.  Sambreel cannot cavalierly invite this Court to disregard intervening precedent from the Supreme Court and the Ninth Circuit.

### 3.  Neither the Rule of Reason Nor the "Quick Look" Doctrine Can Save Sambreel's Section 1 Claims (Counts I & II)

The rule of reason requires a plaintiff to plead (a) "market power within a relevant market" and

---

[17] *See also Universal Grading*, 2011 WL 846060, at *9 (dismissing a monopolization claim premised on "eBay's refusal to deal with coin grading companies who attempt to list coins as 'certified' although they have not been so designated under eBays' Policy.").

(b) "significant anticompetitive effects" in that market.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).  Sambreel has not pled any cognizable market, *see supra* at 15-16, and its allegation that Facebook held 28 percent of the online display ad market precludes a finding of market power, *see supra* at 13.  Moreover, Sambreel has not identified "significant anticompetitive effects" because, for all the reasons discussed above, antitrust law does not concern itself with a party's rules for accessing ***its own website***.  *E.g. LiveUniverse*, 304 F. App'x at 557.

Finally, Sambreel cannot avoid dismissal by using the phrase "quick look" in its Complaint. The quick-look doctrine is neither procedurally nor substantively applicable.  Procedurally, the quick-look doctrine does not alter the well-established pleading standards for Section 1 claims, as courts consistently apply it at the evidentiary stage.  *See, e.g., Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1266 (C.D. Cal. 2000) (considering a summary-judgment motion and rejecting the quick-look doctrine because "these facts do not demonstrate the kind of drastic effect on price or output that would warrant application of the quick look analysis").[18]  Substantively, the quick-look doctrine applies only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Safeway, Inc.*, 2011 WL 2684942, at *16.  It is "best reserved for circumstances where the restraint is sufficiently threatening to place it ***presumptively in the per se class***, but lack of judicial experience requires at least some consideration of proffered defenses or justifications."  *Safeway, Inc.*, 615 F.3d at 1178.  This is plainly not such a case.

### F.    None of Sambreel's State Law Claims Survive Facebook's Motion to Dismiss

#### 1.    Sambreel Has Not Properly Pled A Violation of Section 17200 (Count V)

"Unlawful" Violation:   Sambreel has not properly alleged that an "unlawful" violation of Section 17200 based on its assertion that Facebook's "gating" of its users violated California Penal Code Section 502(c)(7).  *See* Compl. ¶ 95.  Sambreel does not allege that Facebook hacked into Sambreel's servers.  Stripped of legal conclusions, the Complaint suggests only that Facebook used

---

[18] *See also Cal. ex rel. Harris v. Safeway, Inc.*, 2011 WL 2684942, at *16 (9th Cir. July 12, 2011) (reversing the panel's application of quick-look analysis to a summary judgment motion due to the lack of "evidence of actual anticompetitive impact on pricing"); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1121 (E.D. Cal. 2002) (rejecting quick-look analysis in reviewing a summary judgment motion due to the "absence of clear anticompetitive effect" of the agreement).

standard diagnostic tools to determine whether users accessing Facebook's website had signs of adware pollution on their browsers. But to plead a Section 502(c)(7) violation, courts have consistently held that a plaintiff must allege the defendant accessed a user's computer without permission "in a manner that overcomes technical or code-based barriers." *Power Ventures*, 2010 WL 3291750, at *11; *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 716 (N.D. Cal. 2011). Sambreel does not deny that these allegations are absent from its Complaint. *See* Opp'n at 32-33.

Instead, in its Opposition, Sambreel incorrectly argues that the "overcomes barriers" standard applies only to "public computers." *Id.* at 33. As explained in *Power Ventures*, this standard is necessary to save Section 502(c)(7) from being void for vagueness. *See Power Ventures*, Inc., 2010 WL 3291750 at *11 (N.D. Cal. 2010). Without drawing a distinction between public and private computers, courts have stated that the statute "***must be read*** to limit criminal liability to circumstances in which a user gains access to a computer, computer network, *or* website to which access was restricted through technological means." *In re Facebook*, 791 F. Supp. at 716.[19]

