James F. Basile (SBN 228965)
james.basile@kirkland.com
Elizabeth L. Deeley (SBN 230798)
elizabeth.deeley@kirkland.com
Adam L. Gray (SBN 262557)
adam.gray@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Susan Davies (Admitted *pro hac vice*)
susan.davies@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Attorneys for Defendant
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | CASE NO. 12-CV-00668-CAB-KSC<br><br>**REDACTED COPY**<br><br>**DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:      Hon. Cathy Ann Bencivengo<br>Hearing Date:  August 9, 2012<br>Hearing Time:  10:00 a.m.<br>Dept.:      Courtroom 2<br><br>**ORAL ARGUMENT REQUESTED SUBJECT TO COURT APPROVAL** |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................5

    A.    Facebook's Innovative Approach to Advertising Enhances the User Experience.........................................................................................5

    B.    Through the Pro-Competitive Facebook Platform, Facebook Encourages Third Parties to Benefit from Its Social Networking Service Free of Charge .................7

    C.    Sambreel's "PageRage" Adware Was Removed from the Facebook Platform Because It Did Not Comply with Facebook's Terms ............................................7

    D.    PageRage Continues to Inject Ads Directly into Facebook's Service and Violate Numerous Facebook Terms and Policies .....................................................9

    E.    Many Facebook Users Do Not "Choose" to Use PageRage, and They Complain Vociferously about It.........................................................................11

    F.    Facebook Defended Its Service, and Sambreel Responded with this Lawsuit ......14

LEGAL STANDARD...........................................................................................15

ARGUMENT .......................................................................................................16

I.    SAMBREEL CANNOT SHOW A "LIKELIHOOD" OF SUCCESS ON ANY CLAIM.................................................................................................16

    A.    All of Sambreel's Antitrust Claims Fail Because Sambreel Has Not Offered Evidence of a Cognizable Antitrust Injury (Counts I-IV) .....................................16

    B.    Sambreel's Section 2 Monopolization Claims Are Meritless and Unsupported (Counts III & IV) ...........................................................................17

        1.    Sambreel's Theory of "Exclusionary Conduct" Has Been Rejected ........17

        2.    Sambreel Has Not Presented Evidence that Facebook Has Power in Any Cognizable Antitrust Market...............................................................19

    C.    Sambreel's Section 1 Group Boycott and Tying Claims Are Meritless and Unsupported (Counts I & II)........................................................................22

        1.    Sambreel Has Not Shown an Illegal "Group Boycott" (Count I).............22

        2.    Sambreel Has Not Shown Illegal Tying (Count II) ................................24

    D.    Sambreel's Unfair Competition Claim (Count V) Is Meritless and Unsupported.................................................................................................25

    E.    All of Sambreel's Claims Are Barred by the Communications Decency Act ......26

1                  1.    Facebook's Efforts to Restrict Sambreel's Adware Are Immunized by Section 230(c)(2) of the CDA ................................................27

2                  2.    Application of CDA Immunity Bars All of Sambreel's Claims ................28

II.    THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS DENIAL OF THE INJUNCTION ................................................................29

      A.    The PageRage Adware Impairs Facebook's Business Model ...............................29

      B.    The Injunction Would Reward Sambreel's Dishonest and Unlawful Conduct .....30

      C.    The Requested Injunction Would Encourage Similar Free-Riders .......................31

III.    THE PUBLIC INTEREST REQUIRES DENIAL OF THE INJUNCTION ....................31

IV.    SAMBREEL CANNOT SHOW A "LIKELIHOOD" OF IRREPARABLE HARM .......33

      A.    Sambreel's Delay in Bringing Suit Bars a Preliminary Injunction .......................33

      B.    Monetary Damages Will Fully Compensate any Purported Injury, as Sambreel Admits that Its Business Will Survive Absent an Injunction ...............................34

CONCLUSION .................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.,*
141 F.3d 947 (9th Cir. 1998)................................................................... 23

*Adler v. Fed. Republic of Nigeria,*
219 F.3d 869 (9th Cir. 2000)................................................................... 30

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
750 F.2d 1470 (9th Cir. 1985)........................................................... 5, 34

*Am. Promo. Events, Inc. v. City and County of Honolulu,*
796 F. Supp. 2d 1261 (D. Haw. 2011) ................................................... 34

*Amylin Pharms., Inc. v. Eli Lilly and Co.,*
2011 WL 5237558 (S.D. Cal. Jun. 8, 2011).......................................... 34

*Asia Econ. Inst. v. Xcentric Ventures LLC,*
2011 WL 2469822 (C.D. Cal. May 4, 2011).......................................... 28

*Baker v. Ark. Blue Cross,*
2009 WL 764885 (N.D. Cal. Mar. 19, 2009) .............................. 5, 33, 34

*Barton v. District of Columbia,*
131 F. Supp. 2d 236 (D.D.C. 2001) ....................................................... 35

*Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.,*
1994 WL 125173 (N.D. Cal. Mar. 31, 1994).......................................... 34

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) ................................................................................ 22

*Bristol Tech., Inc. v. Microsoft Corp.,*
42 F. Supp. 2d 153 (D. Conn. 1998) ...................................................... 20

*Brown Shoe Co. v. U.S.,*
370 U.S. 294 (1962) .......................................................................... 19, 20

*Bus. Elec. Corp. v. Sharp Elec. Corp.,*
485 U.S. 717 (1988) .......................................................................... 22, 23

*Carlson Cos., Inc. v. Sperry & Hutchinson Co.,*
374 F. Supp. 1080 (D. Minn. 1973) ....................................................... 16

*Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers,*
296 F. Supp. 2d 1159 (C.D. Cal. 2003)................................................... 33

*e360Insight, LLC v. Comcast Corp.,*
546 F. Supp. 2d 605 (N.D. Ill. 2008) ..................................................... 27

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ....................................................................................... 24

*F.T.C. v. R.R. Donnelley & Sons Co.*,
  1990 WL 193674 (D.D.C. Aug. 27, 1990) ................................................... 20

*F.T.C. v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) ...................................................................... 20

*Facebook, Inc. v. Power Ventures, Inc.*,
  2010 WL 3291750 (N.D. Cal. July 20, 2010) ........................................... 1, 18

*Facebook, Inc. v. Power Ventures, Inc.*,
  2009 WL 1299698 (N.D. Cal. May 11, 2009) ........................................... 3, 11

*Fashion Originators' Guild of Am., Inc. v. FTC*,
  312 U.S. 457 (1941) ....................................................................................... 22

*Gaston v. Facebook, Inc.*,
  2012 WL 629868 (D. Or. Feb. 2, 2012) ....................................................... 27

*Hairston v. Pac. 10 Conference*,
  101 F.3d 1315 (9th Cir. 1996) ...................................................................... 17

*Hard Rock Cafe Intern. (USA) Inc. v. Morton*,
  1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) ................................................. 31

*Holomaxx Tech. v. Microsoft Corp.*,
  783 F. Supp. 2d 1097 (N.D. Cal. 2011) .................................................. 27, 28

*In re Beer Antitrust Litig.*,
  2002 WL 1285320 (N.D. Cal. April 3, 2002) ............................................... 23

*In re Facebook Privacy Litig.*,
  791 F. Supp. 2d 705 (N.D. Cal. 2011) ......................................................... 26

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) ........................................................................ 30

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ........................................................ 27, 28

*Lee v. State*,
  869 F. Supp. 1491 (D. Or. 1994) ................................................................. 31

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) .......................................................... passim

*Malaney v. UAL Corp.*,
  2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) .................................. 19, 20, 21

*Mesa Grande Band of Mission Indians v. Salazar*,
  657 F. Supp. 2d 1169 (S.D. Cal. 2009) ........................................................ 20

*Metromedia Broad. Corp. v. MGM/UA Entm't Co., Inc.,*
611 F. Supp. 415 (C.D. Cal. 1985) ............................................................. 20

*Morris Commc'n Corp. v. PGA Tour, Inc.,*
364 F.3d 1288 (11th Cir. 2004) ........................................................... 18, 19

*Morris Commc'ns Corp. v. PGA Tour, Inc.,*
117 F. Supp. 2d 1322 (M.D. Fla. 2000) ..................................................... 32

*Munaf v. Geren,*
553 U.S. 674 (2008) ...................................................................................... 15

*Noah v. AOL Time Warner, Inc.,*
261 F. Supp. 2d 532 (E.D. Va. 2003) ......................................................... 28

*Nova Designs, Inc. v. Scuba Retailers Ass'n,*
202 F.3d 1088 (9th Cir. 2000) ............................................................. 22, 24

*Oakland Trib., Inc. v. Chron. Pub. Co., Inc.,*
762 F.2d 1374 (9th Cir. 1985) .................................................................... 33

*Pallorium, Inc. v. Jared,*
2007 WL 80955 (Cal. App. 4 Dist. Jan. 11, 2007) .................................... 28

*Pom Wonderful LLC v. Purely Juice, Inc.,*
277 F. App'x 744 (9th Cir. 2008) ............................................................... 16

*Rebel Oil Co., Inc. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ...................................................................... 21

*Rick-Mik Enters., Inc. v. Equilon Enter. LLC,*
532 F.3d 963 (9th Cir. 2008) ...................................................................... 25

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
792 F.2d 210 (D.C. Cir. 1986) .................................................................... 19

*Sammartano v. First Judicial Dist. Ct.,*
303 F.3d 959 (9th Cir. 2002) ...................................................................... 31

*SCFC ILC, Inc. v. Visa USA, Inc.,*
936 F.2d 1096 (10th Cir. 1991) .................................................................. 34

*Smith v. Trusted Univ. Standards In Elec. Trans., Inc.,*
2010 WL 1799456  (D.N.J. May 4, 2010) ............................................ 27, 28

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) ....................................................................................... 28

*United Asset Cov., Inc. v. Avaya Inc.,*
409 F. Supp. 2d 1008 (N.D. Ill. 2006) ....................................................... 19

*United States v. Drew,*
259 F.R.D. 449  (C.D. Cal. 2009) ............................................................... 32

*United States v. Microsoft Corp.*,
   253 F.3d 34  (D.C. Cir. 2001) ........................................................................................ 25

*Universal Grading Serv. v. eBay, Inc.*,
   2011 WL 846060 (N.D. Cal. Mar. 8, 2011) ............................................. 1, 16, 17, 18

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ........................................................................................ 18

*Washington Post Co. v. Gator Corp.*,
   No. civ-02-00909-A (E.D. Va. July 16, 2002) ........................................................ 31

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................ 15, 29, 31, 33

*Yountville Investors, LLC v. Bank of Am., N.A.*,
   2009 WL 538667 (W.D. Wash. Mar. 4, 2009) ........................................................ 20

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ........................................................................... 27

## **Statutes**

47 U.S.C. § 230 .................................................................................. 4, 27, 28

Cal. Bus. & Prof. Code § 17200 ........................................................................ 25

California Penal Code § 502(c)(7) ....................................................................... 26

**INTRODUCTION**

Facebook offers a social network that is free to users, and it funds this service primarily through the display of advertisements. Sambreel[1] has contributed absolutely nothing to the development or ongoing maintenance of Facebook's service. Nonetheless, Sambreel seeks to free-ride off of Facebook by injecting its own unauthorized ads and content into Facebook webpages. These Sambreel-injected ads (a) displace and distract from authorized ads that third parties pay Facebook to display, (b) violate Facebook's neutral terms of use, and (c) provoke user confusion and complaints to Facebook. Sambreel now asks this Court for the extraordinary remedy of a preliminary injunction *ordering* Facebook to continue to provide its free service to users who facilitate Sambreel's ad-injection scheme in violation of Facebook's terms of use.

