Gregory P. Olson (Ca. Bar No. 177942)
LAW OFFICE OF GREGORY P. OLSON
501 West Broadway, Suite 1370
San Diego, CA 92101
Telephone: (619) 564-3650
Facsimile: (619) 233-1969
greg@olsonesq.com

Daniel Kotchen (*Pro Hac Vice*)
Daniel Low (*Pro Hac Vice*)
Robert Klinck (*Pro Hac Vice*)
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037
Telephone (202) 416-1848
Facsimile: (202) 280-1128
dkotchen@kotchen.com
dlow@kotchen.com
rklinck@kotchen.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No.: 12-CV-00668-CAB-KSC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION.**<br><br>Judge:    Hon. Cathy Ann Bencivengo<br>Hearing Date: August 9, 2012<br>Hearing Time: 10:00 a.m.<br>Dept.:    Courtroom 2 |

1

## <u>TABLE OF CONTENTS</u>

2  TABLE OF AUTHORITIES ..................................................................................................ii

3  INTRODUCTION ..................................................................................................................1

4  CLARIFICATION OF FACEBOOK'S FACTUAL DISTORTIONS .......................................2

5       A. How PageRage Operates...........................................................................................2

6       B. PageRage Has Millions Of Users And Is Popular......................................................3

7       C. Facebook Operates An Add-On And Allows A Program Similar To PageRage.............5

8  ARGUMENT .........................................................................................................................6

9       A. Sambreel Has A Strong Likelihood Of Success On The Merits.....................................6

10         1. Facebook's Actions Are *Per Se* Illegal Under Section 1 Of The Sherman Act ...6

11            a. Facebook Has Organized A Group Boycott...............................................6

12            b. Facebook Has Engaged In *Per Se* Unlawful Tying ...............................10

13         2. Facebook's Actions Violate Section 2 Of The Sherman Act ...........................10

14            a. Facebook Has Engaged In Exclusionary Conduct..................................10

15            b. Facebook Has Significant Market Power ...............................................12

16         3. Facebook's Actions Violate California's Unfair Competition Law ..................14

17         4. Sambreel Has Suffered Antitrust Injury ........................................................15

18         5. The Communications Decency Act Does Not Immunize Facebook's Actions..15

19       B. Sambreel Will Be Irreparably Harmed In The Absence Of Injunctive Relief...............17

20       C. The Balance Of Equities Favor Sambreel .................................................................19

21       D. The Public Interest Favors Sambreel .......................................................................19

22  CONCLUSION....................................................................................................................20

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3 **Cases**

4 *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005) ...................................19

5 *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) ...........................8

6 *Bristol Tech. Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153 (D. Conn. 1998)...............................15

7 *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717 (1988)......................................................8

8 *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ..................................19

9 *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (Cal. 1999)...............14

10 *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997)......................15

11 *Doe v. Franco Productions*, No. 99 C 7885, 2000 WL 816779 (N.D. Ill. June 22, 2000)........................16

12 *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992) ..............................1, 8, 10, 11

13 *Facebook, Inc. v. Power Ventures, Inc.,* No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ...........................................................................................................................11

14 *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941).................................1, 6, 8

15 *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986).....................................................................1

16 *FTC v. R.R. Donnelley & Sons Co.*, Civ. A. No. 90-1619 SSH, 1990 WL 193674 (D.D.C. Aug. 27, 1990) ...........................................................................................................................12

17

18 *Grading Serv. v. eBay, Inc.,* No. C 09-2755 RMW, 2011 WL 846060 (N.D. Cal. March 8, 2011) .........11

19 *Hairston v. Pac. 10 Conference*, 101 F.3d 1315 (9th Cir. 1996) ..................................................15

20 *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir. 1973)..............................8

21 *Hyperphase Techs., LLC v. Google, Inc.*, 580 F. Supp. 2d 797 (W.D. Wis. 2008)........................3

22 *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010) ..............................................18

23 *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ......................11

24 *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) .............................................6, 7

25 *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ...........................................................................................................................14

26

27 *LiveUniverse, Inc. v. Myspace, Inc.*, 304 F. App'x 554 (9th Cir. 2008)......................................14

*LiveUniverse, Inc. v. Myspace, Inc.*, No. CV 06-6994, 2007 WL 6865852 (C.D. Cal. June 4, 2007)......11

28

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ........................................................................1

*Mainstream Loudon v. Bd. of Trustees of the Loudon County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998) ..........................................................................................................................................................16

*Malaney v. UAL Corp.* No. 3:10-cv-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) .............13

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Company*, 472 U.S. 284 (1985)...8

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ...................................................................................6

*Quezada v. BP Prods. N. Am., Inc.*, No. 06 CV 5378 SJ, 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006) ..18

*Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) .................17

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984)........................................12

*Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ....................................17

*Thalheimer v. City of San Diego*, 706 F. Supp. 2d 1065 (S.D. Cal. 2010)................................................19

*Town of Massena v. Niagara Mohawk Power Corp.*, No. 79-CV-163, 1980 WL 1889 (N.D.N.Y Sept. 8, 1980) .........................................................................................................................................................8

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ............................................................................9

*United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008 (N.D. Ill. 2006) ................................13

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) .........................................................16

**Statutes**

47 U.S.C. § 230(b)(2) .................................................................................................................................16

47 U.S.C. § 230(b)(3) .................................................................................................................................17

47 U.S.C. § 230(c)(2) .................................................................................................................................16

California Penal Code Section 502(c)(7)....................................................................................................14

**Other Authorities**

Black's Law Dictionary (7th Ed. 2000)......................................................................................................16

Statement of Federal Trade Commission Concerning Google/DoubleClick, File No. 071-0170 (Dec. 20, 2007) .......................................................................................................................................................13

## I.    INTRODUCTION

Facebook admits that it has engaged in a scheme to force PageRage from the market by: (1) coercing advertisers not to do business with PageRage and (2) forcing consumers to agree not to use PageRage.  As a result, Sambreel has suffered substantial losses, laid off half its workforce, and defaulted on its line of credit.  *See* Sambreel's Memorandum of Points and Authorities (Doc. No. 3-1) ("Sambreel Br.") at 9-10.  Facebook asks the Court to allow it to continue its scheme during the pendency of this case, thereby forcing Sambreel to take PageRage off the market.  Facebook's arguments fail.

Sambreel's likelihood of success is high.  The Supreme Court has repeatedly held that the type of conduct at issue here is unlawful.  *See, e.g., Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 465-68 (1941) (concluding a group boycott was *per se* illegal); *Lorain Journal Co. v. United States*, 342 U.S. 143, 152 (1951) ("The publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated § 2."); *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 463 (1992) (concluding that Kodak's requirement that it would sell parts to customers only if they agreed to not use competing service companies was *per se* illegal).  Facebook relies exclusively on cases that do not involve remotely similar business practices as those at issue.

