Gregory P. Olson (Ca. Bar No. 177942)
LAW OFFICE OF GREGORY P. OLSON
501 West Broadway, Suite 1370
San Diego, CA 92101
Telephone: (619) 564-3650
Facsimile: (619) 233-1969
greg@olsonesq.com

Daniel Kotchen (*Pro Hac Vice*)
Daniel Low (*Pro Hac Vice*)
Robert Klinck (*Pro Hac Vice*)
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037
Telephone (202) 416-1848
Facsimile: (202) 280-1128
dkotchen@kotchen.com
dlow@kotchen.com
rklinck@kotchen.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 3:12-CV-00668-CAB-KSC<br><br>**PLAINTIFFS' SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO FACEBOOK, INC.'S MOTION TO DISMISS.**<br><br>Judge:        Hon. Cathy Ann Bencivengo |

During the oral argument held on August 9, 2012, the Court asked why Facebook should not be able to control what appears "on" its website. The Court also expressed the concern that Facebook was merely protecting its "virtual property" and that its actions were the equivalent of a business saying that a competitor could not set up a business on its property. During the argument, Sambreel's counsel explained that the changes are made on the *user's* property because they occur *exclusively* on the individual user's web browser and do not result in any changes to Facebook's computers. Courts that have considered products that operate in a fashion similar to PageRage have concluded that Sambreel's position is correct. These courts have concluded that the *users* own the visual representation that appears on their screen, that the website operator has *no* property interest in that representation, and that products that modify the visual representations users see do not infringe a website's intellectual property rights.[1] Specifically, multiple courts have concluded that software products that result in "pop-up" advertising – products that Facebook asserted "operate in a manner similar to PageRage" – do not operate on the underlying website and do not infringe any property rights of the website. *See Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 738 (E.D. Mich. 2003); *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005); *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003).[2] The Ninth Circuit has concluded that end users of copyrighted electronic material may alter the visual representation of the material without infringing the property rights of the copyright holder. *See Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965 (9th Cir. 1992).

These decisions demonstrate that Facebook is not controlling what appears "on" its website and is not protecting its intellectual property. Instead, Facebook is using the Terms of Service for its website to prevent users and advertising partners from doing business with a competitor. The fact that Facebook

---

[1] Because it is beyond dispute that PageRage does not make any changes to Facebook's physical property (*i.e.*, its servers), the Court's suggestion that PageRage operates "on" Facebook's "virtual property" necessarily relates to Facebook's intellectual property rights. Thus, the prior decisions regarding the intellectual property rights are directly relevant.

[2] Facebook previously cited a two-page, unpublished decision related to a product that resulted in "pop-up" advertisements in support of its balance of equities argument. *See id.* at 31 (citing *Washington Post Co. v. Gator Corp.*, No. civ-02-00909-A (E.D. Va. July 16, 2002)). The product at issue in that case was a competitor of the product at issue in the *WhenU* cases. *See 1-800 Contacts*, 414 F.3d at 409 n.12. Thus, Facebook appears to recognize that these cases are relevant to deciding whether PageRage violates Facebook's intellectual property.

has implemented these limitations through its *contractual* Terms of Service does not shield it from liability.  *See* 15 U.S.C. § 1 (outlawing "contract[s]. . . in restraint of trade"); *see also Image Tech. Servs. v. Eastman Kodak Co.*, 903 F.2d 612, 619 (9th Cir. 1990) (noting that Kodak implemented the tying agreement as part of the "Terms of Sale").

## I. WEBSITE OPERATORS DO NOT HAVE A PROPERTY INTEREST IN THE IMAGES DISPLAYED ON USERS' SCREENS AND PRODUCTS THAT ADD CONTENT AT THE BROWSER LEVEL DO NOT OPERATE "ON" THE UNDERLYING WEBSITE.

