James F. Basile (SBN 228965)
james.basile@kirkland.com
Elizabeth L. Deeley (SBN 230798)
elizabeth.deeley@kirkland.com
Adam L. Gray (SBN 262557)
adam.gray@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Susan Marie Davies (*Admitted pro hac vice*)
susan.davies@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Attorneys for Defendant
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMBREEL HOLDINGS LLC; YONTOO LLC; and THEME YOUR WORLD LLC,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>FACEBOOK, INC.,<br><br>　　　　　Defendant. | CASE NO. 12-CV-00668-CAB-KSC<br><br>**DEFENDANT FACEBOOK, INC'S OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS**<br><br>Dept.:　　Courtroom 2<br>Judge:　　Hon. Cathy Ann Bencivengo |

Defendant Facebook, Inc. submits this brief in opposition to Sambreel's "Supplemental Authority" (Doc. No. 56). As discussed below, Sambreel's supplemental brief mischaracterizes the discussion at the prior hearing, and its new case law is legally irrelevant and factually unavailing. Indeed, Sambreel's reliance on "pop-up" adware cases is particularly perplexing, as those cases strongly suggest that *PageRage violates the Lanham Act* by injecting ads directly into Facebook's webpages—further reason to deny Sambreel's injunction request and dismiss the complaint.

## I. WHETHER PAGERAGE VIOLATES INTELLECTUAL PROPERTY LAW IS NOT DETERMINATIVE OF THE *ANTITRUST* ISSUES BEFORE THE COURT

Sambreel's supplemental brief is based on a mischaracterization of the prior hearing. By focusing on isolated phrases in the transcript analogizing Facebook to virtual property, Sambreel suggests that "the Court made clear that it views the intellectual property rights at issue as potentially dispositive" and that the dispute hinges on whether Facebook "owns the 'virtual property' on which PageRage operates."[1] *See Ex Parte* Memorandum. (Doc. No. 54-1) at 2-3. Sambreel thus asks the Court to consider additional case law addressing "*whether PageRage violates Facebook's intellectual property*."[2] *See* Supplemental Authority (Doc. No. 56) at 1 n.2. But as a review of the hearing transcript reveals, the Court did not transform the current proceedings into an intellectual property dispute. Instead, the Court correctly recognized that regardless of whether PageRage operates "on" Facebook's servers or itself violates any law, the controlling principle is that users are obliged to abide by Facebook's terms in order to use Facebook's free, ad-supported service:

> Sambreel Counsel: They [Facebook] don't own the information once it's delivered.
>
> The Court: They own Facebook.com. So if you're on Facebook.com, *you don't have a right to be on – you have to sign a user's agreement*. . . . And, therefore, it has terms and limitations and responsibilities and rights and no rights. And if they want to say 'we don't want that on Facebook.com," *why should the user be able to go "tough, I want it anyway, because it's – because it's in my house now" . . . "or on my screen"?* It's still Facebook.com, and they're saying "well, you can't do it, *go find another social media network then if you want that*.

Hr'g Tr. at 26:5-20.

---

[1] The Court *actually* made clear that the discussion of "virtual property" was simply an "analogy" for purposes of argument. Hr'g Tr. at 59:20-23 ("I think their analogy that this is virtual property and it's their property and they're not going to let you set up your fruit stand on their property[.]").

[2] All emphases added unless otherwise noted.

FACEBOOK'S OPP. TO PLAINTIFFS' SUPPL. AUTH.                              CASE NO: 12-CV-00668-CAB-KSC

As the Court implicitly recognized, the issue presently pending is whether **Facebook has an antitrust duty** to provide its free service to users who modify Facebook with PageRage and to do business with Ad Providers that serve ads on Facebook through PageRage; the current issue is **not** whether PageRage is itself lawful under any specific standard. Although Sambreel tries to conflate these issues, they are separate and distinct. Even **assuming** that the operation of PageRage does not violate intellectual property law (a dubious assumption), antitrust law permits Facebook to refuse to deal with third parties that use PageRage solely because that adware harms and impairs Facebook's service and business model.

The Northern District of Illinois addressed a similar situation in *United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008 (N.D. Ill. 2006). There, the defendant Avaya sold telephone systems and related maintenance and service contracts for those systems. *Id.* at 1013. After Avaya learned that some customers were using its maintenance services to allow the plaintiff UAC to access Avaya maintenance software and offer less-expensive comprehensive repair plans, Avaya refused to sell services to any customers "who [were] clients of unauthorized service providers like UAC." *Id.* at 1033-35. UAC—like Sambreel here—filed an antitrust complaint seeking injunctive relief, but the court recognized that nothing in antitrust law compelled Avaya to continue to provide its service to users against Avaya's own economic interests:

> [R]equiring Avaya to license [maintenance software] or sell [maintenance] services to customers with whom Avaya does not wish to deal is the ***epitome of irreparable harm to a defendant***. If this Court were to issue the requested preliminary injunction, Avaya "will be frozen into an intimate and continuous relationship with" customers that "it no longer wishes to be associated with." . . . [UAC has] failed to consider the intangible harm to Avaya's reputation of being forced to make court-ordered sales it does not wish to make, while being precluded by court order from pursuing the competitive strategy it wishes to pursue.

