1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  SAMBREEL HOLDINGS LLC; YONTOO LLC;        Civil No.    12cv668-CAB (KSC)
    and THEME YOUR WORLD LLC,

12

13                                Plaintiffs,

                                              **ORDER DENYING MOTION FOR**
14              v.                            **PRELIMINARY INJUNCTION AND**
                                              **GRANTING MOTION TO DISMISS**
    FACEBOOK, INC.,

15                                Defendant.   **[Doc. Nos. 3, 22]**

16       Before the Court are Plaintiffs' Motion for Preliminary Injunction [Doc. No. 3] and Defendant's

17  Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

18  [Doc. No. 22.][1] The Court heard oral argument on both motions on August 9, 2012.  Robert Klinck, Esq.,

19  Daniel Kotchen, Esq., and Gregory Olson, Esq. appeared on behalf of the Plaintiffs.  James Basile, Esq., and

20  Elizabeth Deeley, Esq. appeared on behalf of Defendant.  The Court accepted supplemental briefing from

21  the parties following the motion. [Doc. Nos. 54, 56, 57.] Upon consideration of the papers, and argument

22  of counsel, for the reasons set forth below, the Motion for Preliminary Injunction is **DENIED**, and the

23  Motion to Dismiss is **GRANTED**.

24       **I.    BACKGROUND**

25       This case arises out of Plaintiffs' allegations that Facebook attempted to eliminate competition in the

26  sale of online display advertising impressions, and thus violated the antitrust laws.  Sambreel also brings

27  _____

28       [1]Defendant withdrew its motion to dismiss for improper venue pursuant to Rule 12(b)(3). [Doc.
    No. 52.]

pendant state claims for unfair business practices, intentional interference with contract, and intentional interference with prospective economic advantage.

Defendant Facebook maintains a social networking website, and operates a platform through which third-party developers distribute and operate applications, including those that allow users to customize the appearance of their Facebook pages and online games.  Facebook makes money by selling display advertising on its site, and, according to the Complaint, is the single largest supplier of advertising impressions on the internet. [Doc. No. 1 ("Compl.") at ¶1.]  Plaintiffs Sambreel Holdings, LLC, Yontoo LLC, and Theme Your World, LLC (collectively, "Sambreel") allege that they offer products that "add functionality to web browsers." [Compl., ¶ 2.]  One of Sambreel's first products was "PageRage," a product which allows users to add designs that are displayed when they visit Facebook's website.  Rather than altering Facebook's programming, Plaintiffs allege that PageRage operates by "adding layers to the web browser residing on its users' computers.  The designs added by PageRage are visible only to individuals who have installed the Yontoo Platform and enabled the PageRage application." *Id.*

Plaintiffs allege that PageRage, and Sambreel's other products, compete with Facebook in the sale of display advertising impressions. *Id*.  Specifically, Plaintiffs allege that PageRage offers advertisers "an alternative means to display advertising to individuals while they are accessing the Facebook website." *Id.*

According to the Complaint, from October 2008 through July of 2009, PageRage included the browser add-on along with an application that operated on the Facebook Platform, and generated approximately $100,000 in monthly revenues.  In July 2009, Facebook approached Sambreel, and explained that PageRage needed to be operated independent of the Facebook Platform, and requested that the application not operate on the Platform.  Plaintiffs allege that Facebook did not object to the browser add-on, and even offered suggestions on how Sambreel could operate the product without the application.  Sambreel removed the application from the Platform. *Id.* at ¶ 3.

Plaintiffs allege that between July 2009 and October 2010, PageRage grew significantly, and was regularly garnering more than 1 million users per day, and generating more than $1 million in monthly revenues.  At that point, Facebook's counsel sent a letter to Sambreel objecting to PageRage, and Sambreel worked with counsel, and believed the parties had resolved the issue by early 2011. *Id.* at ¶ 4.