**"Unfair" Violation:** Nor has Sambreel properly alleged an "unfair" violation of Section 17200 because its alleged "unfair" activity is coextensive with the conduct supporting its Sherman Act claims. *See* Compl. ¶ 94. In its Opposition, Sambreel argues that Facebook "ignores" *Cel-Tech Commc'n, Inc., v. L.A. Cellular Tele. Co.*, 20 Cal. 4th 163 (Cal. 1999). Opp'n at 32. Not true. Facebook relies on post *Cel-Tech* decisions, including from the Ninth Circuit, which conclude that where "the same conduct is alleged to support both a plaintiff's federal antitrust claims and a state-law unfair competition claims, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition." *LiveUniverse, Inc.*, 304 F. App'x at 558. The Ninth Circuit considered *Cel-Tech* in reaching its decision as the *LiveUniverse* plaintiff unsuccessfully relied on *Cel-Tech*. *See* Opening Br. of Appellant at 41, 2008 WL 2559160, at *41 (9th Cir. 2008). Moreover, post-*Cel-Tech* California

---

[19] Sambreel's reliance on *People v. Lawton*, 48 Cal. App. 4th Supp. 11 (1996), as a basis for not applying the "technical or code-based barriers" standard is misplaced. In *Lawton*, the defendant used a public computer terminal to "'bypass security and penetrate levels of software not open to the public' and his offense lay in such bypassing and penetration." *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 35 (2007) (discussing *Lawton*). As *Chrisman* made clear, the criminal act in *Lawton* was the "bypassing and penetration," not simply accessing "levels of software not open to the public." *Id.* Thus, Sambreel's only purported case for this private-public distinction undercuts its argument, as the defendants' conduct in *Lawton* violated the *Power Ventures* standard.

1    appellate courts agree with the Ninth Circuit's reasoning:

2        [T]he determination that the conduct is not an unreasonable restraint of trade necessarily
3        implies that the conduct is not 'unfair' toward consumers.  To permit a separate inquiry into
         essentially the same question under the unfair competition law would only invite conflict and
4        uncertainty[.]

5    *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) (citing *Cel-Tech*); *see also SC Manuf'd*

6    *Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 93 (2008).

7                    **2.      Sambreel Has Not Pled a Tortious Interference Claim (Counts VI & VII)**

8            This Court should dismiss Sambreel's tortious interference with contract claim.  ***First***,

9    Sambreel cannot rely solely on "upon information and belief" that Facebook was allegedly aware of

10   Sambreel's contracts with eight advertisers, a necessary element of its tortious interference claim.  "In

11   the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to

12   survive a motion to dismiss for failure to state a claim."  *Solis v. City of Fresno*, 2012 WL 868681, at

13   *8 (E.D. Cal. March 13, 2012).  Sambreel does not attempt to distinguish or even mention the *Solis*

14   decision in its Opposition, which was quoted in the Motion.

15           ***Second***, California's privilege to enforce one's own contracts protects Facebook's alleged

16   actions.  As Sambreel concedes in its Opposition, a court may dismiss a complaint based on an

17   affirmative defense if that defense "appears on the face of the pleading."  *McCalden v. Cal. Lib. Ass'n*,

18   955 F.2d 1214, 1219 (9th Cir. 1990); Opp'n at 34.  Sambreel specifically alleges that Facebook

19   entered "agreements" with advertising networks that allow Facebook to condition their status as

20   advertising providers on compliance with Facebook's neutral terms, and that "Facebook ***used these***

21   ***agreements*** to coerce [advertising networks] to cease doing business with" Sambreel based on

22   PageRage's prohibited ad-layering.  *See* Compl. ¶¶ 21-22, 32.  Thus, Facebook's alleged "coercion"

23   was its protected enforcement of its own preexisting contracts.  *See supra* at 7.[20]

24                                    **CONCLUSION**

25           For these reasons and all the reasons discussed in the Motion, Sambreel's Complaint should be

26   dismissed.

27   _____

28   [20]  In its Opposition, Sambreel confirms that its tortious interference with prospective economic
     advantage claim (count VII) is based solely on "Facebook's group boycott and gating campaigns."
     Opp'n at 35.  As explained in the Motion, because Sambreel's allegations for those claims are
     deficient, this claim fails as well.  Mot. at 31.

DATED:  June 15, 2012          Respectfully submitted,

                                KIRKLAND & ELLIS LLP


                                *s/ James F. Basile*
                                James F. Basile
                                Elizabeth L. Deeley
                                Mark E. McKane
                                Adam L. Gray
                                Susan Marie Davies

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2012, I electronically filed the foregoing **REPLY BRIEF IN SUPPORT OF FACEBOOK'S MOTION TO DISMISS COMPLAINT** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Court's Electronic Mail Notice List and by overnight mail delivery to the following:

Daniel Kotchen
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037


DATED: June 15, 2012                          By: _s/  James F. Basile_____
                                                            James F. Basile