Nothing in Sambreel's Motion for a Preliminary Injunction ("PI Motion") justifies this request. No theory of antitrust or any other law bars Facebook from blocking the use of third-party products—including and especially adware—on its own free, ad-supported website. In fact, far from showing a "likelihood" of ultimate success, Sambreel asks this Court to grant an injunction based on a theory that has been *rejected three separate times* by the courts in the Ninth Circuit:

- *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557-68 (9th Cir. 2008) (dismissing antitrust claims based on allegations that MySpace refused to allow its users to upload a third party's video products and links);

- *Universal Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *9 (N.D. Cal. Mar. 8, 2011) (dismissing antitrust claims based on allegations that eBay refused to allow users to use certain third-party coin-grading services when listing "certified" coins for sale); and

- *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *13-14 (N.D. Cal. July 20, 2010) (dismissing antitrust claims based on allegations that Facebook refused to allow users to use a third-party product to access facebook.com).

In short, Sambreel asks this Court to *create new law* at the preliminary injunction stage that contradicts prior decisions in this circuit. And while the law alone forecloses Sambreel's demand, the limited facts available expose what Sambreel is really up to: an inequitable attempt to transform Facebook's website into a public accommodation for the benefit of one parasitic free-rider.

---

[1] Plaintiffs Sambreel Holdings LLC, Yontoo LLC, and Theme Your World LLC are collectively referred to as "Sambreel."

Sambreel attacks Facebook's website through the dissemination of "PageRage," an adware program on a user's computer that injects unauthorized content and ads into Facebook's webpages. In an effort to suggest that PageRage does not alter Facebook's service, Sambreel characterizes its scheme as merely "adding layers." But the computer screen speaks for itself: users with PageRage see *modified* Facebook webpages with unauthorized ads and content injected by Sambreel. In fact, Sambreel readily admits that it adheres to the following business philosophy: why incur the costs of "creat[ing] a competing site from scratch" when you can "layer" content into an existing website in a manner that appears "as if it is one universal application" to the end user. *See infra* at 8, n.9.

Sambreel attempts to justify its scheme by claiming users "choose" to have PageRage on their computers, but that assertion is factually misleading and legally irrelevant. First, Sambreel's own documents show that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ This dissatisfaction with PageRage is consistent with the vociferous user complaints describing PageRage-injected ads as "pornographic," "bait and switch," "disgusting," "embarrassing," "really nasty," "slowing down my connection," and "taking over my homepage." Attached as Appendix A is a demonstrative exhibit compiling quotes from actual user complaints that demonstrate the myriad ways in which PageRage causes confusion and impairs the Facebook user experience.[2]

In any event, whether any number of users "choose" to use PageRage is legally irrelevant. Facebook offers its service *for free* on the condition that users abide by its terms of use, and those terms prohibit doing "anything that could disable, overburden, or impair the proper working of Facebook" or "facilitating . . . any violations" of Facebook's policies—including policies against "*show[ing] third party ads*" on Facebook. By modifying Facebook's service with PageRage (even if unintentionally), users impair the way it is intended to work, facilitate prohibited ad-injection, and

---

[2] Facebook has compiled both Appendix A and a larger table of representative examples of user complaints received by Facebook, obtained from Sambreel, or posed on publicly available websites (Appendix B).

breach the core bargain that allows Facebook to provide a free service in the first place. *See generally Facebook, Inc. v. Power Ventures, Inc.*, 2009 WL 1299698, at *5 (N.D. Cal. May 11, 2009) (rejecting the argument that users could choose to use third-party software because Facebook's "Terms of Use negate this argument").  For Facebook to continue to innovate and operate a successful business, it simply cannot allow third parties to inject ads that impair its website, displace and distract from its authorized ads, and undermine the ability to monetize its service.  No newspaper would allow a free-rider to inject unauthorized ads into its pages, and no grocery store would allow a malefactor to sell unauthorized goods on its shelves.  Neither can Facebook be a free advertising space for Sambreel.

Nevertheless, Sambreel seeks a pretrial judicial order that forces Facebook to (a) do business with advertising providers that inject ads through PageRage and (b) provide its free service to users who facilitate PageRage on that service.  Sambreel cites *no case* in which a court has ordered a business to provide its service to users for free so that *another business* can profit.  To grant Sambreel's unprecedented request would force Facebook to cede control of the function, design, and advertising of *its own website* to third parties.  Such a decidedly anti-competitive result would have far-reaching consequences:  it would eviscerate incentives for website innovation and usher in a new age of judicially-sanctioned internet piracy, which is exactly the result Sambreel seeks.  No such result is warranted because Sambreel has not met its burden on the four requirements for the extraordinary remedy of a preliminary injunction.

**No Likelihood of Success on Counts I-V**:  Sambreel has not proven that it is likely to succeed on the merits because *no court* has ever accepted its "antitrust" theory.  Stripped of legal labels, Sambreel's PI Motion argues only that Facebook refused to deal with users and advertising providers that attempted to use PageRage *on facebook.com* to the detriment of Facebook's business.  As the Ninth Circuit has explained, a defendant's regulation of its own website simply does not implicate the Sherman Act, even in cases where the defendant is considered a monopolist. *See LiveUniverse*, 304 F. App'x at 557.

Second, even if Sambreel had pled a viable claim, it has wholly failed to meet its higher *evidentiary* burden at the preliminary injunction stage.  As just one example, Sambreel has presented *no evidence* of product substitutability necessary for this Court to accept Sambreel's proposed antitrust

markets, such as "online display ads." Moreover, one recent industry analysis described Facebook as possessing a modest share—under 15 percent—of the highly competitive online display advertising space, which negates any suggestion that Facebook is a "monopolist" capable of charging "supra competitive" pricing. Multiple other defenses also bar Sambreel's antitrust claims.

Finally, the Communications Decency Act ("CDA") provides sweeping immunity for any action taken by a website such as Facebook to restrict online material that the website deems "objectionable." 47 U.S.C. § 230(c)(2). Because Facebook users complain to Facebook about the number and content of PageRage-injected ads, Facebook's efforts to restrict such material are immunized by the CDA.

**Balancing the Equities Weighs Heavily for Facebook:** The requested injunction—a judicial order compelling Facebook to allow third parties to use PageRage on Facebook's service—would cede control of Facebook's service to Sambreel and undermine Facebook's business model and basic ability to monetize its own product. Moreover, Sambreel's unclean hands strongly weigh against an equitable order in its favor: Sambreel disseminates its adware through deceptive advertising campaigns; it instructed its employees to create fraudulent positive reviews from "customers" in an effort to mask dissatisfaction with its products; and it misleads Facebook users by serving false online ads and inducements. *See infra* at 30-31.

**An Injunction Would Harm the Public Interest:** Popular and innovative websites routinely use online terms of use to protect the design, functionality, and monetization of their businesses. If enforcing such terms can be deemed a violation of the antitrust laws, then popular websites would be transformed into public commons for the misuse of free-riding third parties. Such a rule would harm legitimate competition and punish Facebook, the developers that depend on Facebook, and countless similarly situated online companies. It would open the floodgates for attacks on popular websites by Sambreel and similar free-riding companies. ███████████████ *See infra* at 7-8, 32.

**No Irreparable Harm to Sambreel:** Should it ultimately prevail, monetary damages would fully compensate Sambreel's purported injury because ***Sambreel admits that it does not need to serve ads on facebook.com in order to survive as an entity.*** *See* Trouw Decl. (Doc. No. 3-2) ¶ 44 ("Based

on its current projections, Sambreel should be able to survive as a company."). "Without a sufficient showing that [the alleged exclusionary practices] threatened [plaintiff's *existence*, any loss in revenue due to an antitrust violation is compensable in damages."[3]   *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing grant of preliminary injunction). Sambreel's delay in seeking a preliminary injunction also bars relief.  Sambreel admits that it knew of Facebook's communications with its advertising providers by July 2011 and Facebook's checkpointing of its users by December 2011, but Sambreel did not seek injunctive relief until March 2012.  *See Baker v. Ark. Blue Cross*, 2009 WL 764885, at *1-2 (N.D. Cal. Mar. 19, 2009) (finding injunctive request "untimely" where premised on conduct the plaintiff was aware of three months earlier).

For these and all the reasons discussed below, Sambreel's PI Motion should be denied.

## BACKGROUND

**A.**     **Facebook's Innovative Approach to Advertising Enhances the User Experience**

Facebook designs and operates a social networking website accessible at www.facebook.com. The service is free to users and enables them to connect and communicate with their friends, families, and communities in unprecedented ways.  Decl. of Jud Hoffman ISO Facebook's PI Opp. ("Hoffman Decl.") ¶ 3.  Since its launch in 2004, Facebook has grown to over 901 million worldwide users.  *Id.* At the root of this success is Facebook's carefully cultivated "user experience." *Id.* ¶ 5.  The company has spent tremendous resources developing a website that is clean and fast and encourages participation by users.  *Id.* ¶¶ 5, 14.  A key component of this user-focused strategy is Facebook's unique approach to advertising.  While social networking and many other Internet-based services have historically sought to maximize their profits by placing ads across every part of their webpages, Facebook tries to promote the user experience over the higher short-term revenues available from "ubiquitous and intrusive ad placement." *Id.* ¶ 18.

***First***, Facebook has chosen to limit the presence of ads on facebook.com to unobtrusive ads located in discrete locations on its webpages ("Facebook Ads"). *Id.* ¶¶ 17, 20. ***Second***, Facebook has

---

[3] All emphases added unless otherwise noted.

adopted important content restrictions and designed a system that seeks to provide targeted ads relevant to the user's interests and characteristics. *Id.* ¶¶ 20, 22. Facebook blocks and disables non-compliant Facebook Ads, and it provides users tools to hide, block, and report Facebook Ads that they find uninteresting or objectionable in any way ("Ad Reporting Mechanisms"). *Id.* ¶¶ 22-25. **Third**, while third parties have an opportunity to display ads within applications ("apps") they run on the Facebook Platform (discussed below), Facebook retains exclusive control over advertising on all other facebook.com webpages. *Id.* ¶¶ 9, 11.

To protect the user experience it has developed, Facebook has created agreements that define its relationship with users, developers, and advertisers. *Id.* ¶¶ 4, 12. The core agreement is Facebook's Statement of Rights and Responsibilities ("Terms of Use"), under which all parties agree not to "upload . . . malicious code," "do anything that could disable, overburden, or impair the proper working of Facebook," or "facilitate or encourage any violations of [the Terms of Use]." *Id.* ¶ 4, Ex. 1. Application developers and operators of other websites also agree that they will not attempt to "show third party ads . . . on Facebook," and advertisers agree that Facebook alone (not any third party) will determine the "size, placement, and positioning of" ads. *Id.* Facebook's Advertising Guidelines also prohibit ads that contain content that is "misleading," "sensational or disrespectful," "sexually suggestive," or otherwise "offend[s] users." *Id.* ¶ 22, Ex. 7.[4]

Importantly, access to Facebook's service is not an unconditional right. If parties violate the "letter or spirit" of the Terms of Use or Advertising Guidelines, Facebook has the right to "stop providing all or part of Facebook" to them. *Id.* ¶ 4, Ex. 1. Enforcement of these policies allows Facebook to control the design, functionality, and monetization of its own service.[5]

---

[4] This brief discusses the Terms of Use and related agreements in place during the second half of 2011. As part of Facebook's normal updating process, these agreements have since been updated and the most recent versions are also attached. *See* Hoffman Decl. ¶¶ 4, 12, 22.