Because the case law is so uniformly against it, Facebook chooses to focus much of its brief and declarations on rhetoric and arguments that denigrate PageRage.  Facebook's criticism is legally irrelevant because the antitrust laws do not allow a competitor to "pre-empt the working of the market by deciding for itself that its customers do not need that which they demand."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 462 (1986).  And Facebook's criticisms are hypocritical, pretextual, and based upon a blatantly misleading factual recitation.  In spite of the fact that browser add-ons, such as Sambreel's products, are a well established part of the internet landscape, Facebook uses considerable rhetorical flair to castigate PageRage – *e.g.*, suggesting that it "hijacks" Facebook's page, "intercepts" transmissions, "injects" content, and "infects" users' computers.  But Facebook cannot possibly mean what it says because it operates its own browser add-on that could just as easily be characterized in these terms.  The facts also belie Facebook's direct assertions that it is seeking to block Sambreel because of its functionality.  Facebook allows browser add-ons that function nearly identically to PageRage so long as these programs do not compete with Facebook for advertisements.  Sambreel's technical analysis of one

1   such program – PageCraze – demonstrates that nearly all of the technical complaints raised by

2   Facebook's expert are equally applicable to the approved Facebook Application. Facebook's concern

3   with PageRage is solely that PageRage is a significant, low-cost alternative for advertisers.

4       Aside from failing to inform the Court of its own browser add-on and its approved Facebook

5   layout applications, Facebook denigrates PageRage with a stilted, one-sided recitation of the facts.

6   Facebook simply ignores the facts that do not fit its narrative. Facebook, for example, fails to note that

7   since April 2010, over 11 million users have installed PageRage directly from PageRage's website.

8   Facebook fails to inform the Court of the significant number of positive e-mails about PageRage, the

9   significant number of e-mails seeking technical support (indicating that users want to use the product),

10   and the PageRage fan pages on Facebook that have over 10,000 "likes." The actual facts – as opposed to

11   Facebook's one-sided rendition – demonstrate that consumers want PageRage.

12       Facebook's discussion of the equitable factors is misguided. The stakes of this motion could not

13   be higher for Sambreel. In the absence of a preliminary injunction, Sambreel will have no choice but to

14   remove PageRage – one of its most popular products – from the market. This will result in a

15   considerable loss of goodwill and potential customers. These are irreparable harms. While the impact of

16   removing PageRage from the market will be devastating for Sambreel, Facebook has not set forth

17   anything beyond its pure speculation that it will be harmed by a granting of the preliminary injunction.

18       Finally, the public interest factor weighs heavily in Sambreel's favor. This case involves a

19   fundamental issue: Should consumers have the right to decide *for themselves* what products they wish to

20   use? Sambreel does not seek to force anyone to use its product. Facebook, on the other hand, believes

21   that it has the right to decide for *all consumers* that PageRage is a bad product that should not be on the

22   market. With all due respect, that is not Facebook's choice to make. The public interest will be served

23   by allowing consumers the right to decide for themselves whether to use PageRage.

24   **II.   CLARIFICATION OF FACEBOOK'S FACTUAL DISTORTIONS**

25       **A.   How PageRage Operates.**

26       Internet web browsers operate to allow computer users to see visual representations of internet

27   web pages. Web browsers receive information from internet servers and convert the information into a

28   document object model ("DOM"). *See* Arana Decl. ¶ 2. The web browser creates a visual representation

that is displayed on the user's computer.  *Id.*  Web browsers are designed to be modified by add-ons, which are programming that modifies the browser's functionality.  *Id.* ¶¶ 3-4.  The makers of web browsers encourage developers to create add-ons and willingly provide developers with programming details.  *See id.* ¶ 3.  A vibrant market has emerged for the development of add-ons.  *See id.* ¶ 5.

PageRage operates as part of the Yontoo browser add-on that resides on an individual user's computer.  *See id.* ¶¶ 6-7.  PageRage allows a user to customize the way that he or she views web pages operated by Facebook.  *See id.* ¶ 6.  The customization occurs *entirely* on the web browser operated on the user's computer.  *See id.* ¶ 7.  PageRage creates the custom views by adding layers to the DOM on the individual user's web browser.  *Id.*

PageRage does not interact with Facebook's computers, does not make any changes to the information on Facebook's servers, does not intercept the information that is sent from Facebook's computers to users' computers, and does not make changes that are visible by any users who have not downloaded PageRage.  *Id.* ¶ 7; *cf. Hyperphase Techs., LLC v. Google, Inc.*, 580 F. Supp. 2d 797, 809 (W.D. Wis. 2008) ("Just as it cannot alter the addressing standard of its third party providers, [Google's browser add-on] cannot modify the web pages it parses. Rather, it modifies a memory representation of the web page solely for the potential benefit of the particular user.").[1]

As it currently operates, PageRage allows users to add designs that appear on the browser when the viewer views the Facebook website.  *See* Arana Decl. ¶ 8.  PageRage also places advertisements that users see when they are using PageRage.  *See id.*  None of the ads cover any Facebook content.  *See id.*  As with all PageRage content, these ads are seen *only* be users who have downloaded PageRage.  *See id.*  And each of the ads has a link at the bottom that says:  "PageRage Ad."  *See* Sullivan Reply Decl. ¶ 20. When a user clicks on the "PageRage Ad" link, it takes them to a website that explains why the ad is there and allows the user to disable PageRage with the click of a button.  *See id.*

### B.    PageRage Has Millions Of Users And Is Popular.

Since April 2010, nearly 20 million people have installed PageRage.  Of those installs,

---

[1] Facebook asserts that PageRage "intercepts" the transmissions from Facebook's computers to a user's web browser.  *See* Facebook's Opposition Brief (Doc. No. 41-1) ("FB Br.") at 9.  This is false.  *See* Arana Decl. ¶ 7.

1    Sambreel's data indicates that approximately 11 million were the result of a user installing PageRage

2    individually (*i.e.*, not as a part of a software bundle). *See* Arana Decl. ¶ 13. This is in addition to the

3    over 8 million individuals who installed PageRage as part of a software bundle. While Facebook

4    denigrates bundling, it is an accepted practice that is used by a number of the largest software and

5    internet companies, including: Google, Microsoft, Adobe, Hewlett-Packard, McAfee, Oracle, Symantec,

6    and Yahoo. *See* Decl. of M. Levin ¶¶ 2-8; Exs. 2-7. As Facebook's expert demonstrates, a user must

7    consent to the installation of PageRage as a part of a bundle. *See* Decl. of E. Hung ¶¶ 11-13.

8        To date, users have created more than 13 million custom layouts. *See* Arana Decl. ¶ 14. At its

9    peak, users were creating tens of thousands of these custom layouts, and more than 100,000 users would

10   select or change their layout *each day*. *See id.* ¶¶ 14-15. As these statistics show, PageRage is a product

11   that users want and use. Moreover, PageRage's customer service e-mail account receives complimentary

12   e-mails praising the product and e-mails seeking technical support. *See* Exs. 8-9. At various times, there

13   have also been PageRage "Fan" pages set up on Facebook. There are currently at least four such pages,

14   and more than 10,000 users have "liked" these combined pages. *See* Ex. 10.