Courts that have considered similar products have concluded that they do not appear "on" the underlying website and do not infringe any property rights of the website operators.  In *Wells Fargo*, the Court addressed whether a product that cause pop-up ads to appear when a user accesses a website infringes the intellectual property of the website.  *See* 293 F. Supp. 2d at 736-37.  The Court explained that the visual representation of a "webpage" on an internet user's computer is the product of a text-based data file sent by the website's host servers, the user's own browser settings, any customization of the browser, and the particular software and hardware configurations of the user's computer:

> 49. When a user attempts to access a webpage, the server hosting the webpage sends information in the form of a file back to the user's browser program.  That file consists simply of lines of text written in Hypertext Markup Language or "HTML."
>
> 50. The browser then interprets the HTML code file, and taking the information in conjunction with the user's own browser settings, requests that the Microsoft Windows operating system open a window to display the webpage.  The operating system, in turn, takes all the information from the browser, combines it with information concerning the user's hardware configuration and the competing claims of other software programs, and then displays content in a window.
>
> 51. The HTML code identifies various elements that help determine how the webpage will ultimately be rendered on a computer user's screen, but it does not provide an actual pixel-by-pixel mapping for rendering the webpage.  A wide variety of other factors will have a significant effect on the ultimate appearance of the webpage on the user's screen, including the user's ability to customize the browser's settings.

*Id.* at 742.[3]  The Court stated that the users own and control the content of the computer display:

> 54. Users have ultimate control over what programs run on their computers, when they are run, and what they are commanded to do.  The user owns and controls the computer and the computer display, including the pixels that generate that display.

---

[3] Citations to the factual record have been omitted throughout.

*Id.* at 743. The Court then noted specifically that any changes that occur on a particular user's computer do not happen "on" the website because a "website" resides on the host servers:

> 81.    Plaintiffs take the position that SaveNow advertisements appear "on" the plaintiffs' website. Such usage misconstrues the technical reality of the Internet.
>
> 82.    A "website" is a series of related webpages, whose program code is located in separate, distinct servers controlled by the owners of the website. When a user accesses a website, the website is not transferred *to* the user's desktop. All that exists on the computer screen is an image generated by the user's web browser based on the instructions received from the text-based HTML code of the webpage. At that point, there is no connection between the individual user's computer and the website.
>
> 83.    Having caused the computer to display a page from one website, the user may request the computer to simultaneously display a page from a different website. The user will then have pages from two different websites on his desktop. If the user has called the second website page up in a new browser window, it will appear in front of the page from the first website and the only indication that the first website has been accessed will be the button on the user's task bar. However, as discussed above, the user can easily size his browser windows to cause pages from *both* websites to appear on his screen, in windows that overlap or not, as the user chooses. Nothing that an individual does in the window displaying one website interferes with data transmitted to or from another website. Likewise nothing that an individual does in a window displaying a different application (*e.g.*, a word processing or instant messenger program) interferes with data transmitted to or from a website which the user has accessed. *A website resides on its own servers where it is protected from tampering by "firewalls" and other Internet security procedures.*

*Id.* at 747 (final emphasis added).

The Court concluded that WhenU's product did not violate trademark or copyright law. *See id.* at 769-71. In rejecting the copyright claims, the Court again noted that the WhenU product does not alter the plaintiffs' websites because the "websites reside on separate servers." *Id.* at 769.[4] The Court noted that website providers "*do not have any property interest in the content of a user's pixels*, much less a

---

[4] The factual description in *Wells Fargo* demonstrates that Facebook's actions are not the equivalent of a store owner controlling who is "in" his store. PageRage does not access Facebook's "store" (its servers). Instead, PageRage allows users to modify the way that they experience the *product* that Facebook delivers. Thus, the appropriate analogies involve complementary after-market products. This distinction sets this case apart from Facebook's "trilogy" of internet cases, which involved website owners limiting the information that could be posted and stored on their own servers (*LiveUniverse* and *Universal Grading*) or the extent to which a competitor would be granted access to the servers (*Power Ventures*).

copyright interest." *Id.* at 771 (emphasis added).[5] The Court expressly distinguished cases that involved instances in which a copyrighted work was altered and then disseminated. *Id.* at 770.[6]

## II. THE NINTH CIRCUIT HAS CONCLUDED THAT USERS HAVE THE RIGHT TO ALTER THE APPEARANCE OF COPYRIGHT-PROTECTED ELECTRONIC MATERIAL.