*Id.* at 1042 (citations omitted). The court further explained that even if UAC had asserted a cognizable claim, Avaya would be "***insulated***" from antitrust liability because it had "valid business reasons" for "its refusal to deal with UAC's clients." *Id.* at 1048 ("[D]ecisions made by Avaya to protect or augment revenues from maintenance contracts are presumptively made for 'legitimate competitive reasons'"). Numerous courts have reached the same conclusion. *E.g. Morris Commc'ns. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004) (holding that the PGA's refusal to deal with parties unless they "agree[d] not to sell [PGA's product] to non-credentialed third-party Internet publishers" was motivated by the

prevention of free-riding, a valid business justification); *LiveUniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852, at *13 (C.D. Cal. Jun. 4, 2007) (dismissing antitrust claim based on MySpace's refusal to allow its users to use a third-party's products and reasoning that the products "could lead to a diminution in MySpace's revenue.").

In sum, whether PageRage violates any intellectual property law or affects Facebook's servers is not determinative of the issues currently before the Court. Because Sambreel does not dispute that (a) Facebook's terms prohibit third parties from using PageRage to change how Facebook's service appears to them and (b) Sambreel seeks to persuade advertisers to use its adware instead of Facebook advertising, the Sherman Act authorizes Facebook to refuse to deal with users or Ad Providers that facilitate PageRage. *See United Asset*, 409 F. Supp. 2d at 1042.

## II.    THE CASES THAT SAMBREEL CITES UNDERMINE ITS OWN ARGUMENT

Assuming for the sake of argument that Sambreel's intellectual property cases have any relevance at this stage, they are no help to Sambreel on either the law or the facts. If anything, they suggest that the operation of PageRage infringes Facebook's intellectual property rights.

**The *WhenU* Cases**:  Sambreel primarily relies on a series of cases brought by websites against WhenU, a maker of "pop-up" adware. While Sambreel focuses on isolated quotes to support its arguments that websites do not have a "property interest" in the user's screen and that adware does not violate the Lanham Act, it ignores the fundamental distinction between the WhenU adware and its own adware: While PageRage injects ads ***directly*** into the same browser window that displays Facebook's webpage, the WhenU adware did not affect the underlying website and only caused ***separate browser windows*** to pop-up—a distinction that each court found critical in declining to impose liability under the Lanham Act:

1. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005):  In *1-800 Contacts*, the Second Circuit reversed the district court's preliminary injunction against WhenU's adware for violating the Lanham Act, focusing heavily on the fact that "[e]ach type of ad appears in a window that is ***separate from the particular website*** . . . the [user] has accessed." *Id.* at 405.  The appellate court disagreed with the trial court's conclusion that the pop-up ads affected the underlying website, explaining:  "[T]he WhenU pop-up ads appear in a ***separate window*** that is prominently branded with the WhenU mark; they have absolutely ***no tangible effect*** on the ***appearance*** or functionality of the 1-800 website." *Id.* at 410.

2. *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003):  In *Wells Fargo*, the court declined to issue an injunction against the adware for violating the Lanham Act, again

emphasizing that the ads (a) appeared in a "separate and distinct" window and (b) could be closed "by clicking on the 'X' box at the top right hand corner of the ad." *Id.* at 745-46. The court specifically contrasted WhenU's acceptable pop-ups with framing: "Framing occurs when one webpage displays the content of another webpage within its own borders. . . . The purpose of framing is to create a ***single seamless presentation*** that integrates the content of the two webpages into what appears to be a single webpage." *Id.* at 748-49.

3. *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003): Like the previous two cases, the district court declined to impose Lanham Act liability and specifically relied on the distinct nature of WhenU's pop-up ads. *Id.* at 727 ("When a WhenU ad appears . . ., it opens in a WhenU-branded window that is ***separate and distinct*** from the window in which the U-Haul website appears."); *id.* at 729 ("[T]he [] program does not change the ***underlying appearance*** of the U-Haul website.").