12cv668

By mid-July 2011, PageRage had grown to more than 4 million users per day, and, according to Plaintiffs, had grown into a legitimate competitor in the sale of online display advertising impressions. Plaintiffs allege that Facebook was threatened by PageRage because it offered advertisers a low-cost alternative to purchasing advertisements from Facebook. *Id.*

Plaintiffs allege that Facebook pursued an anticompetitive scheme designed to eliminate Sambreel as a competitive threat by 1) organizing a group boycott of Sambreel, enlisting application developers and advertising partners to agree not to deal with advertising partners who do business with PageRage; and 2) "gating" consumers who had downloaded PageRage by scanning consumers' browsers to discern whether they had downloaded the product, and requiring them to remove the entire Yontoo platform from their computers (disabling all Sambreel products) before they were allowed to log into Facebook. *Id.* at ¶¶ 5-6.

Within two weeks of the "gating" campaign, Sambreel alleges that it lost more than one million users of its products. *Id.* at ¶ 6. Facebook agreed to stop gating only when Sambreel agreed that it would no longer advertise on PageRage, thereby eliminating PageRage as a competitive advertising alternative to Facebook. On December 22, 2011, Sambreel took down all PageRage ads and stopped generating any revenue through PageRage. *Id.*

Plaintiffs allege that Facebook's scheme has restrained competition because it "eliminated a low cost, direct substitute to Facebook for display advertising (PageRage), stopped Sambreel's growth in the sale of internet display ads, and left Facebook as the only supplier of display advertising impressions experiencing meaningful growth." *Id*. at ¶ 7. Sambreel also alleges that Facebook's conduct has devastated its business, forcing it to terminate more than half its workforce, cease developing new products, and suffer significant financial losses. *Id.*

Sambreel pleads that there are three relevant product markets pertaining to its antitrust claims: 1) the market for social networking services, 2) the market for products that allow users to customize or enhance social networking websites, and 3) the market for online display advertising, including the submarket for display advertising to social media users. *Id*. at ¶¶ 49-64.

/

/

1

2
**II.    MOTION TO DISMISS**

3
Because Sambreel's success on its preliminary injunction motion is dependent upon its

4
likelihood of success on the merits of this matter, the Court will first consider Defendant's arguments on the

5
motion to dismiss. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  In its

6
motion to dismiss, Facebook argues that it took the steps it did in self defense against an illegitimate

7
invasion of its business, and that the antitrust laws do not require Facebook to make its business or its

8
website available to Sambreel.  Facebook further avers that its actions to protect its users from Sambreel's

9
"adware" does not constitute anticompetitive conduct.

**A.    LEGAL STANDARD**

10
Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the

11
complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to

12
dismiss.  The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in

13
light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim

14
showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although Rule 8 "does not require

15
'detailed factual allegations,' ... it [does] demand[] more than an unadorned, the-

16
defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

17
*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

18
To survive a motion to dismiss, Sambreel must allege sufficient factual matter, accepted as true, to

19
"state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also* Fed. R. Civ. P.

20
12(b)(6).  A claim is facially plausible when the collective facts pled "allow[] the court to draw the

21
reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

22
*Twombly*, 550 U.S. at 556).  That is not to say that the claim must be probable, but there must be "more than

23
a sheer possibility that a defendant has acted unlawfully." *Id.*  Facts "'merely consistent with' a defendant's

24
liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).  Further, the

25
Court need not accept as true "legal conclusions" contained in the complaint. *Id.  See also Twombly*, 550

26
U.S. at 555 ("[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action will

27
not do.").

28

12cv668

### B.    ANALYSIS

As discussed during oral argument, the Court notes that this matter raises novel technological issues that, apparently, have yet to be addressed by the courts in the antitrust context.  The Court finds, however, that recent antitrust caselaw involving social media is instructive on the matters at issue here.  *See Liveuniverse, Inc. v. MySpace, Inc.,* 304 Fed.Appx. 554 (9th Cir. 2008); *Universal Grading Service, v. eBay, Inc., et al.,* Case No. C-09-2755, 2011 WL 846060 (N.D. Cal., March 8, 2011)*; Facebook, Inc. v. Powerventures, Inc.*, Case No. C-08-05780, 2010 WL 3291750 (N.D. Cal., July 20, 2010).[2]   As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product.  Indeed, it is well settled that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Verizon Communication Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004), *quoting U.S. v. Colgate and Co.*, 250 U.S. 300, 307 (1919).