[5] Commentators have attributed Facebook's success vis-à-vis competitors like MySpace to Facebook's maintenance of a clean, uncluttered user experience. *See* Felix Gilletee, *The Rise and Inglorious Fall of MySpace*, BUSINESSWEEK, Jun. 22, 2011 (noting that "Myspace pages appear to be host bodies for the worst kinds of advertising parasites" while Facebook has "a clean, ***ad-free*** interface"); Cadie Thompson, *Facebook Won't Cash in on Ads Anytime Soon*, http://www.cnbc.com/id/48136254?__source=yahoo|headline|quote|text|&par=yahoo (last visited Jul. 10, 2012) (noting Facebook "isn't going to risk 'MySpacing' its site" by "over-advertising").

**B.    Through the Pro-Competitive Facebook Platform, Facebook Encourages Third Parties to Benefit from Its Social Networking Service Free of Charge**

Facebook has created a lucrative opportunity for third-party app developers to market their products to Facebook users. Hoffman Decl. ¶ 8. The Facebook Platform is a set of development tools that allows third-party app developers to create a wide array of apps for Facebook users. *Id*. When a user opens such an app, a new webpage appears on the user's screen that includes the "Facebook Canvas." *Id*. ¶¶ 9-11. The Canvas is "real estate" Facebook provides to the developer to display their apps and serve ads, if they so choose. Developers retain 100 percent of any Canvas ad revenue they generate. *Id*. ¶ 9.[6] To use the Facebook Platform, developers must comply with Facebook's terms, *id*. ¶ 12, which require developers to serve ads through certain entities ("Advertising Providers") that have assented to Facebook's "Platform Terms for Advertising Providers." Decl. of Sandy Parakilas ISO Facebook's PI Opp. ("Parakilas Decl.") ¶¶ 3-4.

More than nine million websites and apps have integrated with the Facebook Platform, creating a fertile breeding ground for technological innovation and job creation. Hoffman Decl. ¶ 8. In September 2011, the University of Maryland released a study measuring the impact of the "Canvas application economy." According to that study, between ***182,744 and 235,644 full-time third-party jobs*** were created and between ***$12.19 billion and $15.71 billion*** in value was added to the U.S. economy as a result of apps alone through the Facebook Platform. *See* Decl. of Adam Holbrook ISO Facebook's PI Opp. ("Holbrook Decl.") ¶ 19, Ex 57, at 683. Sambreel's injunction request threatens the vitality of the pro-competitive Facebook Platform.

**C.    Sambreel's "PageRage" Adware Was Removed from the Facebook Platform Because It Did Not Comply with Facebook's Terms**

In stark contrast to the societal benefits created by Facebook, Sambreel's business model is premised on free-riding on the success of innovative companies. ███████████████████████
████████████████████████████████████████████████████████████████████

---

[6] In addition to this Canvas opportunity, the Facebook Platform offers a separate feature known as "Facebook for Websites" or "Facebook Connect." *Id*. ¶ 13. Rather than making apps directly available on Facebook, this feature allows third parties like Sambreel to integrate Facebook's functionality into their own websites. *Id*.

1  █████████████████ [7] *See* Holbrook Decl. ¶ 14, Ex. 52, at 547.  The Wall Street Journal

2  recently described Sambreel's products as a "new generation of controversial advertising software

3  wreaking havoc" on popular internet services by "inserting a layer of ads on websites and covering up

4  other paying ads."[8]  Tellingly, Sambreel actively markets its products to investors as mechanisms to

5  free-ride and ***avoid having to compete*** with successful internet services.[9]

6  Sambreel's PageRage product appears to be designed for exclusive use on Facebook, and

7  Sambreel markets this product to end users as a way to "customize" Facebook's website by adding

8  designs.  *See* PI Mot. at 5.  However, once PageRage is installed on a user's computer (intentionally or

9  otherwise), it injects obtrusive ads across facebook.com in areas reserved for Facebook's content and

10  ads.  Hoffman Decl. ¶¶ 29, 34-40.  Sambreel initially sought to use the Facebook Platform to further

11  its scheme by creating an app titled "PageRage Super Profile."  Decl. of Jared McGuire ISO

12  Facebook's PI Opp. ("McGuire Decl.") ¶ 4.  In March 2009, Facebook warned Sambreel that

13  PageRage was violating Facebook's terms by, among other things, displaying ads on "pages of the

14  Facebook site ***other than [] application [C]anvas pages***."  *Id.* ¶¶ 5-6.  Sambreel continued to violate

15  Facebook's terms and thus Facebook informed Sambreel on July 15, 2009 that PageRage would be

16  removed from the Facebook Platform, explaining: "you are not permitted to show ads on Facebook

17  profiles or pages (as stated in section 9.7 of the [Terms of Use]); ads are only permitted within the

18  [C]anvas page."  *Id.* ¶¶ 7-8.  Sambreel's "PageRage Super Profile" remains disabled.  *Id.* ¶ 9.

---

[7]  Sambreel used to improperly inject ads into bing.com.  However, in response to Microsoft's cease-and-desist letter in December 2011, Sambreel responded that it had stopped its adware attack on that website.  *See* Decl. of Bill Harmon ISO Facebook's PI Opp. ("Harmon Decl.") ¶¶ 8-9, 13-14.

[8]  *See* Holbrook Decl. ¶ 29, Ex. 67 (Emily Steel, *"New 'Adware' Apps Bug Facebook, Google,"* Wall Street Journal Online, http://online.wsj.com/article/SB10001424052970203413304577086463731021828.html).

[9]  In a whitepaper found on Sambreel's website, Sambreel presents a "case scenario" for a hypothetical start-up company that wants to introduce a new feature for a Craigslist-type website that offers classifieds.  *See* Holbrook Decl. ¶ 18, Ex. 56.  According to Sambreel, the start-up has two options: "either (i) make a Craigslist ***competitor*** that possesses this feature, or (ii) develop a feature using Yontoo [that ***modifies Craiglist's own service directly***].  In this scenario, option ii serves as a more viable option because option i requires [the start-up] to compete with [Craigslist]."  *Id.*

**D.     PageRage Continues to Inject Ads Directly into Facebook's Service and Violate Numerous Facebook Terms and Policies**

Based on user complaints around October 2010, Facebook learned that Sambreel was continuing to use its browser "plug-in"—*i.e.*, software that runs in the user's browser—to inject unauthorized ads and content into Facebook webpages. *See* McGuire Decl. ¶ 10.   When Facebook's service is operating as intended, Facebook sends "code to [the user's] browser with instructions for the browser to properly render the Facebook webpage on the person's screen."  Decl. of Christopher Palow ISO Facebook's PI Opp. ("Palow Decl.") ¶ 3.   However, "Sambreel's software intercepts the rendering of Facebook webpages and modifies the browser instructions such that the browser renders Facebook's webpages improperly with Sambreel-specified content, including ads and other content interspersed throughout the Facebook webpages." *Id.*  Indeed, an independent digital forensic examiner has confirmed that Sambreel injects "programming code designed to co-opt the structure of an existing, specific webpage and modify it according to the specifications of [Sambreel]." *See* Decl. of James E. Hung ISO Facebook's PI Opp. ("Hung Decl.") ¶ 16.[10]

The heart of Sambreel's Motion is an attempt to characterize PageRage as nonetheless operating "independent of Facebook."  This is disingenuous because the ***only*** way users can interact with facebook.com is for their browsers to "render" the code sent by Facebook.  By modifying this code for its own purposes, Sambreel is "using" and "accessing" Facebook and is thus subject to the Terms of Use.[11]  Sambreel's argument is also irrelevant because—as has already been judicially recognized—***users*** are bound by the Terms of Use and cannot "choose" to manipulate Facebook's website through prohibited software.  Below are only some of the ways in which the use of PageRage violates Facebook's rules and disrupts Facebook's right to monetize its own product.

**Improper Ad Injection and Displacement**: In violation of the prohibition against "show[ing] third party ads . . . on Facebook" in Section 9.7 of the Terms of Use, PageRage injects ads directly onto Facebook's webpages.  Hoffman Decl. ¶¶ 29, 4, Ex. 1.  And in violation of Section 11.5's rule

---

[10] For the Court's convenience, a glossary of frequently used terms related to the technology at issue is attached as Exhibit C to the Hung Declaration.

[11] Because Sambreel is bound by the Terms of Use for this and other independent reasons discussed in the Motion to Dismiss briefing, Facebook seeks to dismiss this action pursuant to Rule 12(b)(3) based on the mandatory forum clause in those Terms.  *See* Reply ISO Mot. to Dismiss at 4-6.

that "[Facebook] will determine the size, placement, and position of your ads," *see id.* ¶ 4, Ex. 1, PageRage inserts obtrusive "banner ads" "on the right- and left-hand side of the Facebook Home page, on Facebook's login page," and "into the Facebook News Feed." McGuire Decl. ¶ 11; Hung Decl. ¶¶ 29-32. Moreover, PageRage does not simply inject new ads; it ***displaces*** legitimate Facebook Ads.   In a recent press interview, Sambreel CEO Arie Trouw admitted:

> [A PageRage ad] might shift where [a Facebook ad] is a little bit or it might detract from the revenue Facebook is making from it because now there is some sort of competing ad on the same screen. So a person might be a little less likely to click on [Facebook's] ad because they might click on our ad instead[.]

Decl. of Philip Segal ISO Facebook's PI Opp. ("Segal Decl.") ¶ 2, Ex 38; *see also* McGuire Decl. ¶ 12, Ex. 11 (documenting how PageRage "push[es] Facebook's own advertisements down 'below the fold'"). A third-party expert has likewise confirmed this content displacement. Hung. Decl. ¶ 29.

**Objectionable and Misleading Ad Content**:  Sambreel also injects ad content prohibited by Facebook's policies.   Sambreel-injected ads contain content that is lewd and lascivious, such as "sexually suggestive ads with half nude wom[e]n," and Sambreel's software makes it impossible for Facebook users to report and block these objectionable ads. Hoffman Decl. ¶¶ 30, 45-46; Appendix A at 11-12. Sambreel also injects ads that are misleading and associated with spam. Hoffman Decl. ¶¶ 43-44. For example, Sambreel has injected ads promoting a product that purports to allow a user to "See Who Searched You" on Facebook, which is not technically possible. *Id.* Upon clicking on this ad, users are redirected to other webpages that request further action such as buying a product. *Id.* These types of ads violate the Advertising Guidelines and the Terms of Use.

**Impairment of Website Performance, Functionality, and Security**:  As users complain and an independent expert has confirmed, PageRage slows webpage load times when using Facebook's service.  Hung Decl. ¶ 62; Appendix A at 3-4.  PageRage also injects (a) ads that "fail[] to load successfully" or obscure "key official Facebook design elements," Hung Decl. ¶¶ 63-64, and (b) unauthorized buttons designed to look like Facebook content into the Facebook control menu, *id.* ¶ 37. Moreover, the "PageRage software renders the Facebook user's experience less secure by," among other things, "lowering the user's browser security settings" and "attempting to interfere with Facebook's notifications to its users about security risks." *Id.* ¶ 69.  It also allows "third parties

unaffiliated with Facebook to collect" user data.  *Id.* ¶ 42.   Thus, PageRage plainly violates the Facebook Terms of Use' prohibition against "do[ing] anything that could disable, overburden, or impair the proper working of Facebook."  Hoffman Decl. ¶ 4, Ex. 1.