15        Facebook spends much of its brief suggesting that PageRage receives more than its fair share of

16   user complaints in spite of the fact that this is legally irrelevant. Facebook has asserted repeatedly that its

17   users complain "loudly and repeatedly" about PageRage and are confused about the source of

18   PageRage's ads. *See* Doc. No. 10-1 at 1. To support this assertion, Facebook has submitted complaints

19   that it received from 57 users. *See* Facebook's Exs. 17-23. Facebook refers to these as a "sampling" of

20   the complaints but does not provide any further information about the number of complaints. Facebook's

21   submission is especially sparse with complaints showing that users are "confused" about the source of

22   PageRage's ads.[2] Facebook includes four such e-mails. *See* Facebook's Ex. 22. One of those four

23   cannot be about PageRage because it is from a period when PageRage did not contain advertising. *See*

24   *id.* at 192-93 (complaint dated Feb. 23, 2012). Facebook actually demonstrates that PageRage does not

25

---

26   [2] Facebook also repeats its representation that a "prominent technology blogger" was confused about
whether the PageRage ads were placed by Facebook. *See* FB Br. at 13. The individual Facebook refers

27   to is not a "technology blogger" much less a prominent one. The website describes the blogger as an
"on-air & voice talent," "entertainer," "singer/musician," "actor," "comedian," "writer," and "producer."

28   *See* http://mikeholder.com.

1  lead to an inordinate number of complaints.

2        Facebook also cites e-mails that Sambreel produced from its files.  Facebook has categorized e-

3  mails that are either complaints or requests for help uninstalling.  Facebook identifies approximately

4  8,000 complaint e-mails and 11,000 e-mails asking for help uninstalling the product.[3]  Considering that

5  PageRage has been installed approximately 20 million times, Facebook's analysis demonstrates that one

6  out of every 2,500 users have sent an e-mail complaining and one out of every 1,800 users have e-mailed

7  asking for help uninstalling the product.  Facebook's attempt to dwell on these e-mails is misguided.  In

8  fact, Facebook receives considerably more complaints per user about its own product.[4]

9        Facebook's attempt to denigrate PageRage based upon the nature of the complaints is likewise

10  meritless.  Sambreel works to ensure that its advertising partners do not serve ads that are misleading or

11  have adult content.  *See* Sullivan Reply Decl. ¶¶ 17-19.  Because online advertisements are placed in real

12  time, inappropriate ads sometimes make it through a company's best efforts to stop them.  *See id.* ¶ 19.

13  Facebook's discussion of its own advertising system demonstrates that it is not immune from this

14  problem.  Facebook notes that it has a feature that allows a user to block an advertisement and includes a

15  check box that allows a user to identify the ad as, among other things, "misleading," "sexually explicit,"

16  or "offensive."  *See* Hoffman Decl. ¶¶ 22-24.  Presumably, Facebook created this list based upon the

17  types of inappropriate advertisements that were slipping through its screening process.  Sambreel – just

18  like Facebook – investigates complaints about inappropriate advertising and takes action to prevent those

19  ads from appearing in the future.  *See* Sullivan Reply Decl. ¶ 19.  Accordingly, Facebook's attempt to

20  rely on the presence of some "objectionable" advertisements on PageRage is disingenuous.

21      **C.**    **Facebook Operates An Add-On And Allows A Program Similar To PageRage.**

22        While Facebook uses considerable rhetorical flair to castigate PageRage and to suggest that

23

24  ───────────────────

25  [3] Sambreel suspects that these totals include considerable double counting.  Specifically, if an e-mail contained multiple complaints, Sambreel suspects that Facebook counted it as a complaint in multiple of

26  its categories.  The declaration submitted by Facebook does not make clear whether this is the case.  *See* Holbrook Decl. ¶¶ 2-10.  For the sake of this Reply, Sambreel simply assumes that there was no overlap.

27  [4] For example, Facebook receives 2 million complaints (or one for every 450 users) *per week*.  *See* Exhibit 11.  Facebook has faced so many complaints that there is a Wikipedia page dedicated to

28  "Criticism of Facebook."  *See* http://en.wikipedia.org/wiki/Criticism_of_Facebook.

1  browser add-ons are somehow inappropriate programs, it fails to inform the Court that it actually offers a
2  browser add-on. Facebook's add-on injects a "toolbar" that appears at the top of a user's browser. *See*
3  Adams Decl. ¶ 19.   This toolbar "hijacks" other websites by giving users access to Facebook
4  functionality while they are on other websites. *See id.* ¶¶ 18-19. The toolbar also allows users to have a
5  "Facebook Sidebar" that "injects" Facebook content on the left margins of the browser while users
6  browse the internet. *See id.* ¶¶ 18, 20. Facebook's add-on operates while users are visiting competing
7  social networking sites, including Google+. *See id.* ¶ 19-20. Facebook's add-on also can obscure the
8  underlying websites. *See id.* ¶¶ 21-23.

9      Facebook also fails to inform the Court that there is an application on the Facebook Platform
10  offered by a developer known as "PageCraze" that operates in a fashion that is nearly indistinguishable
11  from Facebook's description of PageRage – except that it does not show advertising to users. *See* Adams
12  Decl. ¶¶ 3-15. PageCraze operates as part of a browser add-on, it allows users to add custom layouts, it
13  markets itself as offering "Facebook Layouts," it covers Facebook functionality, it adds tabs and
14  functionality, it allows users to install backgrounds that obscure Facebook content, and it allows users to
15  install layouts that contain "adult" themed material. *See id.* PageCraze also accesses information about
16  Facebook users through the Facebook Platform. *Id.* ¶ 8, Fig. 5.

17  **III.   ARGUMENT**
18      **A.    Sambreel Has A Strong Likelihood Of Success On The Merits.**
19          **1.    Facebook's Actions Are *Per Se* Illegal Under Section 1 Of The Sherman Act.**
20              **a.    Facebook Has Organized A Group Boycott.**
21      The Supreme Court has held consistently that horizontal agreements to engage in group boycotts
22  are *per se* unlawful. *See, e.g., Fashion Originators*, 312 U.S. at 465-68; *Klor's, Inc. v. Broadway-Hale*
23  *Stores, Inc.*, 359 U.S. 207, 212-13 (1959). In 1998, the Supreme Court reaffirmed what it viewed as the
24  classic example of a group boycott that is subject to the *per se* illegality rule – cases in which a "group of
25  competitors threatened to withhold business from third parties unless those third parties would help them
26  injure their directly competing rivals." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). Here,
27  the facts fit precisely within this definition. Facebook and its application developers are horizontal
28  competitors because they compete in selling display advertisements. In fact, often times, users are shown

advertisements served by *both* Facebook *and* an application developer while they are viewing a single web page.  *See* Adams Decl. ¶ 29.  An advertiser could thus choose to purchase an ad from either entity. And, Facebook concedes that all Facebook application developers have agreed to use only approved advertising partners and Facebook blacklists any advertising partner who does business with PageRage. *See* FB Br. at 7, 14.   Thus, a group of competitors (Facebook and the application developers) have threatened to withhold business from third parties (advertising partners) unless those third parties help injure a directly competing rival (Sambreel).  Facebook's concessions are dispositive under *NYNEX*.