Although Sambreel is not aware of a decision by the Ninth Circuit addressing alterations to the appearance of websites, the Ninth Circuit has concluded that products that allow users to modify the appearance of copyright-protected electronic material do not infringe the property rights of the copyright holder. In *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, the Ninth Circuit addressed whether a product known as the "Game Genie," which allowed users to make changes to games played on the Nintendo game console, violated the copyright laws. *See* 964 F.2d 965, 967 (9th Cir. 1992).[7] The facts of that case are similar to those at issue here. The Game Genie worked *only* with the Nintendo system. *See id.* at 967; *cf.* Hearing Tr. at 58:13-19 (noting that PageRage works only while a user is accessing Facebook.com). The Game Genie allowed users to alter the appearance or operation of a game on an individual user's system but did not change the data stored on the game cartridge. *See Galoob*, 964 F.2d at 967. And the Game Genie was useless – it would not display anything on the system – without a game cartridge installed. *Id.* at 969; *cf.* Hearing Tr. at 8:10-11 ("And if there was no Facebook page called up, there would be nothing there."). The Ninth Circuit rejected Nintendo's assertion that the product violated copyright law. *See id.* at 972. In the course of reaching this conclusion, the Court considered the implication of the Supreme Court's decision in *Sony Corporation of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984). The Ninth Circuit concluded that *Sony* stands for the proposition that a copyright does not give its owner the right to dictate how the copyrighted work is to be enjoyed by individual users:

> Nintendo would distinguish *Sony* because it involved copying copyrighted material rather than creating derivative works based on those works. . .

---

[5] *See also 1-800 Contact*, 414 F.3d at 412 (rejecting the argument that a computer user needs "authorization" from a website operator to view other content simultaneously).

[6] This provides yet another distinction from two of the cases relied upon by Facebook. In *LiveUniverse* and *Universal Grading*, the website owner was preventing users from posting information to the website that would then be disseminated to other users.

[7] The Ninth Circuit's decision was cited by the district courts considering whether WhenU's pop-up advertising programs represented copyright violations. *See Wells Fargo*, 293 F. Supp. 2d at 769-70; *U-Haul*, 279 F. Supp. 2d at 731.

> Game Genie users, in contrast, are not invited to view derivative works based on Nintendo's copyrighted works without first paying for that privilege. *Sony* cannot be read so narrowly. It is difficult to imagine that the Court would have reached a different conclusion if Betamax purchasers were skipping portions of copyrighted works or viewing denouements before climaxes. ***Sony* recognizes that a party who distributed a copyrighted work cannot dictate how that work is to be enjoyed.** Consumers may use a Betamax to view copyrighted works at a more convenient time. They similarly may use a Game Genie to enhance a Nintendo Game cartridge's audiovisual display in such a way as to make the experience more enjoyable.

*Id.* at 971 (emphasis added).[8] Thus, under *Lewis Galoob*, Facebook does not have an intellectual property right to limit the way its users view and enjoy its website. Accordingly, PageRage does not implicate Facebook's "virtual property" rights.

Facebook is not protecting or controlling its "virtual property" because Facebook does not have *any* property rights in the display of its website on a user's screen. Instead, Facebook is using its Terms of Service to implement "contract[s] . . . in restraint of trade" with its users and advertising partners. *See* 15 U.S.C. § 1. Stripped of the intellectual property arguments, it is clear that Facebook's contractual provisions are illegal according to standard analysis applied by courts in prior antitrust cases.

Dated: August 22, 2012

LAW OFFICE OF GREGORY P. OLSON

By: s/ Gregory P. Olson
Attorney for Plaintiffs
E-mail: greg@olsonesq.com

and

KOTCHEN & LOW LLP
DANIEL KOTCHEN
DANIEL LOW
ROBERT KLINCK

---

[8] The Ninth Circuit's description of the central holding of *Sony* is particularly relevant because the Court recognized that a user would be free to use a VCR to fast forward through portions of a recorded program. If a content provider cannot object to users completely skipping content (presumably including advertisements), Facebook cannot plausibly justify its actions by asserting that PageRage's additional advertising might diminish the value of Facebook's advertising. Because PageRage does not cover the advertising placed by Facebook, any effect that PageRage's *additional* advertisements has on Facebook's advertising would be less significant than the impact of VCR users fast forwarding through entire commercials (which results in the user not being exposed to the advertisements *at all*).

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO FACEBOOK, INC.'S MOTION TO DISMISS via the CM/ECF system on August 22, 2012.

Dated: August 22, 2012                                    By: s/ Gregory P. Olson
                                                                                       Attorney for Plaintiffs
                                                                                       E-mail: greg@olsonesq.com