In sum, the *WhenU* cases offer Sambreel no solace. While Sambreel relies on out-of-context quotes regarding user choice and "property interests," those quotes addressed ads that "popped-up" in separately branded windows on the user's screen, not affecting the "underlying appearance" of the website at all. In sharp contrast to WhenU, Sambreel's adware ***does*** have a "tangible effect on the appearance" of Facebook's website, and ***does*** seek to "create a single seamless presentation" of Facebook's webpage with Sambreel's ads. *See* Hung Decl. (Doc. No. 41-11) ¶¶ 18-34, 61-64. Indeed, this Court has already recognized this critical distinction:

> <u>Counsel for Sambreel</u>: The advertisements that PageRage places appear below the content.
>
> <u>The Court</u>: But they're on that page. ***They're not on a separate page***. ***They're not a window that opens up***.

Hr'g Tr. at 10:2-5. An independent expert has likewise confirmed that the "PageRage software injects code which modifies the Facebook HTML instructions received by the user's web browser in order to . . . insert non-Facebook third-party advertising panes ***into the standard Facebook layout***." *See* Suppl. Hung Decl. (Doc. No. 50) ¶ 3*; see also* Palow Decl. (Doc. No. 41-5) ¶ 3.

Thus, the *WhenU* cases do not help Sambreel; they suggest instead that it is violating the Lanham Act.[3] While Facebook at this time takes no position on Sambreel's liability for purposes of this proceeding,

---

[3] While the above discussion focuses on the *WhenU* courts' Lanham Act analyses, those courts' treatments of copyright issues (also irrelevant to the issues presently before the Court) are equally unhelpful to Sambreel. For example, the *Wells Fargo* court reasoned that plaintiff had not shown a likelihood of success on copyright claims in part because: "WhenU has ***not*** added anything to the plaintiffs' web pages. If one were able to look at the HTML code of plaintiffs' sites, one would ***not*** see any changes as a result of WhenU's advertisements." *Id.* at 770. In contrast, the "PageRage software ***injects code*** which modifies the Facebook HTML instructions received by the user's web browser in order to change displayed content[.]" *See* Suppl. Hung Decl. (Doc. No. 50) ¶ 3.

FACEBOOK'S OPP. TO PLAINTIFFS' SUPPL. AUTH.   4   CASE NO: 12-CV-00668-CAB-KSC

1  Facebook has previously noted that other courts have reached even *worse* conclusions (for Sambreel) than
2  the *WhenU* courts.  *See Washington Post Co. v. Gator Corp.*, No. civ-02-00909-A (E.D. Va. July 16, 2002)
3  (enjoining a maker of pop-up adware from "[a]ltering or modifying . . . any part of [] any website owned by
4  or affiliated with [the plaintiff], in any way, including its appearance or how it is displayed").

**The *Lewis Galoob* Case**:  In *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965 (9th Cir. 1992), the Ninth Circuit found that the defendant's "Game Genie"—a device that allowed Nintendo players to alter features of Nintendo video games—did not infringe on Nintendo's copyrights in its video games.  This copyright case provides no assistance to Sambreel.  The Game Genie was used to alter transient player characteristics such as increasing the number of lives of a player's character, accelerating the character's speed, and allowing the character to float.  *Id.* at 967.  The court found that none of these alterations resulted in the creation of either a copyrightable work *per se*, or a fixation of a work.  *Id.* at 967-69.  Here, by contrast, there are multiple layers of works and fixations.  The ads generated by Sambreel's product are fixed works, Facebook's website is a fixed work, and the altered Facebook website with the injected Sambreel ads is a fixed work.

Moreover, the facts of *Lewis Galoob* are simply inapposite.  Facebook is ***not*** a physical product that is sold like a video game, ending the transaction with the consumer.  Facebook is an ***ongoing service*** that is ***free*** to users ***so long as*** they agree not to impair Facebook's design and advertising.  Users have not "paid" for Facebook's ongoing service, nor do they have a "right" to perpetual access without following Facebook's terms, as Sambreel seems to believe.  Nothing in *Lewis Galoob* stands for such a proposition.

### III.  CONCLUSION

For the foregoing reasons, Facebook respectfully requests that the Court deny Sambreel's motion for a preliminary injunction and dismiss the complaint.

DATED:  August 23, 2012                    Respectfully submitted,

                                           KIRKLAND & ELLIS LLP


                                           s/ *James F. Basile*
                                           James F. Basile
                                           Elizabeth L. Deeley
                                           Adam L. Gray
                                           Susan Marie Davies (*Admitted pro hac vice*)

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2012, I electronically filed the foregoing **DEFENDANT FACEBOOK'S OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO FACEBOOK'S MOTION TO DISMISS** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the Court's Electronic Mail Notice List and by United States postal service to the following:

Daniel Kotchen
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800
Washington, DC 20037

DATED: August 23, 2012              By: *s/ James F. Basile*
                                            James F. Basile