Facebook has surely invested a significant amount of resources to develop its business, as Plaintiff recognizes in the Complaint, by "aggressively compet[ing] with a number of other social networking websites, including MySpace." [Compl., ¶ 16.]  In doing so, Facebook is now recognized as maintaining "the most heavily trafficked website on the entire internet," boasting 845 million monthly active users, with one in every five page views among internet users in the United States viewing a page on Facebook, and internet users spending more time on Facebook than any other site.  *Id.*  Sambreel also acknowledges that "Facebook has become a critical distribution channel for Application Developers because of its large user base and its viral marketing capabilities."  *Id.* at ¶ 19.  The Court finds that Facebook has a right to protect the infrastructure it has developed, and the manner in which its website will be viewed.  Within this framework

---

[2] Central to Sambreel's argument in both motions is the fact that its *Page Rage*  product does not technically operate "on" the Facebook.com website, but rather on individual users' browsers and is then "layered" on top of the Facebook website.  Thus, it argues, this line of cases is inapposite because it only applies to Facebook's ability to control its own website.  While this distinction was argued at length during oral argument, the Court is ultimately unpersuaded.  The fact that Sambreel was able to accomplish a technological feat and display its ads without being technically "on" Facebook does nothing to take away Facebook's right to dictate the manner in which its users view its website.

the Court will consider whether the Complaint nevertheless alleges that Facebook has violated the antitrust laws.

1.      **Claim 1**: **Sherman Act § 1: Group Boycott**

Sambreel alleges that Facebook's terms of use, to which it requires that each Application Developer agree, includes a provision that obligates Application Developers to use only the Advertising Partners that have been approved by Facebook. *Id.* at ¶ 20. [*See also* Doc. No. 34 at 18.]  This, according to Sambreel, constitutes an agreement among horizontal competitors because Facebook and Application Developers allegedly compete in selling advertising space to advertisers  (Compl., ¶ 18,) and is thus a "contract, combination or conspiracy in restraint of trade and commerce, the purpose and effect of which has been to boycott Sambreel, restrict the ability of Sambreel to compete, and/or eliminate from the market a low cost display ad alternative to Facebook and/or the Application Developers." *Id.* at ¶ 66.  The Claim alleges a *per se* violation, and alternatively a violation under the Rule of Reason Analysis.  *Id.* at ¶ ¶ 67-71.

*__Per Se__*   "[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances.  An agreement of such a kind is unlawful per se." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (citations omitted). In order to establish a *per se* violation of Sherman Act § 1 for an unlawful group boycott, Sambreel must plead that there was 1) a horizontal agreement 2) among direct competitors. *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000), *citing NYNEX Corp.*, 525 U.S. 128.  The Court finds that Sambreel has not pled facts to support a *per se* violation here.

First, the Complaint lacks sufficient facts to support the allegation that there was a concerted effort among the Application Developers and Facebook, as is required by the express terms of Sherman Act § 1, as opposed to unilateral action on the part of Facebook. *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770–771 (1984) (alleged conspiracies between a corporation and its officers, employees, divisions or wholly owned subsidiaries entail merely unilateral action not subject to section 1). At most, Sambreel has alleged independent agreements between each Application Developer and Facebook that the Application Developers will only use Facebook's approved Advertising Partners (Compl., ¶ 20),

12cv668

and in turn agreements between Facebook and Advertising Partners, reserving the right to limit or prohibit Advertising Partners' operation of Facebook Platform if they "'associate... in any manner with a company that Facebook has prohibited from operating on Facebook Platform.'" *Id.* at ¶ 21, *quoting* Facebook Platform Terms for Advertising Providers.[3]  Beyond the agreements which Facebook unilaterally imposes upon companies that utilize the Facebook Platform, there are no allegations that any of the Application Developers themselves agreed with one another.  *Cf. Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 208-09 (1959) (*per se* unlawful group boycott where retail store and 10 household appliance manufacturers and their distributors agreed that distributors would not sell household appliances to competitor); *Fashion Originators' Guild of America, Inc. v. Federal Trade Commisison*, 312 U.S. 457 (1941) (*per se* unlawful group boycott where there was an agreement among a group of clothing designers, manufacturers, suppliers and retailers promising not to sell their clothes to retailers who bought clothes from competing manufacturers and suppliers); *Big Bear Lodging Ass'n v. Snow Summit, Inc., et al.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (allegations of *per se* group boycott sufficient where resort association members agreed not to forward lodging referrals to non-members, and ski resorts agreed to refuse to sell discount lift tickets to non-members).