Under its Terms of Use, Facebook is authorized to deny access to its free service for any one of the reasons discussed above.[12]

**E.     Many Facebook Users Do Not "Choose" to Use PageRage, and They Complain Vociferously about It**

Sambreel's pleadings are replete with claims that Facebook users "want" PageRage and "choose" to suffer its disruptive ad injection.  As a threshold matter, the fact that any number of users may choose to use the prohibited program is ***irrelevant*** to the legal question of whether Sambreel can inject ads into facebook.com.[13]   But based on the evidence before this Court, it is plain that many users (a) do not intentionally download PageRage, (b) do not understand what they are downloading when they do, and (c) mistakenly believe that PageRage is a Facebook-authorized product.   Sambreel's business model intentionally creates this confusion in at least three ways.

***First***, Sambreel misleads consumers by suggesting that Facebook approves or endorses the PageRage adware.  PageRage's website markets PageRage as the "leading Facebook layouts browser application" and "the first browser app that allows Facebook® users to customize and personalize Facebook profiles with ease."  Segal Decl. ¶ 5, Ex. 41.   Sambreel also uses ads that incorporate Facebook's distinctive color scheme and font and invite users to try "New Facebook Layouts." McGuire Decl. ¶ 32.  These misleading ads do "not reference PageRage or explain that the 'Facebook Layouts' are not associated with Facebook" until ***after*** the user clicks "install" and is routed to PageRage's website.  *Id.*

***Second***, Sambreel appears to use "bundling" for the bulk of its distribution.  Bundling occurs when a user attempts to download a non-Sambreel software program and PageRage is "bundled" with

---

[12] Facebook urges the Court to review the screenshots provided in the Hoffman Decl., McGuire Decl., and Hung Decl., as these show in detail what has been described above:  PageRage's improper ad injection, objectionable and misleading content, and impairment of Facebook.

[13] Because access to Facebook is not the right of any party, users cannot "choose" to use adware that violates Facebook's Terms of Use. *See generally Power Ventures*, 2009 WL 1299698, at *5 ("[T]his argument relies on an assumption that Facebook users are authorized to use Power.com or similar services to access their user accounts. The Terms of Use negate this argument.").

the desired program in one download, often with no disclosure regarding the nature of the bundled product.    Hung Decl. ¶¶ 9, 11-12 (documenting a PageRage "bundle" with **no disclosure** on the installation screen regarding PageRage's ad injection or effect on Facebook).   After a user receives PageRage through a bundled download, Sambreel begins injecting ads into Facebook **regardless** of whether the user chooses to use Sambreel's "Facebook layouts." *Id.* ¶ 29.

As a result, users are often confused as to how they received PageRage in the first place.[15]

**Third**, Sambreel actively masks the true nature of its adware product.  The PageRage website contains no clear disclaimer that users are agreeing to receive advertising that is drastically different, more frequent, and more broadly displayed across the screen than Facebook advertising.  Moreover, Sambreel has systemically created fraudulent "customer" reviews for PageRage in order to create a false impression that its product is trustworthy, reputable, and well-liked.

Setting aside how or why Facebook users download PageRage, it is plain that they often deeply regret the consequences of having done so.  Based on data obtained from Sambreel,

---

[14]

[15] Numerous user complaints suggest that users do not intentionally download PageRage.  *See* Appendix A at 15-16; *see also* Segal Decl. ¶ 6, Ex. 42.

1

2

3       During this same period,

4

5

6       Moreover, Sambreel has conceded that it "receives a notification that the product is

7 uninstalled only in limited circumstances," and thus "the 'uninstall' data [discussed above] does not

8 include all users who disable PageRage[.]" *See* Joint Mot. on Discovery, App'x A, Doc. No. 32-1 at 5.

9       Consistent with the ███████████████████████, users have vociferously

10 complained about the plug-in. McGuire Decl. ¶¶ 21-31; Holbrook Decl. ¶¶ 3-11; Appendices A & B.

11 For example, users with PageRage-infected computers have complained that "ads are taking over my

12 homepage, profile, and all the pages I view when I log on," and that "[t]hey are slowing down my

13 connection," *see* Appendix A at 7, which has been confirmed by an independent expert. Hung Decl.

14 ¶¶ 62-63 (explaining that PageRage creates "operational lag time" when browsing Facebook's

15 service). Numerous other users have complained about the objectionable content of PageRage-

16 injected ads, calling them "███████████" "pornographic," and "disgusting." Appendix A at 11;

17 *see also* Appendix B; Hoffman Decl. ¶ 46 (screenshots with objectionable PageRage ads).

18       Users often mistakenly believe that Facebook itself is responsible for the inappropriate and

19 burdensome ads injected by PageRage. For example, users have complained that ████████████

20 ████████████████████████████████████████████ and users have

21 threatened to quit Facebook as a result. Appendix A at 13; *id.* at 5 (███████████████

22 ██████████████████████████████████). Nor is this confusion

23 limited to unsophisticated users of Facebook. In September 2011, a prominent technology blogger

24 wrote an article criticizing ***Facebook*** for "chang[ing] its tune" on advertising by introducing "big" and

25 "gaudy" banner ads. *See* Holbrook Decl. ¶ 21, Ex. 59. Six days later, a fellow blogger corrected the

26 mistake: "What we originally thought to be an upcoming Facebook update has turned out to be a 3rd-

27 party plugin that hijacks your Facebook [and] adds new big, obnoxious ads next to and inside their

28

1   Facebook feeds. . . .   If you're seeing these ads, you'll need to uninstall two separate plugins—

2   *PageRage* and DropDownDeals." *See* Holbrook Decl. ¶ 22, Ex. 60.

3       Thus, the evidence shows that many users are tricked into downloading PageRage, do not

4   understand what it does to their webpages, and then blame Facebook for its harmful effects.

5       **F.     Facebook Defended Its Service, and Sambreel Responded with this Lawsuit**

6       Based on the numerous violations of Facebook's rules and related user complaints discussed

7   above, Facebook took two basic steps to protect its network from PageRage.

8       ***First***, between July and October 2011, Facebook contacted nine Advertising Providers "that

9   were injecting advertisements directly onto Facebook webpages through unauthorized advertisement

10  injection methods to notify them that such advertisement injection methods [did] not comply with

11  Facebook's terms and policies that they agreed to honor."[16]   Parakilas Decl. ¶ 8.   Facebook informed

12  them that "the only authorized means for serving advertisements to Facebook users [was] through

13  Facebook's advertising tools and/or within developer applications on the Facebook Platform." *Id.* ¶ 9.

14  "In response, seven of the Advertising Providers agreed to honor their commitments, and two decided

15  to continue to serve ads through adware plugins and give up their Advertising Provider status."[17]   *Id.*

16  According to ████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████████████████████

21      ***Second***, starting on or about December 12, 2011, Facebook began prompting users with

22  Sambreel's software to remove that software as a condition to accessing Facebook's service.   Palow

23  Decl. ¶ 8.   This "checkpointing" process worked as follows:   "Using the same methods common for

24  basic website functionality," Facebook "inspect[ed] the state of the incoming HTML code from the

---

[16] Advertising providers that inject unauthorized ads directly into Facebook webpages through adware violate at least eight of Facebook's policies. *See* Parakilas Decl. ¶ 7.

[17] Sambreel also inaccurately asserts that Facebook "threaten[ed] to deactivate any Neverblue links that appeared on Facebook if Neverblue continued to market PageRage." Decl. of Markus Levin (Doc No. 3-3) ¶ 3.   Neverblue is an affiliate network that facilitates spam campaigns, and Facebook has blocked Neverblue due to this prohibited activity. Palow Decl. ¶¶ 12-13.

user's browser that [was] calling the Facebook server" in order to "detect whether there [were] changes to the HTML code that ma[de] it inconsistent with Facebook's intention for webpage rendering." *Id.* ¶¶ 4, 6. If Facebook detected "unique elements of Sambreel's HTML code," the user was placed in a "checkpoint" that "prompted users to remove the software before continuing to browse Facebook using the infected browser." *Id.* ¶¶ 7-8. Facebook offered instructions on how to remove the software manually or provided a link to anti-virus software that would remove it automatically. *Id.* ¶ 9. This checkpointing process for PageRage occurred over approximately two weeks in December, and it is ongoing for other malware and adware.[18] *Id.* ¶ 11.

On March 19, 2012—over eight months after Sambreel learned "that Facebook was approaching Sambreel's advertising partners," Sullivan Decl. (Doc. No. 3-6) ¶ 2, and three months after it learned of Facebook's checkpointing, Miller Decl. (Doc. No. 3-4) ¶¶ 14, 18—Sambreel brought this purported antitrust lawsuit. On the same day, Sambreel filed this Motion seeking a judicial order compelling Facebook to change its Terms of Use and act against its business interest by (a) allowing its Advertising Providers to inject ads into facebook.com through adware and (b) allowing users with PageRage-infected computers to use Facebook's free service. *See* PI Mot. at 25.

## LEGAL STANDARD

"A preliminary injunction is an ***extraordinary and drastic remedy***; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations and punctuation omitted). "A plaintiff seeking a preliminary injunction must establish [1] that he is ***likely*** to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citation omitted). And because a preliminary injunction is a "drastic" remedy, the presence of "complex or novel issues of

---

[18] On or around December 23, 2011, at Sambreel's request, Facebook agreed to a standstill arrangement by which it stayed the checkpointing process in exchange for Sambreel's disabling of its unauthorized ad injection into Facebook's service. Palow Decl. ¶ 11. At the time Sambreel filed this PI Motion, it breached the standstill agreement and resumed its ad injection. Facebook has yet to resume the checkpointing process for PageRage at the time of this filing.

law and fact" militates against such relief.  *See Carlson Cos., Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1098 (D. Minn. 1973); *Pom Wonderful LLC v. Purely Juice, Inc.*, 277 F. App'x 744, 746 (9th Cir. 2008) (affirming denial of injunction because the "case involve[d] novel and difficult questions").

## ARGUMENT

## I.      SAMBREEL CANNOT SHOW A "LIKELIHOOD" OF SUCCESS ON ANY CLAIM

### A.      All of Sambreel's Antitrust Claims Fail Because Sambreel Has Not Offered Evidence of a Cognizable Antitrust Injury (Counts I-IV)

Sambreel has no likelihood of success on its antitrust claims because courts have repeatedly rejected its theory of "antitrust injury," which is an absolute requirement for a Sherman Act claim.  *See* Reply ISO Mot. to Dismiss, Doc. No. 35, at 9-10.[19]  In both *LiveUniverse* and *Universal Grading*, the courts held that the preclusion of a third-party product from the defendant's website is *not* the type of injury the antitrust laws were intended to prevent.  In *LiveUniverse*, the Ninth Circuit explained that "LiveUniverse does not explain how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on other social networking websites[.]"  304 F. App'x at 557 (emphasis in original).  And in *Universal Grading*, the court recognized that "*a refusal to deal by itself cannot establish an antitrust injury*" and reasoned that "[P]laintiffs do not explain how eBay's actions *on its own website* can reduce consumers' choices or diminish the quality of their experience on *other* auction websites and thus cause antitrust injury."  2011 WL 846060, at *9 (emphasis in original).  Similarly, Facebook can prevent Sambreel from accessing Facebook and its users from using PageRage, a self-described competitive display advertising program, to alter facebook.com without causing an antitrust injury.[20]

---

[19] Because many of the arguments demonstrating Sambreel's inability to succeed on the merits are briefed extensively in the Motion to Dismiss filings (Doc. Nos. 22, 35), they are repeated here in a more summary form.