Rather than addressing *NYNEX*, Facebook attempts to distinguish *Fashion Originators* by suggesting that the agreements at issue in that case were more extensive than those present here.  *See* FB Br. at 22; *see also* Facebook's Motion to Dismiss Reply Brief (Doc. No. 35) at 11-12.   Facebook's arguments are irrelevant as a matter of law and wrong as a matter of fact.  First, in *NYNEX*, the Supreme Court did not rely upon the breadth of the boycott in *Fashion Originators*.  Thus, Facebook's suggestion that *Fashion Originators* turned on the breadth of the agreement at issue is wrong.  Second, even if the breadth of the agreement mattered, the boycott at issue here is significantly broader.   According to Facebook, *9 million* developers operate on the Facebook Platform.  *See* FB Br. at 7.  And all of these developers have agreed – as a condition of doing business with Facebook – not to use advertising partners blacklisted by Facebook.  *See id.* at 7.   Moreover, Facebook acknowledges that it has 80 advertising partners who have agreed not to do business with developers blacklisted by Facebook.  *See* FB Br. at 35.  Thus, the boycott in this case is considerably more widespread than the boycott at issue in *Fashion Originators*.[5]

Facebook also asserts that the boycott in *Fashion Originators* was different in kind because it involved a boycott of stores that sold "lower-priced garments," while Facebook's boycott is aimed at protecting its website.  *See* FB Br. at 22.  Facebook mischaracterizes the boycott in *Fashion Originators*. That case involved a boycott of any store that sold clothes that were "copies" of the garments

---

[5] Facebook's suggestion also cannot be squared with *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959).  In *Klor's*, a single department store organized a boycott that involved 10 manufacturers and their suppliers refusing to do business with a *single* competitor.  *See id.* at 208.  The Supreme Court concluded without hesitation that the *per se* illegality rule should apply to those facts.  *Id.* at 210.

1   manufactured by members of the boycott. *See Fashion Originators*, 312 U.S. at 461.  The defendants

2   asserted that they were trying to protect their designs.  *Id.*  Facebook makes *precisely* the same argument

3   here.  *See* FB Br. at 22.  Accordingly, *Fashion Originators* is directly on point.

4         Facebook also argues that the *per se* illegality rule does not apply because it is not a horizontal

5   "competitor" with the application developers.  The only support Facebook can muster for this proposition

6   is the Supreme Court's straightforward statement that: "[r]estraints imposed by agreement between

7   competitors have traditionally been denominated as horizontal restraints, and those imposed by

8   agreement between firms at different levels of distribution as vertical restraints." *See Bus. Elec. Corp. v.*

9   *Sharp Elec. Corp.*, 485 U.S. 717, 730 (1988).  That case does not aid Facebook's argument, however,

10  because it involved a clearly vertical relationship in which the parties to the agreement did not compete

11  in any markets. *Id.* at 721. Even if a party has a vertical relationship in one market, it can be a horizontal

12  competitor in others.  In *Eastman Kodak*, for example, the Supreme Court concluded that because Kodak

13  and the service providers were competitors in the market at issue, their relationship was "horizontal" for

14  the antitrust purposes. *See Eastman Kodak*, 504 U.S. at 471 n. 18; *see also Hobart Bros. Co. v. Malcolm*

15  *T. Gilliland, Inc.*, 471 F.2d 894, 899 (5th Cir. 1973) (concluding that relationship was horizontal where

16  manufacturer entered into agreement with one of its distributors where the parties competed in another

17  market); *Town of Massena v. Niagara Mohawk Power Corp.*, No. 79-CV-163, 1980 WL 1889, at *21

18  (N.D.N.Y Sept. 8, 1980).  Facebook and the application developers sell ad impressions to advertisers

19  (and their ads often appear simultaneously).  Thus, the agreement to boycott advertising partners who do

20  business with Sambreel is a "horizontal" restraint.

21        Finally, Facebook asserts that Sambreel has failed to meet its burden of demonstrating that the

22  "*Adaptive Power*" factors have been met.  *See* FB Br. at 23-24.  Facebook's argument ignores the law

23  and the facts.  Facebook's so-called "*Adaptive Power*" factors are derived from the Supreme Court's

24  decision in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Company*, 472 U.S.

25  284 (1985), which makes clear that a plaintiff does not need to prove all of the factors to invoke the *per*

26  *se* rule.  *See id.* at 294-95.  The Ninth Circuit has reached the same conclusion.  *See, e.g., Big Bear*

27  *Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (imposing the *per se* test citing

28  only one factor).  Facebook ignores this precedent.

1    In any event, each factor is present in this case.  First, Facebook's boycott has cut off access to

2    portions of the market that are critical to the success of PageRage – advertisers that represented more

3    than 80 percent of its revenues.  *See id.* (finding denial of access to supply based on lack of availability of

4    "discount" lift tickets or access to referral service).  Facebook inaccurately asserts that Sambreel has not

5    suffered any adverse impact as a result of the pressure.  The loss of access to partners that represented 80

6    percent of PageRage's revenues has been predictable; PageRage's advertising rates have dropped

7    precipitously.  In June 2011, just prior to Facebook's interference, PageRage's average rate per thousand

8    advertising impressions (CPM) was 15.5 cents.  *See* Sullivan Reply Decl. ¶ 11.  In June 2012, the

9    average CPM for PageRage was 3.4 cents.  *See id.*  Moreover, one of the advertising partners that

10   Facebook believes is not doing business with PageRage – Pubmatic – is PageRage's largest advertising

11   partner, representing 65 percent of PageRage's revenues.  *See id.* ¶ 14.  If Facebook coerces Pubmatic to

12   cease doing business with PageRage, the CPM's will decline further.  *See id.* ¶¶ 15-16.[6]

13   Second, Facebook holds a dominant position in the market because it offers the largest supply of

14   online display advertising impressions of any single entity.  *See* Sambreel Br. at 4.  Facebook simply

15   ignores that the "dominant position" element does not require monopoly power.  *See Toys "R" Us, Inc. v.*

16   *FTC*, 221 F.3d 928, 936 (7th Cir. 2000).  Third, Facebook's actions do not enhance overall efficiency or

17   competition.  Facebook argues that the boycott is justified because allowing PageRage to operate will

18   stifle the incentives for companies to innovate.  Facebook's argument is based upon its assertion that

19   Sambreel is a "free-rider."  Facebook is wrong.  Sambreel is an innovator – it developed the *first* product

20   to allow consumers to customize the user's Facebook experience with layouts, and PageRage has enjoyed

21   considerable success as a result.  PageRage's existence does not stifle innovation, it promotes it.