Moreover, even assuming that Sambreel had sufficiently pled the existence of such an agreement, it fails to allege facts to support its assertion that Facebook and its Application Developers are direct horizontal competitors.  Indeed the agreements between Facebook and the Application Developers, which Facebook unilaterally imposes, support the opposite conclusion.  *See* Compl. ¶ 20 ("To distribute their Applications on the Facebook platform, Application Developers must agree to certain Facebook policies.").  The Court finds that this fact itself distinguishes Facebook from its alleged competitors since the Application Developers are only permitted to "compete" with Facebook in the first place because Facebook allows them to do so, and only if they agree to Facebook's terms.  Plaintiff cites no authority to support its argument that

---

[3] While this language is broadly written and may imply that Facebook may threaten to prohibit Advertising Partners from advertising on Facebook it they also advertise with Sambreel on its applications *outside* of Facebook.com, Sambreel does not allege sufficient facts to support a claim that Facebook actually took any steps to do so. The Court thus finds that to interpret the language of the agreement itself as having the *potential* to violate the antitrust laws, in the absence of allegations that such conduct actually occurred, would be purely advisory and the Court declines to do so here.

12cv668

such a relationship is one of horizontal direct competitors, and the Court is not persuaded that one exists here.

Finally, the Court does not find that Facebook's alleged conduct has a "pernicious effect on competition" or lacks "any redeeming virtue" sufficient to conclusively presume it to be unreasonable and therefore justify a *per se* analysis "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." *See  Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289 (1985) (internal quotations omitted).  As set forth above, the Court finds that Facebook has a right to determine with whom it will deal, and on what terms. "[I]t is a longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business." *Kingray, Inc. v. NBA, Inc.,* 188 F.Supp.2d 1177, 1188 (S.D. Cal. 2002) (citation omitted).  Moreover, where legitimate business justifications exist for the alleged conduct, courts often decline to apply the *per se* rule.  *See NYNEX Corp.*, 525 U.S. at 135 ("Boycotts are said to be unlawful per se but justifications are routinely considered in defining the forbidden category.") (citation omitted).  Here, the Court finds that even within the four corners of the complaint, there are legitimate business justifications for Facebook's conduct.  *See e.g.* Compl. at ¶ 20 (recognizing one of the purposes of the terms of use Facebook imposes upon Application Developers is "to ensure that the content of ads placed on their applications comply with Facebook's advertising guidelines – *e.g.* ads with a sexual emphasis or hate speech are not allowed").  Facebook's ability to maintain the quality of its product is surely a legitimate justification for maintaining a list of approved Advertising Partners, and ensuring that such partners adhere to Facebook's requirements. Moreover, the Complaint does not allege facts to support the notion that Facebook has excluded Sambreel or its advertising partners from operating on other social networks.  Accordingly, the Court finds that a *per se* violation has not been alleged. *See Universal Grading Service,* 2011 WL 846060 at *5 ("Because  defendants' activities are not of the kind that lack any redeeming value and do not completely exclude, a *per se* analysis is unwarranted.")

/

/

/

### ***Rule of Reason***

Because the Court finds that the alleged conduct is not a *per se* antitrust violation, it now considers whether the allegations support an antitrust claim under the rule of reason.  Under this more flexible standard, the Court considers whether under "all the circumstances," the alleged conduct "impos[es] an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001).  Sambreel alleges as an alternative to its *per se* claim that Facebook's conduct violates the Sherman Act under the rule of reason analysis because the conduct "caused substantial actual anticompetitive effects in the market for internet display advertising." [Compl., ¶ 68.]  The Court finds that Plaintiff does not allege sufficient facts to support this claim.