[20] Sambreel suggests that *LiveUniverse* and *Universal Grading* are somehow distinguishable because Sambreel experienced greater harm than those plaintiffs.  *See* Reply ISO Mot. to Dismiss at 10.  Of course, the entire basis for this distinction is that Sambreel designed PageRage as a Facebook-specific adware parasite with no independent utility.  And in any event, antitrust injury turns on whether the injury is "of the *type* the antitrust laws were intended to prevent," not on the extent of purported harm.  *See LiveUniverse*, 304 F. App'x at 557.

Nor can Sambreel manufacture an antitrust injury by claiming—without any evidence—that "advertisers pay[] supra-competitive prices for display advertisements" without the PageRage-adware scheme. *See* Compl. ¶ 42. Sambreel lacks standing to even raise such a claim because it does not allege that it is an advertiser who purchases ads directed at Facebook users. *See Hairston v. Pac. 10 Conference,* 101 F.3d 1315, 1322 (9th Cir. 1996) (explaining that "the existence of other, more appropriate plaintiffs" weighs against antitrust standing). Moreover, the purported injury is still tied to advertising *on facebook.com. See Universal Grading,* 2011 WL 846060, at *9. Finally, even assuming that the inability to inject unauthorized ads into Facebook's webpages could constitute an antitrust injury, Sambreel offers *no evidence* to support its assertion that Sambreel's ads are truly comparable to Facebook Ads and cost less. While Sambreel cites its own pricing, it does not attempt to explain how PageRage-injected ads compare to legitimate Facebook Ads in terms of functionality or pricing and offers no evidence upon which this Court could rely to find injury.[21]

**B.     Sambreel's Section 2 Monopolization Claims Are Meritless and Unsupported (Counts III & IV)**

Separately and independently, Sambreel has not shown a likelihood of success on its monopolization (Count III) and attempted monopolization (Count IV) claims under Section 2 because it has not presented the required evidence of (a) exclusionary or anticompetitive conduct and (b) a legally cognizable market over which Facebook has market power.[22]

**1.     Sambreel's Theory of "Exclusionary Conduct" Has Been Rejected**

Stripped of legal labels, Sambreel's entire "exclusionary conduct" argument rests on the allegation that Facebook refused to deal with users and advertising networks that facilitated PageRage's impairment of Facebook's service. *See* Mot. at 18. But as discussed in detail in the Motion to Dismiss briefing, "the Sherman Act does not restrict the long recognized right of a trader or

---

[21] In any event, any comparison between Facebook and Sambreel pricing would be meaningless because, among other things, "Sambreel does not offer the reach, relevance, engagement, and social context to advertisers like Facebook does." Hoffman Decl. ¶ 28.

[22] *See* Mot. to Dismiss at 11 (discussing the elements of actual and attempted monopolization claims). Because Sambreel does not dispute that the "exclusionary conduct" requirement for monopolization is coextensive with the "anticompetitive conduct" requirement for attempted monopolization, *see LiveUniverse,* 2007 WL 6865852, at *16, "exclusionary conduct" is used herein to refer to both claims.

manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  In the internet context, courts have ***repeatedly*** applied this principle to affirm a website's right to exclude third-party products as alleged here:

- *LiveUniverse, Inc.*, 2007 WL 6865852, at *11 (dismissing Section 2 claim based on allegations that MySpace, an assumed monopolist, engaged in "exclusionary conduct" by "destroy[ing]" MySpace users' ability to upload the plaintiff's video products and links on MySpace's website) (*aff'd*, 304 F. App'x at 556-57).

- *Power Ventures*, WL 3291750, at *13 (dismissing Section 2 claim based on allegations that Facebook prevented its users from using a third-party product to access facebook.com and affirming Facebook's "***right to manage access to and use of its website***").

- *Universal Grading*, 2011 WL 846060, at *9 (dismissing Section 2 claim based on allegations that eBay, an assumed monopolist, prevented users from selling coins as "certified" unless so designated by one of five eBay-approved coin-grading services).

*See also* Mot. to Dismiss at 25-27; Reply ISO Mot. to Dismiss at 6-8, 16-17.

Sambreel has not distinguished its Complaint from this case law; it simply asks this Court to be the first to ***create new law*** at the ***preliminary injunction stage***.  Moreover, Facebook's actions are even more justified than MySpace's conduct in *LiveUniverse*.  Facebook made its network available to Sambreel on the same terms and conditions as any other third-party developers, but Sambreel refused to adhere to the rules regarding ad placement.  *See supra* at 7-8.  As such, it does not violate the antitrust laws for Facebook to deny access to Sambreel or any users or advertising networks who facilitate its adware in violation of Facebook's Terms of Use and contrary to Facebook's own business interests.  *See Power Ventures*, 2010 WL 3291750 at *13-14 ("Defendants cite no authority for the proposition that Facebook is somehow obligated to allow third-party websites unfettered access to its own website[.]").

Finally, even assuming that this triad of Ninth Circuit cases did not bar Sambreel's theory, a valid business justification can defeat a Section 2 claim.  *Morris Commc'n Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004).  Here, Facebook plainly had valid business reasons for precluding PageRage because, at minimum, PageRage (a) purposefully seeks to displace and distract from authorized advertising on Facebook, *see supra* at 9-10; (b) distributes objectionable content in its ads, *see supra* at 10; (c) impairs the performance of Facebook's service and exposes users to security

vulnerabilities, *see supra* at 10; and (d) causes meaningful user frustration, resulting in blame directed to Facebook, *see supra* at 13-14. *See Morris Commc'n*, 364 F.3d at 1295 (holding that the prevention of "free-riding" is a valid business justification that defeats an antitrust claim).

### 2. Sambreel Has Not Presented Evidence that Facebook Has Power in Any Cognizable Antitrust Market

Sambreel's failure to prove a relevant market and market power independently bars the Section 2 claims. Sambreel asks this Court to make the unprecedented finding that "online display advertising" and "display advertising impressions to social networking users"[23] are relevant, cognizable antitrust markets. Mot. at 16-18. But Sambreel cites *no case* suggesting the existence of either market, and it provides *no evidence* of price elasticity or product substitutability.

"[T]o justify granting the extraordinary relief of a preliminary injunction" in an antitrust case, the plaintiff must present sufficient proof to support the existence of the claimed market "on a merits-based evaluation of the evidence." *United Asset Cov., Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1010 (N.D. Ill. 2006). "The outer boundaries of a product market are determined by the *reasonable interchangeability of use* or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) (emphasis added). Thus, at the preliminary injunction stage, the plaintiff's burden is to present *evidence* demonstrating the absence of product substitutability and cross-elasticity of demand outside the proposed market, which is typically shown through expert testimony and evidence related to the *Brown Shoe* proxies.[24] *Compare Malaney v. UAL Corp.*, 2010 WL 3790296, at *7-12 (N.D. Cal. Sept. 27, 2010) (denying preliminary injunction because the plaintiff's expert testimony failed to sufficiently prove a lack of product substitutability in

---

[23] In its Complaint, Sambreel argues that there may be a cognizable antitrust market for "display advertising for social media users." *See* Compl. ¶¶ 61, 82-83. In its PI Motion, Sambreel decides to narrow the market definition even further by claiming that the relevant market is instead "display advertising impressions to social networking users." *See* PI Motion at 17.

[24] The *Brown Shoe* court set forth several "evidentiary proxies for direct proof of substitutability," including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" (the "*Brown Shoe* proxies"). *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (J. Bork); 2A Areeda & Hovenkamp, Antitrust Law, ¶ 533, at 257 (explaining that the "[s]ubmarket indicia are best viewed as proxies for cross-elasticities [of supply and demand], and thus the identification of a submarket is in principle no different than the identification of a relevant market").

the proposed market), *aff'd*, 434 F. App'x. 620 (9th Cir. 2011) *with Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 166-67 (D. Conn. 1998) (holding that plaintiff satisfied its evidentiary burden at the preliminary injunction stage by offering "credible and detailed" expert testimony "concerning current buyer reaction to a price increase, and [product] substitutability") (citations omitted).[25]

Sambreel has presented ***no evidence*** to support a finding that either online "display advertising" or "display advertising impressions to social networking users" are relevant, cognizable antitrust markets pursuant to this high standard. *See* Mot. at 16-17. It offers no case law finding the existence of either market. It offers no expert testimony identifying the extent of substitutability and elasticity of demand between online display ads and other forms of online and offline display advertising. If offers no statistical analyses regarding any antitrust issue. And it offers no meaningful evidence on the *Brown Shoe* proxies, including whether sellers of display ad space have "unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors" when compared to other advertising.[26] *See Brown Shoe*, 370 U.S. at 325.

In fact, the only "support" that Sambreel offers are selective excerpts from five hearsay documents that have nothing to do with antitrust markets. None of the materials Sambreel offers as evidencing an "online display advertising" market discuss antitrust markets or offer any evidence that advertisers consider "online display advertising" to be a form of advertising with ***no reasonable substitute*** or cross-elasticity of demand in connection with other forms of advertising. To the contrary, one source states that "[a]dvertising on Facebook . . . combines many of the attributes of

---

[25] *See also F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053-54 (8th Cir. 1999) (reversing the grant of a preliminary injunction due to ***insufficient evidence of a cognizable market***); *F.T.C. v. R.R. Donnelley & Sons Co.*, 1990 WL 193674, at *3-5 (D.D.C. Aug. 27, 1990) (denying preliminary injunction after five-day hearing because the plaintiff's expert testimony and "voluminous" evidence failed to prove a lack of reasonable substitutes outside of the proposed market); *Metromedia Broad. Corp. v. MGM/UA Entm't Co., Inc.*, 611 F. Supp. 415, 425 (C.D. Cal. 1985) (denying preliminary injunction in part because there was "***insufficient evidence in the record from which to*** assess the ***relevant product market***, including "whether there are close substitutes in any meaningful market").

[26] Nor can Sambreel seek to prove its allegations for the first time on reply. *Yountville Investors, LLC v. Bank of Am., N.A.*, 2009 WL 538667, at *1 (W.D. Wash. Mar. 4, 2009) (striking "expert testimony which was presented for the first time in reply" in the context of a preliminary injunction motion); *see generally Mesa Grande Band of Mission Indians v. Salazar*, 657 F. Supp. 2d 1169, 1173 (S.D. Cal. 2009) ("Arguments not raised in the opening brief are ordinarily waived.").

search [advertising.]"  Sambreel Ex. 5 at 18.  And as for Sambreel's narrower alleged market for "display advertising impressions to social networking users," Sambreel's support consists of two reports that do not discuss product substitutability and actually address "*social media*"—not "social networking."[27]   These materials are a wholly insufficient evidentiary foundation to support an unprecedented injunction.  *See, e.g., Malaney*, 2010 WL 3790296, at *5, *7-12.