22

23   _____

     [6] Facebook relies upon a statement from a draft document prepared by an investment bank.  *See* FB Br. at

24   23.  Facebook's reliance on this document is misplaced.  The statement was based upon Sambreel's
     revenues for July through October 2011.  The major impact of Facebook's pressure came in December

25   2011 when Open X ceased doing business with PageRage.  After Facebook forced three of Sambreel's
     major advertising partners (Rubicon Project, Advertising.com, and Admeld) to cease doing business with

26   PageRage in August and September 2011, Sambreel created its own advertising server using Open X's
     open-source software.  *See* Decl. of A. Sullivan ¶ 5.  This allowed Sambreel to replace much of its lost

27   advertising revenue.  *See id.* ¶ 6.  Open X subsequently ceased doing business with PageRage at the end
     of November 2011 in response to Facebook's threats.  *See id.* ¶ 7.  As a result, the advertising rates for

28   PageRage dropped significantly in December.  *See id.*

b.   **Facebook Has Engaged In *Per Se* Unlawful Tying.**

Facebook also has engaged in *per se* unlawful negative tying. An entity with monopoly power in one market may not agree to offer its product to consumers only if they agree not to use a competitor's product in a second market. *See Eastman Kodak*, 504 U.S. at 463. This is precisely what Facebook has done. Facebook's gating campaign involves its conditioning users' access to Facebook on their agreement not to use social networking enhancement products that compete with Facebook. In an attempt to evade the Supreme Court's precedent on this issue, Facebook disingenuously suggests that this case involves gating of *only* Sambreel's products. *See* FB Br. at 24. This is simply false. Facebook's gating has not been limited to PageRage but has, instead, extended to all products that compete with Facebook for advertising – products that Facebook chooses to refer to as "adware." Facebook acknowledges this fact elsewhere in its brief. *See* FB Br. at 15. What Facebook does not tell the Court is that many of these products that Facebook refers to as "adware" offer services that are nearly identical to PageRage. *See* Arana Decl. ¶ 17. The contours of Facebook's gating policy are simple – and indistinguishable from *Eastman Kodak* – Facebook will not allow users to access its site if they use a product that competes with Facebook in the sale of advertising impressions. Facebook, however, allows users to access a nearly identical program that operates on the Facebook Platform and does not advertise.

Facebook's suggestion that there is not a separate market for social networking enhancement products is frivolous. Courts have long accepted the notion that there are distinct markets for products that complement a primary product. *See* Sambreel Br. at 14-15. Facebook's suggestion that there cannot be a separate market because users would not use Sambreel's product if Facebook offered a similar product is similarly without merit. In fact, the competition between PageRage and the Facebook App PageCraze demonstrates the point. Although PageCraze is offered for "free" on the Platform, it has less than 175,000 users. *See* Adams Decl., Fig. 5 ("162,342 people use this app"). PageRage, on the other hand, has millions of users because consumers have decided that it offers a better product.

2.   **Facebook's Actions Violate Section 2 Of The Sherman Act.**

a.   **Facebook Has Engaged In Exclusionary Conduct.**

Facebook's actions fall within well-established categories of exclusionary conduct. The Supreme Court has held repeatedly that a party may not refuse to deal with customers or suppliers because they

1    also choose to do business with a competitor.  *See, e.g., Lorain Journal Co.*, 342 U.S. at 152; *Fashion*

2    *Originators*, 312 U.S. at 465-68; *Eastman Kodak*, 504 U.S. at 463.  Facebook cannot distinguish these

3    cases.  It thus focuses on a series of cases that are irrelevant.  Facebook argues that the antitrust laws

4    allow it to "refuse to deal" with whomever it chooses and its conduct is therefore not exclusionary.  *See*

5    FB Br. at 16-17.  Facebook continues to ignore that courts have drawn a distinction between unilateral

6    refusals to deal and cases in which a party recruits third parties to participate in a concerted refusal to

7    deal.  *See* Sambreel's Motion to Dismiss Opposition (Doc. No. 34-1) ("Sambreel MTD Opp.") at 12.

8    Moreover, if Facebook's assertion – that it has unfettered discretion to decide with whom to deal and on

9    what terms – were correct, antitrust law would be non-existent.  Almost every antitrust claim is premised

10   upon a party's decision about whom to deal with and on what terms.

11          Facebook's reliance on three internet cases is similarly unpersuasive.  These cases are not

12   remotely analogous to the facts at issue here – *i.e.*, a group boycott and negative tying – because they did

13   not involve a defendant who refused to deal with users or business partners who did business with the

14   defendant's competitor.  *See LiveUniverse, Inc. v. Myspace, Inc.*, No. CV 06-6994, 2007 WL 6865852, at

15   *11 (C.D. Cal. June 4, 2007) (complaint was that MySpace would not allow users to post on its website

16   advertisements or content from competing service for others to see); *Facebook, Inc. v. Power Ventures,*

17   *Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) (complaint was that

18   Facebook would not allow competitor access to Facebook's website to scan users' lists of friends and

19   contacts to expand its own service); *Universal Grading Serv. v. eBay, Inc.*, No. C 09-2755 RMW, 2011

20   WL 846060, at *8 (N.D. Cal. March 8, 2011) (coin sellers were free to do business with whomever they

21   chose but could not list a coin as "certified" unless it was graded by an approved entity).

22          Finally, Facebook argues that its actions are justified because they were aimed at protecting itself

23   and its users from a product that it deems bad.  This argument is without merit because it is clear pretext.

24   *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).  Facebook's

25   actions demonstrate that its sole motivation was to eliminate a competitor.  Facebook has never engaged

26   in anticompetitive attacks on companies that offer users the ability to apply layouts that do not compete

27   in the advertising market.  And Facebook was wholly content to cease its gating campaign as soon as

28   Sambreel agreed to cease advertising on PageRage.  *See* Trouw Decl. (Doc. No. 3-2) ¶ 28.

1    Facebook's other asserted justifications ring hollow.  To date, Facebook has produced complaints

2    it received from only 57 users about PageRage and has offered no evidence that it has received a

3    significantly larger number of complaints.  More fundamentally, however, if Facebook's complaints

4    about technical issues and advertising content were legitimately Facebook's concerns – as opposed to a

5    pretext – it could have worked with Sambreel to resolve them.  Sambreel has always been willing to

6    work to address issues, and it has altered the operation of PageRage to address Facebook's concerns.  *See*

7    *id.* ¶¶ 18-20.  Rather than work with Sambreel to address any issues, Facebook launched its scheme to

8    eliminate PageRage as a competitive threat.  This history belies Facebook's assertion that the technical

9    objections are the reason for its actions.