The Complaint does not allege that Facebook has prevented Sambreel from developing products on other websites, or social networks. *See e.g.* Compl., ¶ 25 (describing products in addition to PageRage which Sambreel has launched).  Indeed, as pled, the Complaint characterizes the impact of Facebook's alleged anticompetitive conduct as it pertains to "PageRage" (as opposed to Sambreel).  *See e.g.* Compl. ¶ 32 ("Facebook used these agreements to coerce Advertising Partners to cease doing business with *PageRage*"); *Id.* at ¶ 41 (Facebook's scheme has eviscerated the competitiveness of *PageRage*...) (emphasis added). Because Sambreel concedes that PageRage only operates in conjunction with Facebook (Compl., ¶ 24), and the Complaint lacks factually-supported allegations that implicate the impact of Facebook's actions with respect to anything that occurs outside of Facebook itself, the Court finds that the Complaint does not state a claim for relief with respect to the alleged broader "market for online display advertising" or even the narrower submarket for "advertising on social media sites." *See* Compl., ¶ 68(c).

Thus the Court finds, without determining whether or not the alleged product markets are properly defined for antitrust purposes, that the alleged conspiracy between Facebook and the Application Developers only affects the market for advertising on Facebook itself.  These allegations alone are insufficient to establish a plausible claim of harm to competition that makes "economic sense." *See Universal Grading*, 2011 WL 846060 at *6 (dismissing Sherman Act § 1 claim for failure to allege facts supporting a plausible

claim of harm to competition)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Because the Complaint alleges anticompetitive conduct pertaining to the use of Facebook only, and not the broader market as alleged, the Court finds that the claim fails to establish antitrust injury. "Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003), *quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Thus, to plead antitrust injury, Sambreel must sufficiently allege that the competitive process has been harmed, as opposed to its own injury as a competitor. *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 902 (9th Cir.2002).

Here, Sambreel alleges that "Sambreel has been damaged (i) in its business and property by lost revenue, lost customer contracts, damaged customer relationships, and lost users; (ii) in an amount of ascertainable damages to be established at trial pursuant to 15 U.S.C. § 15(a). [Compl. at ¶ 71.] The Court finds this allegation to be insufficient to establish a harm to competition itself. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115 (1986) (antitrust laws were enacted for the protection of competition not competitors).

The Court is persuaded by the Ninth Circuit's holding in *LiveUniverse*, which found no causal antitrust injury, and no harm to the process of competition and consumer welfare, when the defendant social network MySpace's alleged anticompetitive conduct involved the removal of links to a competitor's website on MySpace.com. 604 Fed.Appx. at 557 ("LiveUniverse does not explain how MySpace's actions *on its own website* can reduce consumer's choice or diminish the quality of their experience on *other* social networking websites, which is the relevant market.") (emphasis in original). Likewise, the Court finds that the allegations here at most demonstrate that Facebook has taken action to control the content of its own website by prohibiting the display of unauthorized advertisements to its users. *See Facebook Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 at *14 ("If Facebook has the right to manage access to and use of its website, then there can be nothing anticompetitive about taking [] action to enforce that right.") The Complaint does not sufficiently allege that Advertising Partners are prohibited from advertising with Sambreel outside of Facebook, or that Facebook users are prohibited from viewing Sambreel advertisements or using Sambreel

12cv668

products on other websites.  As stated above, the Complaint lacks allegations that support anticompetitive effects in any forum outside of Facebook.com, and any harm other than harm to Sambreel itself.  Plaintiff therefore fails to allege harm to competition, and is dismissed on that ground.  *Cargill*, 479 U.S. at 115.

Defendant's motion to dismiss Claim One for unlawful group boycott in violation of Sherman Act § 1 is accordingly **GRANTED**.

### 2.        Claim 2: Sherman Act § 1, Unlawful Negative Tying

Sambreel alleges that Facebook's gating campaign constituted unlawful negative tying because Facebook agreed to offer its website only to users who would agree not to use Sambreel's services.  The two markets at issue are 1) the market for social networking services in the United States, and 2) the market for applications and add-ons that enhance social networking services.  (Compl. ¶ ¶ 50-58).