Sambreel also has not shown that Facebook has actual monopoly power or sufficient market power to create a "dangerous possibility of success."  One recent study indicated that "Facebook's U.S. market share for online display ads fell to 12% in Q1 [2012] from 13.9% the quarter prior," while "Google's . . . display advertising market share rose to 25% from 21.4%."[28]  Thus, this Court is not required to accept Sambreel's allegation that Facebook has a 27.9% share of the "display ad" market, *see* Mot. at 18, which in any event is *insufficient as a matter of law* to support an attempted monopolization claim.[29]  And with regard to its actual monopolization claim, Sambreel does not even allege Facebook's actual market share of "display advertising impressions to social networking users."[30]  However Sambreel attempts to define the advertising market, it defies common sense to assert that Facebook is a "monopolist" or that it can impose "supra-competitive" pricing for ads when studies indicate that its own share is decreasing.  At minimum, these are strongly disputed factual issues that preclude a preliminary injunction.

---

[27] As both reports make clear, "social media" is much broader than just "social networking." It also encompasses internet blogs and websites such as Amazon, Yelp, YouTube and many others.  *See* Sambreel Ex. 23 at 1 (discussing the growth of social networking and other broadly defined "user generated content"); Ex. 24 at 31 (referencing examples of "social media" including Facebook, Amazon.com, YouTube, internet blogging, and others).

[28] Holbrook Decl. ¶ 23, Ex. 61 (Kevin Shalvey, *Facebook's Share of Display Ads Falls; Google's Rises*, Investor's Business Daily, http://news.investors.com/article/616450/201206281302/google-market-share-up-as-facebook-drops.htm?ven=yahoocp,yahoo).   According to a separate study, Facebook currently has a small lead in display ad revenue that Google is expected to overtake next year.  *See* Holbrook Decl. ¶ 24, Ex. 62 (eMarketer Digital Intelligence, *Google Edges Closer to Facebook as US Display Advertising Becomes Two-Horse Race*, http://www.emarketer.com/PressRelease.aspx?R=1008856).

[29] *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("[M]arket share of 30 percent is presumptively insufficient to establish the power to control price.").  Sambreel simply ignores the established 30% rule and cites one case involving a market share of 24%—a *1982* decision that *preceded* the Supreme Court's and Ninth Circuit's definitive statements in *Jefferson Parish* and *Rebel Oil*, respectively.  *See* PI Mot. at 17-18; Reply ISO Mot. to Dismiss at 17.

[30] Sambreel argues only that "Facebook currently represents 90% of all *social networking traffic*." *See* PI Mot. at 17.

**C.    Sambreel's Section 1 Group Boycott and Tying Claims Are Meritless and Unsupported (Counts I & II)**

Sambreel's remaining antitrust claims under Section 1 of the Sherman Act fare no better. *See* Mot. to Dismiss at 11 (discussing requirements for Section 1 claims). Sambreel has merely attached "product tying" and "group boycott" labels to Facebook's lawful refusal to deal with parties that inject or facilitate the injection of unauthorized ads or content on Facebook's webpages. Pleading-by-label must be rejected. Reply ISO Mot. to Dismiss at 6-9; *Blue Shield of Va. v. McCready*, 457 U.S. 465, 492 (1982) (J. Rehnquist, dissenting) ("Especially in the area of antitrust law, labels do not suffice when analysis is necessary."). The Section 1 claims also fail for the following reasons.

**1.    Sambreel Has Not Shown an Illegal "Group Boycott" (Count I)**

**No Basic Per Se Showing:** Sambreel's Motion offers no evidence of a "horizontal agreement among direct competitors," which is an absolute requirement for a per se group boycott claim. *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000). As discussed in the Motion to Dismiss briefing, a simple comparison with Sambreel's primary cited authority, *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941), shows how far removed this case is from a per se boycott. *See* Reply ISO Mot. to Dismiss at 17-18.

In *Fashion Originators*, the nationwide boycott involved 176 competing manufacturers of high-end women's clothing that banded together and agreed not to sell their products to any retail stores that stocked lower-priced garments. 312 U.S. at 461-62. By contrast, all Facebook is alleged to have done is establish and enforce rules for the use of *its own website*. Facebook provides the free Facebook Platform, which app developers can use to distribute their apps *on Facebook's service* so long as they agree that if they serve ads they will do so through Advertising Providers that comply with Facebook's terms. *See supra* at 7. Sambreel argues that the app developers are Facebook's "horizontal competitors" merely because they both receive revenue from ads. *See* PI Mot. at 12. However, the fact that parties *monetize* their products the same way does not render them "horizontal direct competitors"; the proper test is the relationship *among* the parties. *See Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730 (1988) (holding that restraints "imposed by agreement between firms at different levels of distribution [are] vertical restraints"). Because Facebook provides a

platform for apps developers to *distribute* their products on Facebook's service, the parties are plainly at "different levels" of the distribution chain.[31] *See id.*

Even if this relationship were not vertical, Sambreel has failed to offer any evidence of a boycott-type agreement. Sambreel's general assertion that "Facebook has agreed with . . . the [a]pplication [d]evelopers . . . to withhold business from the [a]dvertising [p]artners unless they agree to help injure Sambreel" is devoid of any support or specificity in the complaint or Motion. *See* Compl. ¶ 67, Mot. at 12. It is simply not a "group boycott" agreement to establish and enforce terms of use for one's own website; it is a fully protected right under antitrust law. *See* Reply ISO Mot. to Dismiss at 18.

**No *Adaptive Power* Factors Showing**: Sambreel also has not proven a likelihood of success on the three additional factors the Ninth Circuit has adopted for per se horizontal boycott claims. *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998).[32] *First*, the so-called boycott would not "cut[] off access to a supply, facility or market necessary" for Sambreel to compete. *Id.* Facebook is not the only website that Sambreel can target with adware, and ██████████ ████████████████████████████████████████████████████████████████████ *Second*, Sambreel has not shown that Facebook has a "dominant market position" in a relevant antitrust market for the reasons discussed above. *See supra* at 19-22; *see Adaptive Power*, 141 F.3d at 950. *Third*, Facebook's enforcement of its terms prohibiting Advertising Providers from serving ads on facebook.com through adware is "justified by plausible arguments that they enhanced overall efficiency or competition." *See Adaptive Power*, 141 F.3d at 950. If websites were not allowed to defend their own services against third parties that seek to inject objectionable ads and free-ride on their success, then innovative firms like Facebook would face

---

[31] Moreover, the ads that developers display are confined to the Canvas area provided by Facebook; all developers are prohibited from serving ads outside their apps. *See* Hoffman Decl. ¶ 11.

[32] Sambreel suggests that the court need not even address these three factors if it determines that the alleged group boycott satisfies some undefined standard, *see* PI Motion at 12, but the law suggests otherwise. *Adaptive Power*, 141 F.3d at 950 ("Absent such a showing [of the three factors], the category of activities comprising group boycotts is not to be expanded indiscriminately."); *see also In re Beer Antitrust Litig.*, 2002 WL 1285320, at *5 (N.D. Cal. April 3, 2002).

reduced incentives to develop new products in the first place.  Sambreel cannot rebut this obvious business justification.

**No Rule of Reason Showing**:  Sambreel's Count I claim gets no better under the rule of reason.  *See Nova Designs*, 202 F.3d at 1090 (holding that rule-of-reason claims require additional evidence, "*i.e.*, evidence bearing on market power, injury to competition, and economic sense").  For the reasons discussed above, Sambreel has offered no evidence to support the existence of a cognizable market, *see supra* at 20; no evidence of Facebook's purported market power, *see supra* at 21; and no evidence that Facebook's defense of its own website creates "significant anticompetitive effects" or injury to competition, *see supra* at 16-18.  Thus, the Count I group boycott claim must fail.

### 2.     Sambreel Has Not Shown Illegal Tying (Count II)

Sambreel's Count II "tying" claim is based on the allegation that Facebook "tied" its free social network service to its users' agreement not to use Sambreel's PageRage, an alleged social networking "enhancing" app.  Compl. ¶ 75.  This theory of antitrust "tying" has no chance of success under either the per se or rule-of-reason standard.

**No Per Se Showing**:  Sambreel's theory does not fit the per se "negative tying" framework.  According to the Supreme Court, a negative tie occurs when a defendant agrees to **sell** one product "only on the condition that the buyer . . . agrees that he will not purchase [a different] product ***from any other supplier***."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992).  This is plainly not what Sambreel alleged.  Sambreel claims that Facebook tied access to its social networking service to users' agreement not to use ***Sambreel's*** specific adware product, but it admits that Facebook allows numerous parties to offer other social networking "enhancement" products as defined by Sambreel.[33]  Compl. ¶¶ 37-39, 56-58, 75.  Sambreel does not cite one case finding a "negative tie" based on preclusion of one supplier's product, particularly an adware product designed to impair the proper functioning of a website.  *See* Reply ISO Mot. to Dismiss at 14-15.  It simply attempts to dismiss the Supreme Court rule as "loose language."  *Id.*

---

[33] Under Sambreel's theory, neutral rules for the use of ancillary products in a wide variety of industries would be suspect.  For example, it would be a per se "tying" violation for gyms to require the use of personal trainers who satisfy the gym's requirements and qualifications.

Moreover, a tying claim requires two separate product markets based on "sufficient demand for the purchase of the tied product *separate from* the tying product" by consumers. *See Rick-Mik Enters., Inc. v. Equilon Enter. LLC*, 532 F.3d 963, 975 (9th Cir. 2008); *United States v. Microsoft Corp.*, 253 F.3d 34, 86-88 (D.C. Cir. 2001) (explaining that the independent-demand test turns on "whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms"). Here, because no reasonable consumer would buy "Facebook layouts" from Sambreel if they were available through Facebook directly, Sambreel's alleged markets fail the independent demand test. *See id.* Sambreel certainly has presented no evidence to the contrary.

And even if "social networking enhancements" could be construed as a separate market, this is simply not a "tying" claim. Sambreel has presented *no evidence* that Facebook somehow leverages its social network to force users to purchase "layouts" from Facebook or to gain some competitive advantage in a purported but unproved "enhancement" market. At bottom, Sambreel's "tying" theory is that Facebook tied its free social network to users' agreement not to use a *modified version* of the same social network (Sambreel's unauthorized version with injected ads), which is nonsensical.

**No Rule of Reason Showing:**  Sambreel's tying theory suffers from additional deficiencies under the rule-of-reason standard. "Social networking services" is not a cognizable market over which Facebook has market power, as Facebook's service is free and thus cannot constitute a product market. *See* Mot. to Dismiss at 23-25. Sambreel has also offered no evidence of product substitutability and elasticity of demand. *See supra* at 19-20. Finally, Sambreel cannot show the required "significant anticompetitive effects" because denying access to one's own website does not qualify under Ninth Circuit law. *See* Reply ISO Mot. to Dismiss at 6-8, 17-18. Accordingly, none of Sambreel's antitrust claims (Counts I-IV) have any chance of success.