10                              b.      **Facebook Has Significant Market Power.**

11    In its opening brief, Sambreel demonstrated that the relevant market includes either the broad

12    market for the sale of display advertising on the internet or the sale of display advertising to social media

13    users.  *See* Sambreel Br. at 16-18.  To support this showing, Sambreel cited to Facebook's own S-1

14    Statement filed with the Securities and Exchange Commission, a scholarly article written by an expert in

15    antitrust and online advertising issues, and industry publications that demonstrate the views of the market

16    participants.  *See id.*  This approach is appropriate because "analysis of the market is a matter of business

17    reality – a matter of how the market is perceived by those who strive for profit in it."  *FTC v. R.R.*

18    *Donnelley & Sons Co.*, Civ. A. No. 90-1619 SSH, 1990 WL 193674, at *2 (D.D.C. Aug. 27, 1990).

19    Facebook asserts that Sambreel's showing is insufficient.  Facebook's argument is premised upon

20    its belief that Sambreel must marshal the evidence that it will ultimately use to prove a relevant market at

21    trial.  This belief is wrong.  The Ninth Circuit has made clear that at the preliminary injunction stage, the

22    plaintiff does not need to affirmatively offer evidence sufficient to meet its ultimate burden of proof.  In

23    *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, the defendant challenged the entry of a preliminary

24    injunction in a trademark infringement case where the district court ruled that the plaintiff "had a fair

25    chance of establishing secondary meaning, but would have to produce more evidence at trial to meet its

26    burden of proof."  739 F.2d 1415, 1422-23 (9th Cir. 1984).  The Ninth Circuit affirmed:

27                  As pointed out earlier, the injunction is not a preliminary adjudication on
                    the ultimate merits: it is an equitable device for preserving rights pending
28                  final resolution of the dispute. The district court is not required to make any
                    binding findings of fact; it need only find probabilities that the necessary

1   facts *can* be proved.

2   *Id.* at 1423 (emphasis added).  The question before the Court is whether the information available now

3   indicates that Sambreel has a likelihood of establishing the relevant market.  This does not require

4   Sambreel to marshal the type of evidence that will ultimately be used at trial.

5   Facebook attempts to impose a heightened standard by citing various cases in which courts

6   concluded that the showing of a relevant market was insufficient.  These cases are inapposite.  These

7   cases do not require plaintiffs to present evidence that would be sufficient to demonstrate the relevant

8   markets at trial.  Instead, these cases involve courts concluding that the plaintiff's market definition was

9   inappropriate because it was *contradicted* by the evidence.  *See, e.g., United Asset Coverage, Inc. v.*

10  *Avaya Inc.*, 409 F. Supp. 2d 1008, 1016 (N.D. Ill. 2006); *Malaney v. UAL Corp.* No. 3:10-cv-02858-RS,

11  2010 WL 3790296, at *8-12 (N.D. Cal. Sept. 27, 2010).  Facebook does not attempt to make the type of

12  showing that led courts to reject the markets proposed by plaintiffs in these prior cases.  Instead,

13  Facebook's argument amounts to its assertion that Sambreel has not presented *enough* evidence.  These

14  cases do not support that argument.

15  Facebook also complains that Sambreel does not cite a case defining a market consistent with

16  Sambreel's proposed markets.  This fact, while true, is irrelevant, because there is no case law accepting

17  *or* rejecting the market definitions Sambreel proposes.  But a detailed report from an antitrust

18  enforcement agency validates Sambreel's proposed markets. The Federal Trade Commission conducted

19  an extensive review of online advertising in reviewing a merger between Google and DoubleClick.  *See*

20  Statement of Federal Trade Commission Concerning Google/DoubleClick, File No. 071-0170 at 1 n.2

21  (Dec. 20, 2007) (Ex. 12).  The FTC concluded that "advertising space sold by search engines is not a

22  substitute for space sold directly or indirectly by publishers or vice versa." *Id.* at 3.  The FTC explained

23  that this meant that the two forms of advertising – search advertising and display advertising – do not

24  operate as significant price restraints on each other.  *Id.*  Thus, the FTC explicitly concluded that search

25  advertising and online display advertising are distinct markets for antitrust analysis.

26  Sambreel has presented ample evidence for this Court to conclude that Sambreel has a likelihood

27  of proving the facts necessary to establish its proposed markets. Moreover, there is ample evidence that

28  Facebook has monopoly power in the market for display advertising to social media users, and has

1  significant market power in the broader display advertising market. *See* Sambreel Br. at 4, 17-18.

2  **3.   Facebook's Actions Violate California's Unfair Competition Law.**

3  Facebook has independently violated California's Unfair Competition Law.   Section 17200

4  allows a court to enjoin an action that is unfair or unlawful.   Facebook's actions are both.   Because

5  Facebook's actions violate the Sherman Act, it has engaged in actions that are both unfair and unlawful.

6  Even if Facebook's actions do not meet all the requirements for violating the Sherman Act, Facebook's

7  actions violate Section 17200 because they threaten an incipient violation of the antitrust laws.   Facebook

8  continues to ignore precedent from the California Supreme Court holding that a party's actions may be

9  deemed "unfair" under Section 17200 even if they do not amount to a violation of the antitrust laws. *See*

10  *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999).   Rather than

11  grappling with this case law, Facebook relies upon an unpublished opinion of the Ninth Circuit that held,

12  unremarkably, that a party had not engaged in "exclusionary" conduct had not engaged in "unfair"

13  conduct. *See LiveUniverse, Inc. v. Myspace, Inc.*, 304 F. App'x 554, 558 (9th Cir. 2008).   *LiveUniverse*

14  is simply irrelevant; as discussed *supra*, Facebook has engaged in conduct that unquestionably is

15  "exclusionary."   To the extent there are technical defects in Sambreel's proof on other aspects of its

16  Sherman Act claims, Facebook's actions are nevertheless violations of Section 17200. *See Korea Kumho*

17  *Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11,

18  2008) (refusing to dismiss Section 17200 claim in spite of lack of sufficient pleading on antitrust injury).

19  Moreover, Facebook's gating violates California Penal Code Section 502(c)(7).   While Facebook

20  maintains that it is common for websites to scan the computers of its users, it is not common for websites

21  to scan their users' computers to determine whether the user has loaded an add-on that the website does

22  not approve of, log the users who have installed the program, and subsequently deny those users access

23  to a website. *See* Arana Decl. ¶ 16.   Facebook's actions are wholly out of the ordinary, and it did not

24  inform its users that it was conducting the scans.   As such, Facebook was accessing its users' computers

25  without their permission in violation of California Penal Code Section 502(c)(7).[7]

26

27  [7] Facebook also repeats its incorrect argument that a plaintiff must prove that a defendant overcame technical or code based barriers to gain access to the computer.   This is incorrect when the computer that
28  is accessed is a private computer. *See* Sambreel MTD Opp. at 33.