As a preliminary matter**,** the Court finds that just as Facebook has the right to determine the terms on which it will permit its Application Developers to use the Facebook Platform, it has a right to dictate the terms on which it will permit its users to take advantage of the Facebook social network.  *Trinko*, 540 U.S. at 408; *Live Universe*, 304 Fed. Appx. at 557. There is no fundamental right to use Facebook; users may only obtain a Facebook account upon agreement that they will comply with Facebook's terms, which is unquestionably permissible under the antitrust laws. *Id.*  It follows, therefore, that Facebook is within its rights to require that its users disable certain products before using its website.

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461-62 (1992) *quoting Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5-6 (1958).  The Court finds that the allegations in the Complaint do not support such an arrangement here.  Specifically, the claim is factually limited to an interaction between *Facebook and Sambreel*, alleging that Facebook prohibited its users from accessing their respective Facebook accounts if they had downloaded Sambreel products.  The broader markets alleged, therefore, are not supported by the facts.  Indeed, there are no allegations that Facebook precluded its users from maintaining Sambreel applications for use on other websites.  And to the extent that the alleged gating campaign collaterally prohibited such use by requiring that its users uninstall the entire Yontoo platform, Facebook users have a choice; they can comply with Facebook's terms and uninstall the

software, or they can maintain Sambreel's applications and opt to use other social networking sites.[4] *See e.g. LiveUniverse*, 304 Fed. Appx. at 557 ("consumers remain free to choose which online social networks to join..."). Nor does the Complaint allege that Facebook precluded the use of any enhancement products except Sambreel's in the alleged "tied" market for applications and add-ons that enhance social networking services. *Cf. Kodak*, 504 U.S. 451 (alleging that Kodak had tied equipment repair services to repair parts available only from it); *Real Page, Inc. v. Yardi Sys., Inc.* 852 F.Supp.2d 1215, 1224 (C.D. Cal. 2012) (interpreting *Kodak* and finding that a plaintiff had adequately alleged a "negative tie" where the prohibition barred use of services from *any* competing companies).

Moreover, as with the group boycott claim, the Court finds that the negative tying claim lacks sufficient allegations demonstrating harm to competition, and therefore Sambreel has not established the requisite element of antitrust injury. *Cascade Health Solutions,* 515 F.3d at 902. While the Complaint broadly states that the "tying" market is the broader "social networking market" and the "tied" market is the market for applications and add-ons that enhance social networking services, as pled, Facebook's alleged gating campaign involves no more than a market for Facebook itself, and there are no facts to support the broader market implications that Sambreel alleges here. Accordingly the motion to dismiss Claim 2 is **GRANTED**.

### 3. Claims 3 & 4: Sherman Act §2 Monopolization and Attempted Monopolization

In its third and fourth claims for relief, Sambreel alleges that Facebook violated § 2 of the Sherman Act, claiming that Facebook has "engaged in exclusionary conduct to maintain its monopoly power in the submarket for display advertising for social media users." [Compl., ¶ 82.] Specifically, it alleges that PageRage represented "the most direct substitute for Facebook's own advertising and provided a means to discipline Facebook's pricing." *Id.* at ¶ 84. The Complaint proceeds to define a "series of exclusionary practices designed to eliminate PageRage as a competitor so that Facebook could maintain its monopoly

---

[4]The Court reiterates that there are scant allegations regarding products other than PageRage that Sambreel offers, and also lacks specificity regarding whether or not the disabling of the Yontoo platform prohibits Facebook users from using Sambreel's other products outside of Facebook. *See e. g.* Compl., ¶ 38 (mentioning other Yontoo applications that were disabled, but not alleging that they have any use outside of Facebook.com). The Court declines to uphold Plaintiff's claim for relief because it chose to operate its products in such a way that disabling PageRage requires disabling all Sambreel applications. Regardless, the Court finds that as pled, there are insufficient facts to support a claim for relief for tying.

power," including the "group boycott, gating, and disruption of Sambreel's business with Neverblue to eliminate PageRage as an avenue for advertisers to purchase advertising impressions in the relevant market." *Id.* at ¶ 85.