**D.    Sambreel's Unfair Competition Claim (Count V) Is Meritless and Unsupported**

To prove a likelihood of success on its Count V claim, Sambreel must identify an "unlawful, unfair or fraudulent business act" within the meaning of Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL"). Sambreel alleges that Facebook's actions to protect its website were "unfair" because they violated the policy and spirit of the antitrust laws, *see*

1    Compl. ¶ 94, and that Facebook's "checkpointing" was "unlawful" because it violated California Penal

2    Code § 502(c)(7), *see* Compl. ¶ 95.  Neither assertion is likely to succeed.

3        ***First***, the purportedly "unfair" activity Sambreel challenges is the same conduct alleged to

4    support its Sherman Act claims.  *See id.* ¶ 94.  As the Ninth Circuit has held, where "the same conduct

5    is alleged to support both a plaintiff's federal antitrust claims and a state-law unfair competition claim,

6    a finding that the conduct is not an antitrust violation ***precludes*** a finding of unfair competition."

7    *LiveUniverse, Inc.*, 304 F. App'x at 558.  Sambreel cannot use the UCL to mask its failure to identify a

8    cognizable antitrust claim.  *See* Reply ISO Mot. to Dismiss at 19.

9        ***Second***, Sambreel has not demonstrated a likelihood of success on its alternative claim that

10   Facebook "unlawfully" accessed its users' computers in violation of state law.   Sambreel's vague

11   assertion that Facebook has "gone beyond the traditional 'use' of a computer" by scanning users'

12   browsers to identify PageRage, *see* Mot. at 20, is factually wrong and legally insufficient.   It is

13   factually wrong because Facebook merely used "the same methods common for basic website

14   functionality" by "inspect[ing] the state of the incoming HTML code from the user's browser[.]"

15   Palow Decl. ¶¶ 4, 6.   It is legally insufficient because Sambreel does not allege that Facebook

16   "***over[came] technical or code-based barriers***" that had been "put in place to block defendant's

17   access" to any computer as required to state a Section 502(c)(7) claim.  *See In re Facebook Privacy*

18   *Litig.*, 791 F. Supp. 2d 705, 716 (N.D. Cal. 2011); Reply ISO Mot. to Dismiss at 18-19.

19       ### E.    All of Sambreel's Claims Are Barred by the Communications Decency Act

20       Separately and independently, the Communications Decency Act ("CDA") bars each of

21   Sambreel's claims.  Section 230 of the CDA provides sweeping immunity for:

22        (A) any action voluntarily taken in good faith to restrict access to or availability of
         material that the provider or user considers to be obscene, lewd, lascivious, filthy,
23       excessively violent, harassing or otherwise objectionable, whether or not such material
         is constitutionally protected; or

24
         (B) any action taken to enable or make available to information content providers or
25       others the technical means to restrict access to material described in paragraph (1).

26

27

28

47 U.S.C. § 230(c)(2); *see Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("[An] important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services.").[34]

### 1.   Facebook's Efforts to Restrict Sambreel's Adware Are Immunized by Section 230(c)(2) of the CDA

Facebook's defensive steps to protect its service from Sambreel's unauthorized ad injection constitute voluntary actions to restrict the availability of material that Facebook considers "obscene, lewd, lascivious, filthy, excessively violent, harassing or ***otherwise objectionable***" within the meaning of the CDA.  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Courts have broadly construed the statute's reference to "otherwise objectionable" material.  *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097 (N.D. Cal. 2011) (finding that Microsoft was immune under the CDA for blocking plaintiff's business-related emails, which satisfied the "otherwise objectionable" standard because 0.5% of them were sent to invalid addresses or resulted in a recipient "opting out" from further emails).[35]  Moreover, courts have recognized that the proper inquiry under the CDA is whether the ***defendant*** determined that the material was objectionable, not whether the material was in fact "objectionable" under any objective standard.  *E.g.*, *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) (holding that a defendant is granted immunity based on its subjective determination that material is "objectionable"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) (dismissing claims based on Google's efforts to block the plaintiff's politically-oriented ads under the CDA).

Here, ***both*** Facebook and its users considered material injected into facebook.com via Sambreel's adware to be obscene, lewd, harassing, or otherwise objectionable.  *See* Hoffman Decl. ¶¶ 45-46.  Sambreel has repeatedly exposed Facebook users (including minors) to excessive and lewd ads that users have described as "pornographic," "disgusting," "█████," and "taking over my

---

[34] Facebook falls within the CDA's definition of protected "interactive computer services."  *See Gaston v. Facebook, Inc.*, 2012 WL 629868, at *7 (D. Or. Feb. 2, 2012).

[35] *See Smith v. Trusted Univ. Standards In Elec. Trans., Inc.*, 2010 WL 1799456, at *6 (D.N.J. May 4, 2010) ("Congress included the phrase 'or otherwise objectionable' in its list of restrictable materials, and nothing about the context before or after that phrase limits it to just patently offensive items.").

homepage."[36]  *See* Appendix A at 3, 11, 14.  Thus, Facebook's steps to restrict this content falls squarely within the protection of Section 230(c)(2)(A).[37]  *See Langdon*, 474 F. Supp. 2d at 631.

### 2.  Application of CDA Immunity Bars All of Sambreel's Claims

Because Facebook's defense of its own service falls within both of the statutory safe harbors at Section 230(c)(2), the CDA bars all of Sambreel's claims.  The CDA carves out specific federal laws that are exempt from the CDA's immunity, *see* 47 U.S.C. § 230(e)(1), (e)(2), (e)(4), and courts have rightly held that Congress intended to extend immunity to those not specified.[38]  *E.g.*, *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 538-39 (E.D. Va. 2003) (finding that federal civil rights claims are preempted by § 230).  Because the CDA does not carve out the Sherman Act from the scope of its immunity, Sambreel's antitrust claims are preempted.  *See id.*  The CDA also preempts all state-law claims by stating that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3) .  Accordingly, courts have dismissed UCL and other tort claims such as Counts V-VII in Sambreel's complaint.  *E.g.*, *Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *8 (C.D. Cal. May 4, 2011) (the CDA's immunity "includes state law claims under the UCL").

---

[36] While Sambreel will undoubtedly contend that some users "choose" to use PageRage knowing it injects ads, this is irrelevant because Facebook is entitled to statutory immunity as long as *Facebook* determines that the PageRage-injected ads are objectionable or harassing.  *See Holomaxx Techs.*, 783 F. Supp. 2d at 1104; *see Pallorium, Inc. v. Jared*, 2007 WL 80955, at *7 (Cal. App. 4 Dist. Jan. 11, 2007) (rev. denied) (affirming the application of CDA immunity and explaining that "*whether [Defendant's] filter was over-inclusive is irrelevant* so long as *he* deemed the material to be . . . objectionable").

[37] Facebook's "checkpointing" independently falls within the CDA's second safe harbor immunizing "any action taken to enable or make available to information content providers or others the technical means to restrict access to material" that the defendant considers objectionable.  47 U.S.C. § 230(c)(2)(B).  Facebook took action to "make available" to users "the technical means to restrict access to" the objectionable ads by providing users with instructions and software to remove PageRage.  *See Pallorium*, 2007 WL 80955, at *7 (defendant immune from claims based on the distribution of blocking software).

[38] *See Smith v. Trusted Univ. Standards In Elec. Trans., Inc.*, 2011 WL 90096, at *5 (D.N.J. Mar. 15, 2011) ("[I]mmunity under the CDA applies to *all civil claims* except claims based on alleged violations of intellectual property law and the Federal Wiretap Act."); *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied[.]").

## II.     THE BALANCE OF EQUITIES OVERWHELMINGLY FAVORS DENIAL OF THE INJUNCTION

Sambreel likewise cannot establish "that the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20. The requested injunction would impair Facebook's business model; reward Sambreel's dishonest, inequitable, and unlawful conduct; and embolden similar attacks from other adware makers.

### A.     The PageRage Adware Impairs Facebook's Business Model

**Harm to Facebook's Service**:  As discussed in detail above, the size, placement, and content of PageRage-injected ads impair Facebook's design and greatly frustrate users.  *See supra* at 10, 13; Appendix A at 1-2.  As confirmed by an independent expert, PageRage also "fundamentally alters and negatively affects the Facebook user's experience" by creating "operational lag time" and apparent "technical faults" and obscuring "key official Facebook design elements."   Hung Decl. ¶¶ 61-64. Facebook users have wrongly blamed Facebook for PageRage's ills and threatened to quit Facebook as a result.  Appendix A at 5-6, 13-14.

Because Facebook and other social networking websites are free, they compete based on the *quality* of their services.  Facebook has achieved success in part because it does not do what PageRage seeks to do:  bombard users with obnoxious ads that detract from the user experience and slow down the browsing process.  Instead, Facebook regulates advertising in a manner that has benefited its users and countless developers that have made hundreds of millions of dollars from Facebook's model.  The requested injunction would jeopardize all of this by forcing Facebook to cede control over the design and performance of its service to *Sambreel*, a maker of adware with a very different vision of the user experience on Facebook.[39]

**Harm to Facebook's Monetization**:  PageRage-injected ads also interfere with Facebook's commercial relationships and impair Facebook's ability to monetize its own service.  Hoffman Decl. ¶¶ 47-49.  "Facebook's advertising customers pay for their ads to be shown to users in a discrete and tailored manner, relying on the predictability and organization of the Facebook layout." *Id.* ¶ 48.  As Sambreel's own CEO has admitted, ads injected by PageRage "might *shift* where [a Facebook ad] is a

---

[39] These concerns about the Facebook user experience are not hypothetical, as commentators have cited the obtrusive nature of advertising on MySpace as a critical factor in its user-base decline from 75.9 million to 25 million between 2008 and 2012.  *See* Holbrook. Decl. ¶ 25, Ex. 63 (*MySpace to declare one million new users*, New York Times (Feb. 13, 2012)); *see supra* at 6 n.5.

little bit or it might detract from the revenue Facebook is making from it." *See supra* at 10.   Witness and expert testimony confirm this displacement.   Hung Decl. ¶ 29; McGuire Decl. ¶ 12; Hoffman Decl. ¶ 48.   PageRage-injected ads are also untargeted, ubiquitous, and splashed across the Home Page and various other unapproved locations.   When Facebook users are bombarded with such ads, they are less likely to pay attention to legitimate Facebook Ads.   Hoffman Decl. ¶ 49.   Thus, Sambreel's adware harms Facebook's business model by impairing the unique value Facebook seeks to provide to its legitimate advertising customers.[40]   *Id.* ¶¶ 47-49.

**B.     The Injunction Would Reward Sambreel's Dishonest and Unlawful Conduct**

The equitable remedy of a preliminary injunction should not be awarded to a party with unclean hands.   *See Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 876-77 (9th Cir. 2000).   Here, Sambreel's business model relies on misleading Facebook users and the creation of fraudulent "customer" reviews to mislead consumers and review organizations such as WOT.   *See supra* at 12.

Sambreel's advertising for PageRage also falsely and misleadingly suggests to users and to advertisers that Facebook approves or endorses PageRage.[41]   *See supra* at 11.   Sambreel and its affiliates promote PageRage using elements intended to mimic Facebook's own webpage, exhorting users to "Install New Facebook Layouts." *See* McGuire Decl. ¶ 32. A substantial number of consumers downloaded PageRage under the mistaken assumption that it was approved by or affiliated with Facebook, and they later complained to and blamed Facebook for the resulting alterations to their Facebook pages. McGuire Decl. ¶ 30, Ex. 22; Appendix A 13-16.   Having damaged Facebook through its false advertisements, Sambreel should not be entitled to an injunction that would allow its conduct to continue.   In addition, adware programs that operate in a manner similar to PageRage have

---

[40] Because the requested injunction would cause harm to Facebook's business for the reasons set forth herein and in Facebook's supporting declarations, Facebook requests that Sambreel be required to post security pursuant to Federal Rule of Civil Procedure 65(c) prior to any preliminary order.