### 4.   Sambreel Has Suffered Antitrust Injury.

The antitrust injury standard requires courts "to connect the alleged injury to the purposes of the antitrust laws." *Bristol Tech. Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 165 (D. Conn. 1998) (cited in FB Br. at 20) (internal quotations omitted).  In analyzing antitrust injury, a court assumes that a violation has occurred and asks whether the plaintiff has suffered an injury that is the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's actions illegal. *Id.*  Under this standard, Sambreel has proven antitrust injury.  Facebook's violations involve recruiting business partners to boycott PageRage and in requiring users not to use PageRage.  Courts have routinely held that the victims of these types of activity have suffered antitrust injury. *See* Sambreel MTD Opp. at 14 (collecting cases).  Facebook ignores this case law and, instead, asserts that Sambreel has not suffered antitrust injury because there is no antitrust injury where a website excludes a competitor's product from its website. *See* FB Br. at 16.  Facebook is confusing the issue of whether a violation has occurred with whether Sambreel has standing.  The Ninth Circuit has noted that this is an inappropriate approach. *See Hairston v. Pac. 10 Conference*, 101 F.3d 1315, 1318 (9th Cir. 1996) ("An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred.") (quoting 2 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 360f, at 202-03 (rev. ed. 1995)).[8]

### 5.   The Communications Decency Act Does Not Immunize Facebook's Actions.

Facebook's suggestion that its anticompetitive attacks on Sambreel are immunized under the Communications Decency Act ("CDA") is frivolous.  Facebook seeks to invoke two subsections of the CDA, which immunize it from "civil liability" for:

> (A) any action voluntarily taken *in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

---

[8] In its Motion to Dismiss, Facebook also asserted that there was no antitrust injury because Sambreel had not alleged injury to competition. This argument is without merit because a plaintiff does not need to allege or prove injury to competition to demonstrate antitrust injury. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (explaining that "the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing").

1

2  47 U.S.C. § 230(c)(2) (emphasis added).  Facebook's actions do not qualify for protection.

3         First, the provisions of the CDA that Facebook relies upon do not apply a claim for *injunctive*

4  relief.  *See Mainstream Loudon v. Bd. of Trustees of the Loudon County Library*, 2 F. Supp. 2d 783, 790

5  (E.D. Va. 1998) ("Even if § 230 were construed to apply to public libraries, defendants cite no authority

6  to suggest that the 'tort-based' immunity to 'civil liability' described by § 230 would bar the instant

7  action, which is for declaratory and injunctive relief.); *Doe v. Franco Productions*, No. 99 C 7885, 2000

8  WL 816779, at *5 (N.D. Ill. June 22, 2000) (noting that the plaintiff's claim for injunctive relief was not

9  precluded by the CDA).  The statute shields a defendant only from "civil liability," a term that is defined

10  as "[t]he state of being legally obligated for civil damages."  Black's Law Dictionary (7th Ed. 2000).

11  Sambreel's motion for preliminary injunction does not seek "civil damages" so it is not seeking to hold

12  Facebook "liable" for anything.  Instead, Sambreel's motion asks for *prospective* relief.

13         Second, Facebook's actions are not immunized under § 230(c)(2)(A) because the evidence

14  demonstrates that its actions were not taken *in good faith*.  Facebook's motivation was to eliminate

15  competition not to "protect" its users from objectionable content.  The CDA cannot be used to justify

16  anticompetitive conduct.  *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1178 (9th Cir. 2009)

17  (Fisher, J., concurring) (expressing concern about a defendant hiding behind the CDA to immunize

18  anticompetitive behavior and making clear that Congress did not intend such protection).[9]   The

19  conclusion that the CDA cannot be interpreted to immunize anticompetitive behavior is buttressed

20  because Congress expressed a policy "to preserve the vibrant and competitive free market."  47 U.S.C.

21  § 230(b)(2).    Because the evidence demonstrates that Facebook's motivation was to eliminate

22  competition, it cannot demonstrate that its actions were taken in good faith.

23         Third, nothing in the CDA would immunize Facebook's group boycott.  Facebook's threats to

24  advertising partners do not "restrict access" to objectionable material.  Facebook threatened advertising

25  partners based exclusively on who they do business with, not whether they serve objectionable ads.  In

26

27  ―――――――――――――
    [9] In that case, the issue of the defendant's good faith was not presented because the plaintiff waived that
28  argument.  *See id.*

1   fact, the advertising partners that Facebook has coerced not to do business with PageRage had already

2   agreed to abide by Facebook's advertising guidelines.   And these partners continue to serve ads to

3   Facebook users through applications operated on the Facebook Platform.  Thus, nothing in the CDA

4   could possibly immunize the group boycott.

5         Finally, Facebook's gating is not immunized under § 230(c)(2)(B) because it did not simply

6   provide technical means to users to control access to objectionable material.  Instead, Facebook *required*

7   users not to access certain information.  This is not what is protected by the CDA.  Indeed, Congress's

8   policy statement makes clear that the purpose of the act is to protect *user* control.  *See* 47 U.S.C.

9   § 230(b)(3) (stating that it is the policy of the United States "to encourage the development of

10   technologies which maximize user control over what information is received by individuals, families, and

11   schools who use the Internet and other interactive computer services").

12         **B.      Sambreel Will Be Irreparably Harmed In The Absence Of Injunctive Relief.**

13         Sambreel faces certain irreparable harm in the absence of a preliminary injunction.  Facebook

14   intends to renew its gating campaign if this motion is denied.  This renewed campaign would result in

15   losses of millions of users of *all* of Sambreel's products in a matter of days and the complete destruction

16   of Sambreel.  Accordingly, in the absence of an injunction, Sambreel's only recourse will be to remove

17   PageRage from the market.[10]  The removal of PageRage from the market will result in irreparable harm,

18   including loss of goodwill and loss of the ability to obtain new customers.  The Ninth Circuit has held

19   that these are irreparable harms.  *See, e.g.*, *Stuhlberg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d

20   832, 841 (9th Cir. 2001); *Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597,

21   603 (9th Cir. 1991).  Consistent with this general rule, courts have consistently held that evidence that a

22   plaintiff will be required to remove one of its products from the market or cease selling a product that

23   represents a significant portion of its business is sufficient to show irreparable harm.  *See, e.g.*, *i4i Ltd.*

24

25   ───────────────

[10]  Based upon Facebook's representations regarding Sambreel's ability to operate its other products,

26   Sambreel presumes that Facebook does not intend to renew the gating campaign if PageRage is removed
    from the market.  Facebook has been compiling a list of PageRage users for some time now, and it could

27   renew its gating campaign *even if PageRage is off the market*.  Because its gating campaign results in the
    deletion of the entire Yontoo Platform, this would result in losses of millions of users to other Sambreel

28   products.  Sambreel would not survive if it lost those users.  *See* Hankinson Decl. ¶¶ 4-5.