To state a claim for relief for monopolization under the Sherman Act, Sambreel must show that Facebook 1) possesses monopoly power in the relevant market, 2) through the willful acquisition or maintenance of that power through exclusionary conduct, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident, 3) that causes antitrust injury. *Trinko*, 540 U.S. at 407; *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004). As the Supreme Court has recognized, "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers." *Trinko*, 540 U.S. at 407. "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct."Id.* (emphasis in original). Anticompetitive conduct is that which is without a legitimate business purpose that makes sense only because it eliminates competition. *Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288 (11th Cir. 2004). Similarly, to adequately state a claim of attempted monopolization under Sherman Act § 2, Sambreel must demonstrate 1) predatory or anticompetitive conduct, 2) a specific intent to monopolize, and 3) a dangerous probability of success. *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 456 (1993).

Sambreel alleges that Facebook's policies give it "extraordinary (and unlawful) latitude to restrict competition: if Facebook decides that it does not want its own – or its Application Developers'- Advertising Partners to purchase display ads from a competitor, Facebook can simply prohibit a competitor from operation ***on the Facebook Platform*** and then require the Advertising Partners to stop buying ads from the competitor. Any Advertising Partner that does not comply with Facebook's demand will be ***prohibited from dealing with Facebook and the Application Developers***, thereby foreclosing the customer from a critical distribution channel." [Compl., ¶ 22] (emphasis added).

As with its other antitrust claims, therefore, Sambreel fails to allege facts to support a relevant market which Facebook is capable of monopolizing because the alleged conduct implicates only Facebook's actions to control the content of its own website. Indeed, "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." *TV Communications Network, Inc. v. Turner*

*Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) *citing U.S. v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 393 (1956).

The Court further finds that Facebook's alleged actions do not constitute exclusionary conduct under Sherman Act §2. Indeed, the Court has already found that the Complaint fails to state a claim for group boycott or negative tying, and the Court fails to see the relevance of the only other alleged exclusionary practice, the disruption of Sambreel's business with Neverblue, because Neverblue is a distribution partner, which Sambreel uses to market its products outside of Facebook. *See* Compl., ¶ 36. Thus Sambreel's complaint as to Neverblue relates to advertising on *behalf* of Sambreel's products, as opposed display advertising appearing *on* Sambreel's applications – which is the relevant market alleged here.

Finally, Sambreel's monopolization and attempted monopolization claims are defeated by its failure to allege causal antitrust injury, an element of all antitrust suits. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433, 1445 (9th Cir. 1995) The facts as alleged in the complaint do not support the conclusion that Facebook's preclusion of Sambreel's products from being viewed on its own website harms the process of competition and consumer welfare. *See LiveUniverse*, 304 Fed.Appx. at 557 (finding no causal antitrust injury where MySpace.com precluded its users' ability to access a competitor's website, or to post material downloaded from competitor, on MySpace.com, and observing that the plaintiff did not explain "how MySpace's actions *on its own website* can reduce consumers' choice or diminish the quality of their experience on other social networking websites...") (emphasis in original).

The Court concludes that Sambreel has failed to state a claim for monopolization or attempted monopolization under Sherman Act § 2, and the motion to dismiss Claims 3 and 4 is therefore **GRANTED**.

### 4. Claims: Pendant State Law Claims

Because the Court finds that the federal claims should be dismissed, the Court declines to exercise jurisdiction over the remaining pendant state law claims and therefore dismisses claims 5-7 for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1367(a).

## III Motion for Preliminary Injunction

A motion for Preliminary Injunction may only be granted upon a showing of success on the merits. *See Winter*, 555 U.S. at 20. In light of the above determinations on the motion to dismiss, the Court does

1 | not find a likelihood of success on the merits of Plaintiffs' claims, and the motion for preliminary injunction

2 | is therefore **DENIED.**

3 | **V.    CONCLUSION**

4 | For the reasons set forth above, Facebook's motion to dismiss for failure to state a claim under

5 | Federal Rule of Civil Procedure 12(b)(6) is **GRANTED WITHOUT PREJUDICE**. Plaintiffs' Motion for

6 | Preliminary Injunction is **DENIED.**  Plaintiffs are granted leave to amend the complaint within **30 days** of

7 | this order.

8 | DATED:  November 29, 2012

9

10 | _____
**CATHY ANN BENCIVENGO**
United States District Judge