[41] "A prima facie case [of false advertising] requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in a commercial advertisement or promotion; (3) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (4) the deception is material, in that it is likely to influence the purchasing decision; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 n.4 (9th Cir. 2002) (citation omitted).

1   themselves been enjoined for violation of the Lanham Act.   *See Washington Post Co. v. Gator Corp.*,

2   No. civ-02-00909-A (E.D. Va. July 16, 2002) (enjoining a maker of adware from "[a]ltering or

3   modifying . . . any part of any website owned by or affiliated with [the plaintiff], in any way, including

4   its appearance or **how it is displayed**");[42] *see also Hard Rock Cafe Int'l. (USA) Inc. v. Morton*, 1999

5   WL 717995, at \*24 (S.D.N.Y. Sept. 9, 1999) (enjoining the defendant's attempt to advertise or sell

6   CDs in an internet window "framed" within the Hard Rock website).   At minimum, these decisions

7   counsel against the award of a preliminary injunction validating Sambreel's scheme at this early

8   stage.

9        **C.**     **The Requested Injunction Would Encourage Similar Free-Riders**

10        The requested injunction cannot be viewed in a vacuum.   If Facebook is enjoined from

11   protecting its service against Sambreel's adware, it would be difficult to discern any limiting principle.

12   Such an injunction would embolden other opportunists to similarly free-ride on Facebook and (as

13   discussed further below) other popular websites.   *See* Hoffman Decl. ¶ 51.   An injunction here would

14   punish the innovator Facebook, reward the parasite Sambreel, and encourage further attacks by lurking

15   free-riders.   Nothing could be more inequitable than letting one party sponge profit from the labor and

16   creativity of another.

17   **III.**     **THE PUBLIC INTEREST REQUIRES DENIAL OF THE INJUNCTION**

18        Sambreel has failed to "establish that . . . an injunction is in the public interest." *Winter*, 555

19   U.S. at 20.   "The public interest inquiry primarily addresses impact on non-parties rather than parties."

20   *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002).

21        Sambreel's argument on this required element boils down to two assertions: (a) that the public

22   interest is generally implicated in antitrust cases and (b) that Facebook's guiding principles encourage

23   user autonomy.   *See* Mot. at 24-25.   On the first point, Sambreel's antitrust claims are meritless, and in

24   any event Sambreel "cannot bootstrap a presumed success on the merits into the balancing analysis."

25   *Lee v. State*, 869 F. Supp. 1491, 1502 (D. Or. 1994).   And on the second point, the fact that

26   Facebook's principles encourage user autonomy is not consonant with Sambreel's effort to turn

27

28   [42] *See* Holbrook Decl. ¶¶ 27-28, Ex. 65 (injunction order); Ex. 66 (injunction hearing transcript).

Facebook into an open ground for Sambreel's monetization. Autonomy means the ability of users to utilize legitimate Facebook and Facebook Platform options; it does not mean the ability to use prohibited adware in violation of Facebook's Terms of Use.

Moreover, the requested injunction would harm non-parties in three fundamental ways: *First*, by enjoining Facebook from controlling the use of its own website, the injunction would create a deeply troubling internet precedent. Like Facebook, virtually every popular website uses online terms to regulate its relationships with users and third parties.[43] For example, Microsoft recently convinced Sambreel to halt its ad-injection attack on Microsoft's "Bing" search engine by citing Bing's terms of use and threatening to bring suit. *See* Harmon Decl. ¶¶ 8, 13. Without this basic ability to control one's own website, the internet would effectively devolve into a Hobbesian collection of platforms available to all-comers without restriction and without reward for original creation and innovation. As soon as one website became popular, hordes of free-riders such as Sambreel would create "complementary" products designed to inject unauthorized ads on that platform with impunity. Because such a rule would severely impair incentives to innovate and develop new platforms, the public interest strongly favors protecting online terms of use. *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1331 (M.D. Fla. 2000) ("[T]he public interest is disserved when one competitor is permitted to free ride on the efforts of another[.]").

*Second*, by impairing Facebook's business and user experience, the injunction would directly harm thousands of legitimate businesses that have grown from and now rely on Facebook. The Facebook business model has facilitated hundreds of thousands of new jobs, primarily due to the availability of the Facebook Platform for app developers. *See* Holbrook Decl. ¶ 19, Ex. 57, at 683.[44] By impairing the user experience and driving users away from Facebook, ubiquitous ad injection by Sambreel and similar companies would also drive users away from the Facebook Platform. In effect,

---

[43] Online terms have been repeatedly upheld as valid agreements by courts nationwide. *See United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009) (collecting cases).

[44] *See also* Holbrook Decl. ¶ 26, Ex. 64 (Ki Mae Heussner, *10 startups that couldn't have done it without Facebook,* GigaOM, http://gigaom.com/2012/05/17/10-startups-that-couldnt-have-done-it-without-facebook/ (discussing Facebook's positive impact on the economy and noting that "the future of thousands of companies around the world is now tied to Facebook's success")).

the requested injunction would punish app developers who play by the rules, and reward adware makers like Sambreel who seek to write their own.

*Third*, Facebook users would continue to be exposed to Sambreel's pattern of offensive, disruptive, and false and misleading ads. *See supra* at 13. The public interest factor overwhelming favors the denial of such an injunction.

## IV.   SAMBREEL CANNOT SHOW A "LIKELIHOOD" OF IRREPARABLE HARM

Finally, Sambreel has failed to show a *likelihood* of suffering irreparable harm absent a preliminary injunction. *See Winter*, 555 U.S. at 21. Irreparable harm "is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate." *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1162 (C.D. Cal. 2003) (citation omitted). In evaluating Sambreel's claimed harm, it is critical to consider Sambreel's two distinct requests for injunctive relief—preventing Facebook from (1) enforcing its policies with Advertising Providers and (2) checkpointing its own users.

### A.   Sambreel's Delay in Bringing Suit Bars a Preliminary Injunction

Courts have repeatedly held that a delay of several months before seeking injunctive relief shows a lack of irreparable harm. *See, e.g., Baker v. Ark. Blue Cross*, 2009 WL 764885, at *1-2 (N.D. Cal. Mar. 19, 2009) (finding March 2009 injunctive request "untimely" where premised on conduct the plaintiff was aware of since December 2008).[45] Here, Sambreel admits that it has been aware of enforcement against advertising partners since at least July or August of 2011. Sullivan Decl. ¶¶ 2-3; Trouw Decl. ¶ 22. In fact, ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ .[46] Sambreel further acknowledges that it was aware of the checkpointing process by mid-December. Trouw Decl. ¶¶ 23-25. Despite this admitted knowledge, Sambreel waited to pursue injunctive relief until March 19, 2012—*eight months* after learning of the

---

[45] *See also Oakland Trib., Inc. v. Chron. Pub. Co., Inc.*, 762 F.2d 1374, 1376-77 (9th Cir. 1985) (holding that a "long delay . . . implies a lack of urgency").

[46] Sambreel further admits to knowledge of the full magnitude of the "loss" by "late 2011." Pls.' Opp. to *Ex Parte* App. (Doc. No. 16) at n.5. Tellingly, while Sambreel now claims that it suffered a "loss" of significant "magnitude" as a result of Facebook's interaction with its ad providers, *id.*, ████████ ████████████████████████████████████████████████████████████████ .

purported "boycott" and *three months* after learning of the checkpointing.  Accordingly, Sambreel's delay belies any claim for the drastic remedy of a preliminary injunction.  *See Baker*, 2009 WL 764885, at *1-2.

**B.      Monetary Damages Will Fully Compensate any Purported Injury, as Sambreel Admits that Its Business Will Survive Absent an Injunction**

Sambreel's alleged harm is compensable by money damages.  "[A] loss of customers and a resulting loss in revenue . . . do not amount to irreparable harm because such injuries are measurable and thus have an adequate remedy at law."  *Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.*, 1994 WL 125173, at *3-4 (N.D. Cal. Mar. 31, 1994).  This is particularly true in this antitrust case given that Sambreel seeks *treble* damages, which removes any uncertainty as to whether the amount of damages is sufficient.  *E.g.*, *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991) (vacating injunction and noting that "the potential for treble damages further undercuts [plaintiff's] argument that it will be irreparably harmed").[47]

Moreover, Sambreel admits that "[b]ased on its current projections, *Sambreel should be able to survive as a company*" based on the steps it has already taken.  Trouw Decl. ¶ 44.  This admission forecloses a finding of irreparable harm, regardless of Sambreel's vague allegations about "goodwill" and "prospective customers":  "*Without a sufficient showing that [the alleged exclusionary practices] threatened [plaintiff's] existence, any loss in revenue due to an antitrust violation is compensable in damages.*"  *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing a grant of a preliminary injunction); *see Am. Promo. Events, Inc. v. City and County of Honolulu*, 796 F. Supp. 2d 1261, 1284 (D. Haw. 2011) ("Although the loss of goodwill and reputation are important considerations in determining the existence of irreparable injury, there must be credible and admissible evidence that such damage threatens Plaintiff's businesses with termination.") (citation omitted).

Sambreel cannot manufacture irreparable harm by claiming that "if the Court denies the preliminary injunction, Sambreel intends to completely deactivate PageRage" and shutter Theme Your

---

[47] *See also Amylin Pharms., Inc. v. Eli Lilly and Co.*, 2011 WL 5237558, at *3 n.4 (S.D. Cal. Jun. 8, 2011) ("That treble damages are available . . . bolsters the conclusion that money damages would remedy any potential harm.").

World LLC, the subsidiary that operates PageRage. *See* PI Mot. at 21; Trouw Decl. ¶ 43. PageRage is just one of Sambreel's products—a specific adware program that operates solely on Facebook. *See* Mot. at 5. Sambreel has numerous other adware products and related LLCs, including those that operate on other websites such as MySpace. *See id.*; ███████████████████████. Thus, Sambreel's argument boils down to the claim that its inability to inject ads **on Facebook alone** constitutes an irreparable injury, and courts have rightly rejected claims based on preclusion from a specific venue. *E.g.*, *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) ("[E]ven assuming the plaintiffs had to move their store to another, less profitable venue, this move would constitute merely an economic loss.").

Finally, Facebook's enforcement of its terms and policies with Advertising Providers cannot create a likelihood of irreparable harm for separate and independent reasons. While Sambreel attempts to focus on the 80 entities on Facebook's Advertising Provider list, there are hundreds of additional advertising networks on the internet that Sambreel can and has used to facilitate its scheme. ███████████████████████████████████████████████████████

## CONCLUSION

For all of the foregoing reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction and dismiss the Complaint.

DATED: July 13, 2012

Respectfully submitted,

KIRKLAND & ELLIS LLP

*s/ James F. Basile*
James F. Basile
james.basile@kirkland.com
Elizabeth L. Deeley
elizabeth.deeley@kirkland.com
Susan Davies (Admitted *pro hac vice*)
susan.davies@kirkland.com
Adam L. Gray
adam.gray@kirkland.com

Attorneys for Defendant
FACEBOOK, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 13, 2012, I electronically filed the foregoing **DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Court's Electronic Mail Notice List.

Dated: July 13, 2012

/s/ *James F. Basile*
James F. Basile