1  *P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010); *Ind. Manufactured Housing Ass'n v.*

2  *Pierce*, No. 586-698, 1987 WL 14805, at *5 (N.D. Ind. Jan. 9, 1987); *Quezada v. BP Prods. N. Am., Inc.*,

3  No. 06 CV 5378 SJ, 2006 WL 3837720, at *3 (E.D.N.Y. Dec. 1, 2006).

4       Sambreel is suffering irreparable harm from Facebook's group boycott.  The boycott has already

5  resulted in an 80 percent reduction in advertising rates for PageRage.  And while this case has been

6  pending Facebook has continued to threaten additional advertising partners.  *See* Sullivan Reply Decl.

7  ¶ 8.  Facebook also mistakenly believes that Pubmatic has ceased doing business with PageRage, and

8  Facebook will surely seek to force Pubmatic to stop dealing with PageRage if the Court denies

9  Sambreel's request for a preliminary injunction.  Losing Pubmatic would devastate PageRage, as that

10  partner currently represents 65 percent of PageRage's business.  In addition to the devastating financial

11  effects, the continuing boycott has forced Sambreel to completely reorganize the way it does business

12  and has resulted in a loss of good will and potential customers.

13       Facebook does not address *Stuhlbert* or *Rent-a-Center*, but instead seeks to rely upon a line of

14  cases that holds that *monetary* damages can be irreparable if they threaten an entity's existence.  *See* FB.

15  Br. at 34-35.  The Ninth Circuit's precedents regarding loss of good will and potential customers are

16  clear – these are irreparable harms without any need to show a threat to a company's existence.  And,

17  aside from goodwill and loss of prospective customers, the cases Facebook cites do not involve the level

18  of economic devastation that Sambreel faces.  Sambreel is not the company it was before Facebook

19  initiated its scheme, and it will be fundamentally altered as an entity absent injunctive relief.

20       Facebook's suggestion that Sambreel delayed bringing this case is false.  The effect of the boycott

21  did not come in a single shot because the advertising partners stopped doing business with PageRage

22  over time.  The true impact of Facebook's boycott became apparent in December 2011.  *See* Sullivan

23  Reply Decl. ¶¶ 12-13.  Facebook began its gating campaign a little over a week into that month.  *See*

24  Trouw Decl. (Doc. No. 3-2) ¶ 23-24.  Sambreel acted immediately to avoid the gating, agreeing to cease

25  advertising while the parties discussed a resolution.  *Id.* ¶¶ 28-29.  Those discussions continued until the

26  end of January 2012, when it became apparent that the parties would be unable to agree.  *Id.* ¶ 36.

27  Sambreel filed suit a month and a half later – hardly an excessive delay given the nature of this case.

28

**C.     The Balance Of Equities Favor Sambreel.**

The balance of equities weighs the competing injuries that will be suffered by the plaintiff if the preliminary injunction is denied with the injuries that will be suffered by the defendant if the injunction is granted. *See Thalheimer v. City of San Diego*, 706 F. Supp. 2d 1065, 1086 (S.D. Cal. 2010); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988). This factor weighs overwhelmingly in Sambreel's favor. There can be no question that Sambreel will be devastated by a denial of the motion for preliminary injunction because it will be required to remove one of its most popular programs from the market (or risk losing millions of users of *all* its products in a matter of days). By contrast, the only potential injuries alleged by Facebook are that PageRage is a "bad" product and that PageRage could affect Facebook's monetization. The first argument is without merit because Facebook asks this Court to ignore that PageRage users *have chosen* to download the product and can uninstall it at any time if they choose to do so. Facebook's monetization argument underscores that its true concern about PageRage is competition for advertising. It bases its "monetization" argument upon facts that simply are no longer true. Facebook repeats its assertion PageRage covers or moves Facebook ads down the page. This is false. Facebook's ads remain above the fold, and Sambreel's ads appear *below* Facebook's ads. *See* Arana Decl. ¶ 10. Moreover, Facebook's arguments are wholly speculative.

Facebook's assertion that Sambreel has acted inequitably is meritless. Sambreel has changed PageRage on a number of occasions to address Facebook's concerns and has expressed a continuing willingness to work with Facebook. Sambreel has even opted to remove its best performing advertisement to ensure that no Facebook advertisements are displaced. Facebook, on the other hand, has sought to eliminate PageRage rather than work with Sambreel to address any legitimate technical concern Facebook purports to have. The comparative equities do not weigh in Facebook's favor.[11]

**D.     The Public Interest Favors Sambreel.**

Resolution of this motion will decide: (1) whether PageRage remains available to users and

---

[11] Contrary to Facebook's assertion, Sambreel does not mislead users to believe it is affiliated with Facebook. The PageRage website states repeatedly that it is not affiliated with Facebook. *See* Ex. 1. Facebook's assertion that Sambreel's actions violate the Lanham Act is without merit. *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005) (rejecting argument that a pop up advertisement violates Lanham Act).

1   advertisers and (2) whether Facebook will be allowed to continue to force advertising partners not to do

2   business with PageRage *and* Facebook and its Application Developers.   On both points, the public

3   interest favors granting the injunction.  First, the users' interests favor allowing PageRage to continue to

4   operate.  Users want the ability to customize their Facebook experience and PageRage fills that demand.

5   Any user who does not like PageRage can choose not to install it (or to uninstall it).  Second, advertisers

6   are better off with PageRage on the market because it provides a low-cost competitive alternative.

7          Facebook's assertion that allowing PageRage to operate will lead to a "deeply troubling internet

8   precedent" is without merit.  Facebook simply ignores that add-ons are an accepted, even encouraged,

9   part of the internet landscape.  These products provide legitimate ways for companies to compete – a fact

10  that Facebook has recognized by developing its own add-on.  There is nothing "troubling" or out of the

11  ordinary about these products, and allowing PageRage to operate will not set a troubling precedent.  To

12  the contrary, allowing Facebook to drive PageRage out of the market would be a troubling precedent.

13  **IV.      CONCLUSION**

14         This Court should enter a preliminary injunction that:  (a) prevents Facebook from enforcing or

15  threatening to enforce the portions of its advertising and platform development policies that require

16  Facebook's partners to boycott competing companies and (b) prevents Facebook from requiring

17  Sambreel users to uninstall any Sambreel product before accessing www.facebook.com.

18

19  Dated:  July 27, 2012                            LAW OFFICE OF GREGORY P. OLSON

20                                                   By: _s/  Gregory P. Olson_
                                                         Attorney for Plaintiffs
21                                                       E-mail: greg@olsonesq.com

22                                                   and

23
                                                     KOTCHEN & LOW LLP
24                                                      DANIEL KOTCHEN
                                                        DANIEL LOW
25                                                      ROBERT KLINCK

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION via the CM/ECF system on July 27, 2012.


Dated: July 27, 2012                    By:  s/  Gregory P. Olson
                                             Attorney for Plaintiffs
                                             E-mail: greg@olsonesq.com